No. 26-1444

# United States Court of Appeals for the Ninth Circuit

———— • ————

AMAZON.COM SERVICES, LLC,

*Plaintiff-Appellee,*

– v. –

PERPLEXITY AI, INC.,

*Defendant-Appellant.*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR SAN FRANCISCO, NORTHERN CALIFORNIA IN CASE NO. 3:25-CV-09514-MMC, MAXINE M. CHESNEY, DISTRICT JUDGE

## APPELLANT'S OPENING BRIEF

JOHN B. QUINN
DANIEL C. POSNER
JONATHAN H. KIM
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
johnquinn@quinnemanuel.com
danposner@quinnemanuel.com
jonathankim@quinnemanuel.com

ANDREW H. SCHAPIRO
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

CHRISTOPHER G. MICHEL
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
555 13th Street, NW, Suite 600
Washington, DC 20004
(202) 538-8000
christophermichel@quinnemanuel.com

RENITA N. SHARMA
LUCAS A. HAMMILL
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
(212) 849-7000
renitasharma@quinnemanuel.com
lucashammill@quinnemanuel.com

*Attorneys for Defendant-Appellant*

CP COUNSEL PRESS   (800) 4-APPEAL • (715630)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Perplexity AI, Inc. states that it has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

DATED:  April 1, 2026           QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP

                                 By _____*/s/ John B. Quinn*_____
                                          John B. Quinn
                                    Attorney for Defendant–Appellant

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

PRELIMINARY STATEMENT ..............................................................................1

JURISDICTIONAL STATEMENT .........................................................................4

STATEMENT OF THE ISSUES.............................................................................5

STATUTORY ADDENDUM .................................................................................5

STATEMENT OF THE CASE.................................................................................5

    A.    Legal Background ..................................................................5

    B.    Factual Background...............................................................7

        1.    Perplexity And The Comet Browser...........................7

        2.    Amazon's Efforts To Exclude Comet Users...........10

    C.    Procedural History...............................................................12

        1.    Amazon's Suit And Preliminary Injunction Motion ...............12

        2.    The District Court's Ruling ......................................13

        3.    This Court's Stay Of The Preliminary Injunction ....................15

SUMMARY OF THE ARGUMENT ....................................................................16

STANDARD OF REVIEW ..................................................................................20

ARGUMENT ......................................................................................................20

I.    THE DISTRICT COURT ERRED IN FINDING AMAZON LIKELY TO SUCCEED ON THE MERITS ............................................................21

    A.    The District Court Erred In Finding Amazon Likely To Succeed Under 18 U.S.C. § 1030(a)(2) ...........................22

|  |  |  |  |
|---|---|---|---|
| 1. | | Amazon Is Not Likely To Prove That Perplexity "Intentionally Accessed" An Amazon Computer | 23 |
| 2. | | Even Assuming Perplexity "Accessed" An Amazon Computer, Amazon Is Not Likely To Prove Such Access Was "Without Authorization" | 27 |
| | (a) | This case involves no "private information" implicating the CFAA's prohibition on "unauthorized access" | 27 |
| | (b) | *Power Ventures* does not support a finding of unauthorized access | 30 |
| 3. | | Amazon Is Not Likely To Prove Perplexity "Obtained Information" "From An Amazon Computer" | 34 |
| 4. | | Amazon Is Not Likely To Prove Cognizable Loss Under The CFAA | 35 |

B. Amazon Is Not Likely To Succeed Under The CDAFA .... 39

II. THE DISTRICT COURT LEGALLY ERRED AND ABUSED ITS DISCRETION IN RESOLVING THE REMAINING PRELIMINARY INJUNCTION REQUIREMENTS IN FAVOR OF AMAZON ... 41

A. The District Court Improperly Collapsed The Equitable Requirements For A Preliminary Injunction Into Likelihood Of Success ... 42

B. Amazon Failed To Demonstrate The Equitable Requirements For A Preliminary Injunction ... 45

    1. Amazon Failed To Demonstrate Irreparable Harm ... 45

    2. The Balance Of Equities Strongly Weighs Against An Injunction ... 48

    3. The Public Interest Weighs Against An Injunction ... 50

C. Amazon's Unclean Hands Provide Independent Grounds To Reverse The Preliminary Injunction ... 52

III.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING A BOND ...............................................................55

CONCLUSION ...................................................................................58

# TABLE OF AUTHORITIES

**Page**

## Cases

*adidas Am., Inc. v. Skechers USA, Inc.*,
    890 F.3d 747 (9th Cir. 2018) .............................................................20, 46, 50

*Amazon.com Services LLC v. Perplexity AI, Inc.*,
    No. 3:25-cv-09514 (N.D. Cal.) ...................................................................4

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ..................................................................47

*Ariz. Libertarian Party, Inc. v. Bayless*,
    351 F.3d 1277 (9th Cir. 2003) ..................................................................39

*Benisek v. Lamone*,
    585 U.S. 155 (2018) (per curiam)..........................................................21, 42

*Bucklew v. Precythe*,
    587 U.S. 119 (2019)...............................................................................37

*Chegg, Inc. v. Doe*,
    No. 22-cv-7326, 2023 WL 7392290 (N.D. Cal. Nov. 7, 2023).........................44

*Chrisman v. City of L.A.*,
    65 Cal. Rptr. 3d 701 (Ct. App. 2007) ........................................................39

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) ...................................................................56

*Developmental Servs. Network v. Douglas*,
    666 F.3d 540 (9th Cir. 2011) ...............................................................20, 42

*Dymo Indus., Inc. v. Tapeprinter, Inc.*,
    326 F.2d 141 (9th Cir. 1964) (per curiam) .................................................21

*Facebook, Inc. v. Power Ventures, Inc.* (*Power Ventures II*),
    252 F. Supp. 3d 765 (N.D. Cal. 2017)........................................................43

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) ........................................................... 3, 30-33

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F. Supp. 2d 1025 (N.D. Cal. 2012) ................................................33

*Facebook, Inc. v. Sluchevsky*,
No. 19-cv-1277, 2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) .........................44

*FTC v. Enforma Nat. Prods., Inc.*,
362 F.3d 1204 (9th Cir. 2004) ................................................45

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
826 F.2d 837 (9th Cir. 1987) ................................................53, 54

*Geo Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) ................................................20, 41

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ................................................ 45-46, 48

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ................................ 2, 3, 6, 21, 27-33, 36, 37

*InSinkErator, LLC v. Joneca Co.*,
163 F.4th 608 (9th Cir. 2025) ................................................57

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*,
725 F.3d 940 (9th Cir. 2013) ................................................53

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
4 F.3d 819 (9th Cir. 1993) ................................................51, 52

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ................................................20

*Lucero v. Operation Rescue of Birmingham*,
772 F. Supp. 1193 (N.D. Ala. 1991) ................................................41

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) ................................................23, 34, 35

*Mayor of City of Phil. v. Educ. Equal. League*,
415 U.S. 605 (1974) ................................................41

*Md. Dep't of Hum. Res. v. USDA*,
    976 F.2d 1462 (4th Cir. 1992) ...............................................................56

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ..............................................26

*Moxie Pest Control (Utah), LLC v. Nielsen*,
    164 F.4th 1195 (10th Cir. 2026) ......................................................37, 38

*Open Our Or. v. Brown*,
    No. 6:20-cv-773, 2020 WL 2542861 (D. Or. May 19, 2020) ..........................41

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery
    Co.*, 324 U.S. 806 (1945) ...............................................................55

*Regents of Univ. of Cal. v. Am. Broad. Cos.*,
    747 F.2d 511 (9th Cir. 1984) ...........................................................51

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 364 (9th Cir. 1992) ...........................................................40

*Republic of Philippines v. Marcos*,
    818 F.2d 1473 (9th Cir. 1987) ..........................................................40

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*,
    161 F.4th 590 (9th Cir. 2025) ..........................................................44

*Tagged, Inc. v. Does 1 through 10*,
    No. 09-cv-1713, 2010 WL 370331 (N.D. Cal. Jan. 25, 2010) ..........................45

*Teran v. Superior Court*,
    334 Cal. Rptr. 3d 299 (Ct. App. 2025) ..........................................7, 22, 39

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ..........................................................57

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) ......................................................22, 26, 29

*Van Buren v. United States*,
    593 U.S. 374 (2021) ..............................................3, 7, 22-25, 35-37

*Vasquez v. City of San Jose*,
  634 F. Supp. 3d 712 (N.D. Cal. 2022)................................................................40

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).............................................20, 21, 42-45, 47-50

*X Corp. v. Ctr. for Countering Digital Hate, Inc.*,
  724 F. Supp. 3d 948 (N.D. Cal. 2024)................................................36

## Rules/Statutes

18 U.S.C. § 1030................................................................................6, 14

18 U.S.C. § 1030(a)(2)........................ 2, 12, 13, 22, 24, 26, 27

18 U.S.C. § 1030(a)(2)(C) ..............................................................3, 6, 34

18 U.S.C. § 1030(a)(4)......................................................................12, 14, 22

18 U.S.C. § 1030(c)(2)...............................................................................6

18 U.S.C. § 1030(c)(4)(A)(i)(I) .........................................................6, 35

18 U.S.C. § 1030(e)(2)(B) ........................................................................6

18 U.S.C. § 1030(e)(11).....................................................................6, 35

18 U.S.C. § 1030(g) .........................................................................3, 6, 35

28 U.S.C. § 1292(a)(1)...............................................................................5

28 U.S.C. § 1331 ......................................................................................4

28 U.S.C. § 1367 ......................................................................................5

Fed. R. App. P. 4(a)(1)(A) ..........................................................................5

Fed. R. Civ. P. 52(a)(2)...........................................................................45

Fed. R. Civ. P. 65(c)....................................................................20, 55, 57

Cal. Penal Code § 502 ..............................................................................7

Cal. Penal Code § 502(c)(7)....................................................................39

Cal. Penal Code § 502(e)(1)......................................................................7

1987 Cal. Stat. ch. 1499, pp. 5782-88....................................................7

Counterfeit Access Device and Computer Fraud and Abuse Act of
    1984. Pub. L. No. 98-473, tit. II, ch. XXI, 98 Stat. 1837, 2190-92......................5

## Other Authorities

H.R. Rep. No. 98-894 (1984)................................................................21

S. Rep. No. 104-357 (1996) ................................................................27

## PRELIMINARY STATEMENT

This appeal arises from a novel preliminary injunction based on the implausible premise that Perplexity likely violated the federal Computer Fraud and Abuse Act ("CFAA") and its California counterpart—thereby committing federal and state crimes—when users of Perplexity's "Comet" browser employed an AI "Assistant" feature to access Amazon's website through their own accounts and from their own devices. Amazon's theory, which arises from its objectives to promote its own rival AI tool and preserve its ability to bombard website visitors with ads, represents an alarming expansion of the CFAA and corresponding state law. And deploying that theory against Perplexity in this suit threatens competition and consumer choice during a critical moment in the development of AI.

Notwithstanding those severe legal and equitable flaws, the district court granted Amazon a preliminary injunction in a thinly reasoned order issued just one business day after a hearing during which it repeatedly recognized this as an unprecedented case involving conduct far removed from the statutes' core. A motions panel of this Court promptly stayed the injunction pending appeal. This Court should now reverse for any of multiple independent reasons.

*First*, Amazon is unlikely to succeed on the merits of its overreaching claims. No CFAA decision has ever found liability under any circumstances approaching those in this case. The CFAA, which carries criminal penalties, is designed to

1

address "computer hacking": "breaking and entering" into computers to steal confidential information. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). Amazon's claim bears no resemblance to that statutory paradigm, and Amazon is unlikely to satisfy any—much less all—of the CFAA's demanding elements for a civil claim (or the similar elements of the California counterpart).

As a threshold matter, Amazon is unlikely to satisfy the requirement that Perplexity "intentionally accesse[d]" its computers, 18 U.S.C. § 1030(a)(2), because the only access to Amazon's servers was by *individual users of the Comet browser* from their own computers—not by *Perplexity*. Amazon's entire case turns on conflating (i) access to Amazon's computers by Comet users from their own computers with (ii) access to Amazon's computers by Perplexity, but that is simply wrong. A Comet user accessing Amazon from her own computer is no more equivalent to Perplexity accessing Amazon than a Safari user accessing Amazon from her own computer is equivalent to Apple accessing Amazon. Because Amazon has sued only Perplexity, it cannot meet the "access" element of its CFAA claim.

Even if Perplexity could be understood to have "accesse[d]" Amazon's computers, Amazon's claim is still unlikely to succeed because that access was not "without authorization." *Id.* Amazon account holders authorized the Assistant to access *their own* private information so the Assistant could use it to facilitate shopping on Amazon.com—conduct the district court itself recognized may be

2

"*beneficial*" to everyone involved. 2-ER-143:5 (emphasis added). No other private information was even available to the Assistant (which can only "see" what Amazon shows to the user), let alone accessed or obtained. There was accordingly no unauthorized access here. The district court's heavy reliance on *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016)—a case in which a company accessed *third parties'* private information without their authorization (and for an improper purpose)—is entirely misplaced.

For similar reasons, Amazon cannot show that Perplexity "obtain[ed] . . . information" "from any [Amazon] computer," which are additional requirements for its CFAA claim. 18 U.S.C. § 1030(a)(2)(C). Finally, Amazon cannot show the requisite "loss" within the meaning of the CFAA. 18 U.S.C. § 1030(g). The Supreme Court and this Court have explained that loss in this context requires "technological harms—such as the corruption of files." *Van Buren v. United States*, 593 U.S. 374, 391-92 (2021); *see hiQ Labs*, 31 F.4th at 1195 n.12. Amazon offered no evidence of any such loss. The district court's erroneous decision to discard the Supreme Court's and this Court's analysis of CFAA "loss" as mere dicta alone requires reversal.

*Second*, apart from the merits, the district court's analysis of the other requirements required to enter a preliminary injunction was woefully insufficient. The court effectively collapsed all the other requirements into its prediction of likely

3

success on the merits, which is itself reversible error. When properly considered, the requirements cut overwhelmingly against a preliminary injunction. Amazon has not suffered any cognizable harm, let alone anything approaching irreparable harm, from its own account holders' choice to use the Assistant to purchase products from Amazon. The balance of equities tips heavily toward Perplexity given the profound costs to it of blocking Comet users from accessing the Internet's most prominent e-commerce website. And the public interest weighs strongly against a preliminary injunction that would inhibit competition and consumer choice, empower an Internet giant to abuse its market dominance, and stifle a promising nascent technology.

At bottom, Amazon seeks to further its business interests by excluding users of new and competing technology. Whatever valid mechanisms Amazon might have to pursue that goal, the drastic remedy of a preliminary injunction in this fundamentally misguided suit is not among them. This Court should reverse.[1]

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1331, the district court had federal question jurisdiction over Amazon's claim under the CFAA. NDCA Dkt. 1 ¶¶ 64-71.[2]

---

[1] If the Court leaves the injunction in place, it should at least require Amazon to pay an appropriate bond to assure Perplexity of compensation for the substantial harm it will incur during the case if Perplexity ultimately prevails. *See* Part III, *infra*.

[2] "Dkt." citations refer to this Court's docket, No. 26-1444. "NDCA Dkt." citations refer to the district court docket, *Amazon.com Services LLC v. Perplexity AI, Inc.*, No. 3:25-cv-09514 (N.D. Cal.).

4

Amazon also brought a claim under the California Comprehensive Computer Data Access and Fraud Act ("CDAFA") pursuant to the district court's supplemental jurisdiction, 28 U.S.C. § 1367. NDCA Dkt. 1 ¶¶ 13, 72-81. In an Order dated March 9, 2026, the district court issued a preliminary injunction against Perplexity. 1-ER-8-9. Perplexity timely filed a notice of appeal on March 10, 2026. 3-ER-578-579; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred as a matter of law in concluding that Amazon is likely to succeed on its claims under the CFAA and state law.

2.  Whether the district court legally erred and abused its discretion in concluding that Amazon met the equitable requirements for a preliminary injunction.

3.  Whether the district court abused its discretion in failing to require Amazon to post a bond in connection with the entry of the preliminary injunction.

## STATUTORY ADDENDUM

Pertinent statutes appear in the Addendum.

## STATEMENT OF THE CASE

### A. Legal Background

The CFAA originated in the Counterfeit Access Device and Computer Fraud and Abuse Act of 1984. Pub. L. No. 98-473, tit. II, ch. XXI, 98 Stat. 1837, 2190-92

(codified as amended at 18 U.S.C. § 1030). Congress enacted the CFAA "to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ Labs*, 31 F.4th at 1196. The statute initially imposed criminal penalties on those who "access[]" certain "computer[s] without authorization" and thereby "obtain[]" specified categories of "information." 98 Stat. 2190-91; *see hiQ Labs*, 31 F.4th at 1197 (noting that initial version of CFAA "was limited" to computers "containing national security information or financial data and those operated by or on behalf of the government").

Congress subsequently "extend[ed] the prohibition on unauthorized access to any 'protected computer,'" *i.e.*, any computer used in interstate commerce. *hiQ Labs*, 31 F.4th at 1195, 1197; *see* 18 U.S.C. § 1030(a)(2)(C), (e)(2)(B). Accordingly, anyone who "intentionally accesses a computer without authorization" and "thereby obtains . . . information from any protected computer" faces criminal punishment under the CFAA. 18 U.S.C. § 1030(a)(2)(C), (c)(2). Congress also created a private civil claim under the CFAA, which requires a plaintiff to show that the defendant violated the CFAA's standard for criminal liability and (as relevant here) that the plaintiff suffered an annual "loss" of at least $5,000. 18 U.S.C. § 1030(c)(4)(A)(i)(I); *see id.* § 1030(e)(11), (g). CFAA "loss" is limited to "technological harm[]" to "computer data, programs, systems, or information

6

services"; that is, the type of damage that results from computer hacking. *Van Buren*, 593 U.S. at 391-92.

California passed a similar criminal law, the CDAFA, in 1987. 1987 Cal. Stat. ch. 1499, pp. 5782-88 (codified as amended at Cal. Penal Code § 502). This law, too, was "intended . . . to prohibit acts that would qualify as hacking of or tampering with computers and data." *Teran v. Superior Court*, 334 Cal. Rptr. 3d 299, 307 (Ct. App. 2025). Like the CFAA, the CDAFA allows for private civil claims. Cal. Penal Code § 502(e)(1).

## B.  Factual Background

### 1.  Perplexity And The Comet Browser

Perplexity is an artificial intelligence startup founded in 2022. 3-ER-521 ¶ 2. Perplexity builds AI-powered products designed to make knowledge accessible and useful for everyone. 3-ER-511 ¶ 3. One of Perplexity's core products is an AI-enabled web browser called Comet. 3-ER-512 ¶ 6; 3-ER-521 ¶ 5. To develop Comet, Perplexity spent a significant sum to acquire browser company Sidekick and assembled a team of nearly 100 engineers, researchers, and specialists—the largest team Perplexity had ever devoted to a single project. 3-ER-512-513 ¶¶ 10-11; 4-ER-602-603 ¶ 41. After months of intensive development and innovation, Perplexity launched Comet with limited release on July 9, 2025, and made it widely available on October 2, 2025. 3-ER-513 ¶ 13.

7

The Comet browser, like Google Chrome and Mozilla Firefox, is a software program that is downloaded onto a user's computer to navigate the Internet. 3-ER-521 ¶ 5. It is undisputed that Comet runs locally on the user's machine. 2-ER-269 ¶ 4 (Amazon's expert referring to a process "run on the user's machine within the Comet browser").

Comet includes an optional AI "Assistant" feature that is "directly incorporated into the web browser itself" and thus also operates on the user's computer. 3-ER-556 ¶ 4 (Amazon's expert); *see* 3-ER-521 ¶ 6. If, and only if, the user elects to activate the Assistant (typically, by clicking on a tab on the upper right corner of the Comet browser display screen), the Assistant can perform tasks at the user's direction, such as browsing websites like Amazon.com to shop for requested goods. 3-ER-512 ¶¶ 6-7; 3-ER-521-522 ¶ 6; 3-ER-524-525 ¶¶ 17-18. Although the Assistant might broadly be described as "agentic AI," it is undisputed that the Assistant merely executes instructions a user gives to it. 3-ER-512 ¶¶ 7-8; 3-ER-523-524 ¶¶ 10-11, 17; NDCA Dkt. 4 at 6 (Amazon stating that the Assistant "perform[s] actions on users' behalf"). As an added safeguard, the Assistant requires additional user authorization before performing significant tasks like finalizing a purchase. 3-ER-512 ¶ 8; 3-ER-523 ¶¶ 12-13. Additionally, if the user is not logged into Amazon.com at the time of making a purchase, the user must manually "us[e] the normal login process and their own login information, with no shortcuts or

8

automated authentication"; the Assistant cannot log into a user's Amazon account by itself. 3-ER-525 ¶ 19.

If a user instructs the Assistant to find an item on Amazon.com, the Assistant may take a screenshot of the user's browsing session and send an encrypted version of the screenshot (or an HTML snapshot) from *the user's computer* to Perplexity's servers. Perplexity's servers will then respond to *the user's computer* with instructions for how the Assistant should proceed on Amazon.com. 2-ER-77:17-23; 3-ER-524-525 ¶¶ 17, 19; 4-ER-609 ¶ 15. Perplexity uses the screenshots and snapshots solely to accomplish the user's task (and, when necessary, to identify software errors) and automatically deletes them within 30 days. 2-ER-106:8; 4-ER-609 ¶ 15.

The Assistant never sends more information to Perplexity than what the user can see in the browser window; Perplexity's view is akin to what a person would see from looking over the user's shoulder. 3-ER-524 ¶¶ 16-17. The Assistant never transmits to Perplexity a user's password or payment information unless that information—which Amazon masks—is for some reason visible in the browser window. 3-ER-525 ¶ 20.

It is undisputed that, in the course of a user's use of the Assistant on Amazon.com, no Perplexity computer ever has direct access to an Amazon computer. 3-ER-524-525 ¶¶ 17, 19; *see* 2-ER-269-270 ¶ 4 (Amazon's expert

9

conceding there are "no direct requests from Perplexity hosts to Amazon.com" and that "data from Amazon" is "transmitted to the user's browser ***and then*** to Perplexity servers" (emphasis added)).

### 2. Amazon's Efforts To Exclude Comet Users

Amazon is the world's largest online retailer, and Amazon.com is the world's eleventh-most visited website. NDCA Dkt. 35 at 4; 3-ER-517 ¶ 37. Amazon recently entered the nascent agentic AI market as a competitor to Perplexity. In March 2025, Amazon formed a group focused on agentic AI, and Amazon launched a suite of agentic AI tools in October 2025. NDCA Dkt. 35 at 4-5. Amazon also offers an agentic AI tool called "Buy for Me" that allows customers to purchase items on Amazon.com from third-party retailer websites—often unbeknownst to the customer or the retailer—by using an agentic AI tool to complete the purchase on the third-party retailer's website, all while creating the misimpression that the transaction is being completed on Amazon.com. 2-ER-194-214.

Amazon contacted Perplexity in August 2025 to complain "that Amazon's Conditions of Use require all AI agents to act transparently when they access the Amazon Store." 3-ER-553 ¶ 3. As Amazon later acknowledged, however, Perplexity is not a party to the Conditions of Use—which bind only Amazon users. NDCA Dkt. 4 at 6 (describing Conditions of Use prohibition on the "use of account information for a third party's—like Perplexity's—benefit").

10

Amazon's supposed concern about transparency arose from its objection to Comet's purported failure to use a particular "user-agent string"—a technical device by which web browsers identify themselves to websites—that would communicate that the user has activated an AI agent. 3-ER-566 ¶¶ 11-13. It is undisputed that Perplexity is under no legal duty to equip Comet with any particular user-agent string. NDCA Dkt. 40 at 10 n.8. In any case, Comet uses substantially the same user-agent string as other browsers—such as Microsoft Edge, Brave, and Opera— that are built, like Comet, on a codebase called Chromium, the open-source engine that powers Google Chrome. 3-ER-522 ¶¶ 7-8. The true reason Amazon wants Comet to change its user-agent string is so that Amazon can identify and block the Comet Assistant, forcing customers to view its advertisements and upselling attempts. 3-ER-568 ¶ 22 (complaining that Amazon's advertisers do not pay for their ads to be shown to "automated agents").[3]

---

[3] Amazon asserts that in August 2025, it instituted a technical "block" barring its customers from using the Assistant on Amazon.com and that Perplexity then updated Comet to allow users to evade that block. 3-ER-566-567 ¶¶ 16-17. In reality, a routine security update by Perplexity—in development for weeks before Amazon's alleged "block"—incidentally restored Amazon customers' access to Amazon.com using the Assistant. 3-ER-526-527 ¶¶ 24-27. In its reply brief below, Amazon accused Perplexity, again without evidence, of updating Comet again to allow its users to evade a second alleged block, NDCA Dkt. 40 at 10 n.9, but there had been no such update nor any other effort to evade this supposed block, 2-ER-266-267 ¶¶ 6-10.

11

### C. Procedural History

#### 1. Amazon's Suit And Preliminary Injunction Motion

On October 31, 2025, Amazon sent Perplexity a letter accusing it of violating the CFAA and CDAFA. 3-ER-574-577. Days later, Amazon filed this lawsuit, asserting claims under two prongs of the CFAA: 18 U.S.C. § 1030(a)(2) and 18 U.S.C. § 1030(a)(4), the latter of which requires intent to defraud. NDCA Dkt. 1. Amazon also brought a claim under the CDAFA, *id.*, and moved for a preliminary injunction on all its claims, NDCA Dkt. 4. It argued that the Assistant causes it irreparable harm by "prevent[ing] Amazon from managing how customers access the Amazon Store," thus "degrading Amazon customers' shopping experience." *Id.* at 22. Amazon provided no evidence that any customer had ever complained about or otherwise encountered problems with the Assistant. *Id.* Perplexity opposed the motion, explaining that Amazon was unlikely to succeed on the merits and could not meet the equitable requirements necessary to support the drastic step of a preliminary injunction against its competitor's technology. NDCA Dkt. 35.

Shortly before the preliminary-injunction hearing, news reports revealed that Amazon's "Buy for Me" agentic AI tool had generated widespread complaints. 2-ER-168-170; 2-ER-178-181. It turned out that many of the third-party retailers whose products Amazon listed for sale on its website had not given Amazon permission to do so—and they only discovered those listings after receiving

12

erroneous orders from Amazon's agentic AI tool that were impossible to complete. 2-ER-203-209; 2-ER-219-229; 2-ER-258-260. "Buy for Me" even listed Perplexity merchandise without consent, as Perplexity discovered only after reading the news reports. 2-ER-160 ¶¶ 3-9. With the district court's permission, Perplexity filed a supplemental brief arguing that Amazon's harmful deployment of its own agentic AI while challenging the propriety of Perplexity's far more transparent (and harmless) Assistant amounted to unclean hands and militated against issuing an injunction. NDCA Dkt. 60 at 7.

### 2. The District Court's Ruling

At the preliminary-injunction hearing, the district court indicated that its decision was a close call but it was inclined to rule for Amazon, albeit reluctantly. 2-ER-140:12-16 ("In a way, it's almost as if what [Perplexity is] doing shouldn't be covered [by the CFAA] . . . . [P]eople ought to be allowed to bring these kinds of shopping assistants in and have them talk."); 2-ER-141:11-14 ("[I]t's not initially a strong tip in favor of the Plaintiff . . . but I do think it does tip in their favor."); 2-ER-143:4-6 ("[T]he statute is so broad and covers people who may be performing a beneficial act that I'm kind of stuck with it.").

In a brief order entered the next business day, the court granted a preliminary injunction, ruling that Amazon was likely to show violations of one prong of the CFAA, 18 U.S.C. § 1030(a)(2), and the CDAFA. 1-ER-2-9. The court did not

13

address Amazon's argument under the separate fraud prong of the CFAA, 18 U.S.C. § 1030(a)(4), though it had noted in passing at the hearing that it "d[id]n't think [Amazon had] made out a likelihood on (a)(4)." 2-ER-97:24-25.

Erroneously equating an Amazon customer's use of the Comet browser to access Amazon.com with direct access by Perplexity itself, the district court stated that there was "strong evidence that Perplexity, through its Comet browser," accesses Amazon.com without Amazon's authorization. 1-ER-4. The court then found that Perplexity "obtain[s] information as to the user's private Amazon account information," 1-ER-4, but did not explain what that information is or how it is *Amazon's* private information rather than the user's. The court also acknowledged that Amazon had not suffered technological harm of the kind the Supreme Court and this Court have said is required to support a CFAA claim, but dismissed those statements as dicta. 1-ER-4-5 & n.2.

The district court further concluded that Amazon was likely to succeed on its CDAFA claim "[f]or the reasons discussed above with respect to § 1030." 1-ER-5. The court then collapsed the remaining requirements for injunctive relief, including irreparable harm, into its finding of a likely violation of the CFAA. 1-ER-5-7 (*e.g.*, "Amazon is likely to suffer irreparable harm in the absence of a preliminary injunction, in that Perplexity . . . will continue to engage in the above-referenced challenged conduct."); 2-ER-140:20-23.

14

The preliminary injunction would bar Perplexity from accessing or providing a means for others to access "Amazon's protected computer systems using AI agents," which the court defined as "any software or computer program deployed through Perplexity's Comet web browser that can autonomously or semi-autonomously perform actions and interact with third-party websites on behalf of, or at the instruction of, any user." 1-ER-8 & n.4. Despite recognizing at the hearing that a preliminary injunction could result in "a significant loss of position in the market" for Perplexity "if it turns out that I am totally wrong," 2-ER-142:1-3, the court declined to order Amazon to post any bond, stating it had "insufficient information to place a dollar figure on a loss limited to Comet's access to Amazon's password-protected customer accounts," 1-ER-7. The court issued a seven-day stay but otherwise declined to stay the injunction pending appeal. 1-ER-7-9.

### 3. This Court's Stay Of The Preliminary Injunction

Perplexity filed a notice of appeal the next day and moved to stay the injunction pending appeal. 3-ER-578-579; Dkts. 13.1-14.1. A motions panel of this Court issued an administrative stay and then stayed the injunction pending this appeal and ordered expedited briefing. Dkts. 18.1-19.1.

15

## SUMMARY OF THE ARGUMENT

Amazon is not likely to succeed on the merits of its claims, and it cannot meet the equitable requirements necessary to support the drastic remedy of a preliminary injunction. This Court should reverse for either or both reasons.

**I.** Amazon is unlikely to succeed on the merits of its CFAA or CDAFA claims. These criminal hacking statutes apply to cybercrime, computer fraud, and sabotage—a far cry from the Assistant's access to an Amazon user's own information, at the user's direction, for the purpose of assisting the user's shopping experience.

**A.** The CFAA requires Amazon to establish that Perplexity (i) intentionally accessed a computer (ii) without authorization, thereby (iii) obtaining information (iv) from a computer and (v) causing $5,000 or more in loss. Amazon is unlikely to succeed on *any* of these elements, let alone all of them.

The *first* element is not established because it is undisputed that Perplexity does not gain entry to Amazon's computer systems—it only receives data from browser applications run locally on its users' devices. Perplexity does not "access" Amazon any more than Apple accesses Amazon when a Safari user types "Amazon.com" into his or her address bar.

*Second*, any arguable "access" was not "unauthorized." The only data Perplexity receives (from the user's device, not from Amazon) is either (i) public

16

information available to any person who navigates to Amazon.com or (ii) personal details that the user who activated the Assistant voluntarily provides. No other information is at issue—not any third-party private information nor any information Amazon has any basis to keep private if the user chooses to do otherwise. The district court therefore erred in relying on *Power Ventures*, which involved a company that scraped password-protected data of third-party Facebook users without those users' consent.

***Third*** and ***fourth***, Perplexity did not obtain any information from an Amazon computer. Perplexity does not connect to, and obtains no information from, Amazon's servers or computer systems.

***Finally***, Amazon has not suffered any cognizable loss under the CFAA. The Supreme Court and this Court, in statements the district court wrongly cast aside as dicta, have recognized that the CFAA remedies only technological harms, such as those associated with the corruption of data files. Amazon has alleged no such harm. It claims only harms to its business interests that courts have recognized are not redressable by the CFAA.

**B.** Because the district court merely incorporated its faulty CFAA analysis by reference in determining Amazon's CDAFA claim was likely to succeed, the court's merits determinations should fall together. Further, the CFAA claim is the only basis for federal jurisdiction here, and because it is likely to be dismissed before

17

trial, the court is likely to relinquish supplemental jurisdiction over the CDAFA claim. Courts have repeatedly held that a preliminary injunction should not issue on a state claim over which the court is not likely to retain jurisdiction.

**II.** Even if Amazon could show likely success on the merits, the district court legally erred and abused its discretion in finding Amazon met the other requirements for injunctive relief, which independently warrants reversal.

**A.** The district court applied an erroneous legal standard by effectively holding that Amazon's (nonexistent) likelihood of success *necessarily* also satisfied the irreparable-harm, balance-of-equities, and public-interest requirements. This collapsing of the independent requirements for a preliminary injunction is improper, as the Supreme Court and this Court have recognized.

**B.** Regardless, Amazon has not satisfied the additional requirements for a preliminary injunction.

**1.** Amazon has not demonstrated any *irreparable* harm. Amazon has speculated that the Assistant will damage Amazon's goodwill or create cybersecurity risks, but has produced no evidence that either has occurred or is likely to occur. Amazon's only real complaint is that use of the Assistant results in fewer human eyeballs on Amazon's website and thus fewer opportunities to upsell and advertise to consumers. Such pure monetary injury, even if established, is compensable with money damages and cannot support an injunction.

18

**2.** The balance of harms tips strongly in Perplexity's favor. The injunction would disable Comet's core feature—its Assistant—on the world's largest online retailer. The browser market is highly competitive, and the Assistant is Comet's differentiating feature. If Comet cannot function on such a major platform, customers will turn to other browsers and be unlikely to switch back even if the injunction is later lifted. The irreparable business and reputational damage the injunction will inevitably cause Perplexity vastly outweighs Amazon's purely speculative harm.

**3.** The public interest also disfavors an injunction. Amazon seeks to override the choices of millions of consumers who use the Assistant, even as Amazon works to deploy its own competing agentic AI technology. Stifling consumer choice, competition, and technological innovation is squarely contrary to the public interest. The Court should not give Amazon and other large online platforms a CFAA veto over any digital tools their customers choose to use.

**C.** Amazon's unclean hands independently preclude equitable relief. Amazon complains that Perplexity has robbed it of control over how customers access its website. But Amazon's own agentic AI program trawls independent retailers' websites and lists their products on Amazon.com without their knowledge or permission. Amazon cannot credibly complain about supposed harms that it inflicts on unaware and nonconsenting third parties.

19

**III.** Even if an injunction were appropriate, the district court abused its discretion in failing to require Amazon to post a bond. The district court acknowledged that Perplexity's reputation and market share will suffer during the pendency of the injunction, rendering its refusal to require ***any*** bond inexplicable and inconsistent with Federal Rule of Civil Procedure 65(c).

## STANDARD OF REVIEW

Although it "review[s] the grant or denial of a preliminary injunction for abuse of discretion," this Court "review[s] underlying legal issues de novo." *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1113 (9th Cir. 2025). A district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard." *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011). The Court reviews factual findings for clear error. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018). A "district court's determination as to the amount and appropriateness" of a bond is reviewed for abuse of discretion. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, it may be awarded only upon a "clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Because the "grant of a preliminary injunction is the exercise of a very far

20

reaching power," it should not be entered where the Court would be required to "decide doubtful and difficult questions of law or disputed questions of fact." *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (per curiam).

As the party seeking a preliminary injunction, Amazon must clearly show that: (i) it is "likely to succeed on the merits"; (ii) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (iii) the "balance of equities tips in [its] favor"; and (iv) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Further, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). The district court erred in finding that Amazon met its burden on any of the *Winter* requirements, and this Court should reverse.

## I. THE DISTRICT COURT ERRED IN FINDING AMAZON LIKELY TO SUCCEED ON THE MERITS

Congress enacted the CFAA "to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ Labs*, 31 F.4th at 1196. This Court has accordingly instructed that, when interpreting the Act, courts should "look to whether the conduct at issue is analogous to 'breaking and entering.'" *Id.* at 1197 (quoting H.R. Rep. No. 98-894, at 20 (1984)). This Court and the Supreme Court have likewise emphasized that the CFAA is not "a sweeping Internet-policing mandate" and should not be interpreted in a way that would "transform whole

21

categories of otherwise innocuous behavior into federal crimes simply because a computer is involved." *United States v. Nosal*, 676 F.3d 854, 858, 860 (9th Cir. 2012) (en banc); *see Van Buren*, 593 U.S. at 393 (declining to "attach criminal penalties to a breathtaking amount of commonplace computer activity"). The CDAFA is also "principally aimed at computer hacking and tampering" and was not intended to create liability based on the "disclosure of purely public information that happened to be stored on a computer." *Teran*, 334 Cal. Rptr. 3d at 309.

Amazon's claims bear no resemblance to the paradigmatic applications of those statutes and instead accuse Perplexity of criminal conduct based on activity categorically different from anything Congress or the California Legislature covered in the CFAA and CDAFA. In finding Amazon likely to succeed on its claim under 18 U.S.C. § 1030(a)(2) and a corresponding CDAFA provision, the district court fundamentally misapplied both statutes. This Court should reverse the preliminary injunction on the threshold basis that neither claim is likely to succeed.[4]

## A. The District Court Erred In Finding Amazon Likely To Succeed Under 18 U.S.C. § 1030(a)(2)

To prevail on its CFAA claim under 18 U.S.C. § 1030(a)(2), Amazon must establish each of five independent elements—specifically that Perplexity:

---

[4] The district court correctly noted that Amazon is unlikely to succeed on its claim under the CFAA's fraud provision, 18 U.S.C. § 1030(a)(4), 2-ER-97:24-98:1, and its Order granting the injunction makes no reference to § 1030(a)(4). Accordingly, Perplexity does not address that provision here.

22

(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that [it] (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value.

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009). The district court erred when it held that Amazon is likely to succeed on each of those five elements; in fact, Amazon cannot demonstrate a likelihood of success on any element, and a lack of likely success on even one element is enough to reverse the preliminary injunction.

### 1. Amazon Is Not Likely To Prove That Perplexity "Intentionally Accessed" An Amazon Computer

The CFAA does not define "access," but that term has "long carr[ied] a 'well established' meaning in the 'computational sense'—a meaning that matters when interpreting a statute about computers." *Van Buren*, 593 U.S. at 388 (quoting American Heritage Dictionary 10 (3d ed. 1992)). "In the computing context, 'access' references the act of entering a computer 'system itself' or a particular 'part of a computer system,' such as files, folders, or databases." *Id.* (quoting 1 Oxford English Dictionary 72 (2d ed. 1989)). Accordingly, to "access" a computer, a defendant must "gain entry" to the computer "system itself." *Id.* at 388 & n.6 (citations omitted).

23

Here, it is undisputed that Perplexity never "gain[ed] entry to" an Amazon computer. *Van Buren*, 593 U.S. at 388 n.6 (citation omitted). Amazon's own expert acknowledged there are "no direct requests from Perplexity hosts to amazon.com" and that "data from Amazon" is "transmitted to the user's browser **and then** to Perplexity servers." 2-ER-269-270 ¶ 4 (emphasis added). In other words, only **Comet users** "gain entry" to Amazon, from their own computers. *Van Buren*, 593 U.S. at 388 n.6 (citation omitted). The Assistant's transmission of screenshots **from the user's computer** to Perplexity servers, 2-ER-77:17-23; 3-ER-524-525 ¶ 19; 4-ER-609 ¶ 15, proves the point: If Perplexity itself accessed Amazon.com, there would be no need for the Assistant to send the screenshots from the user's device.

Nonetheless, in a mere half-sentence of analysis, the district court stated that "Amazon has provided strong evidence that Perplexity, through its Comet browser, accesses . . . the user's password-protected account." 1-ER-4. In doing so, the district court made two errors: it (i) ascribed a user's use of software on the user's computer directly to Perplexity, and (ii) ignored the statutory language requiring a plaintiff to demonstrate that the alleged wrongdoer "intentionally accesses **a computer**." 18 U.S.C. § 1030(a)(2) (emphasis added).

*First*, the district court erred by ascribing actions taken by software operating on the user's computer, at the user's direction, to Perplexity. Nobody would say that Apple "access[es]" or "gain[s] entry to" Amazon's computers whenever a person

24

navigates *from her own computer* to Amazon.com using the Safari browser. *Van Buren*, 593 U.S. at 388 & n.6 (citations omitted). And that is true even where—as often happens—the Safari software automatically fills in the user's address and payment information at checkout on the user's behalf. There is no reason to treat the Assistant differently; just as with Apple's Safari, the Assistant is simply a piece of software that exists on the user's computer and operates at the user's direction.

Amazon's counterargument on this point is extraordinarily novel and strained. Recognizing that the only "access" is from the user's own device, Amazon invites a first-of-its-kind finding that the Assistant possesses an intent that should be ascribed to Perplexity—rather than to the user directing the Assistant's conduct. Dkt. 16.1 at 9 (arguing that the intent belongs to "the Comet AI agent, not a person" (internal quotation marks omitted)); NDCA Dkt. 40 at 3. This is not just unprecedented but illogical. No matter its technological capabilities, the Assistant is mere computer software that has no "intent" apart from what the user directs it to do on the user's behalf—as Amazon has acknowledged. NDCA Dkt. 4 at 6 (acknowledging that "Comet users" ask the Assistant to "perform actions on users' behalf"); *id.* at 15 (conceding that "*Amazon customers* . . . use the Comet AI agent to *access* the Amazon Store" (emphasis added)); *see also* 3-ER-523 ¶ 11 (Perplexity Chief Technical Officer explaining that the Assistant "limits itself strictly to actions

25

consistent with the user's stated goals."). Because the Assistant is simply software operating at its user's direction, its "access" cannot be ascribed to Perplexity.

***Second***, the district court erred in finding that Perplexity's direct access to data on a ***user's*** computer was equivalent to Perplexity "intentionally access[ing] ***[Amazon's] computer[s]***." 18 U.S.C. § 1030(a)(2) (emphasis added). District courts in this circuit have already found Amazon's theory unavailing. In *Meta Platforms, Inc. v. BrandTotal Ltd.*, defendant BrandTotal created several versions of a browser extension, one of which monitored ad metrics by automatically sending data to BrandTotal while a user browsed websites like Facebook. 605 F. Supp. 3d 1218, 1232 (N.D. Cal. 2022). Facebook sent the ad data to the user's browser, where the browser extension accessed it and further transmitted it to BrandTotal. *Id.* There, as here, the defendant did not directly access the plaintiff's computers.

The court granted summary judgment to BrandTotal on Meta's CFAA claim related to that browser extension. The court held that Meta had only established BrandTotal's access to data that Meta "ha[d] sent to the individual users . . . on users' computers"—not access to Meta's computers. *Id.* at 1260-61. That conclusion is consistent with this Court's direction that courts should not "transform the CFAA from an anti-hacking statute into an expansive misappropriation statute." *Nosal*, 676 F.3d at 857. The district court's finding that Amazon is likely to establish "access" runs directly afoul of these principles.

26

In short, the undisputed evidence shows that Perplexity does not access Amazon.com: Access to Amazon.com by the user using the Assistant is not access *by Perplexity*, and access to data on users' computers is not access by Perplexity *to Amazon's computers*. The Court can reverse the injunction on this basis alone.

**2.     Even Assuming Perplexity "Accessed" An Amazon Computer, Amazon Is Not Likely To Prove Such Access Was "Without Authorization"**

Assuming arguendo that Perplexity "accesse[d]" an Amazon computer, the access was not "without authorization" under the CFAA. 18 U.S.C. § 1030(a)(2).

(a)     <u>This case involves no "private information" implicating the CFAA's prohibition on "unauthorized access"</u>

As a threshold matter, any alleged access to Amazon's computers by Perplexity would not be "unauthorized access" pursuant to the CFAA because it does not involve Amazon's "private information" or any information Amazon has an interest in protecting. *hiQ Labs*, 31 F.4th at 1197; *see id.* (noting that when the CFAA was amended to "extend the prohibition on unauthorized access to any 'protected computer,' the Senate Judiciary Committee explained that the amendment was designed 'to increase protection for the privacy and confidentiality of computer information'" (quoting S. Rep. No. 104-357, at 7 (1996))).

As a criminal anti-hacking statute, the CFAA does not forbid a user's authorized agent from logging into a public website where the *only* information behind a password-protected "gate" either belongs to the user or is "available to

27

anyone," logged in or not, "with an Internet connection." *Id.* at 1198-99. Where no third party's "expectation of privacy" is at issue, "the 'breaking and entering' analogue invoked so frequently during congressional consideration [of the CFAA] has no application, and the concept of 'without authorization' is inapt." *Id.* at 1190, 1198. This is true regardless of whether the website owner purports to revoke the agent's authorization, and no court (other than the district court below) has held otherwise. Other sources of law may give the website owner a right to exclude the agent, but the CFAA—a federal statute carrying serious criminal penalties—does not. *See id.* at 1196, 1201 (stating that although CFAA does not apply to public websites or encompass violations of private terms of use, "victims of data scraping" might still bring claims for trespass to chattels, misappropriation, or breach of contract).

The district court here extended the CFAA far beyond its textual and precedential confines. Even when the Assistant navigates inside a logged-in session of Amazon.com, the only information it accesses either (i) is also available to logged-out viewers outside of Amazon's password gate (*e.g.*, public retail listings that would show up before or after a user's login), or (ii) belongs to the user who activated the Assistant. *See* 3-ER-524 ¶¶ 16-17 (the Assistant only sees what the user sees in the browser window); Dkt. 16.1 at 4 (describing "customers' private data" behind password gate as the customers' "payment information and delivery

28

addresses" and "browsing and shopping history"). The CFAA does not prohibit either category of access.

This Court has already held that the CFAA does not apply to information in the first category, and such information does not gain CFAA protection simply because it appears on both sides of a password gate. *See hiQ Labs*, 31 F.4th at 1197 ("[T]he [CFAA's] prohibition on unauthorized access is properly understood to apply *only to private information*—information *delineated as private* through use of a permission requirement of some sort." (emphasis added)). And with respect to information in the second category, neither the district court nor Amazon has cited a case in which a user's authorized agent violated the CFAA by accessing *only the user's* private information on a computer. *Cf. Nosal*, 676 F.3d at 861 ("[I]t's very common for people to let close friends and relatives check their email or access their online accounts. Some may be aware that, if discovered, they may suffer a rebuke from the ISP or a loss of access, but few imagine they might be marched off to federal prison for doing so."). Ordinary meaning and common sense confirm that precedent: Access to information that is either public or available to the user who granted access would not, in any meaningful sense, be called "unauthorized." The district court's novel reading to the contrary defies both the statutory language and courts' uniform construction of it.

(b)     *Power Ventures does not support a finding of unauthorized access*

The only case the district court cited to support its unduly expansive reading of the CFAA was *Power Ventures*, 1-ER-4, but it is inapposite.

In *Power Ventures*, this Court partially affirmed a grant of summary judgment to Facebook on its CFAA claim against Power. 844 F.3d at 1064, 1069. In 2008, when **all** of Facebook was still behind a password "gate," Power received access to certain Facebook users' private accounts and used that access to scrape data associated with the users' Facebook "friends" and then spam those friends with mass promotional messages to their external email accounts. *See id.* at 1063.

*Power Ventures* does not support the district court's finding of likely "unauthorized access" for several reasons. First, as this Court explained in *hiQ Labs*, the CFAA in *Power Ventures* applied to protect Facebook's interest in prohibiting Power's access to "private information" belonging to third-party Facebook users (*i.e.*, not the users who provided Power with access to their accounts) for Power's own improper purposes. *hiQ Labs*, 31 F.4th at 1197; *see id.* at 1199 ("[W]e specifically recognized [in *Power Ventures*] that 'Facebook has tried to limit and control access to its website' as to the purposes for which [Power] sought to use it." (quoting *Power Ventures*, 844 F.3d at 1063)). This Court thus recognized Facebook's interest in guarding against access to private information on its password-protected website by a competitor who sought to use that information for

30

purposes inconsistent with Facebook's and the user's grant of access. *See id.*; *Power Ventures*, 844 F.3d at 1067 (stating that Facebook users only "arguably" gave Power "permission to use Facebook's computers to disseminate messages").

Here, there is no evidence that when a user activates the Comet Assistant on Amazon.com (again, from the user's own device), Perplexity gains access to any information other than for the purpose of complying with the user's express instructions—a purpose entirely consistent with Amazon's purpose as well, *i.e.*, shopping. *See* 3-ER-572 ¶ 3 (identifying purpose of "Amazon Store" as allowing customers to "browse, select, and purchase a wide variety of products and services"). Indeed, to the extent the Assistant accesses password-protected areas of Amazon.com that only Amazon account holders can reach, it does so not only with authorization from those account holders, but ***in conjunction with*** them. In particular, even after a user directs the Assistant to shop on Amazon.com, the Assistant cannot log into Amazon.com on its own, nor can it finalize a purchase on its own; it will stop in its tracks until the user manually and in real time logs in herself and finalizes the purchase herself. 3-ER-512 ¶ 8; 3-ER-523-525 ¶¶ 12-13, 19. The Assistant thus cannot be fairly compared to Power, which in *Power Ventures* was accessing Facebook on its own and for its own purposes. *See* 844 F.3d at 1067-68 & n.4 (stating that Power admitted using a person's Facebook account without

authorization, using automated scripts to collect information from Facebook, and using Facebook for "commercial purposes").[5]

Relatedly, as discussed above, there is no evidence here that Perplexity obtains any private information behind any Amazon password "gate" that belongs to anyone other than the users who explicitly authorize Perplexity to have it. *See hiQ Labs*, 31 F.4th at 1201 (recognizing that there could be no CFAA violation where "the data hiQ seeks to access is not owned by LinkedIn and has not been demarcated by LinkedIn as private"). In *Power Ventures*, on the other hand, Facebook had an interest in protecting the private information of the "friends" of the users who provided Power with access to their accounts, because those "friends" had not granted Power access to their own private information. That interest, this Court held, was sufficient to implicate the CFAA. *See Power Ventures*, 844 F.3d at 1068.

Unlike Facebook, Amazon is not a social networking website where third parties upload information with the expectation that it will be accessible only to other authenticated users whose "friend" requests the third parties have accepted. Rather, the *only* arguably private information in any password-protected area of

---

[5] In *Power Ventures*, this Court likened Power's improper purpose to a "shotgun" carried by a visitor to a bank, even if the visitor had a key to a safe-deposit box inside. *See* 844 F.3d at 1068. Regardless of the key, the bank would be allowed to prohibit the entry of an armed visitor. *Id.* Here, because Perplexity has no improper purpose, there is no "shotgun," and the *Power Ventures* analogy does not apply.

32

Amazon.com belongs to the user herself.  Amazon does not dispute that its users are "free to share" all this information "as they see fit." *BrandTotal*, 605 F. Supp. 3d at 1260; *see* NDCA Dkt. 40 at 2, 4 (declining to dispute proposition that users own the data in question).  Amazon thus has no interest—and certainly no interest the CFAA protects—in "demarcat[ing]" such information "as private" such that the user's authorized agent becomes criminally liable upon accessing it.  *hiQ Labs*, 31 F.4th at 1201.

The district court made no finding regarding the nature of the information at issue here.  It simply relied on Perplexity supposedly obtaining "the user's private Amazon account information," 1-ER-4, without identifying what that information is, considering who holds a privacy interest in it, or addressing what "purposes" Perplexity uses it for, *hiQ Labs*, 31 F.4th at 1199.  That was error.

Finally, in *Power Ventures*, Power admitted it had intentionally evaded technical barriers that Facebook imposed.  844 F.3d at 1068; *see Facebook, Inc. v. Power Ventures, Inc.*, 844 F. Supp. 2d 1025, 1038 (N.D. Cal. 2012) (lower court ruling describing "undisputed" evidence that "Defendants circumvented technical barriers").  Here, Perplexity—before even getting the chance to engage in the full discovery that had occurred in *Power Ventures*—has put evidence into the record that it never intentionally evaded any technical "block" Amazon imposed.  *See* 2-ER-266-267 ¶¶ 6-10; 3-ER-527 ¶¶ 26-27.

33

In sum, *Power Ventures* does not control this case.

### 3. Amazon Is Not Likely To Prove Perplexity "Obtained Information" "From An Amazon Computer"

The district court further erred with respect to the third and fourth elements of Amazon's CFAA claim: whether Perplexity, via its supposed unauthorized access to an Amazon computer, "(3) thereby obtained information (4) from any protected computer." *Brekka*, 581 F.3d at 1132. The sole evidence the district court cited to support its ruling on these elements was a paragraph from the declaration of Perplexity's Chief Technical Officer discussing the process by which the Assistant sends encrypted screenshots or HTML snapshots from the ***user's computer*** to Perplexity's servers. 1-ER-4 (citing 4-ER-609 ¶ 15); *see* 2-ER-77:17-23. But there is nothing in the record showing that, even if Perplexity accessed Amazon computers (it did not), Perplexity also obtained information ***from such Amazon computers***— which Amazon argues are the "protected computer[s]" at issue. NDCA Dkt. 4 at 14 (alteration in original) (citation omitted). Indeed, the word "computer" appears in the statute twice, and access to a computer and obtaining information ***from that computer*** are therefore separate elements. *See* 18 U.S.C. § 1030(a)(2)(C); *Brekka*, 581 F.3d at 1132.

The district court misapplied the law in finding Amazon likely to satisfy these elements. It is undisputed that, in the course of a user's use of the Assistant on Amazon.com, there are "no direct requests from Perplexity hosts to amazon.com."

34

2-ER-269-270 ¶ 4 (Amazon expert stating that "data from Amazon" is "transmitted to the user's browser *and then* to Perplexity servers" (emphasis added)). Accordingly, Perplexity "obtains" nothing *from Amazon's computers*. *See* 3-ER-524 ¶ 17 ("The Assistant . . . operates solely on what is displayed in the browser on the user's device."). This undisputed fact is another reason to reverse. *See BrandTotal*, 605 F. Supp. 3d at 1260-61 (granting summary judgment to BrandTotal because its browser extension engaged in mere "reactive" collection of data from "users' computers").

### 4. Amazon Is Not Likely To Prove Cognizable Loss Under The CFAA

Finally, the district court wrongly concluded that Amazon is likely to satisfy the CFAA's loss requirement. 1-ER-4-5 & n.2.

Amazon's civil CFAA claim requires it to show an annual "loss" of at least $5,000. 18 U.S.C. § 1030(c)(4)(A)(i)(I); *see id.* § 1030(e)(11), (g); *see also Brekka*, 581 F.3d at 1132. In *Van Buren*, the Supreme Court recognized that the CFAA's reference to "loss" focuses on "technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data," so that the term "loss" "relates to costs caused by harm to computer data, programs, systems, or information services." 593 U.S. at 391-92 (quoting 18 U.S.C. § 1030(e)(11)). The Court noted that "*[l]imiting* 'damage' and 'loss' in this way makes sense in a scheme 'aimed at preventing the typical consequences of

35

hacking.'" *Id.* at 392 (emphasis added) (citation omitted). In *hiQ Labs*, this Court stated that after *Van Buren*, the CFAA "requires a showing" of the technological harms the Supreme Court identified. 31 F.4th at 1195 n.12; *see X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 983-84 (N.D. Cal. 2024) (dismissing CFAA claim under *Van Buren* because alleged losses were "not technological in nature" and there was "no allegation that [data] was corrupted, changed, or deleted").

Remarkably, the district court dismissed all this as mere dicta—and acknowledged that it had to do so to reach its ruling. Amazon has only alleged three types of losses: (i) employee time spent investigating and responding to the Assistant's activity on Amazon.com; (ii) engineering resources spent to filter out advertising impressions generated by the Assistant's traffic; and (iii) the costs of unblocking the accounts of Amazon users whom Amazon itself blocked for allegedly using the Assistant. NDCA Dkt. 4 at 18-19; 3-ER-567-568 ¶¶ 21-23. In the district court's own words, these asserted damages would "be covered as a loss under the statutory definition before *Van Buren*, which then created an issue in that regard." 2-ER-130:13-18. The district court viewed *Van Buren* as having "created this whole problem, if you will, of what loss counts." 2-ER-110:2-3.

It was not the district court's prerogative to avoid applying *Van Buren*—or to deem it a "problem," 2-ER-110:2—on the ground that its discussion of technological

harms was purportedly dicta. Lower courts are not only bound by the Supreme Court's judgments—they are also bound by the underlying reasoning. *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019) ("[J]ust as binding as this holding is the reasoning underlying it."). And in *Van Buren*, the discussion of technological harms was an essential component of the Supreme Court's rejection of the United States's argument that the CFAA criminalizes mere "'misuse' of sensitive information that employees may permissibly access using their computers." 593 U.S. at 392 (stating that Van Buren's "run of [a] license plate [in a database] did not impair the 'integrity or availability' of data, nor did it otherwise harm the database system itself"); *see hiQ Labs*, 31 F.4th at 1195 n.12. That reasoning controls here, where Amazon has not even alleged, let alone shown a likelihood of proving, any technological harm.

Even if *Van Buren*'s and *hiQ Labs*'s discussion of technological harms was nonbinding, Amazon's alleged damages—purported investigative and business harms—still do not suffice. In *Moxie Pest Control (Utah), LLC v. Nielsen*, 164 F.4th 1195 (10th Cir. 2026), the Tenth Circuit disagreed with this Court and held that *Van Buren* does not foreclose recovery of certain costs attributable to investigating a CFAA violation. *Id.* at 1201. But the court added that "expenses related to business harms" still do not qualify, even if they could otherwise be characterized as investigative costs. *Id.* (stating that not "***all*** investigative costs" are recoverable). The court said recoverable investigative costs must stem from efforts to "identify[]

37

the perpetrator or the method by which the offender accessed the protected information." *Id.* (citation omitted).

The harms Amazon alleges here are not recoverable "losses" even under the *Moxie Pest* standard. Amazon's advertising "harm" is based on allegations that when the Assistant generates traffic on Amazon.com, Amazon must "detect and filter out these non-human impressions" because "advertisers pay for their ads to be shown to humans." NDCA Dkt. 4 at 15 (citing 3-ER-568 ¶ 22). These are not "investigative" costs at all; they are "business harms" resulting from Amazon's own business model. *Moxie Pest*, 164 F.4th at 1201. And Amazon's allegation that it spent money to block and unblock the accounts of customers who used the Assistant, NDCA Dkt. 4 at 15 (citing 3-ER-568 ¶ 23), likewise has nothing to do with "identifying the perpetrator" or the perpetrator's "method," *Moxie Pest*, 164 F.4th at 1201 (citation omitted). It was Amazon's own decision to block and unblock these users for violating Conditions of Use that Amazon admits do not bind Perplexity, NDCA Dkt. 4 at 6; Perplexity had nothing to do with it. Accordingly, these harms are, if anything, mere "business harms," *Moxie Pest*, 164 F.4th at 1201, and do not represent cognizable "loss" under the CFAA under any standard.[6]

---

[6] Further, assuming arguendo that Amazon incurred true "investigative" costs, they are not cognizable because there was no actual violation of the CFAA for Amazon to "investigate." *See BrandTotal*, 605 F. Supp. 3d at 1265 ("Meta faces a hurdle in

**B.     Amazon Is Not Likely To Succeed Under The CDAFA**

The district court's errors in finding a likely violation of the CFAA also infect its finding on the CDAFA claim.  The CDAFA is California's analog to the CFAA, which, like the federal hacking statute, requires that the defendant "access" a computer without authorization.  Cal. Penal Code § 502(c)(7) (anyone who "[k]nowingly and without permission accesses or causes to be accessed any computer" is "guilty of a public offense"); *Chrisman v. City of L.A.*, 65 Cal. Rptr. 3d 701, 704-05 (Ct. App. 2007) (observing that CDAFA prohibits "hacking").  The district court simply incorporated its faulty merits analysis of the CFAA claim by reference in its one-paragraph discussion of the CDAFA claim.  1-ER-5 (finding CDAFA claim likely to succeed "[f]or the reasons discussed above with respect to" CFAA).  As such, the district court's dispositions of these claims should fall together.[7]

---

showing sufficient loss in that . . . much of the conduct Meta was investigating did not actually violate the CFAA.").

[7]   Amazon may argue that the CDAFA is broader in some respects than the CFAA, but the district court did not rely on any purported distinctions between the statutes in its analysis.  No California court has applied the CDAFA to circumstances remotely resembling the present dispute, and this Court should not reach out to decide unsettled state-law issues the district court did not reach itself.  *See Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003) (per curiam) (remanding to district court to decide unsettled question of state law "in the first instance" (citation omitted)).  And in any case, the CDAFA is like the CFAA in that it does not protect the information at issue here just because it originated on an Amazon computer.  *See Teran*, 334 Cal. Rptr. 3d at 307 ("[I]t would seem anomalous to read the statute to impose [liability] on an individual for failing to obtain

39

That the CFAA claim is unlikely to succeed undermines the district court's CDAFA merits determination for an additional reason. The CFAA claim is the only basis in this case for original federal jurisdiction. For the reasons explained above, that claim fails as a matter of law. The CFAA claim is thus likely to be dismissed before trial. And "[t]ypically, 'when federal claims are dismissed before trial . . . pendent state claims should also be dismissed.'" *Vasquez v. City of San Jose*, 634 F. Supp. 3d 712, 732 (N.D. Cal. 2022) (quoting *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367-68 (9th Cir. 1992)). Accordingly, the district court is likely to relinquish supplemental jurisdiction over the CDAFA claim, meaning that claim is unlikely to succeed on the merits in federal court, rendering preliminary injunctive relief on the claim inappropriate. *See Republic of Philippines v. Marcos*, 818 F.2d 1473, 1480 (9th Cir. 1987) (probability of success of federal claim providing basis for federal jurisdiction is relevant to appropriateness of injunctive relief on state-law claim, as state claim "may well be subject to dismissal" if federal claim drops out of the case).

Indeed, to grant relief on a state claim when a dubious federal claim provides the only basis for federal jurisdiction amounts to an argument that "the state tail

---

permission to use a document that is fully available from a public source just because the individual accessed an identical copy of the document from an entity's computer.").

40

should wag the federal dog"—a use of supplemental jurisdiction the Supreme Court has expressly disapproved. *Mayor of City of Phil. v. Educ. Equal. League*, 415 U.S. 605, 627 n.23 (1974) (criticizing dissent for addressing "state law matters in a case where the federal issue is dubious yet is the only basis for federal jurisdiction"). Courts routinely deny injunctive relief on state-law claims when the federal claims providing original jurisdiction are dubious or unlikely to succeed. *See, e.g.*, *Lucero v. Operation Rescue of Birmingham*, 772 F. Supp. 1193, 1207 (N.D. Ala. 1991) (declining to grant preliminary injunction on state law claim because "the basis for federal jurisdiction, if any, is weak"); *Open Our Or. v. Brown*, No. 6:20-cv-773, 2020 WL 2542861, at \*3 (D. Or. May 19, 2020) (same). The same result should follow here.

## II. THE DISTRICT COURT LEGALLY ERRED AND ABUSED ITS DISCRETION IN RESOLVING THE REMAINING PRELIMINARY INJUNCTION REQUIREMENTS IN FAVOR OF AMAZON

If the Court agrees that Amazon is unlikely to succeed on the merits, it need go no further. *See Geo Grp.*, 151 F.4th at 1114 (court need not consider remaining *Winter* requirements if movant is unlikely to succeed on the merits). But even if Amazon could show likely success on the merits of its claims, this Court should still reverse the preliminary injunction because Amazon has failed to establish ***any***, let alone all, of the remaining equitable requirements. And in any case, Amazon's unclean hands preclude it from obtaining a preliminary injunction.

41

**A.** **The District Court Improperly Collapsed The Equitable Requirements For A Preliminary Injunction Into Likelihood Of Success**

As a threshold matter, the district court "necessarily abuse[d] its discretion" by "bas[ing] its decision on an erroneous legal standard." *Developmental Servs. Network*, 666 F.3d at 544. Specifically, the court improperly collapsed all of the equitable requirements for a preliminary injunction into its likelihood of success finding, effectively concluding that likely success on a CFAA claim ***automatically*** justifies a preliminary injunction. Indeed, Amazon urged the district court to do this. *E.g.*, 2-ER-53:18-22; 2-ER-54:2-4; 2-ER-55:4-7 ("If Your Honor agrees with us, [that] we're likely to succeed on the merits, then this [public interest] factor flows almost automatically. In fact, it does flow automatically under the caselaw."). That approach is squarely foreclosed by the Supreme Court's direction that a preliminary injunction does not "follow as a matter of course from [a party's] showing of a likelihood of success on the merits." *Benisek*, 585 U.S. at 158; *see, e.g.*, *Winter*, 555 U.S. at 21-22 (reversing this Court's holding that mere "possibility" of irreparable harm was sufficient where plaintiff "demonstrates a strong likelihood of prevailing on the merits").

The district court's Order makes unmistakable its collapsing of the equitable requirements into likelihood of success. On irreparable harm, the court found that likely unauthorized access to Amazon computers—*i.e.*, a likely CFAA violation—

42

constitutes *per se* irreparable harm to Amazon, with no further analysis. 1-ER-5 ("Amazon is likely to suffer irreparable harm . . . in that Perplexity has made clear that . . . it will continue to engage in the above-referenced challenged conduct."); 2-ER-140:20-23 ("We've talked about likelihood. The next one would be injury. They have a right to keep people out who keep doing it, like Comet, then that's irreparable until they're told to stop."). On the balance of the equities, the court found in Amazon's favor solely because of "Comet's continued [likely] unauthorized access to Amazon's password-protected sites," *i.e.*, a likely CFAA violation. 1-ER-6; *see* 2-ER-141:1-14 (agreeing with Amazon that "there's no balance because you can't do something that's unlawful").[8] And regarding the public interest, the court found that the public "has an interest in protecting computers from unauthorized access," *i.e.*, in preventing a likely CFAA violation. 1-ER-6; *see* 2-ER-141:15-23.

The district court cited no other court that has justified a preliminary injunction under such an analysis. Rather, the district court relied primarily on *Facebook, Inc. v. Power Ventures, Inc.* (*Power Ventures II*), which involved a

---

[8] On the balance of the equities, the district court also stated that "Comet will retain its ability to access the entirety of the web other than the password-protected sections of Amazon's website." 1-ER-6. But it is axiomatic that Perplexity will be allowed to engage in conduct not covered by the injunction. A proper inquiry would have focused on the hardship to Perplexity **that the injunction will cause**. *Winter*, 555 U.S. at 24 (stating that courts must "consider the effect on each party of the granting or withholding of the requested relief" (citation omitted)).

43

*permanent* injunction that was entered after Facebook had ***proved*** its CFAA claim at the summary judgment stage following nearly a decade of litigation. 252 F. Supp. 3d 765, 768, 772 (N.D. Cal. 2017). Whatever the arguable propriety of that approach after extensive findings on a developed record, there is no comparable basis for avoiding findings on the equitable requirements in the context of the ***preliminary*** injunction that the district court issued here. To the contrary, the Supreme Court has emphasized that each of the *Winter* elements deserves ***independent*** consideration. *See Winter*, 555 U.S. at 26-27 (criticizing district court for "assessing the balance of equities and the public interest . . . in only a cursory fashion"); *see also San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 602 (9th Cir. 2025) (vacating preliminary injunction where district court failed to "explain which evidence it found more persuasive or how the equities and public interest ultimately came out" and never specified what the "interests or equities" favoring the grant of injunctive relief even were).[9]

_____

[9]   The district court also quoted *Chegg, Inc. v. Doe*, No. 22-cv-7326, 2023 WL 7392290 (N.D. Cal. Nov. 7, 2023), for the proposition that "numerous courts have found" that, effectively, an ongoing CFAA violation constitutes *per se* irreparable harm for purposes of a preliminary injunction. 1-ER-5 (quoting 2023 WL 7392290, at *8). This was incorrect. *Chegg* was a case where no defendant had been served and thus the allegations of irreparable harm were uncontested. 2023 WL 7392290, at *2-4 (discussing motion for alternative service). Further, the "[n]umerous courts" cited in *Chegg*, 2023 WL 7392290, at *8, were the *Power Ventures II* court (which, again, was considering whether to enter a ***permanent*** injunction) and two other district courts that entered permanent injunctions after the defendants failed to appear. *See Facebook, Inc. v. Sluchevsky*, No. 19-cv-1277, 2020 WL 5823277, at

**B.** **Amazon Failed To Demonstrate The Equitable Requirements For A Preliminary Injunction**

To the extent the district court implicitly found that Amazon had independently satisfied any of the remaining *Winter* requirements for injunctive relief—that is, apart from the district court's erroneous conclusion that Amazon's satisfaction of those requirements necessarily followed from its showing on the merits—the district court abused its discretion in doing so.[10]

**1.** **Amazon Failed To Demonstrate Irreparable Harm**

To show irreparable harm, a plaintiff must do more than offer "[u]nsupported and conclusory statements regarding harm [the movant] might suffer"; it must ground its showing in evidence, not speculation. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). The evidence must show that irreparable harm is "*likely*," the threatened injury is immediate, and monetary damages would be inadequate. *Winter*, 555 U.S. at 22. Amazon pressed two theories of harm below: (i) damage to its goodwill and reputation, and (ii) cybersecurity risks

───────────────

\*9 (N.D. Cal. Aug. 28, 2020); *Tagged, Inc. v. Does 1 through 10*, No. 09-cv-1713, 2010 WL 370331, at \*12 (N.D. Cal. Jan. 25, 2010).

[10] At a very minimum, this Court should remand for particularized findings on how Amazon satisfied each of these requirements based on evidence in the record. *See* Fed. R. Civ. P. 52(a)(2); *FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1219 (9th Cir. 2004) (vacating preliminary injunctions and remanding "for findings of fact and conclusions of law" and "for clarification").

to its customers. NDCA Dkt. 4 at 20-23; NDCA Dkt. 40 at 10-12. The record supports neither.

*First*, Amazon's assertion of damages to its goodwill and reputation is the kind of "unsupported and conclusory" theory this Court rejected in *Herb Reed*. 736 F.3d at 1250; *see adidas*, 890 F.3d at 759-60 (reversing in part for lack of "evidence in the record" supporting the "theory of harm"). Amazon argued that because the Assistant "may not select the best price, delivery method, or product recommendations," 3-ER-566 ¶ 14, customers' "confidence in the Amazon brand as a whole is diminished," NDCA Dkt. 4 at 22-23. Every link in that chain is speculative and unsupported by evidence.

For starters, even after eight months of the Assistant's operation, Amazon did not submit any evidence of harm to its reputation or goodwill: no declaration from a dissatisfied customer, no survey showing reputational damage, no data showing decreased traffic or lost sales. In short, Amazon has no evidence whatsoever showing that any customer has ever experienced a "diminished" shopping experience on Amazon.com based on the customer's use of the Assistant *and* blamed Amazon for that. Nor has Perplexity heard about any such negative shopping experiences. *See* 3-ER-514 ¶ 17. Indeed, when the district court—rightly skeptical of Amazon's implausible argument—asked why a dissatisfied customer would blame Amazon rather than Perplexity for a subpar experience using the Assistant,

46

Amazon offered only the possibility that customers "may not know who to blame." 2-ER-38:18. This speculation falls far short of proof of a "*likely*" irreparable injury. *Winter*, 555 U.S. at 22.

Amazon's briefing below reveals what its theory of lost "goodwill" is actually about: lost advertising and upselling opportunities. Amazon lamented that the Assistant "dissuades [users] from visiting the Amazon Store themselves, depriving Amazon of opportunities . . . to sell additional products by making recommendations or offering promotional benefits," NDCA Dkt. 4 at 22, and that the Assistant may not "add selected products to existing deliveries to meet minimum free-shipping thresholds," 3-ER-566 ¶ 14. But customers who explicitly choose to use the Assistant to shop on Amazon.com are likely doing so precisely *to avoid* Amazon's heavy-handed upselling pressure. In any event, whatever hypothetical lost upselling opportunities Amazon suffers (and again, there is no evidence it has suffered any) are plainly compensable by monetary damages and thus not "irreparable" harm. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (no irreparable harm where "award of damages" would be "adequate").

*Second*, Amazon's cybersecurity theory is similarly unsupported. Nothing in the record suggests that a cybersecurity incident involving an Amazon customer's use of the Assistant to shop on Amazon.com has occurred or is likely to occur. Amazon's argument rests on theoretical security flaws reported by third parties, at

47

least one of which was a company offering a competing AI-powered web browser, 3-ER-556-559 ¶¶ 5-8, and on its own expert's opinion, 2-ER-286-291 ¶¶ 23-28, 2-ER-294-295 ¶ 39. But the same expert acknowledged he "was not able to fully reproduce" the reported vulnerabilities, 3-ER-561 ¶ 13, and the evidence shows that Perplexity has addressed the security risks Amazon identified by implementing multiple layers of security architecture, 3-ER-526 ¶¶ 21-22; 4-ER-611 ¶¶ 23-24; *see also* 3-ER-542-549 ¶¶ 20-29. The Assistant's track record only reinforces the speculative nature of Amazon's supposed cybersecurity concerns: After eight months of operation, there is *zero* evidence of any actual cybersecurity harm connected to the Assistant. 3-ER-514 ¶ 17.

The district court was rightly skeptical of Amazon's argument regarding supposed irreparable harm from cybersecurity concerns—commenting that it was not "blown away" by the argument and that cybersecurity was not a "strong . . . reason here" for injunctive relief (2-ER-147:16-25)—and ultimately made no mention of this issue in the Order. Amazon's purported showing of irreparable harm from cybersecurity risks is "unsupported and conclusory," and it cannot sustain a preliminary injunction. *Herb Reed*, 736 F.3d at 1250-51; *see Winter*, 555 U.S. at 22.

### 2. The Balance Of Equities Strongly Weighs Against An Injunction

Balancing the equities requires a court to compare "the competing claims of injury" and the "effect on each party of the granting or withholding of the requested

relief." *Winter*, 555 U.S. at 24 (citation omitted). As shown, Amazon's side of the injury ledger is empty. *See* § II.B.1, *supra*. And as elaborated below, Amazon has engaged in inequitable conduct that weighs heavily against it in any balancing of the equities. *See* § II.C, *infra*.

Perplexity, by contrast, has engaged in no inequitable conduct, and it would suffer severely from a preliminary injunction. The injunction would disable Comet's core feature on the world's largest online retailer. Perplexity invested tens of millions of dollars and assembled a team of nearly 100 engineers to build Comet around a defining capability: agentic AI that navigates websites and executes tasks at a user's direction. 3-ER-512 ¶¶ 6-7, 10; 4-ER-602-603 ¶ 41. Since its launch, Comet has built a substantial and growing user base around that capability, and many users have set Comet as their primary browser. 4-ER-597-598 ¶¶ 14, 18. The injunction would cripple and reverse that growth. Amazon "ranks among the top five most important sites for [Perplexity's] target demographic," and disabling the Assistant's access to Amazon.com would, at a minimum, result in a severe competitive disadvantage for Perplexity. 3-ER-517-518 ¶ 37.

That harm to Perplexity, moreover, would be irreversible. AI-assisted browsing is a nascent market in which timing is everything, and Comet's first-mover advantage depends on the Assistant being able to function on the platforms that matter most to its users. 3-ER-518 ¶¶ 38-39. The Assistant is the feature that sets

49

Comet apart from other browsers, and browser adoption is "sticky": if the Assistant cannot deliver on its core functionality, users will turn to competing products, and they are unlikely to switch back once they integrate another browser into their routines. 3-ER-518 ¶¶ 38-39. Every user who switches to a competitor during the months or years it will take to resolve this litigation will be a user Perplexity must later try to re-acquire, and by then, Comet may occupy a severely diminished position relative to rivals who were free to iterate and grow during the same period. 3-ER-518 ¶¶ 38-39. And an inability to offer the Assistant on Amazon.com would signal to users, investors, and the market that a key Comet feature does not work on the world's eleventh-most visited website, causing reputational damage that, once incurred, money damages cannot reverse. 3-ER-518 ¶ 40; *see adidas*, 890 F.3d at 756. The evidence in the record overwhelmingly tips the balance of the equities in favor of Perplexity.

### 3. The Public Interest Weighs Against An Injunction

The public interest inquiry asks whether granting an injunction serves the broader interests of society, not merely the plaintiff's asserted interests. *Winter*, 555 U.S. at 24. Those societal interests show that the preliminary injunction here would be harmful to society in three distinct ways, such that this factor also weighs heavily against an injunction.

*First*, the injunction would override the choices of millions of consumers. Consumers voluntarily downloaded the Comet browser, manually logged into their Amazon accounts themselves, and directed the Assistant to shop on their behalf. 4-ER-598 ¶ 18. The injunction would veto those consumer decisions. This Court has repeatedly held that the public interest weighs against injunctions that would deprive consumers of the products and services they prefer. *See, e.g.*, *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) (affirming denial of preliminary injunction that would have "depriv[ed] consumers of a choice of products"); *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 521 (9th Cir. 1984) (public interest served when "the economic voice of the consumer may still be heard").

*Second*, the injunction would allow a dominant platform to suppress a nascent competitor while deploying the same technology itself—contrary to the public's strong interest in healthy economic competition. Amazon is not merely a platform seeking to enforce access controls; it is a direct competitor in the agentic AI market. The injunction would bar a signature Perplexity product from the world's largest e-commerce platform, all while Amazon freely deploys its own competing AI offerings on that same platform—and elsewhere, *see infra* § II.C (discussing Buy for Me feature). Granting a dominant platform the extraordinary remedy of a preliminary injunction that excludes a nascent competitor, while the platform

51

simultaneously deploys the same type of technology for its own benefit, does not serve the public interest. *See Int'l Jensen*, 4 F.3d at 827.

***Third***, affirming the injunction would risk establishing a framework that website operators could wield to block any digital tool they dislike, resulting in consequences well beyond this dispute. The injunction rests on the premise that any software capable of "autonomously or semi-autonomously perform[ing] actions and interact[ing] with third-party websites on behalf of, or at the instruction of, any user," 1-ER-8 n.4, loses authorization under the CFAA once a website operator sends a cease-and-desist letter. *See supra* at § I.A.1-3. That reasoning, if affirmed, would give every website operator a CFAA veto over digital tools—not necessarily limited to AI—that its own customers choose to use. A rule that empowers website operators to selectively block those tools, backed by federal criminal sanctions, would reshape the competitive landscape on the Internet. The public interest counsels against establishing such a framework through preliminary relief, before development of a more fulsome record and a decision on the merits.

## C. Amazon's Unclean Hands Provide Independent Grounds To Reverse The Preliminary Injunction

In issuing the preliminary injunction, the district court ignored the evidence Perplexity put forward regarding Amazon's unclean hands and inequitable conduct with respect to its own use of agentic AI as part of its "Buy for Me" program: Many of the third-party retailers whose products Amazon listed for sale on its website as

52

part of "Buy for Me" had not given Amazon permission to do so. Amazon's AI agent simply plucked them out from the Internet and created fake Amazon listings for them. 2-ER-203-209; 2-ER-219-229. Retailers complained about their products being listed on Amazon.com without their knowledge or approval, and customers and retailers complained about erroneous orders that the retailers could not complete. 2-ER-203-209; 2-ER-213-214; 2-ER-258-260. Perplexity discovered that Amazon had even listed Perplexity's own merchandise via Buy for Me, without Perplexity's permission, 2-ER-160-161 ¶¶ 3-9, which (to paraphrase Amazon) "prevent[ed] [Perplexity] from managing how customers access[ed]" its online store, https://perplexity.supply/, NDCA Dkt. 4 at 22.

This provides yet another independent reason to reverse the injunction. Unclean hands "may militate against issuing an injunction that otherwise meets *Winter*'s requirements." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 947 (9th Cir. 2013). The doctrine applies when (i) the plaintiff's conduct is inequitable and (ii) the conduct relates to the subject matter of the plaintiff's claims. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). Amazon's conduct satisfies both elements of the unclean hands inquiry.

*First*, Amazon's conduct is inequitable. Through Buy for Me, Amazon deploys agentic AI to crawl independent retailers' websites; generate product listings

53

on Amazon.com that those retailers never knew about, let alone consented to; and complete checkout on the retailers' sites whenever an Amazon customer wishes to purchase a product. 2-ER-186-190; 2-ER-194-199; 2-ER-203-209. Amazon created hundreds of thousands of such listings without retailers' consent, reproduced their trademarks without permission, routed customer inquiries to the nonconsenting merchants through masked email addresses, and disclaimed any responsibility for accuracy, fulfillment, or customer service. 2-ER-178-181; 2-ER-219-229; 2-ER-233-236; 2-ER-254-255; 2-ER-258-260. Amazon even deployed Buy for Me against Perplexity itself, listing Perplexity merchandise and reproducing Perplexity's logo without authorization. 2-ER-160-161 ¶¶ 5-8. Unlike the Assistant, Buy for Me has generated widespread complaints from retailers and consumers alike. 2-ER-203-209; 2-ER-213-214.

*Second*, Amazon's conduct "relates to the subject matter of [its] claims." *Fuddruckers*, 826 F.2d at 847. Amazon theorizes that it is harmed when the Assistant "degrad[es] Amazon customers' shopping experience" by "prevent[ing] Amazon from managing how its customers access the Amazon Store." NDCA Dkt. 4 at 22. Buy for Me does exactly that to other retailers. It interposes Amazon between the retailer and the retailer's customers, discourages the customers from visiting the retailer's website, generates product listings the retailer did not author or approve, completes erroneous transactions the retailer cannot control, disclaims all

54

responsibility for customer service, and routes all communications through masked Amazon email addresses that sever the retailer's direct relationship with the customers. 2-ER-178-181; 2-ER-194-199; 2-ER-203-209; 2-ER-251 ("If you have questions about this order, please contact the merchant's customer service directly."); *see also* 2-ER-245-246 (Amazon FAQ stating that Amazon's buyforme.amazon email system "may reduce duplicative promotional emails to reduce customer frustration"). Amazon cannot maintain that its supposed loss of control over its customer relationships causes irreparable injury when those customers voluntarily opt into using the Assistant, but that the same loss of control is unobjectionable when Amazon inflicts it on nonconsenting third parties. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814-15 (1945). Amazon's unclean hands therefore provide an independent basis to reverse the preliminary injunction.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING A BOND

Finally, even if the injunction was proper (it was not), the district court abused its discretion in failing to require Amazon to post a bond to cover damages ***the court itself recognized*** Perplexity faces during the injunction. Under Rule 65(c), a district court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." There is no meaningful dispute

55

that the injunction constitutes a substantial threat to Perplexity's reputation, market position, and valuation. NDCA Dkt. 35 at 25; 4-ER-602-603 ¶ 41. The Assistant is a key selling point of the browser, but consumers will likely be unwilling to use an AI agent that cannot operate on popular websites like Amazon, "the largest online retailer that exists." 2-ER-117:19-20. The injunction thus poses a significant, if not existential, competitive danger to a browser responsible for billions of dollars in value. NDCA Dkt. 35 at 25.

The district court acknowledged that Perplexity faces "a significant loss of position in the market if it turns out that I am totally wrong." 2-ER-142:1-3. The district court's own recognition that the injunction will harm Perplexity renders its denial of bond reversible error. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("[T]he bond amount may be zero *if there is no evidence the party will suffer damages from the injunction*." (emphasis added)); *see also Md. Dep't of Hum. Res. v. USDA*, 976 F.2d 1462, 1483 (4th Cir. 1992) (district court erred in denying bond where it was "evident" that defendants faced "substantial financial losses").

The district court refused to set a bond simply because it found Perplexity's acknowledged harms hard to measure. 2-ER-142:6-7 ("I just have no idea at the moment[.]"). But the solution to this problem was to entertain further briefing and evidence on the bond issue—a solution Perplexity suggested at the hearing. 2-ER-

56

118:9-19. It was not for the district court to simply throw up its hands. The plain language of Rule 65(c) is clear that a preliminary injunction *may not* issue without bond where the defendant faces "costs and damages" during the pendency of the injunction, as the court recognized Perplexity would. District courts enjoy wide discretion in setting the appropriate amount of a bond, especially when a defendant faces difficult-to-quantify reputational harms like those that exist here. *See InSinkErator, LLC v. Joneca Co.*, 163 F.4th 608, 623 (9th Cir. 2025). But a court cannot determine a defendant faces harm and then deny bond altogether. Such an inconsistent decision is a prototypical abuse of discretion. *E.g.*, *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (district court abuses its discretion where its holding is "illogical, implausible, or without support in inferences that may be drawn from facts in the record").

For these reasons, even if the Court determines that Perplexity was properly enjoined, Perplexity is entitled to a bond to cover all damages and costs sustained while the district court's injunction is pending in the event Amazon does not prevail on its claims. The Court should thus, at minimum, remand for the district court to give fuller consideration to the appropriate amount of bond.

## CONCLUSION

The Court should reverse the preliminary injunction and remand for further proceedings.


DATED:  April 1, 2026           QUINN EMANUEL URQUHART & SULLIVAN, LLP


By      */s/ John B. Quinn*
                John B. Quinn
       Attorney for Defendant–Appellant

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1444

I am the attorney or self-represented party.

**This brief contains** 13,604 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ John B. Quinn   **Date** April 1, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                    *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 26-1444

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

◯ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◯ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ John B. Quinn    **Date** | April 1, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# ADDENDUM

# TABLE OF CONTENTS [ADDENDUM]

**Page**

U.S. Code, Title 18, Section 1030 .................................................................ADD-1

Counterfeit Access Device and Computer Fraud and Abuse Act of 1984,
    Pub. L. 98-473, tit. II, ch. XXI, 98 Stat. 1837, 2190-92..........................ADD-8

California Penal Code, Section 502 ............................................................ADD-11

California Statutes 1987, Chapter 1499 .......................................................ADD-17

Subsec. (a)(7). Pub. L. 104–294, § 601(*l*)(1)(A), (C), redesignated par. (5), relating to instruments that have been modified or altered to obtain unauthorized access to telecommunications services, as (7), and struck out "or" at end. Par. transferred to appear in numerical order to reflect probable intent of Congress. Former par. (7) redesignated (9).

Pub. L. 104–294, § 601(*l*)(1)(B), redesignated par. (7) as (9).

Subsec. (a)(8). Pub. L. 104–294, § 601(*l*)(1)(A), (D), redesignated par. (6), relating to scanning receivers or other hardware or software used to obtain unauthorized access to telecommunications services, as (8) and inserted "or" at end. Par. transferred to appear in numerical order to reflect probable intent of Congress.

Subsec. (a)(9). Pub. L. 104–294, § 601(*l*)(1)(B), redesignated par. (7) as (9).

Subsec. (c)(1). Pub. L. 104–294, § 601(*l*)(3)(A), substituted "(7), (8), or (9)" for "or (7)".

Subsec. (c)(2). Pub. L. 104–294, § 601(*l*)(3)(B), substituted "(6), (7), or (8)" for "or (6)".

Subsec. (e)(7), (8). Pub. L. 104–294, § 601(*l*)(2), redesignated par. (7), defining "scanning receiver", as (8).

1994—Subsec. (a)(3). Pub. L. 103–322, § 250007(1)(A), and Pub. L. 103–414, § 206(a)(1), amended par. (3) identically, striking "or" at end.

Subsec. (a)(5). Pub. L. 103–414, § 206(a)(2), added par. (5) relating to instruments that have been modified or altered to obtain unauthorized use of telecommunications services.

Pub. L. 103–322, § 250007(1)(B), added par. (5) relating to transactions involving use of access devices issued to persons other than user.

Subsec. (a)(6). Pub. L. 103–414, § 206(a)(2), added par. (6) relating to scanning receivers or other hardware or software used to obtain unauthorized access to telecommunications services.

Pub. L. 103–322, § 250007(1)(B), added par. (6) relating to solicitations which offer access devices or information regarding access devices.

Subsec. (a)(7). Pub. L. 103–322, § 250007(1)(B), added par. (7).

Subsec. (c)(1). Pub. L. 103–322, § 330016(2)(I), substituted "fine under this title or twice the value obtained by the offense, whichever is greater, or imprisonment" for "fine of not more than the greater of $10,000 or twice the value obtained by the offense or imprisonment".

Pub. L. 103–322, § 250007(2), substituted "(a)(2), (3), (5), (6), or (7)" for "(a)(2) or (a)(3)".

Subsec. (c)(2). Pub. L. 103–414, § 206(b), substituted "(a)(1), (4), (5), or (6)" for "(a)(1) or (a)(4)".

Pub. L. 103–322, § 330016(2)(I), substituted "fine under this title or twice the value obtained by the offense, whichever is greater, or imprisonment" for "fine of not more than the greater of $50,000 or twice the value obtained by the offense or imprisonment".

Subsec. (c)(3). Pub. L. 103–322, § 330016(2)(I), substituted "fine under this title or twice the value obtained by the offense, whichever is greater, or imprisonment" for "fine of not more than the greater of $100,000 or twice the value obtained by the offense or imprisonment".

Subsec. (e)(1). Pub. L. 103–414, § 206(c)(1), inserted "electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier," after "account number,".

Subsec. (e)(5), (6). Pub. L. 103–322, § 250007(3)(A), (B), and Pub. L. 103–414, § 206(c)(2), (3), amended subsec. (e) identically, striking "and" at end of par. (5) and substituting "; and" for period at end of par. (6).

Subsec. (e)(7). Pub. L. 103–414, § 206(c)(4), added par. (7) defining "scanning receiver".

Pub. L. 103–322, § 250007(3)(C), added par. (7) defining "credit card system member".

1990—Subsec. (f). Pub. L. 101–647 inserted at end "For purposes of this subsection, the term 'State' includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States."

1986—Subsec. (f). Pub. L. 99–646 which directed that subsec. (f) be amended by substituting "chapter 224 of this title" for "title V of the Organized Crime Control Act of 1970 (18 U.S.C. note prec. 3481)" was executed by making the substitution for "title V of the Organized Crime Control Act of 1970) 18 U.S.C. note prec. 3481)" to reflect the probable intent of Congress.

#### Statutory Notes and Related Subsidiaries

##### TRANSFER OF FUNCTIONS

For transfer of the functions, personnel, assets, and obligations of the United States Secret Service, including the functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 381, 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

##### REPORT TO CONGRESS

Pub. L. 98–473, title II, § 1603, Oct. 12, 1984, 98 Stat. 2184, directed Attorney General to report to Congress annually, during first three years following Oct. 12, 1984, concerning prosecutions under this section.

### § 1030. Fraud and related activity in connection with computers

(a) Whoever—

(1) having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y. of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

(A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n)[1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B) information from any department or agency of the United States; or

(C) information from any protected computer;

(3) intentionally, without authorization to access any nonpublic computer of a department or agency of the United States, accesses such a computer of that department or agency

---

[1] See References in Text note below.

that is exclusively for the use of the Government of the United States or, in the case of a computer not exclusively for such use, is used by or for the Government of the United States and such conduct affects that use by or for the Government of the United States;

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[2]

(6) knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if—

(A) such trafficking affects interstate or foreign commerce; or

(B) such computer is used by or for the Government of the United States;[3]

(7) with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any—

(A) threat to cause damage to a protected computer;

(B) threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

(C) demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;

shall be punished as provided in subsection (c) of this section.

(b) Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

(c) The punishment for an offense under subsection (a) or (b) of this section is—

(1)(A) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

(B) a fine under this title or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(2)(A) except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(B) a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if—

(i) the offense was committed for purposes of commercial advantage or private financial gain;

(ii) the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

(iii) the value of the information obtained exceeds $5,000; and

(C) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(3)(A) a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

(B) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4),[4] or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(4)(A) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of—

(i) an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)—

(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

---

[2] So in original. The period probably should be a semicolon.
[3] So in original. Probably should be followed by ''or''.
[4] So in original. The comma probably should not appear.

(III) physical injury to any person;

(IV) a threat to public health or safety;

(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

(VI) damage affecting 10 or more protected computers during any 1-year period; or

(ii) an attempt to commit an offense punishable under this subparagraph;

(B) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of—

(i) an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) a harm provided in subclauses (I) through (VI) of subparagraph (A)(i); or

(ii) an attempt to commit an offense punishable under this subparagraph;

(C) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 20 years, or both, in the case of—

(i) an offense or an attempt to commit an offense under subparagraphs (A) or (B) of subsection (a)(5) that occurs after a conviction for another offense under this section; or

(ii) an attempt to commit an offense punishable under this subparagraph;

(D) a fine under this title, imprisonment for not more than 10 years, or both, in the case of—

(i) an offense or an attempt to commit an offense under subsection (a)(5)(C) that occurs after a conviction for another offense under this section; or

(ii) an attempt to commit an offense punishable under this subparagraph;

(E) if the offender attempts to cause or knowingly or recklessly causes serious bodily injury from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for not more than 20 years, or both;

(F) if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for any term of years or for life, or both; or

(G) a fine under this title, imprisonment for not more than 1 year, or both, for—

(i) any other offense under subsection (a)(5); or

(ii) an attempt to commit an offense punishable under this subparagraph.

(d)(1) The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

(2) The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

(3) Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

(e) As used in this section—

(1) the term ''computer'' means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

(2) the term ''protected computer'' means a computer—

(A) exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government;

(B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States; or

(C) that—

(i) is part of a voting system; and

(ii)(I) is used for the management, support, or administration of a Federal election; or

(II) has moved in or otherwise affects interstate or foreign commerce;

(3) the term ''State'' includes the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession or territory of the United States;

(4) the term ''financial institution'' means—

(A) an institution, with deposits insured by the Federal Deposit Insurance Corporation;

(B) the Federal Reserve or a member of the Federal Reserve including any Federal Reserve Bank;

(C) a credit union with accounts insured by the National Credit Union Administration;

(D) a member of the Federal home loan bank system and any home loan bank;

(E) any institution of the Farm Credit System under the Farm Credit Act of 1971;

(F) a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934;

(G) the Securities Investor Protection Corporation;

(H) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1)

**ADD-3**

and (3) of section 1(b) of the International Banking Act of 1978); and

    (I) an organization operating under section 25 or section 25(a)[1] of the Federal Reserve Act;

    (5) the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution;

    (6) the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

    (7) the term "department of the United States" means the legislative or judicial branch of the Government or one of the executive departments enumerated in section 101 of title 5;

    (8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

    (9) the term "government entity" includes the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province, municipality, or other political subdivision of a foreign country;

    (10) the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

    (11) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

    (12) the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity;

    (13) the term "Federal election" means any election (as defined in section 301(1) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(1))) for Federal office (as defined in section 301(3) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(3))); and

    (14) the term "voting system" has the meaning given the term in section 301(b) of the Help America Vote Act of 2002 (52 U.S.C. 21081(b)).

(f) This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses[5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

(h) The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection, concerning investigations and prosecutions under subsection (a)(5).

(i)(1) The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States—

    (A) such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

    (B) any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

(2) The criminal forfeiture of property under this subsection, any seizure and disposition thereof, and any judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except subsection (d) of that section.

(j) For purposes of subsection (i), the following shall be subject to forfeiture to the United States and no property right shall exist in them:

    (1) Any personal property used or intended to be used to commit or to facilitate the commission of any violation of this section, or a conspiracy to violate this section.

    (2) Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this section, or a conspiracy to violate this section[6]

(Added Pub. L. 98–473, title II, § 2102(a), Oct. 12, 1984, 98 Stat. 2190; amended Pub. L. 99–474, § 2, Oct. 16, 1986, 100 Stat. 1213; Pub. L. 100–690, title VII, § 7065, Nov. 18, 1988, 102 Stat. 4404; Pub. L. 101–73, title IX, § 962(a)(5), Aug. 9, 1989, 103 Stat. 502; Pub. L. 101–647, title XII, § 1205(e), title XXV, § 2597(j), title XXXV, § 3533, Nov. 29, 1990, 104 Stat. 4831, 4910, 4925; Pub. L. 103–322, title XXIX, § 290001(b)–(f), Sept. 13, 1994, 108 Stat. 2097–2099; Pub. L. 104–294, title II, § 201, title VI, § 604(b)(36), Oct. 11, 1996, 110 Stat. 3491, 3508; Pub. L. 107–56, title V, § 506(a), title VIII, § 814(a)–(e), Oct. 26, 2001, 115 Stat. 366, 382–384; Pub. L. 107–273, div. B, title IV, §§ 4002(b)(1), (12), 4005(a)(3), (d)(3), Nov. 2, 2002, 116 Stat. 1807, 1808, 1812, 1813; Pub. L. 107–296, title XXII, § 2207(g), formerly title II, § 225(g), Nov. 25, 2002, 116 Stat. 2158, renumbered § 2207(g), Pub. L. 115–278, § 2(g)(2)(I), Nov. 16, 2018, 132 Stat. 4178; Pub. L. 110–326, title II, §§ 203,

---

[5] So in original. Probably should be "subclause".

[6] So in original. Probably should be followed by a period.

§1030 TITLE 18—CRIMES AND CRIMINAL PROCEDURE Page 322

204(a), 205–208, Sept. 26, 2008, 122 Stat. 3561, 3563; Pub. L. 116–179, §2, Oct. 20, 2020, 134 Stat. 855.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 11 of the Atomic Energy Act of 1954, referred to in subsec. (a)(1), is classified to section 2014 of Title 42, The Public Health and Welfare.

Section 1602(n) of title 15, referred to in subsec. (a)(2)(A), was redesignated section 1602(o) of title 15 by Pub. L. 111–203, title X, §1100A(1)(A), July 21, 2010, 124 Stat. 2107.

The Fair Credit Reporting Act, referred to in subsec. (a)(2)(A), is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, §601, Oct. 26, 1970, 84 Stat. 1127, which is classified generally to subchapter III (§1681 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

The Farm Credit Act of 1971, referred to in subsec. (e)(4)(E), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, which is classified generally to chapter 23 (§2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

Section 15 of the Securities Exchange Act of 1934, referred to in subsec. (e)(4)(F), is classified to section 78o of Title 15, Commerce and Trade.

Section 1(b) of the International Banking Act of 1978, referred to in subsec. (e)(4)(H), is classified to section 3101 of Title 12, Banks and Banking.

Section 25 of the Federal Reserve Act, referred to in subsec. (e)(4)(I), is classified to subchapter I (§601 et seq.) of chapter 6 of Title 12. Section 25(a) of the Federal Reserve Act, which is classified to subchapter II (§611 et seq.) of chapter 6 of Title 12, was renumbered section 25A of that act by Pub. L. 102–242, title I, §142(e)(2), Dec. 19, 1991, 105 Stat. 2281.

The date of the enactment of this subsection, referred to in subsec. (h), is the date of enactment of Pub. L. 103–322, which was approved Sept. 13, 1994.

#### AMENDMENTS

2020—Subsec. (e)(2)(C). Pub. L. 116–179, §2(1), added subpar. (C).

Subsec. (e)(13), (14). Pub. L. 116–179, §2(2)–(4), added pars. (13) and (14).

2008—Subsec. (a)(2)(C). Pub. L. 110–326, §203, struck out "if the conduct involved an interstate or foreign communication" after "computer".

Subsec. (a)(5). Pub. L. 110–326, §204(a)(1), redesignated cls. (i) to (iii) of subpar. (A) as subpars. (A) to (C), respectively, substituted "damage and loss." for "damage; and" in subpar. (C), and struck out former subpar. (B) which read as follows:

"(B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused)—

"(i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

"(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

"(iii) physical injury to any person;

"(iv) a threat to public health or safety; or

"(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security;".

Subsec. (a)(7). Pub. L. 110–326, §205, amended par. (7) generally. Prior to amendment, par. (7) read as follows: "with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to cause damage to a protected computer;".

Subsec. (b). Pub. L. 110–326, §206, inserted "conspires to commit or" after "Whoever".

Subsec. (c)(2)(A). Pub. L. 110–326, §204(a)(2)(A), struck out "(a)(5)(A)(iii)," after "(a)(3),".

Subsec. (c)(3)(B). Pub. L. 110–326, §204(a)(2)(B), struck out "(a)(5)(A)(iii)," after "(a)(4),".

Subsec. (c)(4). Pub. L. 110–326, §204(a)(2)(C), amended par. (4) generally. Prior to amendment, par. (4) related to fines and imprisonment for intentionally or recklessly causing damage to a protected computer without authorization.

Subsec. (c)(5). Pub. L. 110–326, §204(a)(2)(D), struck out par. (5) which related to fine or imprisonment for knowingly or recklessly causing or attempting to cause serious bodily injury or death from certain conduct damaging a protected computer.

Subsec. (e)(2)(B). Pub. L. 110–326, §207, inserted "or affecting" after "which is used in".

Subsec. (g). Pub. L. 110–326, §204(a)(3)(B), in the third sentence, substituted "subsection (c)(4)(A)(i)(I)" for "subsection (a)(5)(B)(i)".

Pub. L. 110–326, §204(a)(3)(A), which directed substitution of "in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)" for "in clauses (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)" in the second sentence, was executed by making the substitution for "in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)" to reflect the probable intent of Congress.

Subsecs. (i), (j). Pub. L. 110–326, §208, added subsecs. (i) and (j).

2002—Subsec. (a)(5)(B). Pub. L. 107–273, §4005(a)(3), realigned margins.

Subsec. (c)(2)(B). Pub. L. 107–273, §4002(b)(1), realigned margins.

Subsec. (c)(2)(B)(iii). Pub. L. 107–273, §4002(b)(12)(A), inserted "and" at end.

Subsec. (c)(3)(B). Pub. L. 107–273, §4005(d)(3), inserted comma after "(a)(4)".

Subsec. (c)(4)(A), (C). Pub. L. 107–296, §2207(g)(2), formerly §225(g)(2), as renumbered by Pub. L. 115–278, §2(g)(2)(I), inserted "except as provided in paragraph (5)," before "a fine under this title".

Subsec. (c)(5). Pub. L. 107–296, §2207(g)(1), (3), (4), formerly §225(g)(1), (3), (4), as renumbered by Pub. L. 115–278, §2(g)(2)(I), added par. (5).

Subsec. (e)(4)(I). Pub. L. 107–273, §4002(b)(12)(B), substituted semicolon for period at end.

2001—Subsec. (a)(5)(A). Pub. L. 107–56, §814(a)(1)–(3), designated existing provisions as cl. (i), redesignated subpars. (B) and (C) as cls. (ii) and (iii), respectively, of subpar. (A), and inserted "and" at end of cl. (iii).

Subsec. (a)(5)(B). Pub. L. 107–56, §814(a)(4), added subpar. (B). Former subpar. (B) redesignated cl. (ii) of subpar. (A).

Subsec. (a)(5)(C). Pub. L. 107–56, §814(a)(2), redesignated subpar. (C) as cl. (iii) of subpar. (A).

Subsec. (a)(7). Pub. L. 107–56, §814(b), struck out ", firm, association, educational institution, financial institution, government entity, or other legal entity," before "any money or other thing of value".

Subsec. (c)(2)(A). Pub. L. 107–56, §814(c)(1)(A), inserted "except as provided in subparagraph (B)," before "a fine", substituted "(a)(5)(A)(iii)" for "(a)(5)(C)", and struck out "and" at end.

Subsec. (c)(2)(B). Pub. L. 107–56, §814(c)(1)(B), inserted "or an attempt to commit an offense punishable under this subparagraph," after "subsection (a)(2)," in introductory provisions.

Subsec. (c)(2)(C). Pub. L. 107–56, §814(c)(1)(C), struck out "and" at end.

Subsec. (c)(3). Pub. L. 107–56, §814(c)(2), struck out ", (a)(5)(A), (a)(5)(B)," after "subsection (a)(4)" in subpars. (A) and (B) and substituted "(a)(5)(A)(iii)" for "(a)(5)(C)" in subpar. (B).

Subsec. (c)(4). Pub. L. 107–56, §814(c)(3), added par. (4).

Subsec. (d). Pub. L. 107–56, §506(a), amended subsec. (d) generally. Prior to amendment, subsec. (d) read as

follows: "The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under subsections (a)(2)(A), (a)(2)(B), (a)(3), (a)(4), (a)(5), and (a)(6) of this section. Such authority of the United States Secret Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.''

Subsec. (e)(2)(B). Pub. L. 107–56, § 814(d)(1), inserted '', including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States'' before semicolon.

Subsec. (e)(7). Pub. L. 107–56, § 814(d)(2), struck out ''and'' at end.

Subsec. (e)(8). Pub. L. 107–56, § 814(d)(3), added par. (8) and struck out former par. (8) which read as follows: ''the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information, that—

''(A) causes loss aggregating at least $5,000 in value during any 1-year period to one or more individuals;

''(B) modifies or impairs, or potentially modifies or impairs, the medical examination, diagnosis, treatment, or care of one or more individuals;

''(C) causes physical injury to any person; or

''(D) threatens public health or safety; and''.

Subsec. (e)(10) to (12). Pub. L. 107–56, § 814(d)(4), (5), added pars. (10) to (12).

Subsec. (g). Pub. L. 107–56, § 814(e), substituted ''A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages.'' for ''Damages for violations involving damage as defined in subsection (e)(8)(A) are limited to economic damages.'' and inserted at end ''No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.''

1996—Subsec. (a)(1). Pub. L. 104–294, § 201(1)(A), substituted ''having knowingly accessed'' for ''knowingly accesses'', ''exceeding authorized access'' for ''exceeds authorized access'', ''such conduct having obtained information'' for ''such conduct obtains information'', and ''could be used to the injury of the United States'' for ''is to be used to the injury of the United States'', struck out ''the intent or'' before ''reason to believe'', and inserted before semicolon at end ''willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it''.

Subsec. (a)(2). Pub. L. 104–294, § 201(1)(B), inserted dash after ''thereby obtains'', redesignated remainder of par. (2) as subpar. (A), and added subpars. (B) and (C).

Subsec. (a)(3). Pub. L. 104–294, § 201(1)(C), inserted ''nonpublic'' before ''computer of a department or agency'', struck out ''adversely'' after ''and such conduct'', and substituted ''that use by or for the Government of the United States'' for ''the use of the Government's operation of such computer''.

Subsec. (a)(4). Pub. L. 104–294, § 201(1)(D), substituted ''protected computer'' for ''Federal interest computer'' and inserted ''and the value of such use is not more than $5,000 in any 1-year period'' before semicolon at end.

Subsec. (a)(5). Pub. L. 104–294, § 201(1)(E), inserted par. (5) and struck out former par. (5) which related to fraud in connection with computers in causing transmission of program, information, code, or command to a computer or computer system in interstate or foreign commerce which damages such system, program, information, or code, or causes a withholding or denial of use of hardware or software, or transmits viruses which causes damage in excess of $1,000 or more during any

one-year period, or modifies or impairs medical examination, diagnosis, treatment or care of individuals.

Subsec. (a)(5)(B)(ii)(II)(bb). Pub. L. 104–294, § 604(b)(36)(A), which directed insertion of ''or'' at end of subsec., could not be executed because no subsec. (a)(5)(B)(ii)(II)(bb) existed subsequent to amendment by Pub. L. 104–294, § 201(1)(E). See above.

Subsec. (a)(7). Pub. L. 104–294, § 201(1)(F), added par. (7).

Subsec. (c)(1). Pub. L. 104–294, § 201(2)(A), substituted ''under this section'' for ''under such subsection'' in subpars. (A) and (B).

Subsec. (c)(1)(B). Pub. L. 104–294, § 604(b)(36)(B), struck out ''and'' after semicolon at end.

Subsec. (c)(2)(A). Pub. L. 104–294, § 201(2)(B)(i), inserted '', (a)(5)(C),'' after ''(a)(3)'' and substituted ''under this section'' for ''under such subsection''.

Subsec. (c)(2)(B). Pub. L. 104–294, § 201(2)(B)(iii), added subpar. (B). Former subpar. (B) redesignated (C).

Subsec. (c)(2)(C). Pub. L. 104–294, § 201(2)(B)(iv), substituted ''under this section'' for ''under such subsection'' and inserted ''and'' at end.

Pub. L. 104–294, § 201(2)(B)(ii), redesignated subpar. (B) as (C).

Subsec. (c)(3)(A). Pub. L. 104–294, § 201(2)(C)(i), substituted ''(a)(4), (a)(5)(A), (a)(5)(B), or (a)(7)'' for ''(a)(4) or (a)(5)(A)'' and ''under this section'' for ''under such subsection''.

Subsec. (c)(3)(B). Pub. L. 104–294, § 201(2)(C)(ii), substituted ''(a)(4), (a)(5)(A), (a)(5)(B), (a)(5)(C), or (a)(7)'' for ''(a)(4) or (a)(5)'' and ''under this section'' for ''under such subsection''.

Subsec. (c)(4). Pub. L. 104–294, § 201(2)(D), struck out par. (4) which read as follows: ''a fine under this title or imprisonment for not more than 1 year, or both, in the case of an offense under subsection (a)(5)(B).''

Subsec. (d). Pub. L. 104–294, § 201(3), inserted ''subsections (a)(2)(A), (a)(2)(B), (a)(3), (a)(4), (a)(5), and (a)(6) of'' before ''this section'' in first sentence.

Subsec. (e)(2). Pub. L. 104–294, § 201(4)(A)(i), substituted ''protected'' for ''Federal interest'' in introductory provisions.

Subsec. (e)(2)(A). Pub. L. 104–294, § 201(4)(A)(ii), substituted ''that use by or for the financial institution or the Government'' for ''the use of the financial institution's operation or the Government's operation of such computer''.

Subsec. (e)(2)(B). Pub. L. 104–294, § 201(4)(A)(iii), added subpar. (B) and struck out former subpar. (B) which read as follows: ''which is one of two or more computers used in committing the offense, not all of which are located in the same State;''.

Subsec. (e)(8), (9). Pub. L. 104–294, § 201(4)(B)–(D), added pars. (8) and (9).

Subsec. (g). Pub. L. 104–294, § 604(b)(36)(C), substituted ''violation of this section'' for ''violation of the section''.

Pub. L. 104–294, § 201(5), struck out '', other than a violation of subsection (a)(5)(B),'' before ''may maintain a civil action'' and substituted ''involving damage as defined in subsection (e)(8)(A)'' for ''of any subsection other than subsection (a)(5)(A)(ii)(II)(bb) or (a)(5)(B)(ii)(II)(bb)''.

Subsec. (h). Pub. L. 104–294, § 604(b)(36)(D), substituted ''subsection (a)(5)'' for ''section 1030(a)(5) of title 18, United States Code'' before period at end.

1994—Subsec. (a)(3). Pub. L. 103–322, § 290001(f), inserted ''adversely'' before ''affects the use of the Government's''.

Subsec. (a)(5). Pub. L. 103–322, § 290001(b), amended par. (5) generally. Prior to amendment, par. (5) read as follows: ''intentionally accesses a Federal interest computer without authorization, and by means of one or more instances of such conduct alters, damages, or destroys information in any such Federal interest computer, or prevents authorized use of any such computer or information, and thereby—

''(A) causes loss to one or more others of a value aggregating $1,000 or more during any one year period; or

§ 1031                    TITLE 18—CRIMES AND CRIMINAL PROCEDURE                    Page 324

''(B) modifies or impairs, or potentially modifies or impairs, the medical examination, medical diagnosis, medical treatment, or medical care of one or more individuals; or''.

Subsec. (c)(3)(A). Pub. L. 103–322, §290001(c)(2), inserted ''(A)'' after ''(a)(5)''.

Subsec. (c)(4). Pub. L. 103–322, §290001(c)(1), (3), (4), added par. (4).

Subsec. (g). Pub. L. 103–322, §290001(d), added subsec. (g).

Subsec. (h). Pub. L. 103–322, §290001(e), added subsec. (h).

1990—Subsec. (a)(1). Pub. L. 101–647, §3533, substituted ''paragraph y'' for ''paragraph r''.

Subsec. (e)(3). Pub. L. 101–647, §1205(e), inserted ''commonwealth,'' before ''possession or territory of the United States''.

Subsec. (e)(4)(G). Pub. L. 101–647, §2597(j)(2), which directed substitution of a semicolon for a period at end of subpar. (G), could not be executed because it ended with a semicolon.

Subsec. (e)(4)(H), (I). Pub. L. 101–647, §2597(j), added subpars. (H) and (I).

1989—Subsec. (e)(4)(A). Pub. L. 101–73, §962(a)(5)(A), substituted ''an institution,'' for ''a bank''.

Subsec. (e)(4)(C) to (H). Pub. L. 101–73, §962(a)(5)(B), (C), redesignated subpars. (D) to (H) as (C) to (G), respectively, and struck out former subpar. (C) which read as follows: ''an institution with accounts insured by the Federal Savings and Loan Insurance Corporation;''.

1988—Subsec. (a)(2). Pub. L. 100–690 inserted a comma after ''financial institution'' and struck out the comma that followed a comma after ''title 15''.

1986—Subsec. (a). Pub. L. 99–474, §2(b)(2), struck out last sentence which read as follows: ''It is not an offense under paragraph (2) or (3) of this subsection in the case of a person having accessed a computer with authorization and using the opportunity such access provides for purposes to which such access does not extend, if the using of such opportunity consists only of the use of the computer.''

Subsec. (a)(1). Pub. L. 99–474, §2(c), substituted ''or exceeds authorized access'' for '', or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend''.

Subsec. (a)(2). Pub. L. 99–474, §2(a), (c), substituted ''intentionally'' for ''knowingly'', substituted ''or exceeds authorized access'' for '', or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend'', struck out ''as such terms are defined in the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.),'' after ''financial institution,'', inserted ''or of a card issuer as defined in section 1602(n) of title 15,'' and struck out ''or'' appearing at end.

Subsec. (a)(3). Pub. L. 99–474, §2(b)(1), amended par. (3) generally. Prior to amendment, par. (3) read as follows: ''knowingly accesses a computer without authorization, or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend, and by means of such conduct knowingly uses, modifies, destroys, or discloses information in, or prevents authorized use of, such computer, if such computer is operated for or on behalf of the Government of the United States and such conduct affects such operation;''.

Subsec. (a)(4) to (6). Pub. L. 99–474, §2(d), added pars. (4) to (6).

Subsec. (b). Pub. L. 99–474, §2(e), struck out par. (1) designation and par. (2) which provided a penalty for persons conspiring to commit an offense under subsec. (a).

Subsec. (c). Pub. L. 99–474, §2(f)(9), substituted ''(b)'' for ''(b)(1)'' in introductory text.

Subsec. (c)(1)(A). Pub. L. 99–474, §2(f)(1), substituted ''under this title'' for ''of not more than the greater of $10,000 or twice the value obtained by the offense''.

Subsec. (c)(1)(B). Pub. L. 99–474, §2(f)(2), substituted ''under this title'' for ''of not more than the greater of $100,000 or twice the value obtained by the offense''.

Subsec. (c)(2)(A). Pub. L. 99–474, §2(f)(3), (4), substituted ''under this title'' for ''of not more than the greater of $5,000 or twice the value obtained or loss created by the offense'' and inserted reference to subsec. (a)(6).

Subsec. (c)(2)(B). Pub. L. 99–474, §2(f)(3), (5)–(7), substituted ''under this title'' for ''of not more than the greater of $10,000 or twice the value obtained or loss created by the offense'', ''not more than'' for ''not than'', inserted reference to subsec. (a)(6), and substituted ''; and'' for the period at end of subpar. (B).

Subsec. (c)(3). Pub. L. 99–474, §2(f)(8), added par. (3).

Subsec. (e). Pub. L. 99–474, §2(g), substituted a dash for the comma after ''As used in this section'', realigned remaining portion of subsection, inserted ''(1)'' before ''the term'', substituted a semicolon for the period at the end, and added pars. (2) to (7).

Subsec. (f). Pub. L. 99–474, §2(h), added subsec. (f).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–296 effective 60 days after Nov. 25, 2002, see section 4 of Pub. L. 107–296, set out as an Effective Date note under section 101 of Title 6, Domestic Security.

#### TRANSFER OF FUNCTIONS

For transfer of the functions, personnel, assets, and obligations of the United States Secret Service, including the functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 381, 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

#### REPORTS TO CONGRESS

Pub. L. 98–473, title II, §2103, Oct. 12, 1984, 98 Stat. 2192, directed Attorney General to report to Congress annually, during first three years following Oct. 12, 1984, concerning prosecutions under this section.

### § 1031. Major fraud against the United States

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, including through the Troubled Asset Relief Program, an economic stimulus, recovery or rescue plan provided by the Government, or the Government's purchase of any troubled asset as defined in the Emergency Economic Stabilization Act of 2008, or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

(b) The fine imposed for an offense under this section may exceed the maximum otherwise provided by law, if such fine does not exceed $5,000,000 and—

98 STAT. 2190          PUBLIC LAW 98-473—OCT. 12, 1984

Penalties.
49 USC app.
1472.

(d)(1) Section 902(m) of the Federal Aviation Act of 1958 (49 U.S.C. 1472(m)) is amended to read as follows:

"FALSE INFORMATION AND THREATS

"(m)(1) Whoever willfully and maliciously, or with reckless disregard for the safety of human life, imparts or conveys or causes to be imparted or conveyed false information, knowing the information to be false and under circumstances in which such information may reasonably be believed, concerning an attempt or alleged attempt being made or to be made, to do any act which would be a felony prohibited by subsection (i), (j), (k), or (l) of this section, shall be fined not more than $25,000 or imprisoned not more than five years, or both.

"(2) Whoever imparts or conveys or causes to be imparted or conveyed any threat to do an act which would be a felony prohibited by subsection (i), (j), (k), or (l) of this section with an apparent determination and will to carry the threat into execution shall be fined not more than $25,000 or imprisoned not more than five years, or both.".

(2) That portion of the table of contents contained in the first section of the Federal Aviation Act of 1958 which appears under the side heading

"Sec. 902. Criminal penalties."

is amended by striking out

"(m) False information."

and inserting in lieu thereof

"(m) False information and threats.".

Effective date.
18 USC 31 note.

SEC. 2015. This part shall become effective on the date of the enactment of this joint resolution.

Counterfeit Access Device and Computer Fraud and Abuse Act of 1984.
18 USC 1001 note.

CHAPTER XXI—ACCESS DEVICES AND COMPUTERS

SEC. 2101. This chapter may be cited as the "Counterfeit Access Device and Computer Fraud and Abuse Act of 1984".

SEC. 2102. (a) Chapter 47 of title 18 of the United States Code as amended by chapter XVI of this joint resolution is further amended by adding at the end thereof the following:

Penalties.
18 USC 1030.

"§ 1030. Fraud and related activity in connection with computers

"(a) Whoever—

"(1) knowingly accesses a computer without authorization, or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend, and by means of such conduct obtains information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph r. of section 11 of the Atomic Energy Act of 1954, with the intent or reason to believe that such information so obtained is to be used to the injury of the United States, or to the advantage of any foreign nation;

42 USC 2014.

"(2) knowingly accesses a computer without authorization, or having accessed a computer with authorization, uses the oppor-

PUBLIC LAW 98-473—OCT. 12, 1984          98 STAT. 2191

tunity such access provides for purposes to which such authorization does not extend, and thereby obtains information contained in a financial record of a financial institution, as such terms are defined in the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.), or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.); or

"(3) knowingly accesses a computer without authorization, or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend, and by means of such conduct knowingly uses, modifies, destroys, or discloses information in, or prevents authorized use of, such computer, if such computer is operated for or on behalf of the Government of the United States and such conduct affects such operation;

shall be punished as provided in subsection (c) of this section. It is not an offense under paragraph (2) or (3) of this subsection in the case of a person having accessed a computer with authorization and using the opportunity such access provides for purposes to which such access does not extend, if the using of such opportunity consists only of the use of the computer.

"(b)(1) Whoever attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

"(2) Whoever is a party to a conspiracy of two or more persons to commit an offense under subsection (a) of this section, if any of the parties engages in any conduct in furtherance of such offense, shall be fined an amount not greater than the amount provided as the maximum fine for such offense under subsection (c) of this section or imprisoned not longer than one-half the period provided as the maximum imprisonment for such offense under subsection (c) of this section, or both.

"(c) The punishment for an offense under subsection (a) or (b)(1) of this section is—

"(1)(A) a fine of not more than the greater of $10,000 or twice the value obtained by the offense or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense under such subsection, or an attempt to commit an offense punishable under this subparagraph; and

"(B) a fine of not more than the greater of $100,000 or twice the value obtained by the offense or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under such subsection, or an attempt to commit an offense punishable under this subparagraph; and

"(2)(A) a fine of not more than the greater of $5,000 or twice the value obtained or loss created by the offense or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2) or (a)(3) of this section which does not occur after a conviction for another offense under such subsection, or an attempt to commit an offense punishable under this subparagraph; and

"(B) a fine of not more than the greater of $10,000 or twice the value obtained or loss created by the offense or imprisonment for not than ten years, or both, in the case of an offense under subsection (a)(2) or (a)(3) of this section which occurs after

98 STAT. 2192          PUBLIC LAW 98-473—OCT. 12, 1984

a conviction for another offense under such subsection, or an attempt to commit an offense punishable under this subparagraph.

U.S. Secret Service, investigations.

"(d) The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section. Such authority of the United States Secret Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

"(e) As used in this section, the term 'computer' means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.".

(b) The table of sections at the beginning of chapter 47 of title 18 of the United States Code is amended by adding at the end the following new items:

"1030. Fraud and related activity in connection with computers.".

Report.
18 USC 1030 note.

SEC. 2103. The Attorney General shall report to the Congress annually, during the first three years following the date of the enactment of this joint resolution, concerning prosecutions under the sections of title 18 of the United States Code added by this chapter.

## CHAPTER XXII

State and local governments.
Labor relations.
29 USC 524a.

SEC. 2201. Notwithstanding this or any other Act regulating labor-management relations, each State shall have the authority to enact and enforce, as part of a comprehensive statutory system to eliminate the threat of pervasive racketeering activity in an industry that is, or over time has been, affected by such activity, a provision of law that applies equally to employers, employees, and collective bargaining representatives, which provision of law governs service in any position in a local labor organization which acts or seeks to act in that State as a collective bargaining representative pursuant to the National Labor Relations Act, in the industry that is subject to that program.

29 USC 167.

## CHAPTER XXIII

Penalties.
*Ante*, p. 2040.

SEC. 2301. (a) Subsection (a) of section 1963 of title 18 of the United States Code, as amended by chapter III of this title, is further amended by adding at the end the following: "In lieu of a fine otherwise authorized by this section, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds."

(b) Section 1963 of title 18 of the United States Code, as amended by chapter III of this title, is further amended by striking out subsection (d).

(c) Section 1963 (m)(1) of title 18 of the United States Code, as amended by chapter III of this title, is further amended by striking out "for at least seven successive court days".

21 USC 853.

(d) Section 413(a) of title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended by chapter III of this title, is further amended by adding at the end the following: "In lieu of a fine otherwise authorized by this part, a defendant who



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**PENAL CODE**

**Section 502**

---

502.  (a)  It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b)  For the purposes of this section, the following terms have the following meanings:

(1)  "Access" means to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2)  "Computer network" means any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities.

(3)  "Computer program or software" means a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4)  "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network.

(5)  "Computer system" means a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control. A "computer system" includes, without limitation, any such device or system that is located within, connected to, or otherwise integrated with, any motor vehicle as defined in Section 415 of the Vehicle Code.

**ADD-11**

(6) "Government computer system" means any computer system, or part thereof, that is owned, operated, or used by any federal, state, or local governmental entity.

(7) "Public safety infrastructure computer system" means any computer system, or part thereof, that is necessary for the health and safety of the public including computer systems owned, operated, or used by drinking water and wastewater treatment facilities, hospitals, emergency service providers, telecommunication companies, and gas and electric utility companies.

(8) "Data" means a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

(9) "Supporting documentation" includes, but is not limited to, all information, in any form, pertaining to the design, construction, classification, implementation, use, or modification of a computer, computer system, computer network, computer program, or computer software, which information is not generally available to the public and is necessary for the operation of a computer, computer system, computer network, computer program, or computer software.

(10) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(11) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(12) "Computer contaminant" means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network.

(13) "Internet domain name" means a globally unique, hierarchical reference to an internet host or service, assigned through centralized internet naming authorities, comprising a series of character strings separated by periods, with the rightmost character string specifying the top of the hierarchy.

(14) "Electronic mail" means an electronic message or computer file that is transmitted between two or more telecommunications devices; computers; computer networks, regardless of whether the network is a local, regional, or global network; or electronic devices capable of receiving electronic messages, regardless of whether the message is converted to hard copy format after receipt, viewed upon transmission, or stored for later retrieval.

(15) "Profile" means either of the following:

(A)  A configuration of user data required by a computer so that the user may access programs or services and have the desired functionality on that computer.

(B)  An Internet website user's personal page or section of a page that is made up of data, in text or graphical form, that displays significant, unique, or identifying information, including, but not limited to, listing acquaintances, interests, associations, activities, or personal statements.

(c)  Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

(1)  Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2)  Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3)  Knowingly and without permission uses or causes to be used computer services.

(4)  Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5)  Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6)  Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7)  Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(8)  Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

(9)  Knowingly and without permission uses the internet domain name or profile of another individual, corporation, or entity in connection with the sending of one or more electronic mail messages or posts and thereby damages or causes damage to a computer, computer data, computer system, or computer network.

(10)  Knowingly and without permission disrupts or causes the disruption of government computer services or denies or causes the denial of government computer services to an authorized user of a government computer, computer system, or computer network.

(11)  Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a public safety infrastructure computer system computer, computer system, or computer network.

(12)  Knowingly and without permission disrupts or causes the disruption of public safety infrastructure computer system computer services or denies or causes the denial

**ADD-13**

of computer services to an authorized user of a public safety infrastructure computer system computer, computer system, or computer network.

(13) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or public safety infrastructure computer system computer, computer system, or computer network in violation of this section.

(14) Knowingly introduces any computer contaminant into any public safety infrastructure computer system computer, computer system, or computer network.

(d) (1) Any person who violates any of the provisions of paragraph (1), (2), (4), (5), (10), (11), or (12) of subdivision (c) is guilty of a felony, punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years and a fine not exceeding ten thousand dollars ($10,000), or a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, by a fine not exceeding five thousand dollars ($5,000), or by both that fine and imprisonment.

(2) Any person who violates paragraph (3) of subdivision (c) is punishable as follows:

(A) For the first violation that does not result in injury, and where the value of the computer services used does not exceed nine hundred fifty dollars ($950), by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000) or in an injury, or if the value of the computer services used exceeds nine hundred fifty dollars ($950), or for any second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(3) Any person who violates paragraph (6), (7), or (13) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B) For any violation that results in a victim expenditure in an amount not greater than five thousand dollars ($5,000), or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(C) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000), by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(4) Any person who violates paragraph (8) or (14) of subdivision (c) is punishable as follows:

**ADD-14**

(A)  For a first violation that does not result in injury, a misdemeanor punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(B)  For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(5)  Any person who violates paragraph (9) of subdivision (c) is punishable as follows:

(A)  For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B)  For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(e)  (1)  In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

(2)  In any action brought pursuant to this subdivision the court may award reasonable attorney's fees.

(3)  A community college, state university, or academic institution accredited in this state is required to include computer-related crimes as a specific violation of college or university student conduct policies and regulations that may subject a student to disciplinary sanctions up to and including dismissal from the academic institution. This paragraph shall not apply to the University of California unless the Board of Regents adopts a resolution to that effect.

(4)  In any action brought pursuant to this subdivision for a willful violation of the provisions of subdivision (c), where it is proved by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice as defined in subdivision (c) of Section 3294 of the Civil Code, the court may additionally award punitive or exemplary damages.

(5)  No action may be brought pursuant to this subdivision unless it is initiated within three years of the date of the act complained of, or the date of the discovery of the damage, whichever is later.

(f)  This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any

transaction, nor shall it make illegal any employee labor relations activities that are within the scope and protection of state or federal labor laws.

(g)  Any computer, computer system, computer network, or any software or data, owned by the defendant, that is used during the commission of any public offense described in subdivision (c) or any computer, owned by the defendant, which is used as a repository for the storage of software or data illegally obtained in violation of subdivision (c) shall be subject to forfeiture, as specified in Section 502.01.

(h)  (1)  Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of lawful employment. For purposes of this section, a person acts within the scope of employment when the person performs acts which are reasonably necessary to the performance of their work assignment.

(2)  Paragraph (3) of subdivision (c) does not apply to penalize any acts committed by a person acting outside of their lawful employment, provided that the employee's activities do not cause an injury, to the employer or another, or provided that the value of supplies or computer services which are used does not exceed an accumulated total of two hundred fifty dollars ($250).

(i)  No activity exempted from prosecution under paragraph (2) of subdivision (h) which incidentally violates paragraph (2), (4), or (7) of subdivision (c) shall be prosecuted under those paragraphs.

(j)  For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

(k)  In determining the terms and conditions applicable to a person convicted of a violation of this section the court shall consider the following:

(1)  The court shall consider prohibitions on access to and use of computers.

(2)  Except as otherwise required by law, the court shall consider alternate sentencing, including community service, if the defendant shows remorse and recognition of the wrongdoing, and an inclination not to repeat the offense.

(Amended by Stats. 2019, Ch. 16, Sec. 1.  (AB 814)  Effective January 1, 2020.)

# Volume 3

# STATUTES OF CALIFORNIA

## AND DIGESTS OF MEASURES

## 1987

Constitution of 1879 as Amended

General Laws, Amendments to the Codes,
and Resolutions passed by the
California Legislature

## 1987–88 Regular Session
## 1987–88 First Extraordinary Session



*Compiled by*
**BION M. GREGORY**
*Legislative Counsel*

admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294. Evidence of profit and financial condition shall be admissible only as to the defendant or defendants found to be liable to the plaintiff and to be guilty of malice, oppression, or fraud. Evidence of profit and financial condition shall be presented to the same trier of fact that found for the plaintiff and found one or more defendants guilty of malice, oppression, or fraud.

(e) No claim for exemplary damages shall state an amount or amounts.

(f) The amendments to this section made by Senate Bill No. 241 of the 1987–88 Regular Session apply to all actions in which the initial trial has not commenced prior to January 1, 1988.

SEC. 7.  Section 425.13 is added to the Code of Civil Procedure, to read:

425.13.  No claim for punitive damages against a health care provider shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code. The court shall not grant a motion allowing the filing of an amended pleading that includes a claim for punitive damages if the motion for such an order is not filed within two years after the complaint or initial pleading is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier.

---

## CHAPTER 1499

An act to repeal and add Section 502 of the Penal Code, and to amend Section 653.5 of, and to add Section 653.1 to, the Welfare and Institutions Code, relating to crimes.

[Approved by Governor September 30, 1987. Filed with
Secretary of State September 30, 1987 ]

*The people of the State of California do enact as follows:*

SECTION 1.  This act shall be known and may be cited as the "Comprehensive Computer Data Access and Fraud Act."

SEC. 2.  Section 502 of the Penal Code is repealed.

SEC. 3.  Section 502 is added to the Penal Code, to read:

502.  (a) It is the intent of the Legislature in enacting this section

to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means two or more computer systems connected by telecommunication facilities.

(3) "Computer program or software" means a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network.

(5) "Computer system" means a device or collection of devices, including support devices and excluding calculators which are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control.

(6) "Data" means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

(7) "Supporting documentation" includes, but is not limited to, all information, in any form, pertaining to the design, construction, classification, implementation, use, or modification of a computer, computer system, computer network, computer program, or computer software, which information is not generally available to the public and is necessary for the operation of a computer, computer system, computer network, computer program, or computer software.

**ADD-19**

165240

(8) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access.

(9) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(c) Except as provided in subdivision (i), any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(d) (1) Any person who violates any of the provisions of paragraph (1), (2), (4), or (5) of subdivision (c) is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(2) Any person who violates paragraph (3) of subdivision (c) is punishable as follows:

(A) For the first violation which does not result in injury, and where the value of the computer services used does not exceed four hundred dollars ($400), by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation which results in a victim expenditure in an

amount greater than five thousand dollars ($5,000) or in an injury, or if the value of the computer services used exceeds four hundred dollars ($400), or for any second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(3) Any person who violates paragraph (6) or (7) of subdivision (c) is punishable as follows:

(A) For a first violation which does not result in injury, an infraction punishable by a fine not exceeding two hundred fifty dollars ($250).

(B) For any violation which results in a victim expenditure in an amount not greater than five thousand dollars ($5,000), or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(C) For any violation which results in a victim expenditure in an amount greater than five thousand dollars ($5,000), by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(e) (1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data may bring a civil action against any person convicted under this section for compensatory damages, including any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

(2) In any action brought pursuant to this subdivision the court may award reasonable attorney's fees to a prevailing party.

(f) This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any transaction, nor shall it make illegal any employee labor relations activities that are within the scope and protection of state or federal labor laws.

(g) This section applies only to public offenses committed on or after January 1, 1988. It is the intent of the Legislature that this section be given no retroactive effect and persons who commit a violation of the provisions of Section 502 in effect prior to January 1, 1988, shall be held responsible therefor.

**ADD-21**

(h) Any computer, computer system, computer program, instrument, apparatus, device, plans, instructions, or written publication used in the commission of any public offense described in subdivision (c) may be seized under warrant or incident to a lawful arrest. Any property seized under this subdivision is subject to forfeiture pursuant to Section 502.01.

(i) (1) Subdivision (c) does not apply to any person who accesses his or her employer's computer system, computer network, computer program, or data when acting within the scope of his or her lawful employment.

(2) Paragraph (3) of subdivision (c) does not apply to any employee who accesses or uses his or her employer's computer system, computer network, computer program, or data when acting outside the scope of his or her lawful employment, so long as the employee's activities do not cause an injury, as defined in paragraph (8) of subdivision (b), to the employer or another, or so long as the value of computer services, as defined in, paragraph (4) of subdivision (b), which are used do not exceed one hundred dollars ($100).

(j) ·No activity exempted from prosecution under paragraph (2) of subdivision ·(i) which incidentally violates paragraph (2), (4), or (7) of subdivision (c) shall be prosecuted under those paragraphs.

(k) For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

SEC. 4. Section 653.1 is added to the Welfare and Institutions Code, to read:

653.1. Notwithstanding Section 653, in the case of an affidavit alleging that the minor committed an offense described in Section 602, the probation officer shall cause the affidavit to be immediately taken to the prosecuting attorney if it appears to the probation · officer that the minor has been referred to the probation officer for any violation of an offense listed in subdivision (b) of Section 707 and that offense was allegedly committed when the minor was 16 years of age or older. If the prosecuting attorney decides not to file a petition, he or she may return the affidavit to the probation officer for any other appropriate action.

· SEC. 5. Section 653.5 of the Welfare and Institutions Code is amended to read:

653.5. (a) Whenever any person applies to the probation officer to commence proceedings in the juvenile court, the application shall be in the form of an affidavit alleging that there was or is within the county, or residing therein, a minor within the provisions of Section 602, or that a minor committed an offense described in Section 602 within the county, and setting forth facts in support thereof. The probation officer shall immediately make any investigation he or she

deems necessary to determine whether proceedings in the juvenile court shall be commenced.

(b)   Except as provided in subdivision (c), if the probation officer determines that proceedings pursuant to Section 650 should be commenced to declare a person to be a ward of the juvenile court on the basis that he or she is a person described in Section 602, the probation officer shall cause the affidavit to be taken to the prosecuting attorney.

(c) Notwithstanding the provisions of subdivision (b), the probation officer shall cause the affidavit to be taken within 48 hours to the prosecuting attorney in all of the following cases:

(1)  If it appears to the probation officer that the minor has been referred to the probation officer for any violation of an offense listed in subdivision (b) of Section 707.

(2)  If it appears to the probation officer that the minor is under 16 years of age at the date of the offense and that the offense constitutes a second felony referral to the probation officer.

(3)  If it appears to the probation officer that the minor was 16 years of age or older at the date of the offense and that the offense constitutes a felony referral to the probation officer.

The provisions of subdivision (c) shall not apply to a narcotics and drug offense set forth in Section 1000 of the Penal Code.

The prosecuting attorney shall within his or her discretionary power institute proceedings in accordance with his or her role as public prosecutor pursuant to subdivision (b) of Section 650 and Section 26500 of the Government Code. However, if it appears to the prosecuting attorney that the affidavit was not properly referred, that the offense for which the minor was referred should be charged as a misdemeanor, or that the minor may benefit from a program of informal supervision, he or she shall refer the matter to the probation officer for whatever action the probation officer may deem appropriate.

(d)   In all matters where the minor is not in custody and is already a ward of the court or a probationer under Section 602, the prosecuting attorney, within five judicial days of receipt of the affidavit from the probation officer, shall institute proceedings in accordance with his or her role as public prosecutor pursuant to subdivision (b) of Section 650 of this code and Section 26500 of the Government Code, unless it appears to the prosecuting attorney that the affidavit was not properly referred or that the offense for which the minor was referred requires additional substantiating information, in which case he or she shall immediately notify the probation officer of what further action he or she is taking.

SEC. 6.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution for those costs which may be incurred by a local agency or school district because this act creates a new crime or infraction, changes the definition of a crime or infraction, changes the penalty for a crime or infraction, or eliminates a crime or infraction.

However, notwithstanding Section 17610 of the Government Code, if the commission on State Mandates determines that this act contains other costs mandated by the state, reimbursement to local agencies and school districts for those costs shall be made pursuant to Part 7 (commencing with Section 17500) of Division 4 of Title 2 of the Government Code. If the statewide cost of the claim for reimbursement does not exceed five hundred thousand dollars ($500,000), reimbursement shall be made from the State Mandates Claims Fund.

----

## CHAPTER 1500

An act to add Chapter 5.7 (commencing with Section 92590) to Part 57 of the Education Code, relating to manufacturing and automation research, and making an appropriation therefor.

[Approved by Governor September 30, 1987  Filed with
Secretary of State September 30, 1987.]

I am deleting the $200,000 appropriation contained in Section 2 of Senate Bill No. 1647

This bill would appropriate $200,000 to support the University of California Institute for Manufacturing and Automation

The demands placed on budget resources require all of us to set priorities. The budget enacted in July, 1987 appropriated nearly $41 billion in state funds. This amount is more than adequate to provide the necessary essential services provided for by State Government. It is not necessary to put additional pressure on taxpayer funds for programs that fall beyond the priorities currently provided

Thus, after reviewing this legislation, I have concluded that its merits do not sufficiently outweigh the need this year for funding top priority programs and continuing a prudent reserve for economic uncertainties.

I would, however, consider funding the provisions of this bill during the budget process for Fiscal Year 1988–89. It is appropriate to review the relative merits of this program in comparison to all other funding projects. The budget process enables us to weigh all demands on the state's revenues and direct our resources to programs, either new or existing, that have the most merit

With this deletion, I approve Senate Bill No 1647.

GEORGE DEUKMEJIAN, Governor

*The people of the State of California do enact as follows:*

SECTION 1.   Chapter 5.7 (commencing with Section 92590) is added to Part 57 of the Education Code, to read:

### CHAPTER 5.7.   INSTITUTE FOR MANUFACTURING AND AUTOMATION RESEARCH

92590.   The Legislature finds and declares the following:

(a) That a recent study documented that key industries in this state have experienced a decline in productivity from 1972 to 1982 when compared with the rest of the nation. The decline occurred in industries such as computers and civilian aerospace which have been critical to the growth of California's economy.

**ADD-24**