NO. 26-1444

# United States Court of Appeals for the Ninth Circuit

AMAZON.COM SERVICES, LLC,

*Plaintiff-Appellee,*

– v. –

PERPLEXITY AI, INC.,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR SAN FRANCISCO, NORTHERN CALIFORNIA IN CASE NO. 3:25-CV-09514-MMC, MAXINE M. CHESNEY, DISTRICT JUDGE

## EXCERPTS OF RECORD
## VOLUME 2 OF 4 – Pages 10 to 298

JOHN B. QUINN
DANIEL C. POSNER
JONATHAN H. KIM
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
johnquinn@quinnemanuel.com
danposner@quinnemanuel.com
jonathankim@quinnemanuel.com

ANDREW H. SCHAPIRO
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

CHRISTOPHER G. MICHEL
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
555 13th Street, NW, Suite 600
Washington, DC 20004
(202) 538-8000
christophermichel@quinnemanuel.com

RENITA N. SHARMA
LUCAS A. HAMMILL
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
(212) 849-7000
renitasharma@quinnemanuel.com
lucashammill@quinnemanuel.com

*Attorneys for Defendant-Appellant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, District Judge

AMAZON.COM SERVICES, LLC,      )
                               )
          Plaintiff,           )
                               )
vs.                            )   No. C 25-09514-MMC
                               )
PERPLEXITY AI, INC.,           )
                               )
          Defendant.           )
_____)

San Francisco, California
Friday, March 6, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING 9:02 - 11:09/11:25 - 12:36 = 3 HOURS 18 MINUTES

APPEARANCES:

For Plaintiff:

Hueston Hennigan, LLP
523 West Sixth Street
Suite 400
Los Angeles, California 90014
BY:  MOEZ M. KABA, ESQ.
BY:  CHRISTINE M. WOODIN, ESQ.
BY:  YOUZHIHANG DENG, ESQ.

Hueston Hennigan, LLP
1 Little West 12th Street
3rd Floor
New York, New York 10014
BY:  HAGAN SCOTTEN, ESQ.
BY:  LISA CHEN, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

2

For Defendant:

                    Quinn Emanuel Trial Lawyers
                    865 South Figueroa Street
                    10th Floor
                    Los Angeles, California 90017
          BY:  DANIEL C. POSNER, ESQ.
          BY:  JOHN B. QUINN, ESQ.

                    Quinn Emanuel
                    50 California Street
                    Suite 22nd Floor
                    San Francisco, California
                      94111
          BY:  MR. JONATHAN H. KIM, ESQ.

Transcribed by:     Echo Reporting, Inc
                    Contracted Court Reporter/
                    Transcriber
                    echoreporting@yahoo.com

3

Friday, March 6, 2026                                    9:02 a.m.

                    P-R-O-C-E-E-D-I-N-G-S

                         --oOo--

          THE CLERK:  Now calling Civil Matter 25-9514,
Amazon.com Services, LLC versus Perplexity AI, Inc.
     Counsel, please approach the lectern.

          THE COURT:  Okay.  Good morning.

          THE CLERK:  And if you could state your
appearances for your colleagues as well.

          THE COURT:  All right.  Let's start with
Plaintiffs.

          MR. KABA:  Sure thing.  Good morning, your Honor.
Moez Kaba, Christine Woodin, Hagen Scotten, Youzhihang Deng,
and --

          THE COURT:  Too fast.

          MR. KABA:  Okay.

          THE CLERK:  And into the microphone.

          THE COURT:  Mr. Scotten, and then who else have
you got?

          MR. KABA:  Moez Kaba.

          THE COURT:  Okay.

          MR. KABA:  Christine Woodin.

          THE COURT:  I have that.

          MR. KABA:  Hagen Scotten.

          THE COURT:  We've got him.

4

MR. KABA:  Youzhihang Deng.

THE COURT:  Okay.  Some of these people are not on my list, but that's okay.

MR. KABA:  I apologize for that.

THE COURT:  All right.  So, that's the last name that's spelled --

THE CLERK:  D-E-N-G.

THE COURT:  All right.  Okay.  Thank you.

MR. KABA:  And Lisa Chen, C-H-E-N.

THE COURT:  Okay.

MR. KABA:  For Plaintiff.

THE COURT:  All right.  Is there anyone left at the -- all right.

Now for the Defense.

MR. QUINN:  Good morning, your Honor.  My name is John Quinn appearing for the Defendant Perplexity.  With me is my partner Dan Posner.

MR. POSNER:  Good morning.

MR. QUINN:  And our colleague Jonathan Kim.

MR. KIM:  Good morning, your Honor.

THE COURT:  Very good.  Good morning.  Thank you.  Welcome.

All right.  So, sit down and make yourselves comfortable for a minute.  So, we have a motion for preliminary injunctive relief.  I just wanted to mention

*Echo Reporting, Inc.*

14

5

before we launch into whatever we do this morning here in court that I did receive essentially on the eve of the hearing this morning a motion for leave to file an amicus brief by a company called Relex, Inc. (phonetic). They indicated that I believe there was no objection by the Plaintiff, but once by the Defendant.

Is that correct?

MR. POSNER: Yes. This is Mr. Posner. Yes -- I'm not sure if this is on. Yes, we do have an objection based on timeliness. The brief was obviously filed the day before this hearing, which --

THE COURT: Right.

MR. POSNER: -- we believe is untimely really under any standard. We haven't had a full opportunity to digest it, certainly no opportunity to respond to it. So, we would request that it not be considered in the record.

THE COURT: Well, I am essentially leaning toward denying the motion at least for purposes of this hearing. If I were to grant the motion before the hearing, then we're looking at whoever was posing the position taken in the amicus brief, needing time to respond to it. The hearing will go over. Everybody is -- maybe not in full, but it would go over for any opportunity to respond. Everybody was ready to go forward today essentially and have their positions stated without having to deal with this other

6

argument.

So, at least as of this time, I'm not granting it, and I think I'd probably just deny it in general because if I can, I'd like to give you some kind of tentative or even a ruling today if possible because you've spent an awful lot of time on this already.

So, at the moment, I'm just going to put it aside. We did have an earlier request for an amicus brief, and I have granted that particular motion.

Interesting, though, it did cite a case that said, yes, you could grant it even though on the eve of trial essentially, but that's for that judge, not for us here.

Okay.

MR. POSNER: Thank you, your Honor.

THE COURT: All right. So, then let's I guess get into -- and I have a pretty good idea of what's going on here, although I'm not at all really technologically sophisticated. So, I tried to put whatever's going on here into essentially more, I don't know, anthropomorphic truth perhaps or something where I could just simplify it a bit and, as I understand it on Amazon, if somebody has an account and they want the Defendant, their AI agent -- and I guess is there a dispute over whether one could call in a bot? Can you call in a bot or only an AI agent? It's shorter to say bot, but I can say AI agent if you want me

7

to.

UNIDENTIFIED SPEAKER: I'm not sure about bot, your Honor. We refer to it as an AI agent.

THE COURT: I know.

(Portion of proceedings missing.)

MS. CHEN: Yes, it is now.

THE COURT: All right. Well, occasionally when there's not going to be an AI agent, Mr. Posner, the account holder. He says, I'm more like you, drop in and help me and pick out something nice to wear, whatever and give me some instructions, and I come in, and I intentionally pretend I'm (indiscernible), and I do (indiscernible.) I'm well aware of the way I do, and he's giving me instructions. He wants to impress -- or he wants something. I'm not sure what kind of instructions he may give me, but it's going to save him time.

All right. So, I'm going to do whatever I'm doing or whatever I do, and I have while I'm there heard pretty much whatever he can observe on the screen, and I'm not sure if I get any other information, but I get information off the website that he's using and he's using what is the Plaintiff's website.

So, you end up with essentially me dropping by looking in this website. Now, they prefer to tell me how to shop. They're a business. This isn't a charitable organization.

*Echo Reporting, Inc.*

17

8

And I say, no, we want to sell you (indiscernible). We don't want Judge Chesney coming in here and picking things out for you. You can pick your own things out. Thank you very much.

So, that's kind of where we are as I understand it putting it in very very simple non-technological terms. And then we have a couple of statutes, the federal statute and the state statute, and the cases haven't really helped us a lot on some of these issues. And even if I were to find, for example, which I'm kind of inclined to do since I was giving the Defendants to make probably the first argument on this if you have -- whether or not there's been a violation of 103502.

Instead he had some loss. He had a flurry of cases all following in terms of time but not necessarily the holding the Van Buren case, when he was in court, where what appears to be dicta (indiscernible) narrow definition of loss that doesn't appear to apply here. However, and then we have the Ninth Circuit and dicta stating that that is a requirement, that essentially -- and then we have other courts going contrary to whatever the Ninth Circuit said is dicta -- about the dicta in the Supreme Court. We have Judge Spero, apparently he reached a decision. Also, the 10th Circuit recently came down more in accord with what Judge Spero found.

9

We have Judge Breyer, the Supreme Court opinion, as requiring some kind of (indiscernible) to the computer. Maybe some other cases, but then they are pretty recent.

So, we have to make some determination in that regard that also the question about where that (indiscernible) because nobody (indiscernible) in those cases.

So, anyway, that's sort of a preview of my (indiscernible). All right. And I'm not sure where we are as far as I had some of my advance information from (indiscernible) from Ms. Gardner (indiscernible).

I think it was Plaintiff's counsel that had a PowerPoint, is that correct? So, you know, you did not have a chance to play that in some way. So, if you would like to do that, that's fine.

I've kind of given everyone an idea of just where I'm leaning and where I see the main -- main issues to be. So, maybe we'll start with Plaintiff's counsel because it's their motion. Okay.

MR. KABA: Thank you very much, your Honor.

THE COURT: All right. And I'd just ask that each counsel, when they come up to the mic, to -- to state your appearance because, again, we just have a recording.

I'm now being handed something called (indiscernible) -- motion for preliminary injunction and a bunch of slides. Was this given to Defense counsel?

10

MR. KABA:  Yes, we -- we handed the slides.  Then they -- they also have slide decks which they may or may not use.  We also -- they gave that to us as well.

THE COURT:  Okay.  Good.

MR. KABA:  Your Honor, I'm sorry.  Moez Kaba for Plaintiff Amazon.

Your Honor, I have a lengthy deck.  I don't actually want to go through all of it.  Instead, I wanted to -- the Court with issues that the Court, quite frankly, are familiar with at this point.  A lot of papers have been filed.

What I would like to do, though, is just focus on a few key aspects of the Court's remarks and -- and really make sure we are clear on what Amazon is seeking in this case.

THE COURT:  Okay.

MR. KABA:  We are asking the Court to resolve a question we submit the law actually has already answered. When it comes to Perplexity has been told in writing unambiguously and repeatedly, that it is not authorized to access another company, here Amazon, password protected system, and it continues to access them anyway, does the law provide a remedy.

We believe the answer under the federal statutes, the FAA, the California statute, CEAFA, and this Circuit's

11

controlling, is yes. The answer does not change because the unauthorized accessor, in your metaphor, you, Judge, is an AI company or because it convened some customer to use its product or even if it thinks I'm actually helping the customer do it.

And we think -- consider what Perplexity is actually asking this Court to hold. Here is an entire ecosystem of password protected systems on the Internet, your Honor, shopping websites, Facebook profiles, legal services companies like Lexus, Netflix, to bank accounts. Every one of those companies is entitled under established Federal and California law to control who can access the private information sitting behind their login wall.

Perplexity advocates a rule that none of those restrictions should matter because it, as an agent, may go where it wishes, take what it finds, and disregard the restrictions website owners place on it. Perplexity's claim really boils down to a user's consent is a master key. It unlocks any password protected system on the Internet regardless of what the system's owner has said. That is not the law of the Ninth Circuit. That is not the law of California. No case supports that when checked, nor should this Court.

By contrast our request is narrow, and it is grounded in the law. The CEAFA prohibits intentionally accessing a

12

password protected system without authorization. California's CEAFA is broader than that even, and it prohibits accessing a computer system.

Amazon has told Perplexity, you may not access our password protected systems. We would like you to stop. That was the injunction, your Honor. It is not -- it is not an injunction or a prohibition on visiting public web pages on Amazon.

THE COURT: I understand that. I can't remember if you used the bank example or that's just something that came to mind, that a person was maybe walking in a bank, and that was fine, and let's say somebody's got a safe deposit box and it's in a separate room and they say, here I am again, where should we go to the safe deposit box, and the bank essentially took that safe deposit box (indiscernible) on what we know.

MR. KABA: Right.

THE COURT: You're not going and for whatever reason, okay, I'll leave the bank and --

MR. KABA: Yes, it did.

THE COURT: Maybe I don't. Maybe I find somebody who's an insider with a key, an actual (indiscernible) out of there, which would -- the safe deposit box I would assume. That's not happening here, but anyway.

MR. KABA: You're right. That -- I didn't -- the

13

other one I sort of was toying with, your Honor, is important, I mean, was the public allowed to be there.  But mostly we have to show ID when we walk in, but, you know it's open to the public.

But in order to go back to your Honor's chambers, that person has to be authorized.  Now, your clerk may be authorized.  Your clerk may have a keycard.  Your clerk may have (indiscernible) that, Hey, would you run to the back and grab something for me?  Even hand the front the keycard. That doesn't mean the front is allowed to go back there. The Court didn't authorize that.  That's another sort of less bot (indiscernible) metaphor that we were using.

THE COURT:  Right.  So, let's just say for a moment that whoever the friend is who got the keycard to go back to chambers says -- they go back there and they get whatever they get.  They (indiscernible), and they think, Gee, I had no idea that I couldn't.  I thought that (indiscernible) knew what he was talking about.  He gave me the keycard and okay.  But then if it's made clear to the person and you say you have in your letter.  I don't think there's any dispute about clarity of the letter.  We've talked about that, but if anybody was under the impression that it was okay, as long as the account holder said it was okay, then Amazon made an effort to tell the alleged intruder that they were intruding and (indiscernible) as far

*Echo Reporting, Inc.*

14

as Amazon is concerned.

So, okay. You've covered all that.

MR. KABA: Yeah. And, so, that -- and that's really what's happening (indiscernible) that if you've got (indiscernible). We said in our letter. They acknowledge it in their public statement. We filed this lawsuit.

So, now the answer, your Honor, we could -- it sounded like you have a couple of really sort of core questions on -- on the merits. One of them was the law question.

THE COURT: Yes.

MR. KABA: So, I think we have to go, one, just what is the loss here. I think the statute is helpful. The statute defines loss to include all sort -- all sorts of loss, and I think that's where the Court has to start, as many District Courts in this case have started.

But I think you can also go to <u>Power Ventures</u> (phonetic), your Honor, which is a Ninth Circuit decision from 2015. It is a pre <u>Injurin</u> (phonetic) decision, I acknowledge, but it has not ever been overruled by the Ninth Circuit.

So, when you start with the text of the statute, 1030(e)(11), loss is defined to include the reasonable cost to any victim, including the cost of responding to an event, conducting a damage assessment, and restoring the data, program, system or information --

*Echo Reporting, Inc.*

24

15

THE COURT: (Indiscernible.)

MR. KABA: -- to a condition.

THE COURT: All right.

MR. KABA: And in Power Venture, the Ninth Circuit says, again, undisturbed, that the loss includes the -- this language, and the Ninth Circuit considered sufficient loss in that case the cost to investigate and respond to Power Venture's essentially trespass onto Facebook password protected places.

So, we think the Ninth Circuit has actually at least currently binding, not a dicta or dicta on dicta, considered investigative and responsive cost to be sufficient for their -- for their statute.

We've also cited -- and I know your Honor's familiar with it because you just cited back to me a bunch of these cases on courts in this District overwhelmingly considering investigative and other responsive costs to qualify as losses. We said that the case, the Apple v. NCO, case, the case -- it's all cited in our reply.

THE COURT: So, (indiscernible) question, you have to concede how (indiscernible), the Ninth Circuit making the comment it does, which are called the dicta that (indiscernible), and basically said, well -- and I have a footnote to confuse everybody -- Van Buren reviewed the statutory admission of "damage" and "loss" and concluded

16

that this civil remedies provision requires a showing of "technological harm" such as the corruption of files of the type of unauthorized users caused the computer system to make as far as internal (indiscernible).

But, again, here we've got an interesting situation because they (indiscernible) --

MR. KABA:  They weren't.

THE COURT:  -- that we have here.  They were looking at someone going beyond authorization, and they have a page that they essentially thought that confounded that -- in violation of a criminal statute that everybody pretty much uses a computer or goes on the web would be in violation and (indiscernible) trying to show what the statute was more likely to be covering, they then gave a rather narrow definition.  Now, whether they did that simply to make a  point of having, say, looked at the Ninth Circuit (indiscernible), actually saying this is what's required, which is kind of an interesting point.  It's not binding in the moment.  If one is concerned about what way the Supreme Court is going, then one would say, Gee, it looks like the majority of them are all -- the majority of them were thinking that it's a very narrow definition that -- it's certainly narrower than the -- than the language that is in the law section, 1030, which doesn't go that far.

The Ninth Circuit in making their comment in

17

(indiscernible) thought about (indiscernible) or maybe just didn't think it was important at that point. They certainly didn't need to address the issue as a (indiscernible) matter in a case. They already had been cited matters in the case on other issues.

But they just left us here with that, and certainly leaves the Court this question because keep in mind I'm not deciding today whether the Plaintiff wins the case or not.

MR. KABA: Of course.

THE COURT: I'm only here to decide whether they have a likelihood to prevail, and then the (indiscernible) the likelihood (indiscernible) go to the Supreme Court. It's going to find that they've been damaged, and then they'll take the loss (indiscernible) -- whether these losses as asserted would then be (indiscernible) amounts of the losses and where is the Ninth Circuit going to -- and in any event, so, that's one question.

But even if we could just get past this, if we do, we still have (indiscernible).

MR. KABA: But that's exactly right, your Honor, because I -- your Honor sort of laid out the land better -- better than I could. You're right. I mean, in Power Ventures, again, (indiscernible) doesn't cite, Power Ventures court says, yes, you investigated and responded to these. (Indiscernible.) We haven't (indiscernible).

18

THE COURT: Well, let me add a little bit because it -- I have done this before. So, for whatever reason, they can get a (indiscernible).

MR. KABA: Yes.

THE COURT: And If there was one sitting in the chair here, they would be telling you slow down, and I didn't have to say anything. The recorder doesn't care, but if you want me to really follow your argument, you have to slow down a little bit. Okay.

MR. KABA: Certainly, your Honor.

THE COURT: All right. Thank you.

MR. KABA: So, as -- as you already pointed out, the -- the sort of trail of what our loss is goes from the statute to the kind of reference in Van Buren, the -- not analyzed for the reason you've just described, because that would have taken someone who had authorization, and the argument was that you'd use it in the wrong way. To hiQ (phonetic), which doesn't deal with password protected spaces at all and the ability to have to address the loss question.

But we go back to Power Ventures when the Ninth Circuit "new the (indiscernible) cost to be sufficient to get over the $5,000 threshold. And, as you are saying, your Honor, here we are not on a definitive at the end of the case do we win. It's the likelihood of success and is there enough

28

19

here to give us -- to give the Court comfort that there are losses that exceed this threshold.

I would say under any view of losses, we will exceed the threshold. We have put in a declaration from Mr. Fernandes at paragraph 21 saying even as of the date of the declaration, we had exceeded the $5,000 threshold 50X. And some of it is to investigate. But, your Honor, there are also other harms to the accounts that were responded to for which there were (indiscernible).

So, even if you don't consider the investigative responsive call on their own email, we have to restore accounts that got blocked because we believed they were using the Agent AI, in violation of our rules. We have to --

THE COURT: So, is that my fault that the AI Agent that you decided to do that?

MR. KABA: Well, your Honor --

THE COURT: It's not my idea.

MR. KABA: Well, if you break into my home, is it really your fault that I have to put up a window again? Yes, I would say so. So --

THE COURT: Well, no. This isn't really broken, all right. This is entered, and I came in, and I looked around, and I said okay there's something really here that I want to take. I checked out your TV. It's not new enough,

29

20

I checked out your stereo, I went through other things and then I left, all right, didn't really take anything with me. I learned a lot while I was there. Maybe I can picture the -- kind of off somewhere so that I can remember to come back at a later time or what have you, but I haven't been terribly impressed with my being at fault for you deciding that you were going to close out the account. So, maybe you could clarify, but I read that more or less as -- well, let me ask you. Why did you close down the account? That's (indiscernible) because you wanted to shop and you deleted something (indiscernible)?

MR. KABA: Because based on our detection, your Honor, it didn't appear that it was Mr. Posner. It appeared that it was somebody who was not authorized based on the way that you as the agent are clicking through pages or scanning information --

THE COURT: Okay. You were protecting Mr. Posner from unauthorized intruders?

MR. KABA: We were -- and we were protecting the integrity of our passwords protected system from unauthorized intruders.

THE COURT: If you closed him out, you would close me out?

MR. KABA: Correct. And that's what you try to do

21

when you put up a lock.  You -- you say that's not being used properly.  Someone is accessing or a bot or, I'm sorry, an agent or someone else is accessing this account without authorization.  We're going to block it.  Then we find out, Oh, it was him.  I used this agent.  I want my account back. Then we have to restore it back.  And that's another form of loss that goes beyond just the investigative cost and response cost here, your Honor.

THE COURT:  What was the loss then that Amazon incurred by (indiscernible) or locking Mr. Posner out of his account?

MR. KABA:  Well, it was -- the -- the loss was having to restore the account.  So, the amount of engineering time and response time.

THE COURT:  Okay.

MR. KABA:  That's what's captured in the declaration.

THE COURT:  All right.  Now, I will say that I wanted to take a look at whether you're using in-house people who are salaried in some way and you said to them, okay, go do this other job, that other job you usually do, and that your balance sheet at the end of the year may not look any different.  You didn't hire outside people, third parties to come in, what have you.  And I could see some law that said that that -- if your own people are spending time

22

doing something that is different than what their regular job was or that the -- or assigning them to (indiscernible), that that would count.

So, I guess that's okay, but it gave me pause for a minute because ordinarily people are saying (indiscernible) this, and in this instance you didn't put your own people and said go over there and figure it out. So, okay. Keep going.

MR. KABA: That's -- that's correct, your Honor. And I -- I would say that the Fernandes declaration explained at least to that point what the losses were, what the costs were, and the amount of money that Amazon had already spent we believe is cognizable under -- I have the declaration up on the screen if your Honor would like to look at it, but it goes into some detail about it's investigating, it's monitoring, it's remediating the effect of the -- its unauthorized activity.

UNIDENTIFIED SPEAKER: But, your Honor, I think --

THE COURT: Stop for a minute.

MR. KABA: Certainly.

THE COURT: It's very interesting. My understanding if we -- I see people here in court that flip these monitors in such a way that I have to turn them all the way around to see what you're seeing, and then I can see it on the screen that it had been moved frankly, because if

32

23

it's close enough on the screen that is closest to you, not the one that's farthest from you. Apparently, if it has to go on the -- someone has to flip everything back again, but it wasn't doing that before. So, okay.

There are a couple of losses you're incurring that I wasn't terribly impressed with. And, so, just to let the Defendants know, one was the cyber security issue which there may well be a triable issue as to whether or not one of the informations is acquired and sent somewhere that isn't subject to having in a way that otherwise would be. That seems like a triable issue but not necessarily one in which you're likely to prevail on, but you'll want a declaration on that particular point. And I'm trying to think the types of cyber security, I have to double check with some of the others, but the idea of going in and trying to figure out what happened, who was there, was there any damage, et cetera at least in the past have been not to the loss under Section 1030 even. I guess just for the record, I should -- so, 15 U.S.C. Section 1030, and we're looking primarily at (a) and then as well as Section (g), and then also when I mention 502, that's the California Penal Code and originally I think, I'm sorry, you're not a district attorney. How can you be bringing anything under the California Penal Code. I don't know why the legislature was so lazy that they couldn't simply put civil claims in the

24

Civil Code and leave the Penal Code to everybody who practices criminal law in the Federal Court. But, anyway, they didn't. They I guess -- to the state, and, so, there you are in the Penal Code.

MR. KABA: Yes.

THE COURT: Which doesn't happen very often.

MR. KABA: Yeah. And then with the California system, there are often civil causes of action buried as well in the Penal Code, and I think, as the Court has seen, there are cases here in Federal Court that assert claims under 502.3 of the California Penal Code, and because your Honor asked about that additional section, 502(e) authorizes a civil action by any owner of a computer system who suffers damage or loss from a violation. It does not have a -- a minimum dollar threshold. It does not limit it in any way. There's no case law that says that it is -- some losses are cognizable and others are not.

And, so, I think the -- and -- and if we're talking -- frankly, he didn't even respond on this -- on the issue in his opposition which we would submit concedes the -- the point. Our -- our view is we've satisfied the loss threshold for purposes of the PI under 1030 -- 18 U.S.C. 1030(e)(11), but even if there was a question about that, the CDA that they claim under 502(c) and 502(e) of the California Penal Code puts that question to rest because

*Echo Reporting, Inc.*

25

there is at least some loss here.  There is at least some harm here.

And, so, I think that should address any question that the Court has really on loss for purposes at least of -- of issuing the preliminary injunction.  I --

THE COURT:  Let me stop you for a minute.  Can I see the clerk up here.

THE CLERK:  Yes, your Honor.

(Pause.)

THE COURT:  All right.  So, we have pretty much covered --

MR. KABA:  Yeah.

THE COURT:  -- whether there's a showing of wrongdoing and there's other initial loss.  There were, of course, other issues.  If one is going to seek preliminary injunction with.  Otherwise what I was talking about injury or damage, of course then you have the statute for that standing under the statute, and then you need to be able to make a showing of irreparable injury for purposes of injunctive relief that caused (indiscernible) -- that if I'm going to grant your motion, you have to show that you would be -- not you personally.  I'm sorry -- that your client would be irreparably injured if they don't get this relief and -- and that would be any way that's not compensable just at the end of the day with damages.

35

26

So, you have that showing that you have to make, and then we can get to the hardships in terms of (indiscernible), and then, lastly, whether the public's interest, as the Defendant's arguing, essentially, well the public, Mr. Posner and anybody else who actually (indiscernible).

So, I guess maybe you should take those up also at this time just --

MR. KABA: Yes. I understand. And, with the Court's permission, my -- my partner, Mr. Scotten, is going to address the other three factors. I just wanted to make sure that if the Court had any more questions on the -- the merits.

THE COURT: Yes, but then I'm not sure what (indiscernible) is going to take to --

MR. KABA: Understood.

THE COURT: -- raise something that gives me some pause again, and I may have to have you back up here.

MR. KABA: I understand.

THE COURT: All right.

MR. KABA: So, why don't I shift to Mr. Scotten, to address the other factors, and then I'll be back insofar as if there are any further questions on the merits, your Honor.

THE COURT: Great.

36

27

MR. SCOTTEN:  Thank you, your Honor.

(Pause.)

MR. SCOTTEN:  So, again, Hagen Scotten, your Honor.  Thank you very much.

THE COURT:  Yes.

MR. SCOTTEN:  I will be pretty brief here.  I don't think that Perplexity has cited to a single case where a court found violation of the CFA or CEAFA and didn't also find the other factors satisfied.  I'll go through them pretty quickly.

I'm going to flip through my slides to help me remember, but I (indiscernible) for them, have to go through it.

THE COURT:  So, I asked the court reporter.  She did say she could (indiscernible).  I'm not sure what (indiscernible), and I didn't have anything go down.  So, she took the time to try and put this together.  I'll just slide back a bit --

MR. SCOTTEN:  Sure.

THE COURT:  -- and try and look at your slides if you want me to and view or however.

MR. SCOTTEN:  Your Honor, I'm comfortable just us talking.  And if there's a quote I want you to see, I'll suggest you turn to your screen, your Honor.

THE COURT:  Okay.  Thanks.

28

MR. SCOTTEN: So, irreparable harm where I'll spend most of my time, we've identified three phases of irreparable harm. Each one is sufficient. They are unauthorized access to controlled computer systems, damage to our customer relationships and goodwill, and then security risks.

THE COURT: Okay. The goodwill is the third one I mentioned. I couldn't quite -- I didn't quite see if somebody was unhappy with their shopping experience as overseen by me, the AI Agent as opposed to Amazon itself, then why wouldn't they just get mad at me, even though I'm free at this point, but, otherwise it was not (indiscernible) for me. So, why wouldn't you just say, Ah, we're not going to use the check me or AI Agent anymore because, you know, it didn't do a very good job, and I'm just going back to Amazon? Why would they get mad at you?

MR. SCOTTEN: Well, because, essentially, your Honor, they very may not know who to blame, right. If -- if Mr. Posner said, Judge Chesney, please go to Face -- to Amazon and buy me some towels, and the towels take too long to get there, they're overpriced, they're not the best towels, Mr. Posner doesn't know that Judge Chesney's a bad shopper versus Amazon's a bad store. And, so, next time, just as likely to, Judge Chesney, you seem like a great shopper, but Amazon is terrible. Go -- go shopping at

29

Target.  Go shopping at the whole Net.  I don't trust Amazon like I used to where I always got the best products the fastest.

And, you know, in one individual case, just you and Mr. Posner, your Honor, who knows how that goes.  Would it have cost millions of users?  There's a significant impact on goodwill reputation.

THE COURT:  Has that happened either immediately in this particular case or based on some prior experience at either Amazon or some similarly situated to the current facts here at this hearing or is it just a few?

MR. SCOTTEN:  I would think it's a -- it's a reasonable -- we put in two sworn declarations explaining how this works, but the simple answer, of course, is, your Honor, we don't know because Perplexity refused to be transparent.  We don't know when -- when a customer doesn't come back, they just don't come back.  We don't even know if they used Comment, much less why, which really gets to why this is a class of irreparable harm.  You can't quantify it because we don't know who's coming and who's going.

THE COURT:  Fair enough.  I'm not going to try to find a way that the AI Agent, because if I don't use their (indiscernible), because apparently (indiscernible).

MR. SCOTTEN:  Well, they're controlling access to their (indiscernible) I guess.

*Echo Reporting, Inc.*

39

30

I would also suggest, your Honor, there's a good reason the cases don't usually get to this, Power Ventures or (indiscernible). They stop at my first factor, which is unauthorized access to private password secured areas which are privately controlled is alone a sufficient irreparable harm.

THE COURT: Yes. They have seen that they have a liability and the act that creates liabilities -- well, not liabilities, the act that constitutes a violation can also be a dual role in the essential -- the harm. In other words, if I don't stop it they'll keep coming by, well, then you can analogize it a little bit to address (indiscernible). So, let's say somebody owns a piece of property, they don't live there or anything, and that would be a privacy interest. It's open land, and they own it and they test it off and asserts that, you know, trespassers (indiscernible) trespassers will be shot, (indiscernible) -- but, anyway, just no trespasses and then -- and say somebody drops by and comes in, climbs over the fence and I've told them repeatedly please stay out, this is private property, and they don't, they get (indiscernible), they get an injunction to stop from going on my property, and the trespasser can say, I'm not doing anything really (indiscernible). I've got a view of the ocean or I've (indiscernible), but, nonetheless, I think is probably

31

entitled to.  So, I guess that's kind of what this law (indiscernible).

MR. SCOTTEN:  I think that's right, your Honor.  I think you can see at page 20 of our opposition, Perplexity doesn't contest this rule.  Their answer here is, you know, we're not doing it.  It's a merit defense.  But I don't actually think there's a real legal dispute that if we make out violations which I think are pretty clear for the reasons just discussed, that irreparable harm follows.

And I mentioned the goodwill.  So, I'll just mention the third category briefly, which is risk, the danger posed by Perplexity.  And this is an area where there's a dispute, that you Honor need not reach because the first two factors are so clear, but I do think we have much better the argument, and we've put in two declarations from -- from Professor Evans, an expert here.  And they contested the first one.  We put in a rebuttal declaration that explained in great detail the particular vulnerabilities of (indiscernible).  Essentially, it's such a powerful tool that could go anywhere and look at anything and responsible -- responsible parties do not design a router to be that powerful so it can access all the stuff and see all these things, and that is what makes it so dangerous.  The case law here is also clear.  I think we cited the very recent WhatsApp decision from this District finding that security

32

risk for a business that's on the Internet, as both WhatsApp and Amazon are, are going to be harmed. And Dr. Evans' work here is buttressed by several studies done by other (indiscernible). It's found specific vulnerabilities, and Perplexity says, well, we attached those, but that's a little -- it's sort of like closing the barn door after the horse bolted. Of course, the horse didn't bolt through it, but that's only because their industry partners told them, Hey, your barn door's open, before the -- the horse got out.

So, I think we have incredibly well grounded set of risks, and I think the (indiscernible) brief, the one your Honor didn't check, the older one, also does a good job explaining why risks with AI agents can be greater magnitude because it's not just you shopping for Mr. Posner, your Honor. You're -- you're shopping for thousands and hundreds of thousands of people. And, so, if something is going wrong, it's going to be replicated at great scale. So, I think we also make it out on that ground. So, irreparable harm I think is pretty easy. (Indiscernible) on the merits. I'll take the other two factors quickly.

Similar -- slow down, yes, your Honor. Thank you.

THE COURT: If you wanted to cite me to where you think you've made the strongest showing on the security (indiscernible) to -- now, you were citing to Fernandes declarations or a different one?

42

33

MR. SCOTTEN:  More recent, Evans declaration.

THE COURT:  Oh, Evans.

MR. SCOTTEN:  So, here, your Honor --

THE COURT:  Wait.

MR. SCOTTEN:  Sorry.

THE COURT:  Get it out of the pile, all right. (Indiscernible) declarations -- okay.  Some of them were (indiscernible), declarations filed by -- if the Court is going to potentially -- surreply -- (indiscernible) reply all get into the things that you say (indiscernible).

MR. SCOTTEN:  Sure.  So, here's --

THE COURT:  Could you wait one second?

MR. SCOTTEN:  Yes, your Honor.  Of course.

THE COURT:  Thank you.

Now, here is the problem I'm having.  What I think is the original Evans, which was filed quite sometime ago in November --

UNIDENTIFIED SPEAKER:  That's right, your Honor.

THE COURT:  Then I'm trying -- and I'm sure I had it here somewhere.  I don't want to take too too much time on that, but I thought I'd just have you point me to where there -- that particular matter is raised, and let me find -- I don't know that I have that.  I should, but --

MS. CHEN:  Your Honor, Plaintiff has a copy.

THE COURT:  Well, that's fine, but I want to see

34

if also I could find it.  I also want to suggest to Plaintiffs that any time you file a brief in connection with a matter that's going to be heard, you put the hearing date and time on it, okay.  Right now I mostly just have a lot of things that I have to figure out.  Give me a second, and I may take this also -- just a minute.

I thought I had everything until -- it concerns me here.

(Pause.)

THE COURT:  Okay.

MR. SCOTTEN:  Yes, your Honor.  And I apologize for interrupting the Court's search before.  What I was going to suggest, your Honor, the conclusion is also on your Honor's screen.  That is one area where I thought the PowerPoint might actually be helpful.

THE COURT:  All right.  I may pop back and look at that because the -- (indiscernible) stuff, of course, is mostly attached?

MR. SCOTTEN:  That's right, your Honor.

THE COURT:  Give me a second.

(Pause.)

THE COURT:  Well, that's a little bombastic.

MR. SCOTTEN:  Well, it's -- It is just included as paragraph 39, and, actually, I think your Honor's -- that sort of gets to the point your Honor's talking about, the

35

back and forth rounds here.

So, we put on -- in Dr. Evans' additional declaration. Perplexity contested it. We put in this rebuttal declaration your Honor has now, which has 38 paragraphs leading to the conclusion that Perplexity is quite dangerous. Perplexity, of course, did not like that. So, as your Honor pointed out, they put in what amounted to a surreply. But the surreply did not contest these points. It was essentially about other issues such as whether the second time we blocked them, they really knew we were blocking them.

Dr. Evans' detailed explanation of why AI is particularly dangerous is essentially at this point unrebutted, and I take your Honor's point you want facts. I don't want to belabor the facts, but I'm happy to walk through sort of the -- the basic principles here.

THE COURT: Well, let's just say (indiscernible) something, so now you don't have it. So, I was endeavoring to take a quick look at what preceded the conclusory remarks that are on the screen, just to see if I'm missing something from before or I missed something before.

(Pause.)

THE COURT: All right. What he is saying is that the response by Perplexity to what Plaintiff pointed out did not address certain risks that he felt were particularly

*Echo Reporting, Inc.*

45

36

important, in other words, what he's saying, rather than some of the problems, but you haven't -- you haven't said (indiscernible).

Now, what is it that he is saying specifically they didn't address that remains outstanding as his allegation of what was wrong?

MR. SCOTTEN:  I think --

THE COURT:  And let me hand this back.

MR. SCOTTEN:  Thank you, your Honor.

THE COURT:  Okay.

MR. SCOTTEN:  And I think it is -- it is more than what Dr. Evans was saying is there is a systemic category, nature of risk, that they have not remedied at all.  They sort of patched specific holes in the dike, but the dike as a whole is incredibly weak and likely to break.

One of the basic problems is computer scientists who specialize in security have this thing called Rule of Two. There are three possible broad categories of capability that one could give a tool like Comet.  They could give it the ability to search the Internet, which means icking information from everyone, makes it very vulnerable to bad information getting in there.  They can give it the ability to access personal information, things like browsing history, shopping history on Amazon, your address, which is dangerous in a different way because those are things people

37

don't protect, and they can give it the ability to do things like buy stuff on Amazon, what computer scientists call changed states, actually make things happen.

And Dr. Evans has in what is unrebutted testimony explained that responsible programs only have two out of those three things. That's the Rule of Two. Don't give it all three capabilities.

Perplexity chose to give the Common AI Agent all three capabilities. They made it powerful, and as -- as he said and his language was (indiscernible) too dramatic, flashy, that it was powerful. Wow, this is a great sports car. It can do all kinds of amazing things. But that makes it dangerous.

THE COURT: Okay. What do you think (indiscernible)?

MR. SCOTTEN: Essentially, the ability to take in information from anywhere, so, you can browse the Internet. It's undisputed, Comet's browser.

THE COURT: Yes.

MR. SCOTTEN: Which -- which has a vulnerability aspect because it means you can pull in bad code from anywhere.

THE COURT: Without describing why it's important, if you just wanted to list some --

MR. SCOTTEN: Sure.

*Echo Reporting, Inc.*

38

THE COURT: -- and outline one, two, three.

MR. SCOTTEN: Sure.

THE COURT: What's one?

MR. SCOTTEN: One, broad access to data.

THE COURT: Okay. What's two then?

MR. SCOTTEN: Two, access to personal data. So, narrow but dangerous. One is wide, public data. Two is narrow, private data, things like -- so, Google can search the Internet, but it can't just look at your bank account, for example. So, two is access to personal or private data.

THE COURT: Right. So, broad doesn't encompass two?

MR. SCOTTEN: Correct. Broad in the sense of can scroll the whole Internet. So, a lot of these risks --

THE COURT: Yes.

MR. SCOTTEN: I won't tell you what the (indiscernible) that's right, sorry, your Honor.

THE COURT: All right. You can scroll the whole Internet but not what? Because, two, is the what?

MR. SCOTTEN: Two is the stuff that is personal, private, passwords.

THE COURT: All right. Password protected, let's say. So, broad is just some kind of public broad is what you're saying?

MR. SCOTTEN: Like the Internet, for example, your

*Echo Reporting, Inc.*

48

39

Honor. Anything browser, if look at the Internet like Google Net.

THE COURT: Okay. But, as I understand it, if you were doing the outline, it wouldn't be broad as one or let's say broad, Roman I and access to password protected or private information would be (a). It would be Roman II.

MR. SCOTTEN: That is right, your Honor.

THE COURT: Okay. Keep going.

MR. SCOTTEN: And then Roman III is the ability -- and Professor Evans is in the back of the courtroom. He's probably cringing at my lay explanations but is the ability to do things.

THE COURT: All right.

MR. SCOTTEN: He is the security expert whose declaration --

THE COURT: No, no. Where is he in the courtroom? I want to see if he is cringing. So far, no.

MR. SCOTTEN: Good. It's the ability to do things. Your Honor can imagine that if you had one and two, so, you're looking at all this information, maybe you're still not dangerous because you're not doing anything with it, but Comet can be dangerous, because it's an agent, can go shopping, which is why we're here in front of your Honor.

So, what Professor Evans --

THE COURT: Okay. Three is you don't just get it

40

and kind of hang out there, but you then start doing things, very much like Mr. Posner could do -- if he wanted to take the time to do it himself and he's a busy lawyer. He doesn't have time to shop for himself. Okay.

MR. SCOTTEN: Right. Mr. Posner, to be clear, has all three of these capabilities. People have these capabilities. Responsible design does not trust Comet, does not trust an AI Agent with all three of these capabilities, and that's the systemic and unaggressive issue --

THE COURT: Okay.

MR. SCOTTEN: -- identified.

THE COURT: Why don't I -- cyber security question. How am I different when I'm shopping as Mr. Posner than Mr. Posner is? In other words, why was he doing -- if he just did it himself, would not create the cyber security concern, right? Amazon has whatever protections in place that would deal with his shopping. Is that right?

MR. SCOTTEN: Correct.

THE COURT: All right. But then he turns it over to me. What do I do differently as him that he isn't doing that creates the cyber security difference?

MR. SCOTTEN: So -- so, two things, your Honor. One -- and this is what I was getting at from the amicus brief -- your Honor can operate at scale. You can do a billion things at once. You can -- you -- if Mr. Posner

41

makes a mistake, he makes one mistake.  If your Honor -- not your actual Honor, but if the agent makes a mistake, you can replicate a million times over because you operate at scale.

THE COURT:  What's the mistake?

MR. SCOTTEN:  Transferring too much data back to Perplexity, reading code on the Internet that tells you to do malicious things, which would be actual vulnerability if it were detected in -- repeatedly by Perplexity's competitors.

THE COURT:  Well, let me get back to that for a minute.  Just assume he's not using it.  He's just doing whatever he's doing.  Is he making any mistakes then that you would be able to articulate?  He's just a shopper with an account.

MR. SCOTTEN:  Amazon shoppers, like all people, can make mistakes.

THE COURT:  Yeah, what -- what would be an example then of a mistake that the account holder could make? Anything they do is what Amazon lets them do, isn't it?

MR. SCOTTEN:  They could fall for a scam.  The --

THE COURT:  Hmm?

MR. SCOTTEN:  Fall for a scam, and that happens, and that's a risk you have to accept when you deal with people.

THE COURT:  Well, is that on the -- the Web

42

itself, on Amazon?  Wouldn't that be somebody else's fake Amazon or something like that?

MR. SCOTTEN:  It could be any number of things. It could be sending you a real Amazon information to a scamming website.  It could be -- and these are similar to the issues that were actually detected.  It could be -- sorry, your Honor.

THE COURT:  No.  I'm just trying to think.  In other words, let's say somebody gets the spear -- by email that says something like, I don't know, I don't remember what some of these were that went out but -- but some concern about some charge on your Amazon account or something like that and then you have a password -- they get some kind of information that would allow somebody then to get into that account or at least use the information in some way other than the desirable.

All right.  Let's say that -- that some -- that somebody like Mr. Posner, except he wouldn't fall for it, but let's say somebody like him wanted, they could deliver to a third party protected information from the Amazon account they pulled.  Okay.  Now, are you concerned that I as an AI Agent would fall for some spear fishing on Amazon?

MR. SCOTTEN:  Not only concerned.  This is something that happened.  This is exactly what those multiple industry sources that Perplexity says it's now

43

addressed did.  I mean, the agent -- agents are in some ways more human than we think.  It -- it falls for these types of scams.  It did fall for these scams.  It will do that, and it can do it not just for Mr. Posner's information but for lots of folk's information.

THE COURT:  Okay.  But then they said they fixed it?

MR. SCOTTEN:  They said they fixed those specific attacks.  It's sort of, you know, those three things will not happen again, but that is really what I'm trying to get at with the Evans declaration.  It's going to happen.  It's a systemic vulnerability.  That exact thing will happen, but there's been no rebuttal to the point that this sort of thing is a continued vulnerability because of those three capabilities.  And -- and I think a lot of it, your Honor, just to back up a step, is helpful to your Honor in understanding why Amazon is so concerned.  But the Court need not reach it.  Again, we're pretty set at step one. The law rightly says it's enough harm to interfere in Amazon's ability to control systems, and that makes sense. Let Amazon worry about that.  That's the harm, not -- not letting other people in the control systems.

Public interest, your Honor.  On -- actually, I think, your Honor said you wanted to hear hardship first, hardships.  Right.  Balancing the scales.

44

So, this -- this is an easy one in our view because the scales look like this. Courts say time and again if you're -- you're in violation of these statutes, there is no -- you have no hardship in stopping doing that. And our injunction here is exceedingly narrow. We are asking the Court just to say don't go into password protected areas of our store. That doesn't count as a hardship. And in other cases, the Ninth Circuit in (indiscernible), for example, had said, You're going to face -- you, the Defendant, are going to face devastating or extreme hardships. Still doesn't count if it's solely because of your illegal conduct.

So, we think there's almost nothing on one side of the scale. I just talked about what's on Amazon's side of the scale. It's the harms we just discussed.

THE COURT: Yes.

MR. SCOTTEN: I should note, though, that I think Perplexity's harms are exaggerated. Perplexity touts itself as accurate -- and we're not disputing this -- in all person agent. It makes websites. It helps you study. It can summarize news articles. It can write emails. The idea that it will cease to function as a viable enterprise or even be materially impaired by not being able to go to the password protected area of a single website, probably would not be much of a hardship, even if it's cognizable, which it isn't.

45

And then, finally, your Honor, on public interest, again, the courts say -- Power Ventures says -- Parsant (phonetic) says that you are -- it is in the public interest to prevent unauthorized access to computer systems. If your Honor agrees with us, then we're likely to succeed on the merits, then this factor flows almost automatically. In fact, it does flow automatically under the case law.

And that makes sense. These statutes are for the policy judgment, don't do this. So, of course, the public interest is in not doing it.

The last point I'll stress on that, though, because I think it is helpful from the prior (indiscernible), again, the one your Honor accepted. This lack of transparency has additional public interest costs. When an agent like Comet refuses to identify itself, it can't be held accountable. Actually, another good distinction between yourself and Mr. Posner, if Mr. Posner does do something wrong -- Mr. Posner can never do something wrong. But, if a malicious shopper does something wrong. They can be held accountable. If they commit a tort, you can sue them.

Perplexity hides its role so it can be legally accountable. It's not accountable for any harms it may cause. And, as the amicus points out, that's also discourages innovation area of safety. If -- if you know who's doing what, then if you incentivize folks to be safe

46

because they know they'll be held accountable for unsafe -- Perplexity's refusal to identify itself or to identify its Comet Agent when it's in the store defeats that.

And -- and I'll stop there unless your Honor wants to hear more of these.

THE COURT: No. The amicus brief that I did allow for you to file, they're not going to get into whether it's a violation or whatever in general, but they wanted to point out why it's important to identify one's self as an AI agent, and that's their position.

MR. SCOTTEN: I think that's right, your Honor.

THE COURT: Okay. All right. If I were to grant the relief sought in some format, there's the question of a bond, and we don't have to do that right now, but is that part of what you're inclined to talk about or somebody else?

MR. SCOTTEN: I'm happy to discuss the bond, your Honor, and I think the short answer on that is the -- this Court has ample discretion under Rule 65 if, as here, Defendant asks for a specific amount under the Ninth Circuit case in Barkwell and Gomez (phonetic), they need evidence. They need to make a showing.

They haven't made that showing, particularly for the $1 billion amount that they have asked for. Their sole citation is to paragraph 41 of the Shettelinko (phonetic) declaration. That has some sealed numbers in it. So, I'm

47

not going to talk about specific numbers, but the point is those numbers are relevant.  They talk about numbers of the valuation of Perplexity, and they suggest -- I'm not sure they've really established a link -- of how much the Perplexity valuation is relevant to Comet.

But what they haven't established or even really tried to show is that Comet is going to be materially affected by not being allowed to go into one password protected part of one website.  They give you the premise, well, here's the value of Comet.  Comet -- well, you need to indemnify us essentially for (indiscernible) into that.  There is no reason whatsoever to think Comet's going anywhere just because it can't go into one part of the Amazon Store.  So, they haven't made their showing on that, and I think that's all I can say on that.

THE COURT:  Just --

MR. SCOTTEN:  Right.

THE COURT:  -- talking about -- I'm sure I brought it out, the problem was that because they were two essentially kind of cyber security declarations that wasn't within a big binder.  So, it didn't quite fit, and I put both of them to the side and then couldn't see over the other big stack -- both of them handy, but I'm just --

MR. SCOTTEN:  And we're sorry about the hearing date.  As you know, your Honor, the hearing date has moved a

48

couple of times in this, but we apologized they weren't organized around that.

THE COURT: Okay. Yes. I think -- and talking about the bond for a second just to -- to set it up just to get there because I still haven't heard from the table across the aisle here.

The idea of a bond is what does the Plaintiff ultimately lose. In other words, yes, if the Court found that the Plaintiff has a likelihood of success or, as you know, there's an alternative test in the Ninth Circuit. If the Plaintiff raises a serious question on an issue, as long as they can show that imbalanced it sharply as opposed to just in but sharply in favor of the movant, then that could be enough.

And, so, you're looking at, well, what if -- what if at the end of the day the Plaintiff loses. What has happened to the Defendant in the interim? And the question then is have they had to shut down things, did they go to the factory and fire all the employees? What happened there that really needs to be compensated in some way and -- because the Plaintiff didn't win, all right. So, that's what we're looking at.

In this instance we haven't talked about the idea of the alternative test. We've already been talking about likelihood. If you do show that, in other words, if I were

49

to find that, then, of course, then there's a less chance that you're going to lose at the end of the day, but there's always a possibility because usually preliminary injunctions are sought in a part of the case, and all kinds of things can happen along the way.

So, I did look carefully to see if there could be any kind of figure put on just shutting down your Amazon operation versus shutting everything down essentially. I didn't see it, but I can hear from them this morning and see if they -- they have anything further that I can actually consider in connection with this hearing, but I figured we may as well take that up as well now, and you have. So --

MR. SCOTTEN: Thank you, your Honor. And I do want to be precise about one thing before I sit down.

THE COURT: Um-hmm.

MR. SCOTTEN: Nobody wants to shut down their Amazon operation. To be clear, Comet, the browser, is welcome everywhere on Amazon. If Mr. Posner wants to use Comet, the browser, to do his shopping on Amazon, he can do that. The Comet AI Agent is free to look around in all of the public parts of the Amazon Store. We are not asking them to shut down any Amazon operation or anything approaching that.

We're really just saying these are password protected. Don't send your agent. You can go there yourself, but don't

*Echo Reporting, Inc.*

50

send your agent in there. So, it is much narrower.

THE COURT: Let's just say as a practical matter, how it would work as you say would be fine. So, here I am, and I -- they just have me look around to the public area, which is everything for sale on the website, and let's assume that Mr. Posner can tell me what he wants me to look for in particular and I do that, and then he goes, okay, that's great. Thank you very much. I want to buy it. All right. Then he would go into this personal account, and he would place the order that way, having had me find it for him? Is that the --

MR. SCOTTEN: I am not that much of an expert on how Comet works. But, yes, that is my understanding, that it can fill -- under -- under Ninth Circuit law, it can look at public spaces, and under Ninth Circuit law, it can't go into private spaces. So, it looks around the Internet, finds what you want, and then you just have to do it yourself.

THE COURT: At that point?

MR. SCOTTEN: At that point.

THE COURT: Otherwise, I could just do the order for him, and it shows up on his doorstep, or whatever?

MR. SCOTTEN: And if you assumed your Honor's analogy, I think you could say where that's perfectly reasonable. Nobody's really going to have a problem if Mr.

*Echo Reporting, Inc.*

51

Posner asks you to do some window shopping for him and -- and come back and, your Honor says, I thought these towels are nice. But you can imagine a lot of stores that would not allow your Honor to walk in there with Mr. Posner's credit card and say, hi, I'm -- I'm Dan Posner. I'm here to buy some towels.

THE COURT: Okay. All right. Thank you.

MR. SCOTTEN: Thank you, your Honor.

THE COURT: All right. Now, who's going to -- let's -- I just want to make sure on our time, just make -- I know we're already over an hour. So, we don't have to worry about the court reporter needing a break or anything, but I just wanted to check.

All right. So, who's going to speak first on -- on behalf of Perplexity?

MR. QUINN: I am, your Honor. John Quinn. I'm here for Perplexity. We have a presentation also.

THE COURT: All right. Well, I'm going to hear that as soon as you hand it up to me, which you did. Thank you.

Will you need the screen as well or --

MR. QUINN: Yes.

THE COURT: Okay.

MR. QUINN: Yes, I will I think.

THE COURT: Feel free to do that, but let me know

52

if you're doing it because, as I said --

MR. QUINN: I'll call -- I will call it out.

THE COURT: -- behind me, and I do want to look at you. So, all right. Go ahead.

MR. QUINN: Thank you, your Honor.

I'd like to begin by discussing the likelihood of success under Section 2030(a)(2), and the first question, the first question to be addressed is who's accessing Amazon's computer because the -- the CEAFA requires that there be access to a computer. Who's accessing?

Amazon's opening papers dealt with this -- the intentional access element of the CEAFA in just one sentence. They said, and I quote:

> "There can be no real dispute that Perplexity intentionally accessed Amazon's computers when deploying its Comet AI Agent into the Amazon Store through Amazon's private customer accounts."

Their entire case on access rests on this assumption. It is a faulty assumption that Perplexity is deploying the Comet AI and is accessing the computers. In fact, it is Amazon's users that are deploying from their own account in an authenticated authorized browsing session that they have initiated through the browser window.

53

If I could just maybe go back to -- I think the Court has a graph of how the agent works, but it might be useful to look at some screenshots --

THE COURT: Okay.

MR. QUINN: -- that show him actually in action.

THE COURT: Okay. Let's see. I'll back up a bit so that I can hopefully look at this and not lose track of you up there.

MR. QUINN: Yes. So, we're looking at page four.

THE COURT: Okay.

MR. QUINN: So, Perplexity's Comet is, of course, a Web browser. And that, of course, is software that loads websites on the user's device. It renders the pages, and it allows users to interact with those pages.

The Assistant is one feature of that browser. Now, this is information -- when you log in, this is information that Amazon returns to the user's browser. And the Assistant is a feature. When the user downloads the Comet Web browser, there is a box they can check. You'll see it in the upper right-hand corner. It's circled -- it's circled there -- is a box they can check to activate the browser.

This AI Assistant, you'll see, is entirely opt in. Users must discernibly enable it. And, once enabled, it never acts on its own initiative.

*Echo Reporting, Inc.*

54

THE COURT:  How -- can I stop you for just a second.  So, how do we get to this screen?  This would not be in our Amazon screen, correct, originally, because Amazon wouldn't have the Assistant up there, would it?

MR. QUINN:  Well, if they're using the Comet browser -- they have to be using the Comet browser.

THE COURT:  All right.

MR. QUINN:  So, they've logged into Amazon using the Comet browser.

THE COURT:  All right.  Now -- all right.  So, they're using the Comet browser which then brings up in the Amazon screen with the -- through the browser?

MR. QUINN:  Exactly.  So, Amazon would log -- Amazon returns certain information, HTML code.  So, he can then connect with the -- interact with Amazon website, and they can check that box that you see in the upper right-hand corner, and this is something the -- the user has to enable. It runs locally on the user's device.  So, the user has this on their browser.  And it only reacts to instructions from the human user.

As if any browsing session, Amazon returns this HTML code back to the user, and this is true whether the user is a human being or whether it's the Assistant, same thing happens.

The Comet that -- we can turn that, look at the next

*Echo Reporting, Inc.*

64

55

page, you'll see that we just enlarged that. That's what you'd check, that box. And if you check the box -- if we can turn to the next page, page six -- this side bar that you see on the right-hand side comes up. You see it says Assistant.

THE COURT: Um-hmm.

MR. QUINN: And so that would show that the Assistant is there, and if you then -- if you turn to the next page, if you give the Assistant then an instruction, this is what I want -- and this example you'll -- on page seven, you'll see the user has given an instruction, please purchase the best afternoon tea, et cetera, to have in the spring.

THE COURT: You lost me a moment.

MR. QUINN: This is on page seven.

THE COURT: Okay. Yes. Yes. I see it. I'm actually going to look at the printed --

MR. QUINN: Right.

THE COURT: -- slide to that one, looks smaller.

MR. QUINN: So, you've given the Assistant an instruction, and once you've given the Assistant an instruction, the Web page, you'll see it changes color. It becomes blue. It says the Assistant's on. It's been given a request, and it's on the request. And it starts to return information, and you see that in the browser window.

*Echo Reporting, Inc.*

56

And it reaches a point where it's found something that it thinks complies with the request. It's using the reading capability to comply with the request. And if we look at page seven, you'll see it's come up with a product that it thinks is responsive.

And at that point, it stops. You'll see over on the right-hand side, at the bottom, it says, complete the purchase of the tea. And you have to either -- at that point the user has to say, okay, that's what I want, click on purchase or, cancel.

THE COURT: Okay. Just go back to the very, very beginning. If someone wants to use its Assistant, all right, it -- it just downloads the Comet browser?

MR. QUINN: It got the Comet browser. You'll have that box, the option to use the Assistant. You can click it or not as you wish.

THE COURT: So, what, like Fire Fox, something like that or something different?

MR. QUINN: Well, that's another browser.

THE COURT: Okay.

MR. QUINN: Comet's a browser.

THE COURT: Okay.

MR. QUINN: It's a Chrome based. It's based on the -- the Chrome system, which is very common. I don't know if Fire Fox is.

57

THE COURT: Well --

MR. QUINN: Like any -- like any other browser.

THE COURT: Okay.

MR. QUINN: Browser that makes it possible --

THE COURT: Chrome?

MR. QUINN: Exactly.

THE COURT: Okay. So, they -- they download it. Now they've got Comet, and Comet doesn't show up immediately on Amazon, then, I would guess, but Mr. Posner, for example, as a sort of generic user has to then select that it wants to go to Amazon?

MR. QUINN: Yes, it does, like any other browser. You'd have to type in Amazon.com.

THE COURT: All right. Otherwise, you'd go look it up and --

MR. QUINN: Oh, yeah, whatever.

THE COURT: -- on the chart, Target, or wherever he wants to go, Best Buy, what have you.

MR. QUINN: Exactly.

THE COURT: Okay. And, so, anyway, but he ends up on Amazon, and then he gets to that first screen.

MR. QUINN: You get to that first screen.

THE COURT: That --

MR. QUINN: He's deciding he's using the Comet browser. He types in Amazon.com.

58

THE COURT:  Right.

MR. QUINN:  You see he's got the Assistant.

THE COURT:  Okay.

MR. QUINN:  He wants to use the Assistant to help him find some afternoon tea.

THE COURT:  Let's -- otherwise, he just uses it like a regular browser.  He's on Amazon?

MR. QUINN:  Exactly.

THE COURT:  All right.

MR. QUINN:  Exactly the same.

THE COURT:  But he wants to get this special service Perplexity.  Then he says, okay, Assistant.  Has he in some fashion given Comet his password that -- and he goes, fine, I want the Assistant.  How does the Assistant actually get in there?

MR. QUINN:  Well, I mean, he has to type in -- he has to type in Amazon if he wants to get to Amazon.

THE COURT:  Right.  He first gets to Amazon.

MR. QUINN:  Right.

THE COURT:  Now he's got this screen that looks pretty much like the Amazon screen except it's got this other option, the Assistant.

MR. QUINN:  Yes.

THE COURT:  So, he can either use -- essentially use this just like he could let's say Google Chrome or he

*Echo Reporting, Inc.*

59

could get the special attention that Comet could provide for shopping for him.  He doesn't have to do anything here, just going to give an instruction, well, here's the shopping list, buy this stuff, deliver them to me.  Okay.

But how is he enabling -- in other words, he -- he just clicks on Assistant, and somehow then Comet is able to get into his private account that otherwise would be password protected.  Has he in some fashion digitally conveyed his password to Comet?

MR. QUINN:  I mean, he's going to have to log in. He's going to have to log in if he wants to get to his own information, his own private information, and we'll get to that.

THE COURT:  Oh, okay.  Fine.

MR. QUINN:  All right.

THE COURT:  I jumped ahead.

MR. QUINN:  So, I -- I assume that he's just accessed the site.  He's decided, I want the Assistant to do this.  He gives the Assistant some instructions.  The Assistant comes up with some options on Amazon based on the information that Amazon provides, and you'll see there on page seven it's asking him, do you want this?  If you want this, you have to, you know, either purchase or cancel.

THE COURT:  Okay.

MR. QUINN:  That's the user's decision.

*Echo Reporting, Inc.*

60

THE COURT: Okay. Hang on. So, he's actually interacting with it at this point? He hasn't just turned the whole process over to Comet. He has then in some way had to acknowledge that --

MR. QUINN: And this all --

THE COURT: Well, hold on -- acknowledge that he wants what they've come up with?

MR. QUINN: If he wants to purchase it, the Assistant stops. And you'll see there either authorize the purchase or cancel.

THE COURT: All right. I'm on seven, which -- wait a minute. Did you want me to keep going maybe eight -- from seven to eight?

MR. QUINN: Yeah. So, it's actually page seven -- it's page eight at the bottom.

THE COURT: All right.

MR. QUINN: It says option, purchase or cancel.

THE COURT: Okay. Where does he select then, go ahead and buy? Is that on seven or eight?

MR. QUINN: That is on page eight. You'll see it there at the bottom in the right-hand corner.

THE COURT: Just purchased?

MR. QUINN: There's two boxes, purchase or cancel.

THE COURT: Okay.

MR. QUINN: Your decision.

*Echo Reporting, Inc.*

61

THE COURT: All right. So, he actually has to be staying with this in some way. He can't just originally click Assistant, tell him what he wants and then go do something?

MR. QUINN: Exactly. And this is invariably -- this is all of the cases.

THE COURT: Okay.

MR. QUINN: He can go make a cup of coffee while the Assistant does whatever it does. He comes back, oh, the Assistant has served this up. I need to make a decision. And then he can decide if he wants it, he clicks on purchase.

THE COURT: Okay.

MR. QUINN: And then, we get to page nine, and at this point, it says it's been added to your cart. To complete the purchase, this is where he has to actually log in. Please sign into your Amazon account at the current page and proceed.

So, he actually has to log in now. And this is where he's accessing -- they call it private information. Amazon at this point understands this is the person who's using it.

THE COURT: Okay.

MR. QUINN: So, he's logs in at that point, and then it goes to checkout. That's page 10.

THE COURT: Okay.

62

MR. QUINN: And, again, it says, place order now. You see it in his cart. Place order, and you can complete the order or, again, he can cancel. That's -- that's the process that happens.

THE COURT: Okay. Now, Comet is in it some way, isn't it?

MR. QUINN: I'm sorry?

THE COURT: Comet is in his account?

MR. QUINN: Comet is on the browser. Comet is on his device.

THE COURT: Okay.

MR. QUINN: It's local.

THE COURT: Okay.

MR. QUINN: Okay. So, this is not -- this is not Perplexity's service.

THE COURT: Okay. So, the argument that's been made in the papers is that somehow there's a distinction between being in just his account, which is kind of his, is separate in some manner from the Amazon computer, if you will?

MR. QUINN: Or from the Perplexity computers, and this -- this is really the key point.

THE COURT: All right.

MR. QUINN: Who is accessing Amazon? Is it Perplexity or is it the user. And like any other --

63

THE COURT: But just give me a chance to --

MR. QUINN: Sorry.

THE COURT: -- scroll through it for a second because if you lose me in your argument along the way, I get kind of lost.

MR. QUINN: Got it.

THE COURT: So, you know, if I'm getting promoted to the next frame, first I have to get past whatever is in this one.

So, your argument has been that the AI Agent has -- Comet has gotten into the user's account. I call it Mr. Posner. It's just easier to use him. But, in any event, it got into his account, and he's taking it to maybe not particularly a tea, and -- and from whatever's happened there, isn't really involving Amazon's computer or say Perplexity's server. So, everything's fine. In your view, you haven't done anything to Amazon. He's just -- he's in a safety deposit box, and Amazon is saying, well, how'd you get in there? And the box is really part of a hard system. It isn't just sitting there on the sidewalk. And, so, that's really the issue that we've got here is a technological matter which I -- you know, I can understand if the issue, quite frankly, were (indiscernible) happens most exactly, and if he can -- you know, you can continue now and we'll see where we get.

*Echo Reporting, Inc.*

73

64

MR. QUINN: All right.

THE COURT: Okay.

MR. QUINN: So, the Comet browser, like any browser, is resident -- it's local on the user's device.

THE COURT: Um-hmm.

MR. QUINN: And, yes, the user is obviously interacting with Amazon. The user -- the Perplexity servers are not interacting with Amazon. It's the user through this browser and this AI Agent which is resident on the local device.

THE COURT: So, you're saying Comet is backed off at this point, and it's not engaged in any way when the purchase is made?

MR. QUINN: No. The Assistant is a feature of the Comet browser. So, yes, that browser session is still open. What the AI is doing and what it's serving up is done in the context of that authorized browser session, using the AI Agent, which is part of the browser.

THE COURT: Well, let's go back. In other words, if we went back to nine for a moment and the AI Assistant is telling Mr. Posner, look, if you really want this stuff, you're going to have to sign into your account. And then, once he does that, does he turn it back over to the Assistant to make a purchase?

MR. QUINN: Well, the Assistant asks him, you

65

know, it's added to your cart.  We saw that.

THE COURT:  They're giving permission.  They're not --

MR. QUINN:  Yeah.

THE COURT:  -- running contrary to what he wants, but it sounds like the Assistant is taking the order.

MR. QUINN:  Well, he has to say, I want to do --

THE COURT:  Yes.

MR. QUINN:  He has to check the box ordered.

THE COURT:  Well, he's telling the Assistant, yes, go ahead and place the --

MR. QUINN:  Yeah.

THE COURT:  -- order, though?

MR. QUINN:  Yes.

THE COURT:  Okay.  All right.  Okay.  So, let's keep going wherever you want to go with this.

MR. QUINN:  Well, that's -- that's kind of how a purchase happens.

THE COURT:  Yes.

MR. QUINN:  And it's all -- it does not -- it's all happening between the browser and the Amazon site.

THE COURT:  Well, to the point that maybe they're just talking amongst themselves and haven't gotten into the private account yet, in other words, is still hanging out on the public account in some way until they get into the

*Echo Reporting, Inc.*

75

66

private one, maybe that is just operating pretty much in the public realm. But then at some point, the -- he, I'll just say Mr. Posner. Okay. Do you want me to get into the safe deposit box or don't you, because I can't really get back in there and deliver it to you because you're somewhere else and can't get it himself unless you let me, and if you let me purchase it, you're going to have to open in some way the safe deposit box, and you'll have to give -- or give me the key in some fashion. I can get in there, and I can get whatever it is, get out, and give it to you. I'm kind of in there, but I think interacting with Amazon's wallet in a private area somehow I got --

MR. QUINN: Once he's logged in, he's on his account. Amazon knows that it's him. But it's all --

THE COURT: They think it's him.

MR. QUINN: Yeah, they think it's him.

THE COURT: All right.

MR. QUINN: But it's -- it's still interacting between the browser, the user and Amazon.

THE COURT: Um-hmm. Okay. Now, there's an allegation that essentially it's based on what they think is essentially an acknowledgment by your client that they take some snapshots and send them back to I guess Perplexity, and do you want to tell me about that?

MR. QUINN: Yes. Yes. Exactly. The Comet

67

Assistant sends screen -- screenshots and MTL codes back to Perplexity's servers.  That's where -- that's the reasoning layer that -- so, the Comet Assistant receives this information from Amazon, and it sends screenshots back to Perplexity's computers.

THE COURT:  Why are they doing that, by the way?

MR. QUINN:  Because the reasoning layer about what images are being shown, served up, which are consistent with what the user says they want, that reasoning layer says, this is what you should click on.

There's an illustration here.

THE COURT:  Yes.  Thank you.

MR. QUINN:  It's -- yes, that's on page 12.

THE COURT:  Yes.  So, okay, I'm there.  So, I'm there, and it's a screenshot with some instructions as to that that's Amazon.

MR. QUINN:  All right.  So, the Comet Assistant on the browser sends screenshots, and this is interaction with Perplexity at this point.  You have the browser there sending screenshots of what the user sees, an HTML code and JPEG, back to the servers.  No other information, other than those screenshots, get sent back -- is sent back to Perplexity's servers.

THE COURT:  Okay.  And they're doing this for some reason --

68

MR. QUINN: Yes, because that -- that's -- Sorry.

THE COURT: If we both talk, it won't work. So, if I can just complete the thought here for a minute. Is it so that they can -- it can then serve Mr. Posner in the future, kind of keep some record of what he's doing or why is the thing sent on as opposed to just, okay. You did that thing and that's kind of it?

MR. QUINN: That's where the engineering is, the -- the reasoning layer I've referred to it, as the Perplexity computers that said, oh, Mr. Posner asked for this. This has been served up. Is this consistent with what Mr. Posner has asked for? So, the --

THE COURT: Okay. And cross-checking --

MR. QUINN: It's not really a cross-check because that reasoning -- once you click on it, the Perplexity computers having been sent this by the browser, looks at it and tells them this is what you should print out.

THE COURT: Okay.

MR. QUINN: So, the -- the communication here is always between, on the one hand, the browser, Comet and Amazon and Amazon and Perplexity.

THE COURT: Okay.

MR. QUINN: Perplexity provides that reasoning layer. It says, oh, you sent me the screenshot. This is it. This is consistent with what Mr. Posner wants, and

69

that's what you should serve up.

THE COURT: Okay. So, it actually is how it's activated, so to speak, so that the past can be complete.

MR. QUINN: Exactly.

THE COURT: Okay.

MR. QUINN: So, at no point is there a communication between Perplexity's servers and Amazon. Perplexity is never accessing Amazon. Perplexity is accessing information which is on the browser that Amazon accessed, that Amazon has sent and has rendered. Okay. So, it's already there. So, this -- this brings us -- this is what in grant total the Court called reactive data collection. If you're -- if another computer is merely reacting to data that the platform has already served up, there's no issue. There's no issue. It's not accessing the computer itself. It's accessing the browser. And this is the (indiscernible) case, and it -- they don't really have a response to this case, this notion of reactive data collection.

THE COURT: Okay.

MR. QUINN: No communications directly between Perplexity and Amazon, only with the browser.

THE COURT: Okay. All right. Let's -- unfortunately, I'm trying to find my other copy, but that's okay.

70

Even if material wasn't sent to Perplexity, isn't Perplexity responsible for its AI Agent, Comet, and should Comet be (indiscernible)?  Really, isn't it Perplexity that's sending it there and allowing it to be there?

MR. QUINN:  No.  It's the user, your Honor, the user who has given instructions, and --

THE COURT:  I know, but somebody somewhere -- and you say, oh, gee, it's not Perplexity.  It's Comet. Whatever thing does it, Comet -- and Comet's not doing anything wrong, but Comet -- you never even get to Perplexity.

And then my question is, well, whatever Comet's doing, isn't it doing it as an agent of Perplexity?

MR. QUINN:  It's doing it as an agent of the user. It's not using -- it's something that's a resident of the browser, but it's chosen to use the Chrome browser that has this feature.  And, like, the key from --

THE COURT:  Comet --

MR. QUINN:  No.  Comet is a process of Perplexity. But if something -- what would be illegal, what would be a problem, we can at least get over the first element of access if it's Perplexity was accessing Amazon's computers. And my point here is the Plaintiff's case here fails on the first element.  Perplexity does not access Amazon's computers.

71

THE COURT: Well, Comet can, let's say --

MR. QUINN: Comet --

THE COURT: Comet on behalf of Perplexity because Comet is just a thing. In other words, if somebody buys a car and it blows up in their face, they don't sue the car, right? They sue the company that made it. Okay.

So, all right. But, in any event, either way, what you're saying is whether it's Comet or Perplexity that should be responsible for Comet, that what happened in the private area of the Amazon website stayed there being run by the user, not by Comet in some way. Comet didn't do anything, that it interacted with Amazon in some fashion. Okay.

MR. QUINN: Well, Comet, like any other browser, did interact with Amazon.

THE COURT: Well --

MR. QUINN: And user --

THE COURT: Then what -- if it did in a way that interacted to the protected access with Amazon, why wouldn't Perplexity be responsible for their crime so to speak?

MR. QUINN: Well, I mean, it's the user that's logged in and has accessed what they call the protected area. That's something I think we can drill down on and talk about exactly what that is. But it's the user that's decided, I want -- I've logged in. I'm accessing my private

*Echo Reporting, Inc.*

72

areas.  And now I'm enabling the Assistant to help me there.

THE COURT:  Right.

MR. QUINN:  But, I mean, the -- I think that the crucial point here is there is no access by Perplexity to Amazon's computer.  What's happening is software that the user has chosen to download and use on its own device, locally stored there, is interacting with the Amazon website.

THE COURT:  Right.  And I think the whole dispute is coming down to if the user said it's okay, is it okay.  And that's what Amazon disputes.  In other words, they say, all right, even if you thought it was okay, based on what the user said was okay, once we weighed in and told you we didn't agree, then you can't do it, and Perplexity's position is, yes, we can.  You can't tell us we can't do it when the user says it's okay.  And then that's a question of how the law comes out on that point.

And I just want to make sure -- I've got various cases.  So, I have some that I have pulled out just to have handy over the loss issue because there was a number there.  And then I have a big stack with it that I have been going through when various (indiscernible) have been tied.  But, I was very organized when I came out here, but now I'm not so organized.  First on the list -- and let me see if I can find that, looking for it there.

82

73

(Pause.)

THE COURT: I want to just find the particular phrase in the case that we're relying on --

MR. SCOTTEN: I think it's Reactive -- reactive data collection, Brand Total.

THE COURT: Yes, the --

MR. SCOTTEN: There the other service that was accessing the data was acting on it, operating on data that Facebook had sent to the user. So, it was information that Facebook had sent to the user. The user had that information, and the Defendant they are Brand Total, like another social media network was reactive -- interacting with that data.

THE COURT: Right.

MR. SCOTTEN: Facebook said, you're violating the law. You're accessing our computer, and the Court said, no. That's reactive data collecting.

THE COURT: Okay. And that's where -- I should have that here, but, no. Let me find it. So, I just wanted to check that before we went too much further, and I want to take a little break to grab -- just a moment or two, and to just -- to make a check again where I might have it.

Why don't you just give me the cite, so that I make sure that I'm --

(Pause.)

74

THE COURT: Just give me the whole title and the language. I'm pretty sure that I have it, though.

UNIDENTIFIED SPEAKER: The full name of the case, your Honor, is Meta Platforms --

THE COURT: Um-hmm.

UNIDENTIFIED SPEAKER: -- vs. Brand Total.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: 605 F.Supp.3d, 1218. It's a case from this District.

THE COURT: Right. If we can go back for a second, and, as I said -- but I want to check both. That's the only one that --

(Pause.)

THE COURT: Aha. In a separate stack of super important cases that I should -- I was looking at it in great part for the loss question. So, take me to the page that you want me look at, and I will just double check that because this was Chips Bureau, and it's fairly recently --

UNIDENTIFIED SPEAKER: I think at least one package to look at is at 1260 to 61, 1261.

THE COURT: A long case. So, this is getting toward the latter part of it. Yes, okay. Thank you. Okay. And just give me a second here. I've got -- I was going to say I thought I had it, and I did and I thought it was so interesting that the -- Okay. One second.

75

(Pause.)

THE COURT: Yeah, here we have the reactive data collection phrase and (indiscernible).

So, in this instance, though, and I thought when I searched Meta was that our situation was somewhat different, and I'll give counsel a -- I'll give the attorney the last word since it's your motion. I'll give him a chance to explain why they think it's different.

You think it's the same because?

MR. QUINN: The Court found that Meta was sending information to the user, and the Defendant was only operating on that information that the user had. It was accessing and engaging and working with that information that Meta had already sent to the user.

(Pause.)

THE COURT: I'm not sure they were in the -- the private area. It was more like the user was distributing once the user got the information, sending it out to Brand Total, but that Brand Total hadn't dropped by itself into the private area. At least that's how I was reading it at the time, and if I'm wrong in any respect in that regard, please correct me in that.

MR. SCOTTEN: Well, I mean, by hypothesis, let's assume that some private information was pushed out by Meta, and that was in this repository of information that the

76

Defendant was operating with.  The Court says that's not accessing Meta's computer.

THE COURT:  Right.

MR. SCOTTEN:  And, so, here.  And, again, we should talk about private data and what they mean by that, private section.

THE COURT:  Okay.

MR. SCOTTEN:  But so here if -- where we -- Perplexity is only interacting with what Amazon has already sent, and it exists locally on the browser.

THE COURT:  I get it.

MR. SCOTTEN:  Perplexity is never interacting with Amazon.  So --

THE COURT:  Perplexity (indiscernible) Perplexity and Comet --

MR. SCOTTEN:  Yes.

THE COURT:  I'm not sure you can do that because Comet is acting on behalf of Perplexity.  If not, they should get a different --

MR. SCOTTEN:  We -- so, no question that the browser, Comet, is a Perplexity product, but it's the user that's deploying the browser, and it's interacting with Amazon.

THE COURT:  Okay.

MR. SCOTTEN:  And it's a -- it makes a fundamental

*Echo Reporting, Inc.*

77

difference here. The server -- the Perplexity servers are not accessing Amazon. They're accessing only what Amazon has already sent to the user.

And the -- there isn't -- so far as we're aware, your Honor, there's no case that has found that information that's already been sent, it's off the reservation, is accessed by some third party, that that's a violation, that that's access. That -- that satisfies the first --

THE COURT: Well, I agree with that. It's just a question of whether that's all that's being done here or not, and it would seem to me that it was different, but in any event, okay.

All right. Now, how about whatever else --

MR. SCOTTEN: Yeah. I mean the last word on that, your Honor, is that if the -- if the browser -- if the AI Assistant is an agent of anyone, it's an agent of the user. It's not -- Perplexity is not the one who has told the agent what to do. It's a product we put out in the marketplace. That's true.

THE COURT: Right.

MR. SCOTTEN: But we're not the one that told them -- gave instructions, or told them to go into Amazon and to decide to use this. The user's done all that.

THE COURT: Well --

MR. SCOTTEN: And, your Honor, if -- if Amazon has

*Echo Reporting, Inc.*

78

an issue with that, I would submit they have terms of service which don't bind Perplexity.  Now, they -- they don't dispute that.  There's no contractual relation.

THE COURT:  Yes.

MR. SCOTTEN:  The terms of service are with their user.  And, as I understand it, their view is their terms of service prevent users from using this AI Agent.

THE COURT:  Yes.

MR. SCOTTEN:  Their beef ends with their users. Their beef isn't with us because we created the product.

THE COURT:  Okay.  Thank you.  Perhaps -- The chances of (indiscernible) their own customer with --

MR. SCOTTEN:  I think pretty remote.  I -- I agree with that, your Honor.  I mean, their users -- this is a product that people are finding useful and want to use.  But that's -- so, that's the first element of access, and for the reasons I've said, I think their -- their claim fails at the first element.

The second element is that it has to be done -- access has to be done without authorization.  And here they rely on the Power Ventures case, and if you recall, in the Power Ventures case, Power Ventures was a competing social media site that somehow got a fake access -- got some Facebook user to share credentials so they could then go in, and what they did is they spammed all the user's terms.  They

*Echo Reporting, Inc.*

79

pretended they were Facebook. They said, you know, we're Facebook, invited them to join their competing site, took information from inside of the Facebook site. It was completely -- in fact, this was a time when I think the case was 2005, 2007, when the entire Facebook setting was password protected. You couldn't get on -- you couldn't log on without that, completely different circumstance that the Power Ventures solicited the Facebook user's login credentials, entered those credentials, logged in, scraped Facebook, misrepresented themselves to third parties, and Facebook -- used Facebook data to solicit Facebook users to join their social media site.

The Court said this is unauthorized. It doesn't matter if you got one person on the front end to share their credentials so that you get in and do all these things. The Court said that that was unauthorized. And Power Ventures was doing that for their own purposes, and this -- and I think that is -- that's a very important point here. In hiQ, the Court interpreted that rule, that there was no authorization as meaning you have to understand authorization in terms of the platform's purposes.

Facebook wasn't giving authorization for a competing social media site to go in and scrape all the data and take everything.

THE COURT: No. They say there's -- there's

80

nobody in the middle like you have here. All right. That makes an intermediate authorization which is Mr. Posner or his equivalent. But the question comes back to again whether that counts, all right, and what the Plaintiff's arguing is, fine. You got one authorization, but you didn't get our authorization, and then they cite case law to say you need ours, and you can say that Power -- you know, Power Venture is different because there was (indiscernible) and their motivation was different, and et cetera. So, it may be yours, but it doesn't mean that -- a little better. They still lost. So, that's the -- yeah.

MR. SCOTTEN: Well, I think what the hiQ court said --

THE COURT: Oh, we're on hiQ now?

MR. SCOTTEN: Yeah. It says --

THE COURT: I'll get that.

MR. SCOTTEN: And just to jump to my --

THE COURT: I mentioned that -- I think I need to pull that out. Keep going.

MR. SCOTTEN: Just to jump, my point here is, your Honor --

THE COURT: Right.

MR. SCOTTEN: -- that "authorization" has to be understood in terms of the purpose of the access. That's what the hiQ -- that's how the hiQ court interpreted Power

81

Ventures.  The Court said there:

"We specifically recognize that Facebook has tried to limit and control access to its website as to the purposes for which the Defendant sought to use it."

In other words, our purposes of accessing our site don't include scraping and supporting and enhancing a competing website.  You have to understand what is the purpose of --

THE COURT:  I understand, but motive isn't part of the law.  You know, somebody could do it for charitable purposes, saying, gee, you know, we're just trying to help out.  This is for the poor, and it still would not necessarily make it legal.

MR. SCOTTEN:  I understand that, your Honor.  But what I'm suggesting is that authorization is an element of purpose that's embedded in the concept of authorization, and that's what the hiQ court said.

For example, if we can go back to the bank and the safety box analogy --

THE COURT:  Okay.

MR. SCOTTEN:  -- if somebody goes into the bank premises with the purposes of legitimately going to their safety deposit box, that's authorized.  You don't even have

82

to ask the bank's permission.  That's the reason the bank exists.

THE COURT:  Okay.

MR. SCOTTEN:  If somebody -- and it was cited in the case -- if somebody walked in with a shotgun, there isn't authorization to do that.  There isn't authorization to go in with a weapon and make the prospect that you're going to conduct a robbery.  That's not authorized.

THE COURT:  Okay.  And how about somebody who is authorized brings their friend in and tries to bring him into the locked room?

MR. SCOTTEN:  Well, what's the purpose?  I mean, just to gloss over the friend, this isn't a person, it's a piece of software that somebody's chosen to enable.

But, your Honor, what's the purpose?  The purpose is to buy product from the Amazon website.

THE COURT:  No, no.  I understand you can say, what are you complaining about?  We're helping you make sales.  They say they want to make -- All right.  Then --

MR. SCOTTEN:  Yeah.

THE COURT:  -- they either entitled them to go up and stand by that position or they're not.

MR. SCOTTEN:  Yeah, they -- they can tell they're users if they want to establish that rule.  My point -- my only point here --

83

THE COURT: Okay. All right. Go ahead.

MR. SCOTTEN: My only point here is the hiQ court recognized that authorization must be understood in terms of the purpose of the access, and here the purpose is exactly the reason Amazon exists, to buy Amazon products.

THE COURT: Okay.

MR. SCOTTEN: So --

THE COURT: All right. Okay.

MR. SCOTTEN: -- we submit --

THE COURT: I understand that you are drawing contention that (indiscernible) would be made between what's going on here, which is not necessarily nefarious in any way or unreasonable, you could say. Between what's going on here and maybe in other cases on which the Plaintiffs are aligned, that these distinctions do exist, and their position is, nevertheless, what's going on is still coming under the statute. We're not accusing you of being horrible people necessarily. Maybe they are, but they may back off after a little bit. And let's perhaps -- pejoratives in that regard and are just saying, look, this isn't meaning what we want to do, and you -- you just told us that you figured that we're -- we're not bad guys and we should be able to keep doing it and serve the clientele, and it sounds like that's what we come down to, and I have to really look at the statutory language.

93

84

Do you want to do loss at all or do you want to stay on access?

MR. SCOTTEN: Well, I -- I do want to. I did -- I'm past access now. I'm now to the second element of authorization.

THE COURT: Okay. But we did talk about that. In other words, it's -- it's perfectly clear that the user has given authorization --

MR. SCOTTEN: Right.

THE COURT: -- to come into their space so to speak. Sit down. They're getting around there too, then turn it over. So, my original kind of example was -- with the safe deposit box is the user didn't even show up. They just gave the key, if you will, to their buddy because the more convenient was to let them go in and get whatever it was, and any cash they needed, and they weren't able to do it themselves. The buddy volunteered. And that's a little different. Let's say that they both go in together, for whatever reason, and then get lunch, you know, have lunch after. Come on in with me and then you'll find this interesting.

Anyway, the main thing is they go in together, and they're saying -- so, they aren't really just turning it over without any kind of control. The user is telling the agent what it can do and can't do and everybody recognizes

85

that. And, so, the question is do you still need authorization to be there, and the Plaintiff says, sorry, and our position is you do need our authorization to be there. And I don't even think at this point they're willing to say if you just stay with Comet instead of Mr. Posner, that we would give you authorization to be there. It was originally a considerable concern just the idea of not identifying one's self as being something other than just a regular person.

So, that they're not focusing on for this particular claim, except on a loss where they do say that their advertisers had to pay them when a person, real person, clicked on the ad and that it doesn't count if it's a search engine like Comet. And, therefore, because they're trying to be honest, even though you say, hey, I can get more money on this, they say, well, no, but we don't pay to do that and that we have to go back and figure out whether it was Comet and whether it was Mr. Posner and the individual, and then refund them, which they say takes time and effort. So, there is that concern, but we're not relying on it. Okay. In other words, you're saying your only problem is if you just (indiscernible) you would be fine, you could all go off then to do your business together.

So, at this point, it's just getting the authorization or at least I feel they have and they also feel that that's

86

important.

So, let's say you have authorization, in other words, the dispute here is do we need this or not.  They say yes.  You say no, and that they have loss, right.

MR. SCOTTEN:  And -- and the third element is that we have to obtain information --

THE COURT:  No.

MR. SCOTTEN:  -- from the computer.

THE COURT:  Let's go back.  I want to go back to the statute, and we'll look at it.  Let's start with 1030, and that's with --

Okay.  So, Section (a)(2) -- well, (2) and potentially access the computer without authorization or achieved authorized access.  That second alternative is what was before Van Buren.  And thereby obtained.  And then if you go down past (a) and (b) to (c), (c) says information from any protected computer.

Now, are you saying that Comet is not getting any information when it shows up with permission for Mr. Posner to be in his password protected area of Amazon?

MR. SCOTTEN:  If the user goes to log on and -- and accesses their private information, then, yes, the browser -- Amazon sends to that browser those Web pages which are interpreted.  So, the -- that's on the browser. The browser has that, and you an see it on the screen.

87

There's no question about that.

THE COURT: So, Comet sees it?

MR. SCOTTEN: Comet sees what the user sees. But, your Honor, Perplexity doesn't obtain that. All Perplexity gets --

THE COURT: Well, okay. But I -- this is an argument that we'll have to -- I hadn't really realized that is exactly what you were saying, that Comet's some kind of free agent that has nothing to do with Perplexity. If Perplexity didn't get anything but Comet did and Comet is let's say an agent doing what Mr. Posner tells it to do but it's also there as a product of or an agent of Perplexity, it's not just there to (indiscernible), because it's duplicative. And, so, it does exist in some way, sure. And if you're right that Perplexity is totally out of the picture, then Perplexity should belong in the lawsuit, unless one wants to say that they got information by the screenshots. Okay.

So, I want to see if Plaintiff is saying I need both or if they're saying, even if we never have the screenshots. We still have liability, access and fits under you know what's going on and okay.

So, that's the main one. To the extent there's any indication under (a)(4) as opposed to (2), I don't think they've made out a likelihood on (a)(4), which is the

88

fraudulent. We don't need to get into that or -- and then we get to whether then there can be a civil suit, and then we get into the loss (indiscernible) that this Court is pretty small given the nature -- the endeavor.

But, all right. So, you think they would have to do more than just Comet. They'd have to do more than just seeing on the screen what Mr. Posner or the user is seeing?

MR. SCOTTEN: What we're talking about now is the third element about obtaining information.

THE COURT: Yeah.

MR. SCOTTEN: So, you have to access the computer, and the defendant would have to obtain information from that computer.

THE COURT: Yes.

MR. SCOTTEN: And in shorthand, your Honor, yes, there are screenshots that go to the Perplexity servers. Perplexity servers get that from the agent that's on the browser. They don't get -- they don't act -- I've already made my argument about how we don't access the computer, but we don't get information from Perplexity's computer. We have to access it -- to be liable, we'd have to access the computer, and we'd have to get information from the computer. Perplexity only gets information from the user's computer, the information Amazon has sent, the periodic screenshots that were sent by the user's computer to

89

Perplexity's computer.

THE COURT: Okay. I'm showing Perplexity as the recipient in and of itself out for a minute and just look at what Comet is doing.

On the possibility that I find that Comet -- that Perplexity is responsible and what Comet did violates, can't -- okay. So, they're there, and they're seeing what -- in a protected access of Amazon.

Are you suggesting that they didn't bother with some of the things that Amazon might be particularly concerned about when they're just looking at things that could be seen anyway on the public website or are you not making that distinction?

MR. SCOTTEN: Well, I'm reluctant to -- I'm very reluctant to abandon the position that there's a difference between the browser and the AI enabled browser which sits on the user's computer and Perplexity's computer.

THE COURT: Okay. But you don't have to abandon it. I'm just saying let's say we stop there for a minute, and you don't have to concede the point. I'm just saying that if you didn't use it, go further. Perplexity is -- maybe you don't want to address that. I mean, it's fine. We can just look at it as the idea that what went to Perplexity is just something that the user handed it. Okay. All right. But they did hand it first to Comet, who sent

*Echo Reporting, Inc.*

90

it, if they did, to Perplexity, because the user can't send it directly to Perplexity.

MR. SCOTTEN: The user's computer did. The user's computer on which the Comet and the AI Agent have an enabled resides, but the user's computer sent screenshots. No information screenshots went from -- from Amazon to Perplexity. All that Perplexity got, its servers got, came from the user's computer.

THE COURT: Well, where in -- where the screenshot comes from?

MR. SCOTTEN: That comes from the -- the -- so, the AI Agent sends the -- the user's computer, including the browser, the AI, sends the screenshots to Perplexity.

THE COURT: Yes, but first the screenshots had to come from somewhere.

MR. SCOTTEN: That's -- that's a yes. They are screenshots of information that Amazon had sent to the user.

THE COURT: Okay.

MR. SCOTTEN: Or the HTML code --

THE COURT: Okay.

MR. SCOTTEN: -- in the browser session, and screenshots are sent to Perplexity.

THE COURT: Okay.

MR. SCOTTEN: Now, the information that's sent, the -- Amazon is -- makes a big point about the fact that

*Echo Reporting, Inc.*

91

this can be private information, and I think it's important we drill down on there's no claim with his credit card information, payment information. They were able to -- their expert describes how he constructed a test where he could navigate and, you know, go to Amazon, go to my browsing history, do a summary of my browsing history, and could cause it to take a screenshot and send that to a -- a sort of a faux Perplexity that he had set up. But all that information, private information they referred to, is the user's information, your Honor. I mean, you get -- I get the impression if you read their papers as if this agent is roaming around in the Amazon website and extracting private information. There is no extracting that goes on here. The user logs on. Amazon knows who the user is. It will serve up things which are similar to, you know, what you've shown interest in in the past. They would regard that as private information. And when you log on as somebody, Amazon knows who you are, and they would say, oh, that's private, you know.

THE COURT: Okay.

MR. SCOTTEN: But the point is it's the user's information. Amazon doesn't own the user's information.

THE COURT: No. Okay.

MR. SCOTTEN: It's all the individual -- and I don't think there's any case where there's a violation

*Echo Reporting, Inc.*

92

that's been found where it's the user authorizing the sharing of its own information.

THE COURT: Okay. And I'll get back to counsel for Amazon on this, but what I think is very interesting is you've picked Mr. Kim as the account holder on screenshot 10, so it relates to Jonathan Kim. And, so, using the account, I think Mr. Posner and -- is this your office address that you have here?

Anyway, so, that's Mr. Kim. I'm not sure what address that is.

Okay. So, now, do you want to -- question for time, I need to check just to see if anybody needs a break. If they don't, we'll just keep going. Let me check with the court --

(Pause to confer.)

THE COURT: We're doing fine because today I don't have any case management conferences. So, we'll come back and -- why don't we just say 15 minutes, come back in 15 minutes. Thank you.

THE CLERK: We're in recess.

(Proceedings recessed briefly.)

THE CLERK: We're back on the record.

THE COURT: All right. So, what do you want to start with?

MR. QUINN: Your Honor, just to wrap up, we've

93

talked about the first element, access. We've talked about the second element, authorization. We've talked about the third element, obtain information.

My first point on that it had to come from the computer rather than from the user. My Second point is -- and I don't think Amazon disputes this -- the information we're talking about is the user's own information. They used this term "private information". It's the user's own information.

THE COURT: Okay.

MR. QUINN: And I don't think that Amazon even contends that the user is not free to do whatever they want with their own information. I mean, I think arguably, this doesn't come under the act-- it's like somebody hacking themselves.

THE COURT: Sure. Well, then --

MR. QUINN: Arguably, I don't think this even comes under the act at all.

In the BrandTotal case, they somewhat similarly in granting summary judgment on the issue of access, the Court in BrandTotal noted that the data at issue is "information that Meta has never argued users are not free to share as they see fit".

THE COURT: Right.

MR. QUINN: My browsing history, I can share it

103

94

with Perplexity. I can share it with whoever I want. That is the only information we're talking about is the user's own information.

So, we don't think they've satisfied obtain -- the obtain information element. This is not private information in the sense used in the statute or used in the case law. There's no case law that says somebody can hack their own information.

And, also, the law is clear in Van Buren and the Nusaw (phonetic) case this statute is not a misappropriation statute. It's a -- call it hacking or improper access, what you will. Amazon doesn't have the ability to control what happens to the data, its data, after it releases it, after it returns it to the user.

THE COURT: Well, I'll accept that -- that to a certain extent, but aren't they getting information -- like, again, it's not necessarily information that the user wants to keep from Comet or Perplexity or anybody else that it wants to kind of engage with. But they're getting some information about the user's buying habits. They know that until you get into the actual private part, if you will, you know, the password protected, if you want to use that instead, probably feels better -- the password protected part, it isn't until you're in there that they know that Mr. Posner has -- you know liked this product enough that he's

95

actually went and bought it. Up until then, it can be I'm interested. I want to buy it, but then he may change his mind. Something -- something came up in the interim and he's decided he didn't want it. He's got something from Target. He's going to do something else.

But they -- they do find out that he's willing to buy and does buy because they're there when he buys it, and that's a little different than just making this personal information to have helping maybe with his shopping, if you will. It's a little bit different, but okay.

MR. QUINN: Yeah, we're not -- we're not talking about credit card information or information like that.

THE COURT: But when he buys -- let me ask you this question. Let's say somebody does find something on Amazon and it says, How you going to pay for it? Now, you could say if you got PayPal, I want to buy it with PayPal. Then they know you get somebody who knows how to use that PayPal account, but they don't know the credit card. But they may have a credit card on file or they may have to put one in, in which case it may just show ultimately the last four numbers, but they would get those if the -- the user has a credit card. That shows on the screen, doesn't it? I think it does.

MR. QUINN: Let' suppose it does. That's the user's information.

96

THE COURT: No, I understand.

MR. QUINN: And, so, the user has activated the agent. It's doing this.

THE COURT: No, no, I --

MR. QUINN: And -- and I think the record -- the record's undisputed let's say that if there's a screenshot, sends that kind of information like, Hey, you have this screenshot. It's deleted after 30 days.

THE COURT: Okay.

MR. QUINN: But the user is not objecting to that.

THE COURT: Fine. Okay.

MR. QUINN: So, this is --

THE COURT: I agree. That's --

MR. QUINN: This is not like any of the cases we've discussed.

THE COURT: Okay. Let's assume that they have to piece together bits of each case that's not the same and make one that looks like this one and have it, nonetheless, come under that is able to do that. I get your point. They're not really stealing something, all right, from the user, okay. There is an argument perhaps that Comet's stealing something from Amazon, and we'll see what they say about that. But it's not the idea that they are getting something that the user doesn't want them to have. They concede that.

*Echo Reporting, Inc.*

97

MR. QUINN: Right. And that's -- that's an important concession. They're -- they're --

THE COURT: Yes, I know, but we're back to the same point of if the user doesn't care, can Amazon nonetheless say that they do, and that's kind of what it keeps coming down to, and we'll see if that pans out when I hear the final remarks from Plaintiff's counsel.

Okay. Now, we have gone through the elements up to the idea of loss.

MR. QUINN: I -- we're up to -- we're on loss. We're up to that.

THE COURT: Okay.

MR. QUINN: Up to that issue on the underlying -- we acknowledge that there is some tension in the case law post the Van Buren case that the Ninth Circuit hasn't fully sorted out yet. You know, we -- we rely, of course, on the X court case, Judge Breyer's opinion in the internal investigations of an unauthorized access don't qualify as damages.

I think the language in the Van Buren opinion about the technological harm, that what we should be looking at here is that the Court, just as Judge Breyer says in that case, was the kind of harm that results from hacking. I mean, this is -- this is basically -- that that's the kind of activity --

98

THE COURT: What?

MR. QUINN: -- the statute is intended to address, the kind of harm that results from hacking. And I think he mentioned the case of example of corrupted files is another case that talks about software patches and the like.

And the cases that Amazon relies on here, the -- the Apple v. NCO and TK Global, neither of those cases came to terms with or contended with the -- the Van Buren Court's limitation of SGAA damages to those arising from hacking. That really -- that really wasn't disputed.

And in the Apple case, Apple went to the damages that arise from actual technological harm such as the cost of the developing and deploying security patches and software upgrades in response to malware attacks.

And we don't have anything like that here. And then the new authority that was lodged this week out of the 10th Circuit we think, of course -- we think it helps us, surprise, surprise, because there the 10th Circuit said:

          "Expenses related to business harms

          such as the cost of investigating our

          competitive use protective information

          obtained as the result of the TFAAA

          violation would not qualify."

QED. So, I mean, that's -- that's exactly our position. And the 10th Circuit based its decision on its

99

conclusions that the technological harm in Van Buren was dicta -- that it was dicta, but they acknowledged that the Ninth Circuit reached the opposite conclusion in hiQ Labs, that it was not dicta.  So --

THE COURT:  In dicta.

MR. QUINN:  Huh?

THE COURT:  In dicta they -- in dicta they described what the Supreme Court said in dicta.

MR. QUINN:  Yeah.  So --

THE COURT:  The Supreme Court is like double dicta.

MR. QUINN:  That's -- the point is that they acknowledged that the Ninth Circuit reached the opposite conclusion.

THE COURT:  Yeah.

MR. QUINN:  The Ninth Circuit said that wasn't dicta.  So --

THE COURT:  Well, they certainly are clear that the Ninth Circuit had said that in footnote somewhere of one of the opinions, but it was dicta because they had already gotten -- it was in a footnote because it was dicta in that particular case, although that's not a specific case.  But in this particular, since it -- the packet was in a footnote made it even clearer that it was just kind of a comment and not really even acknowledging that they have considerable

100

case law to the contrary, although that case law indicated Van Buren.  Van Buren created this whole problem, if you will, of what loss counts.  Up until then, the other kinds of losses were considered cognizable under Section 1030, and all of a sudden, in trying to make a point about why this police officer shouldn't be considered a criminal for going beyond what he was authorized to do, they decided to make the promise that this is so remote from what the statute is designed to do, specifically, keep out hackers and any damage that -- of the type that hackers create, and then all of a sudden, we've got now this whole issue that were they just going a little farther than they had to or otherwise. But, yes, and I was very -- kind of circled -- kind of underlined a part that you had said in your response to their perhaps totally -- not totally encapsulated noticed recent decision, and then he said, Look, you guys said a little bit about it, and that goes beyond the Local Rules. So, we get to say something too, and what we say is -- and they pointed out, one, that according to 10th Circuit, there's law in the Ninth Circuit, and we're in the Ninth Circuit, not the 10th, and also the language about what expenses would not qualify, and then you would put what the Plaintiff is saying is the expenditure that they made into that kind of related to this is harm such as the cost of investigating our competitive use information.

101

I'm not sure if they were thinking that was a little more remote than what we have here, but we did hear from Plaintiff's counsel on that. This was more or less at a minimum they're saying our loss was his to responding to that they're not checking out what they're doing later and whether or not they've managed to get some competitive edge out there once they have this information. But, yes, they didn't solve the problem at all. It's just one more commentary after <u>Van Buren</u> and, you know, some law that -- authority that's precedential is in that contiguous circuit, albeit not this one. (Indiscernible) sort of close to what I think your thoughts were.

MR. QUINN: If we -- if we drill down on the particular elements of the claimed damages, the damages of reopening customers' accounts that were -- were blocked, it was their decision to try to do a block, which turned out to be ineffectual, not because of anything we did. In fact, we didn't try to dodge that, contrary to what they say. That story is laid out in the papers. It was their decision to try to do that. As a result, it was predictable that some of their customers' accounts which had a problem, they had to spend money to do that. That was their own decision. They didn't call us up and ask us, you know, We're going to be blocked, and we're going to hold you accountable for it. Entirely it was their decision.

102

They have to reimburse advertisers because agents don't have eyeballs for something like that.

THE COURT: Don't they --

MR. QUINN: That's their business model. That's -- we had nothing to do with that. They -- we weren't -- they didn't consult us about that. That's -- that's something they have to deal with. They say it's like -- it's telling us that, you know, a doctor has to -- you know, somebody has to pay for a broken leg because somebody (indiscernible). Well, that kind of assumes the conclusion. That argument assumes the conclusion that we violated the act. So, I don't think they've identified any compensable harm here at all. None of it rises to the level of technological, as -- as your Honor knows, at least as we interpret the cases.

I'll turn now to irreparable harm, and I think this is maybe their weakest case of all, of all the elements for an injunction. They have an expert who's submitted mostly in a reply brief a parade of horribles of technical things about why agents and the -- you know, Perplexity's AI Assistant in particular, are riskier, are bad things, are prone to calamities and the like. But, your Honor, it is all utter speculation.

Under the case law that we've cited on page 19 of our opposition brief, they have to show more than that there's

112

103

actually a risk.  They have to show more than something -- this could go wrong or a vulnerability to your -- you have to show that it is likely, it's actually likely, and you have to identify specific facts that show why -- why it's likely.

Experts can look at this, and, you know, we can get a parade of experts who can come here and say, you know, this technology, this software, this agent, this one's more dangerous to that and rank them.  But the fact of the matter is in the real world, it hasn't happened.  They've had all kinds of engineers.  One of their experts tried to replicate one of these vulnerabilities and failures and said that he couldn't do it.  I mean, there had been a problem in the past.  We've had -- we fixed it.  There is no showing whatsoever that there's -- that in the real world those vulnerabilities have played out, and they want an injunction on a criminal statute that's a criminal statute where the Rule of Lenity applies?  I think their -- their case on irreparable harm doesn't get out of the starting gates.

Now, they had another argument.  They said, Well, accessing our computers, that in itself is irreparable harm, and they cite these cases where -- totally different scenarios like the -- you know, the case where they spammed the Facebook account and all the friends.

We did not take control of their computers.  We did not

*Echo Reporting, Inc.*

113

104

-- there's -- there was no changes to their systems, monkeying with their systems, no changes to their cyber security measures, activity monitors, access controls, logins. We did none of those things under -- under any view of the facts here.

So, and -- and on the -- I just -- I don't see it. This is an easy way out here I think. I don't see a case for irreparable harm.

I'll turn now to balance of the hardships. And this AI Agent for our browser, I mean, we're kind of a first mover there. This is a big advantage to us. We all know first mover advantages are important. I mean, to enjoin us, still a company that's had some success, when it's still an early stage company, to deprive us of that first move -- mover advantage right out of the box is an -- is a very significant hardship for us. And it's -- it's something we have -- obviously, you know, people appreciate it. It's something that attracts users to Perplexity. It would be a very significant hardship for us to use this -- lose this Assistant, which is discriminating for us.

Amazon is the biggest marketplace -- maybe the biggest marketplace online in the world. I don't know. I think they get something like it's the ninth most visited website. And to tell us -- us and our employees and et cetera that we can't go there, return all this data and all this browsing

*Echo Reporting, Inc.*

105

history, I mean, it's an extraordinary hardship that we'd be apprised with.

I don't see the hardship to Amazon at all. I heard -- I listened carefully when counsel was describing what the hardship would be to them, and I'm really not -- I'm not understanding. I -- I would have thought a case could be made that actually this is good for Amazon because it's easier to use Amazon and people -- they'll sell more products, but on that Amazon side where of the scales, I just don't see the case.

In terms of public interest, it's a public interest in innovation. The next new thing in artificial intelligence now is Agentic AI. We're all hearing that. Now, I am, maybe the Court too, learning something about that.

But there is an enormous public interest in advancing AI and new AI tools. And there's a public interest in consumer choice. They say that, you know, the use of AI degrades their customer experience. Well, wait a minute. Customers have decided to use the AI. They've decided that is the kind of experience they want. So, maybe they won't have the opportunity to be upsold, offered new products and all the other things that you get when you log in as you and are watching the screen and making the purchases themselves. They may regret that. But that's the customer choice. And, so, consumer choice, innovation, advancing the latest

106

technology I think all weigh in the interest of the public interest against entering an -- an injunction here.

And I'm going to end my remarks now unless the Court has some questions for me.

(Pause.)

THE COURT: Well, I did give counsel for Plaintiff an opportunity to discuss the question of a bond. I don't know if you want to get to that point since, of course, your argument is you should never be there. Mr. Scotten did talk about it, and if -- if you -- you know, on the chance that I might order an injunction, do you want to say anything about the bond?

MR. QUINN: I think -- maybe I'll defer to my partner.

THE COURT: Mr. --

MR. QUINN: I haven't honestly focused on that, your Honor.

THE COURT: All right. Well, I didn't spend a lot of time on it, but it is something that came up, and the concern -- oh, state your appearance.

MR. POSNER: This is Dan Posner for the Defendant Perplexity.

THE COURT: Thank you. The Amazon account --

MR. POSNER: I think I -- my shopping history, everything has been utterly exposed today.

107

THE COURT: So, Mr. Posner, one of the concerns the Court has was if it -- it was a situation where a bond might be appropriate or it's needed, that essentially Amazon is saying if -- if we have to cut out this part of our business, we are going to lose a very very large sum of money. But it wasn't like tied to how much business Perplexity is essentially doing in terms of funds by having the Comet, the agent.

MR. POSNER: Well -- well, I think that's in large part because that's not really how Perplexity's business operates. And the way that we justify the bond that we seek, which was a large significant number, was based on the valuation of the company and our product offering and the significance to a recent valuation of our introduction of the -- the Comet Assistant, the Agentic AI Program.

And I think it's, you know, intuitive that if a browser or an agent that part of the benefit of which -- a large part of the benefit of which is to do shopping, if that agent and browser could not access the largest online retailer that exists, people just aren't going to use it. They're certainly not going to use it for their shopping. They might not use it for anything. So, it would be devastating for this browser and the Assistant to be unable to access Amazon.com for what could be a year, two years, the length of the case. We all know how things work.

108

So, it -- it's not directly tied to some source of revenue stream that we'd be losing.  It's really reputation.  As Mr. Quinn argued about, the first mover advantage, the fact that we're still a growing company, and that we've got this product that's basically doing quite well.  If all the sudden we weren't able to access Amazon, that would -- it would obviously have severe consequences because I think that's fair to say.

I -- I will comment, and I hope we don't need to get here.  You know, Amazon didn't raise the issue of a bond in its motion.  We spent I believe all of a paragraph talking about it.  This is a significant case.  There would be significant consequences of an injunction.  If your Honor were, in fact, inclined to issue the injunction, it might make sense to entertain further briefing on the issue of the bond because of the amounts that we're taking -- talking about and the stakes here.  I don't know that this issue's been fully explored before the Court based on what we had the opportunity to submit to this point.  So --

THE COURT:  And let me just look for a second at all of the statements your file -- I should say you may be right that the -- let me just go here.  You addressed the -- Perplexity then toward the end of the brief regarding the bond, and I'm just double checking something here, and I think you are correct that that was the first time it came

109

up, and then in their reply, just to double check that, then at that point, Amazon then weighed in on the bond.

Okay. I just wanted to double -- double check that chronology.

MR. POSNER: Yes. And, so, I do think there's more detail that we could provide, including about the competitive landscape and what our competition is doing and -- and could and would be doing during the period during which we would be enjoined and the significance that that might have on our -- on our company's existence and value.

THE COURT: Well, okay. I'm not sure I want to get more briefing. That was one problem here. Okay. Well, I appreciate that further elaboration, and then I guess I'm going to go back to Plaintiff's counsel since they're the ones trying to (indiscernible).

MR. POSNER: Thank you, your Honor.

THE COURT: All right. Thank you, Counsel.

MR. KABA: Thank you, your Honor. Moez Kaba again, for Plaintiff.

The Court's already given us a lot of time. It's very obvious the Court is quite familiar with the case law in the record. So, if the Court will indulge me, I'd like to make just a few points in response, and obviously will answer any additional questions the Court has.

THE COURT: All right.

119

110

MR. KABA: We could start with the accessing information. I think the Court's really just honed in on the issue with Perplexity's argument here, but I would like to remind the Court of the record, and I think it answers the questions pretty definitively about Perplexity accessing information on Amazon.com's password protected area. So, if we could just go to slide 52 of our deck.

And, your Honor, I would call out for the record the declaration. These are not Amazon's words. These are Perplexity's words.

THE COURT: (Indiscernible.)

MR. KABA: Yeah. So, the words we are all now eagerly awaiting.

THE COURT: Well, alternatively --

MR. KABA: Yes.

THE COURT: So, otherwise, I was going to say I can go to what engaged me as to --

MR. KABA: Yes.

THE COURT: (Indiscernible).

UNIDENTIFIED SPEAKER: Thank you, your Honor.

THE COURT: Okay.

MR. KABA: Here is how Perplexity described what its Comet AI Agent does, and it's -- it's quite clear that Comet is just their product. I mean, your Honor's point, you don't -- you don't sue a product. You sue the entity

111

that owns and is responsible for the product. That's why they're here, to argue for what they want Comet to be allowed to do. We -- Mr. Posner just came up and said Comet is a big deal for us.

Obviously, they are (indiscernible) over what Comet is doing. And what Perplexity's CTO, the cofounder said, is that here is all the things our agent does. It navigates purposely through the site here, Amazon. It automates clicks within Amazon's use of interface, including on our secure web pages. It browses for you. This is how Perplexity advertises Comet. It's clicking. It's scrolling. It's interacting with the site.

So, this whole notion that, Oh, there's nothing going on back here. It's just -- it's just the user sitting around deciding what to do, that's not what their own CTO and cofounder admitted under oath, your Honor.

Let's turn then to the next slide and this whole idea of Magistrate Judge Spero's language -- I'm violating the rule of too many words on a slide, your Honor, but I'll go through it briefly.

This is, again, Perplexity's own declaration, this time by the Chief Business Officer, Mr. Shevelinko (phonetic), Docket 35. Perplexity says, Oh, your Honor, this is like BrandTotal. We are just reactively collecting information.

Now, your Honor already pointed out, as Magistrate

112

Judge Spero indicated in BrandTotal, that page, there was actually a violation on one part of BrandTotal's conduct and no violation of the other, and when BrandTotal talked about reactively collecting information, it said specifically during the user's normal operation of the (indiscernible). There was no intermediate party here, the AI Agent, in the middle clicking, scrolling, filtering information -- these are Perplexity's about what Comet AI does -- processing that information and providing information to the user.

In BrandTotal, the user was just getting information while they were normally operating the website, and then the user was deciding to send that information on to the Defendant, and that wasn't enough for a TFAAA violation in that case.

This is not that case. In this case, again, critically, Perplexity's own description of what it does, it says, as Mr. Shevelinko says in paragraph six, instead of passively displaying whatever content websites throw at a person, Comet works on the user's behalf, filtering noise, surfacing what matters, and handling routine tasks. He goes on to say Comet -- what sets Comet apart is its Agentic capability, the ability to find information and act on it intelligently and autonomously. This is Perplexity's agent accessing information by their own terms from Amazon's secure servers, and I thought this slide was actually -- I

*Echo Reporting, Inc.*

122

113

understand it -- and I'm pointing to slide 12 -- Perplexity's presentation. I think this gives away the game. They -- they're trying to draw an artificial distinction. They are admitting Comet is accessing Amazon and obtaining information from Amazon. But then they're saying, Oh, but Perplexity is sort of this other thing. Well, no, Comet is not an entity. Comet is Perplexity. So, the fact that Perplexity is going through its agent, Comet, to do so, does not immunize Perplexity from liability under the CFAA.

But they still -- and nothing we talked about for the last hour plus even touched on the California version of this statute, the CDAFA, which defines access even more broadly. The CDAFA also defines access to cause input to or cause output from a computer.

So, even if you take everything else Perplexity said about, Oh, Comet's just operating there in the background, it is causing input to Amazon's computer and causing output from Amazon's computer. That can also satisfy the access harm of this CDAFA.

I want to turn then, your Honor, to obtaining information. And here again, the Court need not take our word for it. We can look at Perplexity's own admissions in its declaration. In the Yarats declaration, your Honor -- again, this is Docket 35-02, Exhibit 3, which is the Yarats

*Echo Reporting, Inc.*

123

114

declaration -- it says when the Assistant requires contextual information, it may temporarily store a JPEG or HTML snapshot of the web page currently displayed on the user's device on a Perplexity server.

Your Honor, as you said, Okay. So, you're storing this snapshot. Where are you getting it from? They tell us they're getting it from the secure part of Amazon.com. It then says, Yeah, we have the rule. We won't keep it for more than 30 days and, you know, we'll use it for, in their words, "debugging potential errors". No idea what that means. But as your Honor pointed out, it doesn't matter under the text of the CFAA. 1030(a)(2) speaks only to obtaining information. It doesn't say for what purpose you're going to use it. It doesn't say what your motive is. It doesn't say if your motive's good or bad. That -- besides whether or not the law has been violated, the Court's got to just look at the text of the statute, and the statute directs us on all of these elements which have been met here.

So, what do we actually -- what is it actually coming down to? And the Court commented about very early (indiscernible) and in my esteemed colleague's argument here, which is isn't this just about Perplexity saying, The user told us to do this and Amazon saying, That's not enough? And I think that's exactly right, your Honor. And

115

I think the case of the Power Ventures is actually far more on point than Perplexity would like this Court to believe.

In Power Ventures, your Honor, it -- the users were giving consent.  In Power Ventures, the Ninth Circuit says, frankly, the consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computer after Facebook's express revocation of permission.  And that's 844 F.3rd at 1058.

THE COURT:  Give me just a second just to follow that --

MR. KABA:  Yes, your Honor.

THE COURT:  -- comment.  All right.  And we're dealing with the Ninth Circuit opinion?

MR. KABA:  We are dealing with the Ninth Circuit opinion.

THE COURT:  Which page were you on?

MR. KABA:  I was on page 1058, your Honor.

THE COURT:  Okay.  And if you'd just give me a moment to catch up --

MR. KABA:  Sure.

THE COURT:  -- with that.  All right.  Where were you quoting or what would you like to emphasize on that page?

MR. KABA:  I -- I'd like to emphasize, your Honor, the portion -- it's the beginning of the paragraph, that

116

first full paragraph on 1058.  It says:

"The consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission."

And then the Ninth Circuit answered the very question that your Honor asked.  It says, Well, okay, if Amazon's saying you need both, at the end of that paragraph, your Honor, we'll see.  It says:

"For Power to continue a campaign using Facebook's computers, it needed authorization from -- it needed authorization both from individual Facebook users who control their data" -- same argument, their data -- "and personal pages and from Facebook which stored this data on its physical servers."

Permission from the users alone was not sufficient to constitute authorization after Facebook issued its cease and desist letter.

But, your Honor, I want to point you to another part of the Power Ventures opinion which again squarely rejects the theory of Perplexity's defense here.  And that's on page

117

1067, your Honor.

THE COURT: Okay. I'm there.

MR. KABA: And the Ninth Circuit goes through the case law, and it says in the first full paragraph after, again, the beginning of that page, it says, Once permission has been revoked -- and, your Honor, it's sort of in the middle of that paragraph.

THE COURT: I see it.

MR. KABA: -- technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability.

So, the enlisting of a Amazon user to aid in Comet's access does not excuse Comet's liability.

So, in <u>Power Ventures</u>, you have users' consent. You have access to users' email addresses. That's all that was being taken, users' email addresses. No argument there that Facebook owned some -- some of the parties' email addresses. And the Ninth Circuit says, No. That is still a CFAA violation, and that's because, your Honor, as you said, you look at the statute. 1030(a)(2) says obtained information. It doesn't say obtains information that exclusively belongs to the Plaintiff. It says obtains information from any protected computer. And we have hit every single one of those elements, and we can rely on Perplexity's CTO and cofounder and Chief Business Officer's own admission to get

118

us there.

I'll touch briefly -- unless your Honor has further questions on the merits, I'll just touch briefly on the other elements that we talked about.

THE COURT: What were they?

MR. KABA: Oh, just on -- on -- we had heard some argument on irreparable harm, public interest. I -- Mr. Scotten's made those arguments. We -- we -- I would just -- I just want to emphasize --

THE COURT: You're leaving the loss part aside then. Just go to the other elements of I guess at that point we're on the preliminary injunction element.

MR. KABA: Yeah, well, I'll mention -- I'll mention loss because --

THE COURT: Well, that too.

MR. KABA: Yeah. I --

THE COURT: We talked about --

MR. KABA: We've talked about it at length. I would say -- I would say on loss, your Honor, we aren't -- you're -- you're absolutely right. I mean, the -- the declaration that details the 260,000 top loss at that point, it wasn't the -- the Moxy investigate what your competitor did with the data. That -- that's not what that amount was expended for. That amount was expended to put up a block, to investigate the intermission of the block, to restore

119

accounts, to correct the harm that occurred to Amazon as a result of Perplexity's unauthorized access.

I do -- I will just touch on your other point, your Honor, because you -- you made it, which is, Well, you obtained information kind of a couple of ways, you know. These are -- you're sending stuff back to your server. They're admitting they do that. They're also admitting in their -- in their declarations that they're getting instructions from Perplexity.

But all of this is a distraction because just the viewing of the information, your Honor, by Comet AI, the Perplexity AI Agent, is enough under the law, and -- and we note that your Honor in our reply brief at footnote three, we cite case law. We say Perplexity says that obtaining the information requires more than viewing it, but that's not what the law actually is. In the United States v. Strude (phonetic) case, which is a 3d Cal. case, it says:

"Obtaining information from a computer can be described as including inherently mere observation of the data. Actual application need not be proved."

There's another case we cite, Shamrock Foods from the District of Arizona 535 F.Supp.2d, 962, which says the statute confirms -- the legislative history confirms that the CFAA was intended to prohibit electronic trespassing,

120

not the substantive abuse of misuse of information.

And here the information that they are not only viewing -- did you have a question, your Honor?

THE COURT: No.

MR. KABA: Okay.

THE COURT: Just that wasn't actually a part I was thinking about. I was thinking more about the Van Buren issue that was raised.

MR. KABA: Yes, on loss. Is that right, your Honor?

THE COURT: Yes.

MR. KABA: Yeah.

THE COURT: In other words, assuming arguendo that whatever your client did once they found out that this was going on, would, at least in great part if not in totality cover -- or be covered as a loss under the statutory definition before Van Buren, which then created an issue in that regard.

I was just wondering if you wanted to say anything more about Van Buren. I don't think you need to --

MR. KABA: I --

THE COURT: -- because we have the -- whatever we've got and that created -- that was created there.

But I do want to ask you about 502 because let's assume for a moment that there is a problem under 1030 in light of

130

121

Van Buren. In 502 they define damages, all right. And in (e)(1) -- let's see. I guess it's the only one that says that -- if you want to get it in front of you first, I'll read you the part that I'm looking at.

MR. KABA: Yeah. I believe it's -- well, your Honor --

THE COURT: So, this is the Penal Code for Section 502.

MR. KABA: I -- I have it. I have it in front of me.

THE COURT: All right. So, if you're looking at (e)(1) and then you say compensatory damages shall include, and I -- I really don't like it when anybody uses that word because you never know if they mean it to say it includes but it isn't limited to or they're really saying consists of, and then particularly when it used shall, right. So, anyway, shall include.

Now it says any expenditure reasonably and necessary incurred to verify that a computer was or was not altered, damaged or deleted by the access.

All right. Now, it's what your -- because this doesn't have a problem as far as Van Buren goes, but if any of what you are saying your client had to do covered by the idea of checking to see if there was any alteration and damages to which --

*Echo Reporting, Inc.*

122

MR. KABA: Yeah, I think the -- the nature of the investigation and the response included and include whether or not this unintended intermediary has done something to the account, has engaged in transactions that should not have been engaged in, that's the part of the whole reason for the investigation that --

THE COURT: Not later but while it's being --

MR. KABA: Correct. Correct.

THE COURT: -- competitive. Defendants lay out -- and to me the Moxy case, for example -- which, again, it's not a Ninth Circuit case, but essentially saying, but you can't keep going on there.

For example, if you had patent infringement, you could check to see if there was infringement but not once somebody infringed what they did with it and what they made --

MR. KABA: Yeah.

THE COURT: -- and how they competed with you. That may be too far off.

MR. KABA: Right. And this --

THE COURT: -- they accuse excuse you.

MR. KABA: Yes.

THE COURT: Not essentially approximate loss if you want to do it that way.

MR. KABA: Okay. I mean, it's a fair characterization of their argument, and I think that you are

123

absolutely right, that the losses of which we have -- that we have identified are not the "and then what did they do with our information?"

THE COURT: No.

MR. KABA: I do want to, if I may, your Honor, point out another part of -- of (e)(1). So, your Honor's, looking to the definition of compensatory damages under (e)(1). I would say if you look at (e)(1), it says in addition to any other civil remedy, the owner of the system, et cetera, who suffered damage or loss -- that's broader -- may bring a civil --

THE COURT: Shall include. I'm just saying, unilaterally, they didn't have a definition of damages.

MR. KABA: That's right.

THE COURT: And, so, that probably just means that you have to first start with you suffered damage or loss. Then you could start arguing again, Okay. We had a loss. It wasn't damaged. 1030 you've got loss or damage or --

MR. KABA: That's right.

THE COURT: -- and now you may independently apprise. They didn't bother to say what loss would include. They have a definition of injury that's not included in any of the statutes you're relying on. So, again, I'm just saying maybe these things weren't written as well.

MR. KABA: Yeah. I mean, it's fair. And, of

*Echo Reporting, Inc.*

124

course, your Honor, 502(e)(1) says in addition to compensatory damages, we can seek injunctive relief. That -- that's what the --

THE COURT: Well, yes, but you first have to have I think a loss.

MR. KABA: That's where --

THE COURT: That's why I say you're not even (indiscernible).

MR. KABA: That's right. And -- and that is the point I think that where we're going, the dialogue that your Honor started with me the first time and continuing now is --

THE COURT: Okay.

MR. KABA: -- whatever the CFAA says, the California version doesn't seem to have a Van Buren issue so to speak.

THE COURT: All right. So, you wanted to talk a little more about public interest. What should know?

MR. KABA: Only to -- only to -- to reemphasize just two narrow points, your Honor. One is the harm from the loss of the access and control over one's access password protection system is recognized by the law as sufficient case after case as a violation of the statute CFAA or the California statute is enough.

But the second point I would make, your Honor, is all

*Echo Reporting, Inc.*

125

of this talk about public interest and consequences and innovation and -- and the need to have first mover advantage, all of that may be something Perplexity likes, but there is not a case out there that says you are allowed to do that while violating the statute.

So, yes, you can be as innovative as you want, and you ought to be innovative, and you ought to go out there and find as many customers as you want, but you don't get to keep and maintain your first mover advantage by going into password protected areas once we told you not to.  And there is no public interest or competitive interest in violating the law.

And here we are just talking about limiting access to Amazon's password protective area.

THE COURT:  Yes.  I do see Power Ventures as the -- well, courts have consistently held in CFAA cases that the public interest solution favors an injunction.  They then cite one case --

MR. KABA:  Yes.

THE COURT:  -- one case that says, so, consistently and in any event --

MR. KABA:  Well, I guess with Power Ventures no issue.

THE COURT:  As I was saying before you jumped in enthusiastically --

*Echo Reporting, Inc.*

126

MR. KABA:  Sorry.

THE COURT:  -- nonetheless, it does appear that one can say at least that there's always an interest against people violating the law.  All right.  But then, again, that's almost a given in any case in which anybody is getting an injunction because you couldn't enjoin someone from doing something that's legal.  So, I'm not sure where that goes exactly, but I do understand that at a minimum, if you have a right to keep people out and that if somebody says I -- I don't think I have to stay out, that you could enjoin them then from doing that, and then, if they keep doing it, then it's harmful to you, and the public interest has an interest in people not being harmed.

It's not the strongest public interest, but at least it -- it could be found to be that way.  In other words, yes, certain users would like people to come in.  Other users may think, no, they read this and they should stay out, that it's too much of this stuff going on.  Who knows?

But, all right.  It's a factor.  It certainly doesn't weigh against, as far as I can tell, whether we're -- it's something I could find weighed in your client's favor if everything else goes along.

So, okay.  I think you've covered --

MR. KABA:  I've -- yes, I'm happy to -- we're at -- we're at past the lunch hour, but I'm happy -- or at

*Echo Reporting, Inc.*

136

127

least into it, but --

THE COURT: Yes.

MR. KABA: -- I'm happy --

THE COURT: No. I think we've covered -- okay. Why don't you go ahead and have a seat.

MR. KABA: Okay. Thank you, your Honor.

THE COURT: All right. And I'll wait till he gets back there.

Okay. This is a case that required me to familiarize myself with areas that I've not been very familiar with, frankly. I do think it was interesting and that the various points that you've made are the best points that each of you can make for your perspective clients.

A little bit more has been said today to help clarify matters which I think is important, and -- and I think it was worth going through everything that we've gone through today, although, I thought that I had a pretty good handle on it before you came in. I do feel it's important to hear again if both of you are receptive to (indiscernible) on this.

I am inclined to make the following order, and if I do -- I may do a fairly brief order if I do what I'm inclined to do. If I do something different, then it would be longer and more descriptive with why I decided I want to do something differently than I'm expressing now. But I do

137

128

want to get myself a final opportunity, and don't -- don't worry, just make a ruling right now.

Now, I -- I understand where the Defendant is coming from and that they feel -- and I think they've made a pretty good showing that what their client does is helpful, that it's being done at the request of the account holder at Amazon, that there is not the traditional egregious behavior that often is covered by a criminal statute.

In the same light, what Comet and thereby Perplexity appears to be doing seems to fall under the statutes, which are quite broadly worded.  If someone gained access under 1030 and essentially under those circumstances doesn't have permission from someone who is entitled to keep someone out, in other words, that you do need their authorization, if they just get access, then that's the start of being liable, and then you have a question of whether there is any damage or loss that has occurred as a result.

Really, I guess I could say this.  It's a little bit broader under 502 than it is under 1030.  So, even though they can get kind of discussed together because they overlap quite a bit, but you do have to gain information under 1030 in order to have some kind of okay, not just show up and kind of sit there and -- I don't know, or blindfolded.  I don't know, anyway, to get any kind of information because now you're seeing things, some of which may be duplicated on

129

the public area and much of which is not.

We talked a bit about the information that can be gained here. At a minimum, somebody's shopping preferences, what they're going to buy, again, with authorization from the account holder.

And then 502 you really just have to show up there and have access. And then the damages or loss is written a little broader in some respects under 1030, and maybe a little narrower -- it's hard to tell because of the way it was written -- under (e)(1). But in either case, it looks like on the statutes that the Plaintiff has shown that they have suffered a cognizable loss.

Then a question I -- I guess is how that then fits in to go from there, because under 1030, we may have a more narrower interpretation of the language in 1030 by Van Buren, and, so, they do -- if I just go back for a second to -- just a moment. I just want to check one thing here.

(Pause.)

THE COURT: All right. In (g) of 1030, it says any person who suffers damage or loss. And then when you go to Van Buren, I don't know if they really may have lost so much or they were really looking at damage. My feeling is if the -- the Supreme Court really had to look at this issue, that they may then analyze it a little differently than they did when (indiscernible) has to do it and that

130

under 1030 that I would say that in all likelihood, the losses that are alleged here would not necessarily be excluded and be not compensable under Van Buren, but even if ultimately one were to be limited in the way that Van Buren is in order to bring a viable claim under 1030, you do have 502, and the Supreme Court hasn't weighed in on that at all. And I think that then at a minimum, that although I'm inclined to find that the Plaintiffs have shown a likelihood to prevail on 1030, if not because of Van Buren, then because of 502, that they still have shown a likelihood, and I realize there are issues here that the Defendant has raised about coverage. In a way, it's almost as if what they're doing shouldn't be covered. And one could say it's a public consent or maybe it's -- people ought to be allowed to bring these kinds of shopping assistants in and have them talk. But it -- it does seem like both statutes are very broad on this, probably internal, probably internal and that's just typical.

So, then we would get to -- to the preliminary injunction, and so -- all right. We've talked about likelihood. The next one would be injury. They have a right to keep people out who keep doing it, like Comet, then that's irreparable until they're told to stop.

Then -- so, then going to those elements -- and let me go back and -- I have a (indiscernible) out there. Okay.

*Echo Reporting, Inc.*

131

We have a balance, and, according to Plaintiffs, there's no balance because you can't do something that's unlawful. If I look at what the defendant is arguing, which is essentially providing a service that they won't -- they may be edged out of market if they came to amount if they got it early and others don't take over, but if, in fact, they can't raise that argument, if it's not lawful -- I don't know. Again, as I say, you can't get an injunction against someone who's doing something lawful. So, that would be always the case.

All right. So, it's not a -- in my view, it's not initially a strong tip in favor of the Plaintiff if we were only looking into this question, but I do think it does tip in their favor. And, so, we have that.

And then -- so, then the public interest, again, I think they get broad with that, and, although one could say that, again, just the argument you can't do something that's unlawful seems like it comes up pretty much all the time. Okay.

Because you have to have a claim before you get an injunction on it. You can't have a claim on something when you don't think it's contrary to either statutory or constitutional or common law. That covers that range.

If I do make this finding and have to consider a bond, I understand what was being said by Mr. Posner and in the

*Echo Reporting, Inc.*

141

132

papers by the Defendant, but this could be a significant loss of position in the market if it turns out that I am totally wrong and to win this case, it has to be decided on its merits, but the Plaintiff's case has not been proved up, and the same -- I can't just pull a number out of the air and put it on a bond, and I just have no idea at the moment what that particular segment of Perplexity's business is -- is worth either now or in the future as this case moves forward. I know that a request was made to -- to get a chance to elaborate on the bond, but I guess -- and that request perhaps could have been made earlier. If, for example, Perplexity wanted to say, okay, you've got a couple of issues here that are coming up really in the first instance in the reply and things weren't fleshed out before and we really want to come in and have a chance to do a supplemental declaration. We think -- and I'm like, Well, I've granted it, but I -- I really don't want to start expanding this matter now. I -- well, I recognize though that if -- if I am wrong, that Perplexity at the end of the day will have lost substantially some money, and they won't necessarily be able to recover it by saying Chen sued me. But I don't really quite know how to deal with that, I'm sorry to say.

So, this is -- this is a tentative. I think the presentation by the Defendant was very well presented on

142

133

this. You've done -- their position is very well presented in their opposing papers, and I think that the presentations here today made their position even clearer to me. I think that I have the view that the statute is so broad and covers people who may be performing a beneficial act that I'm kind of stuck with it. So, that is my tentative ruling.

I'd like to get an order out fairly quickly if I stick with that. And, so, it may be more abbreviated than some of the other decisions that you've seen cited to in Plaintiff's papers. I do want to thank you all for the time you've spent on it in the --

UNIDENTIFIED SPEAKER: Yes.

THE COURT: -- over the night and today. That will conclude the matter. Mr. Posner?

MR. POSNER: Well, may I have a brief word, your Honor?

THE COURT: Well --

MR. POSNER: You can tell me if --

THE COURT: -- the matter is submitted.

MR. POSNER: Understood. The issue I was going to raise, your Honor, if you're inclined to consider at all the issue of stay pending the appeal, if you're inclined to follow through on your tentative, we would ask for a stay pending the appeal, and I'll just note here we -- we could brief it, but on the issue of harm, to the extent that

*Echo Reporting, Inc.*

143

134

they're relying on sort of a legal presumption on the basis of the violation to show harm, I think that's telling that there really wouldn't be, you know, some catastrophic harm to them. They haven't really identified actual harm. They're -- they rely on essentially on violation.

So, we would say that it would -- it would be prudent to issue a stay pending the appeal whereas you've acknowledged that I believe it's the case that we would be suffering harm while the injunction is in place.

THE COURT: I can hear from Plaintiff's counsel in a minute, but I -- I'm kind of concerned about that because it isn't just that you're doing it. It's not quite as clean as, oh, the example I gave where there's too many (indiscernible) operating that it's fenced in. They're saying that as long as this goes on, they have to keep going at it and making adjustments and checking on things.

My initial response to that would be, No, you don't really have to do it because they're not doing anything wrong. But I -- I think that this appeal could go on for a long time, you know, that -- because whoever gets it is going to have to deal with the general liability as far as coming under the statute. Then they're going to have to deal with Van Buren and whatever the Ninth Circuit says in their footnote. Then it would just be quite lengthy and -- let me see what the opposition says, and I do want to

*Echo Reporting, Inc.*

144

135

understand.

MR. POSNER: I'll just do -- if there's a -- if there's an option for a stay pending appeal which we might request in writing. There's also an option to stay the injunction for I believe seven days so that we could file a request for stay in the Ninth Circuit. And at a minimum, if your Honor falls through on the tentative, we would ask for that stay.

THE COURT: Well, I might consider that, all right, to give you the -- the limited time to see if you could get something from a higher authority. Okay. I will consider that.

MR. POSNER: Thank you.

THE COURT: Let's just get the opposition up here.

UNIDENTIFIED SPEAKER: Sure. Your Honor, we would -- we would oppose a request for a stay pending the appeal. Their violations your Honor states is the tentative. Your Honor will have concluded that. We have the likelihood of success on the merits that there is, in fact, a violation here. And the other factors, as your Honor has already described, there is an ongoing harm to -- to us. We do have to continuously look at, investigate, determine what actions to take, particularly given that Perplexity, as your Honor knows in the record, disguises that it's there in the first place.

136

So, we would oppose. If they -- if they want to file a motion, then, of course, your Honor would rule on it in due course, but preliminary injunctions get -- get appealed and say you're not -- you're not entitled to a stay in any sense of the matter of right. But if they file papers, your Honor, we will -- we'll file our opposition and make sure the Court has a full record.

THE COURT: Well, I'm wondering do we need papers filed on it, but I guess that -- well, let me get both the options, and I didn't go over this like for the Plaintiff and I'll hear from the Defendant.

If the Ninth Circuit, particularly in light of the -- the case they had most recently after Van Buren, was really interested in taking a look at this and has a real question about it, maybe they should be taking a look at it early, but that still doesn't deal with 502.

Now, let's see. Let's say I did grant a limited stay that would give the Defendant an opportunity to seek a stay of my order. All right. (Indiscernible). And, so, they would file whatever they file. Then you would respond. And how long are they taking to -- if you know?

UNIDENTIFIED SPEAKER: In other cases I have before the Ninth Circuit it's been taking the completion of briefing plus about a month. And they don't do -- the motions now is just once a month.

*Echo Reporting, Inc.*

137

THE COURT: So, maybe out to about what then?

UNIDENTIFIED SPEAKER: Well, five to eight weeks depending on when the papers get out.

THE COURT: Okay. All right. So, not extraordinarily long, but just -- just so the tape recorder would know, that was just to -- don't know who was adding the -- that information.

Well, I'll tell you, if I -- and, critically, if I took the time to do a very long detailed order, perhaps it would take that much time while there wouldn't be decision anyway, and they would continue to do what they did during that time. So, we're not really losing that much time if I do a pretty short version and then the possibility of getting it stayed from the Ninth Circuit comes up. At that point, if they really think there's a -- a significant question here, maybe they should look at it. As I was saying, the behavior that's occurring, I wasn't blown away by the cyber security document. All right. That would be a particularly stronger reason not to have this data out there because -- I don't know how many of you keep getting notices that -- but if I have together all of the three services I get on credit reporting now because of people telling me that whatever I've got information that is in the app, I think cyber security is -- it's important, but I wasn't sure that that really was as strong a reason here for a lawsuit.

*Echo Reporting, Inc.*

147

138

So, all right.  I'm going to grant your request, your oral request.  I will -- once I issue -- and I may issue in your favor, then maybe --

MR. POSNER:  We'll hold out hope, and if your Honor's inclined to do the longer order that takes more time, we would welcome the Court's reasoning.

THE COURT:  Okay.  I think you've got the -- you know, like we've spent a number of hours here, and I've tried to make clear where I'm coming from, and I think I have.  If there's any gap in that reasoning, you can tell me now, not the agreement but just the -- like if I'm not covering something, then I -- I would endeavor to do that.  So, I -- what I'm going to do is I -- I'm going to grant you the request, all right.  Yes?

UNIDENTIFIED SPEAKER:  Your Honor, just to clarity, the request to grant the temporary stay so --

THE COURT:  Yes.

UNIDENTIFIED SPEAKER:  Not -- not the whole stay.

THE COURT:  Not the whole stay.

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  The mini stay.

UNIDENTIFIED SPEAKER:  The mini -- so, the seven-day stay so they could seek relief.

MR. POSNER:  And that stay would presumably run from the date of any order that the Court issues?

*Echo Reporting, Inc.*

139

THE COURT: Exactly, because I haven't ruled yet. I just want to go back one more time. I've seen the Plaintiff's very impressive job making their point for your client and you have also, and then, you know, the papers there aren't something that somebody could just say this is all malarkey and sit down. And, so, I really want to just make sure I haven't overlooked anything. And, so, I feel confident that I have considered this to the best of my ability, I haven't overlooked something, and I'm going to give it my best shot on the rulings, and I'm going to issue an order that's relatively brief, incorporates by reference what I've said today and possibly has a few highlights just to give you and idea. Then, at that point, I will include in it the stay pending your request to get a stay from the Ninth Circuit, in other words, a seven-day stay basically.

UNIDENTIFIED SPEAKER: Thank you, your Honor.

THE COURT: All right.

UNIDENTIFIED SPEAKER: And, your Honor, we think you -- you've got it all right.

THE COURT: All right. And --

UNIDENTIFIED SPEAKER: And with that --

THE COURT: -- they think I've got it all wrong. So, we will see when this comes down, but thank, you all. We are in recess at this time.

(Proceedings adjourned at 12:36 p.m.)

*Echo Reporting, Inc.*

149



140

*Echo Reporting, Inc.*

150

141

## CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber
Wednesday, March 11, 2026

*Echo Reporting, Inc.*

**HUESTON HENNIGAN LLP**
Moez M. Kaba (SBN 257456)
mkaba@hueston.com
Christine Woodin (SBN 295023)
cwoodin@hueston.com
Hagan Scotten (*Pro Hac Vice*)
hscotten@hueston.com
Billy Joe McLain (SBN 290682)
bmclain@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 866-4825

Attorneys for Plaintiff
AMAZON.COM, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMAZON.COM SERVICES LLC., a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>PERPLEXITY AI, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 3:25-cv-09514-MMC<br><br>**DECLARATION OF VAUGHN SCHERMERHORN IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF AMAZON'S MOTION FOR PRELIMINARY INJUNCTION** |

152

**<u>DECLARATION OF VAUGHN SCHERMERHORN</u>**

I, Vaughn Schermerhorn, declare:

1. I am the Director, Off Amazon Selection ("OAS") and Customer Reviews at Plaintiff Amazon.com Services LLC ("Plaintiff" or "Amazon"). I have held this role since March 2022. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could and would testify competently to such facts under oath.

2. In my role as Director, OAS and Customer Reviews, I oversee Amazon's Buy for Me feature, leading the teams that design and develop the necessary software, maintain and monitor security and privacy safeguards, and plan product enhancements and updates.

**I.    Amazon Introduced Buy for Me in April 2025.**

3. In April 2025, Amazon launched Buy for Me as a beta feature to allow customers to use Amazon to complete purchases from other merchant websites if Amazon does not sell the item directly.

4. Buy for Me enables Amazon to surface and list products available from across the internet. Customers can then find what they are looking for in a single, familiar experience on Amazon.

5. When Amazon has the appropriate capabilities, the Buy for Me feature is available, and Amazon enables the customer to instruct an AI agent to complete the purchase on their behalf, allowing customers to use their stored delivery preferences and payment methods to make a purchase from the merchant.

6. Merchants and products are surfaced on Buy for Me through an automated process, called "crawling," by which Amazon browses the internet and collects data from public merchant websites. Specifically, Amazon gathers product information available on a merchant's site.

7. Each listing also has product availability and pricing information. When a customer clicks on the listing and visits the full detail page for the product, Amazon also conducts a real-time offer refresh.

8. When viewing and purchasing a product through Buy for Me, Amazon customers

153

are informed that they are engaging with a product listing from a third-party merchant website. On Amazon, products surfaced through Buy for Me are separated from search results available directly through Amazon in a standalone "widget" with a black banner with high-contrast white font informing customers that they are viewing "Results from the web," and that they are able to "Shop other stores directly." On the product's detail page, instead of the usual yellow "Add to cart" and "Buy Now" buttons for products available on Amazon, products surfaced through Buy for Me include a black button that says, "Buy for me." Amazon customers are then informed in the same high-contrast font, "You're about to purchase from [third-party merchant website]."

9.     Both in the search results and on each product's detail page, Amazon includes a link labeled "Learn more," which, when clicked, takes customers to an FAQ page explaining that Buy for Me enables customers to "shop with AI assistance." *See Shop Other Stores Directly: Customer FAQ*, Posner Decl., Ex. J, Dkt. No. 60-12.

10.     The FAQ page reiterates that when a customer uses the Buy for Me service to buy a product, they are not purchasing a product from Amazon. *See id.*

**II.     Amazon Operates Transparently and Adheres to Industry Principles.**

11.     Buy for Me operates transparently and adheres to widely used industry principles for automated access.

12.     For example, when completing a purchase, Buy for Me identifies itself as an AI agent, by utilizing a user-agent string understood in the industry to signify non-human internet browsing.

13.     As another example, before building the Buy for Me listings, Amazon reads the relevant website's robots.txt file (available at the domain name/robots.txt) to read the site's coded instructions. Robots.txt is a standard across websites which provides certain code instructions in an established format on which parts of a website may be crawled. If a merchant's robots.txt requests that the part(s) of the website containing product information not be crawled, Amazon will not create catalog listings for that merchant's products listed on those parts of the website.

14.     As yet another example, if a merchant requires a CAPTCHA—a test designed to

distinguish computers from humans—at checkout or any other point, Amazon will halt operations on that webpage and will not complete the CAPTCHA.

15. Amazon securely provides the customer's name, stored delivery preferences, and payment method to third-party merchants when placing Buy for Me orders. Further, orders placed using Buy for Me use an automatically generated, anonymized email address with the @buyforme.amazon domain. Merchant emails sent to the @buyforme.amazon email are forwarded to the Amazon customer who placed the order without changes. The customer can also directly email the merchant regarding their order.

16. If a merchant types "buyforme.amazon" into a browser's URL field or into a search engine on the web, they will reach the Amazon FAQ page for Buy for Me, which explains what Buy for Me is. *See id.*

17. Amazon is compliant with prevailing security protocols for protecting customer information. Amazon's Buy for Me processes have been audited with a finding of zero defects.

### III. Amazon Respects Merchant Preferences.

18. Amazon respects merchants' choices about participation in Buy for Me, even if a merchant's site is public. Amazon has a public-facing merchant-specific FAQ page for Buy for Me, which conveys Amazon's Buy for Me operations. *See Shop Other Stores Directly: Merchant FAQ*, Posner Decl., Ex. I, Dkt. No. 60-11.

19. Amazon directs merchants who seek to opt out of Buy for Me to email branddirect@amazon.com. Amazon responds to opt-out requests within two business days. *See id.* A merchant's removal from Buy for Me is internally recorded. Less than 1% of merchants whose products are available through Buy for Me have opted out.

20. Amazon did not access a password-protected portion of Perplexity's website or violate either version Perplexity's robots.txt file rules when gathering Perplexity's product data to create listings. I have reviewed both Perplexity's April 2025 robots.txt file, a true and correct copy of which is attached hereto as Exhibit 1, and Perplexity's January 16, 2026 robots.txt file https://perplexity.supply/robots.txt, a true and correct copy of which is attached hereto as Exhibit

2. The URL pattern Amazon accessed, /products/any-product-handle.js, was not blocked by any "disallow" instruction in Perplexity's robots.txt file, either in April 2025, or in January 2026.

21.    As of January 16, 2026, Perplexity had not opted out of Buy for Me by emailing branddirect@amazon.com.  *See Shop Other Stores Directly: Merchant FAQ*, Posner Decl., Ex. I, Dkt. No. 60-11.  Regardless, as of January 20, 2026, Amazon initiated removal of Perplexity from Buy for Me.

22.    Bobo Design Studio is a merchant who requested to opt out from Buy for Me.  Once Bobo Design opted out of Buy for Me, Amazon promptly removed it from Buy for Me within two business days.

**IV.    Amazon Only Accesses Public Portions of Websites.**

23.    Buy for Me does not access password-protected portions of websites.  Buy for Me only completes transactions on public websites and does not bypass site security or override authentication requirements.

24.    Amazon is aware of a claim by Sammy Gorin Art that it restricted access to its product catalog information through password and authentication controls.  In that instance, however, the site's product catalog information was publicly accessible.

25.    Amazon gathers public product information from a merchant's websites by visiting "products.json," which is accessed by navigating to the [domain name]/products.json.

26.    Sammy Gorin Art's products.json page, available at https://sammygorinart.com/products.json, is not password protected, and contains product catalog information in HTML code.  *See Products*, Sammy Gorin Art, https://sammygorinart.com/products.json, a true and correct copy of which is attached hereto as Exhibit 3.  Amazon relied on that publicly available products.json data to surface the merchant's selection in the Buy for Me experience.  Amazon did not create any accounts to circumvent any wholesaler authentication barriers or otherwise attempt to navigate to protected areas of Sammy Gorin's site, or any other merchant's site.  Amazon did not access any password-protected pages on Sammy Gorin Art's website.

27.     Buy for Me would not have been able to complete a purchase on Sammy Gorin Art's website if authentication was required for checkout.  To complete a purchase upon a customer's request, the Buy for Me agent proceeds to a permalink for the cart of a merchant's website (*e.g.*, [domain name]/cart/[variantID]).  If password protection applies to the /cart portion of a website, checkout cannot be completed through Buy for Me.

28.     When Sammy Gorin Art requested to opt out of Buy for Me, Amazon implemented the necessary steps to promptly remove the merchant's products from Buy for Me.

29.     Buy for Me does not have the capability to use or create user credentials for third-party websites.  Buy for Me does not circumvent authentication or use user credentials to secure access to password-protected portions of a website.  Amazon investigates all reports of this nature, coordinates with the merchant as appropriate, and respects merchants' requests to opt-out.

-5-

Case No. 3:25-CV-09514-MMC
DECLARATION OF VAUGHN SCHERMERHORN

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on this 26 day of January, 2026, at Seattle, Washington.



Vaughn Schermerhorn

-6-

Case No. 3:25-CV-09514-MMC
DECLARATION OF VAUGHN SCHERMERHORN

Docusign Envelope ID: 1AD23EA9-4C58-4F6B-8591-C13C75902FAB

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Daniel C. Posner (Bar No. 232009)
danposner@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100

Andrew Schapiro (admitted *Pro Hac Vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1881
Telephone:      (312) 705-7400
Facsimile:      (312) 705-7401

Renita N. Sharma (admitted *Pro Hac Vice* )
renitasharma@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100

William Pilon (Bar No. 326487)
williampilon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:      (650) 801-5000
Facsimile:      (650) 801-5100

Attorneys for Defendant Perplexity AI, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMAZON.COM SERVICES LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>PERPLEXITY AI, INC., a Delaware corporation,<br><br>                    Defendant. | Case No. 3:25-cv-09514-MMC<br><br>**DEFENDANT'S SUPPLEMENTAL DECLARATION OF HENRY MODISETT IN SUPPORT OF OPPOSITION TO AMAZON'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. Maxine M. Chesney<br>Courtroom 7<br><br>Hearing Date: February 13, 2026<br>Hearing Time: 9:00 a.m. |

Case No. 3:25-cv-09514-MMC
SUPPLEMENTAL DECLARATION OF HENRY MODISETT

159

Docusign Envelope ID: 1AD23EA9-4C58-4F6B-8591-C13C75902FAB

I, HENRY MODISETT, declare as follows:

1.    I am the Vice President of Design at Perplexity AI, Inc. ("Perplexity").  I submit this declaration in further support of Perplexity's Opposition to Amazon's Motion for Preliminary Injunction.  I have personal knowledge of the matters stated below, and if called as a witness to testify to them, I could and would do so.

2.    I joined Perplexity in 2022 and have served as the head of Perplexity's Design team since September 2023.  As the Vice President of Design, I oversee all of Perplexity's software product design and creative studio, which maintains our brand and marketing materials.

**The Perplexity Store**

3.    Perplexity's online store has been in operation since 2024.  Perplexity sells branded merchandise including apparel (t-shirts, hoodies, long-sleeve tees, kids' clothing), accessories (stickers, notebooks, caps), home goods (coffee beans, espresso sets, mugs), artwork prints, and Perplexity Pro gift subscriptions.  Our website is https://perplexity.supply/.

4.    Perplexity has never maintained an Amazon seller account and has not authorized any third party to list or sell Perplexity products on Amazon.

**Amazon's Unauthorized Conduct**

5.    On or about January 6, 2026, we discovered that Perplexity's products were appearing on Amazon.com under Amazon's "Buy for Me" and/or "Shop stores directly" feature. Perplexity did not authorize, consent to, or have any knowledge of these listings before this discovery.

6.    Perplexity first became aware of the unauthorized listings when news reports emerged in the first week of January 2026 about Amazon's "Buy for Me" program enrolling merchants without consent, prompting us to search Amazon.com and discover that our own products had been listed.

7.    Upon investigation, we discovered that Amazon had listed our products, including Perplexity-branded t-shirts, hoodies, coffee beans, and accessories.  These listings included product descriptions, images, and pricing information taken from our perplexity.supply website without our

-2-                                                    Case No. 3:25-cv-09514-MMC

SUPPLEMENTAL DECLARATION OF HENRY MODISETT

160

Docusign Envelope ID: 1AD23EA9-4G58-4F6B-8591-C13C75902FAB

Case 3:25-cv-09514-MMC    Document 60-1    Filed 01/15/26    Page 3 of 3

knowledge, as well as our trademarked Perplexity logo reproduced without authorization. The following screenshot shows an example of these unauthorized listings appearing on Amazon.com:



8.     At no time did Perplexity receive any communication from Amazon requesting permission to list Perplexity products, notifying Perplexity that Perplexity products had been listed, or explaining the terms of participation in the "Buy for Me" program. Amazon enrolled Perplexity without any opt-in process.

9.     As of the date of this declaration, Perplexity products remain listed on Amazon.com.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 14th day of January, 2026 in Zurich, Switzerland.

By    *Henry Modisett*
        Henry Modisett

-3-                                                    Case No. 3:25-cv-09514-MMC

QUINN EMANUEL URQUHART & SULLIVAN, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Daniel C. Posner (Bar No. 232009)
danposner@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Andrew Schapiro (admitted *Pro Hac Vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1881
Telephone:     (312) 705-7400
Facsimile:     (312) 705-7401

Renita N. Sharma (admitted *Pro Hac Vice* )
renitasharma@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

William Pilon (Bar No. 326487)
williampilon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

Attorneys for Defendant Perplexity AI, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMAZON.COM SERVICES LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>PERPLEXITY AI, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:25-cv-09514-MMC<br><br>**DECLARATION OF DANIEL C. POSNER IN SUPPORT OF DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO AMAZON'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. Maxine M. Chesney<br>Courtroom 7<br><br>Hearing Date: February 13, 2026<br>Hearing Time: 9:00 a.m. |

I, Daniel C. Posner, declare as follows:

1. I am an attorney licensed to practice in the State of California. I am a partner with the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Defendant Perplexity AI, Inc. ("Perplexity"). I have personal knowledge of the matters set forth in this declaration, and, if called as a witness, I could and would testify competently to those matters.

2. Attached as Exhibit A is a true and correct copy of the article by Rafe Rosner-Uddin titled "Amazon accused of listing products from independent shops without permission" published in the Financial Times on January 6, 2026, available at https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2, accessed on January 12, 2026.

3. Attached as Exhibit B is a true and correct copy of the article by Annie Palmer titled "Amazon's AI shopping tool sparks backlash from online retailers that didn't want websites scraped" published in CNBC on January 6, 2026, available at https://www.cnbc.com/2026/01/06/amazons-ai-shopping-tool-sparks-backlash-from-some-online-retailers.html, accessed on January 14, 2026.

4. Attached as Exhibit C is a true and correct copy of the press release by Amazon Staff titled "Helping customers discover even more selection on Amazon" published on About Amazon on February 11, 2025, available at https://www.aboutamazon.com/news/retail/search-products-amazon-shopping-feature, accessed on January 13, 2026.

5. Attached as Exhibit D is a true and correct copy of the press release by Amazon Staff titled "Amazon's new 'Buy for Me' feature helps customers find and buy products from other brands' sites" published on About Amazon on April 3, 2025, available at https://www.aboutamazon.com/news/retail/amazon-shopping-app-buy-for-me-brands, accessed on January 13, 2026.

6. Attached as Exhibit E is a true and correct copy of the article by Allison Smith titled "Brands are upset that 'Buy For Me' is featuring their products on Amazon without permission" published in Modern Retail on January 6, 2026, available at https://www.modernretail.co/technology/brands-are-upset-that-buy-for-me-is-featuring-their-products-on-amazon-without-permission/, accessed on January 14, 2026.

-1- Case No. 3:25-cv-09514-MMC

DECLARATION IN SUPPORT OF SUPPLEMENTAL BRIEF

7.      Attached as Exhibit F is a true and correct copy of the Reddit post by user cwhite616 titled "'Buy It For Me' scam" published on Reddit in r/amazonprime on November 10, 2025, available at https://www.reddit.com/r/amazonprime/comments/1ot1hsw/buy_it_for_me_scam/, accessed on January 14, 2026.

8.      Attached as Exhibit G is a true and correct copy of the article by Luis Rijo titled "Amazon AI scraping project creates unauthorized listings for small brands" published in PPC Land on January 3, 2026, available at https://ppc.land/amazon-ai-scraping-project-creates-unauthorized-listings-for-small-brands/, accessed on January 14, 2026.

9.      Attached as Exhibit H is a true and correct copy of the news article by Athena Jreij titled "Palm Springs small business alleges Amazon listed products for sale without consent" published on KESQ News Channel 3 on January 2, 2026, available at https://kesq.com/news/2026/01/02/palm-springs-small-business-alleges-amazon-listed-products-for-sale-without-consent/, accessed on January 14, 2026.

10.      Attached as Exhibit I is a true and correct copy of the Amazon webpage titled "Shop other stores directly" (Merchant FAQ) published on Amazon.com, available at https://www.amazon.com/b/?_encoding=UTF8&node=204815362011, accessed on January 13, 2026.

11.      Attached as Exhibit J is a true and correct copy of the Amazon webpage titled "Shop other stores directly" (Customer FAQ) published on Amazon.com, available at https://www.amazon.com/b?node=204815148011, accessed on January 13, 2026.

12.      Attached as Exhibit K is a true and correct copy of the Amazon webpage titled "Terms of Use when you shop brand sites by directing Amazon to complete a purchase on your behalf," last updated April 3, 2025, published on Amazon.com, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=TvONBJQDmg1tTiTKVC, accessed on January 14, 2026.

13.      Attached as Exhibit L is a true and correct copy of the news article by Matt Day of Bloomberg, titled "Amazon AI tool blindsides merchants by offering products without their knowledge" published by The Seattle Times on January 12, 2026, available at

https://www.seattletimes.com/business/amazon-ai-tool-blindsides-merchants-by-offering-products-without-their-knowledge/, accessed on January 14, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed on this 15th day of January, 2026, in Los Angeles, California.

By _____ */s/ Daniel C. Posner* _____
Daniel C. Posner

-3-                                                    Case No. 3:25-cv-09514-MMC
DECLARATION IN SUPPORT OF SUPPLEMENTAL BRIEF

165

# EXHIBIT A

**⬛ Page Vault**

| | |
|---|---|
| Document title: | Amazon accused of listing products from independent shops without permission |
| Capture URL: | https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2 |
| Page loaded at (UTC): | Mon, 12 Jan 2026 20:50:05 GMT |
| Capture timestamp (UTC): | Mon, 12 Jan 2026 20:51:14 GMT |
| Capture tool: | 10.71.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/142.0.7444.177 Safari/537.36 |
| Operating system: | Linux (Node 22.21.1) |
| Capture ID: | cgehKxZi4AoKXGYUrDPaye |



Presented by          In collaboration with

**FT** LIVE    **IGNITES** ASIA

## FUTURE OF ASSET MANAGEMENT Asia
Navigating disruption, scaling new opportunity

6 May 2026 | In-Person | Park Royal Marina Bay, Singapore | #FTFoAM
Super Early Bird Special: **Save up to $770 on your pass when you book before 16 January!**

Book your pass

# FINANCIAL TIMES

     My Account

HOME   WORLD   US   COMPANIES   TECH   MARKETS   CLIMATE   OPINION   LEX   WORK & CAREERS   LIFE & ARTS   HTSI     FT Digital Edition   Portfolio   myFT

**Amazon.com**   ( + Add to myFT )

# Amazon accused of listing products from independent shops without permission

Complaints from retailers come as ecommerce giant sues start-up for sending AI 'agents' to shop without its consent





The $2.5tn online retailer has listed some independent shops' full inventory on its platform without seeking permission, four business owners have told the FT © Patrick T. Fallon/AFP/Getty Images

**Rafe Rosner-Uddin** in San Francisco

Published JAN 6 2026      💬 30 🖶

### Follow the topics in this article

US companies    ( + Add to myFT )

Retail sector    ( + Add to myFT )

Technology sector    ( + Add to myFT )

Ecommerce    ( + Add to myFT )

Amazon.com    ( + Add to myFT )

Amazon has been accused of listing products from independent retailers without their consent, even as the ecommerce giant sues start-up Perplexity over its AI software shopping without permission.

The $2.5tn online retailer has listed some independent shops' full inventory on its platform without seeking permission, four business owners have told the Financial Times, enabling customers to shop through Amazon rather than buy directly.

Two independent retailers told the FT they had also received orders for products that were either out of stock or were mispriced and mislabelled by Amazon, leading to customer complaints.



My Account

Two independent retailers told the FT they had also received orders for products that were either out of stock or were mispriced and mislabelled by Amazon, leading to customer complaints.

"Nobody opted into this," said Angie Chua, owner of Bobo Design Studio, a stationery store based in Palm Springs, California.

Tech companies are experimenting with artificial intelligence "agents" that can perform tasks like shopping autonomously based on user instructions.

Amazon has blocked agents from Anthropic, Google, OpenAI and a host of other AI start-ups from its website.

It filed a lawsuit in November against Perplexity, whose Comet browser was making purchases on Amazon on behalf of users, alleging that the company's actions risked undermining user privacy and violated its terms of service.

In its complaint, Amazon said Perplexity had taken steps "without prior notice to Amazon and without authorisation" and that it degraded a customer shopping experience it had invested in over several decades.

Perplexity in a statement at the time said the lawsuit was a "bully tactic" aimed at scaring "disruptive companies like Perplexity" from improving customers' experience.

The recent complaints against Amazon relate to its "Buy for Me" function, launched last April, which lets some customers purchase items that are not listed with Amazon but on other retailers' sites.

Retailers said Amazon did not seek their permission before sending them orders that were placed on the ecommerce site. They did not receive the user's email address or other information that might be helpful for generating future sales, several sellers told the FT.

"We consciously avoid Amazon because our business is rooted in community and building a relationship with customers," Chua said. "I don't know who these customers are."

Several of the independent retailers said Amazon's move had led to poor experiences for customers or hurt their business.

Sarah Hitchcock Burzio, the owner of Hitchcock Paper Co in Virginia, said Amazon had mislabelled items leading to a surge in orders as customers believed they were receiving more expensive versions of a product at a much lower price.

Document title: Amazon accused of listing products from independent shops without permission
Capture URL: https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2
Capture timestamp (UTC): Mon, 12 Jan 2026 20:51:14 GMT






Share

Save

My Account

Sarah Hitchcock Burzio, the owner of Hitchcock Paper Co in Virginia, said Amazon had mislabelled items leading to a surge in orders as customers believed they were receiving more expensive versions of a product at a much lower price.

"There were no guardrails set up, so when there were issues there was nobody I could go to," she said.

Product returns and complaints for the "Buy for Me" function are handled by sellers rather than Amazon, even when errors are produced by the Seattle-based group.

Amazon enables sellers to opt out of the service by contacting the company on a specific email address.

Amazon said: "Shop Direct and Buy for Me are programmes we're testing that help customers discover brands and products not currently sold in Amazon's store, while helping businesses reach new customers and drive incremental sales.

"We have received positive feedback on these programmes. Businesses can opt out at any time."



Unhedged: Chart of the Week

The Unhedged team tells the big stories from the world of finance in a simple, striking visual format

+ Newsletter sign up

Copyright The Financial Times Limited 2026. All rights reserved.

Reuse this content          Comments

## Latest on Amazon.com



**Lex Ecommerce**

Why big online retailers are setting up shop in the real world

PREMIUM



**Artificial intelligence**

Amazon overhauls AI team as chief declares an 'inflection point'



**OpenAI**

Amazon in talks to invest more than $10bn in OpenAI



**Renewable energy**

Climate rift opens between Amazon and rivals in row over data centre power










**Claer Barrett**

I've been caught out by a Ring doorbell – have you?


**Investment trusts 2025**

AI investing looks beyond the Magnificent Seven


**Nuclear energy**

Amazon's X-energy gets backing from Jane Street as investors bet big on nuclear


**Amazon.com**

Amazon joins Big Tech bond rush with $12bn debt sale

## Comments

### Comment guidelines

Please keep comments respectful. Use plain English for our global readership and avoid using phrasing that could be misinterpreted as offensive. By commenting, you agree to abide by our community guidelines and these terms and conditions. We encourage you to report inappropriate comments.

💬  Comments are closed on this story.

**All Comments** 30                                    Sort by  | Newest ⌄ |

—  **Rapid26**  5 DAYS AGO

This has the feel of a very early stage disruption to the whole e-commerce model that might be quite painful for the likes of Amazon. Interesting to see how this plays out.

👍 Recommend 1   ↩ Reply   ⌥ Share                                    ⚑ Report

—  **E8**  5 DAYS AGO

I recommend reading "the everything war" by Dana Mattioli. If you are interested in this subject

👍 Recommend 1   ↩ Reply   ⌥ Share                                    ⚑ Report

—  **do not resuscitate**  4 DAYS AGO
↩ In reply to **E8**
Thanks! I've just pre-ordered the paperback on amazon.

👍 Recommend   ↩ Reply   ⌥ Share                                    ⚑ Report

—  **Jonsdottir**  6 DAYS AGO

I'm trying to remember the last time I bought something from Amazon that was from Amazon, not a 3rd party.

Might as well go straight to someone who sells that thing - it's not going to be cheaper or quicker to get it via Amazon.

Example - the NHS have provided our elderly mother with non-spill cups, but nothing to clean them with. We have an old school hardware shop in my town that sells narrow bottle-brushes, perfect for cleaning the mouthpiece of these cups. It would have been quicker to

Example - the NHS have provided our elderly mother with non-spill cups, but nothing to clean them with. We have an old school hardware shop in my town that sells narrow bottle-brushes, perfect for cleaning the mouthpiece of these cups. It would have been quicker to go to the shop, buy the brush, an envelope and the stamps to send it to her house, than buy it from a 3rd party seller, who then packed it in a bag that wouldn't fit in the letterbox, and whose delivery service ignored the instructions on where to leave the parcel, ie NOT hanging out of the front door.

👍 Recommend 4   ↩ Reply   ⌁ Share                          🏳 Report

---

**Librarian Capital**  6 DAYS AGO

How this turns out will be influencial on the future of online marketplaces including Rightmove and Autotrader, as well as Online Travel Agents.

👍 Recommend   ↩ Reply   ⌁ Share                          🏳 Report

---

**Just a simple man**  6 DAYS AGO

I'd love to hear a US lawyer's opinion on Amazon's liabilities, if the independent retailer's website were to contain specific terms of use, prohibiting data scraping, or reuse of any of the content and materials presented.

Surely that would be such a slam dunk, that a class action law suit is probably being drafted as we speak?

👍 Recommend 3   ↩ Reply   ⌁ Share                          🏳 Report

---

**earnest**  6 DAYS AGO

Big tech is clearly too busy building moats rather than serving customers.

👍 Recommend 3   ↩ Reply   ⌁ Share                          🏳 Report

---

**Dairyfarmersdaughter**  6 DAYS AGO

How can businesses opt out then they never opted in in the first place. Shameful.

👍 Recommend 6   ↩ Reply   ⌁ Share                          🏳 Report

---

**Foreign Interference**  6 DAYS AGO

Starter for 10: Is Amazon a free market ?

👍 Recommend   ↩ Reply   ⌁ Share                          🏳 Report

> **Black Camel**  6 DAYS AGO
> ↩ In reply to **Foreign Interference**
> Yanis Varoufakis argues it's not even a market.
>
> Amazon bears closet similarity to an empty hall of mirrors (the consumers are completely isolated from each other).
>
> 👍 Recommend 3   ↩ Reply   ⌁ Share                          🏳 Report

---

**Chris1234**  6 DAYS AGO (Edited)

Amazon doesn't care about privacy. They literally have a product in Alexa that listens and learns based off of your data. Their entire business model is extracting rents and data

Document title: Amazon accused of listing products from independent shops without permission
Capture URL: https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2
Capture timestamp (UTC): Mon, 12 Jan 2026 20:51:14 GMT                          Page 5 of 9

172

**Chris1234**  6 DAYS AGO (Edited)

Amazon doesn't care about privacy. They literally have a product in Alexa that listens and learns based off of your data. Their entire business model is extracting rents and data through its website, that's all it is. They only care because they cannot control what an ai does. They need people to do the buying because their entire model consists of exploiting consumers and sellers alike. They cannot exploit an ai through their data and history the way they can a person. The government should use this in their anti Monopoly argument. Because it's exactly what a monopolistic corporation does

👍 Recommend 2    ↩ Reply    ⤳ Share                    ⚑ Report

**Multipass**  6 DAYS AGO

Is anti-trust law a lucrative field? The way things are going it seems soon I'll have to pay some tech bro oligarch just to turn on my computer.

👍 Recommend 7    ↩ Reply    ⤳ Share                    ⚑ Report

> **Chris1234**  6 DAYS AGO (Edited)
> ↩ In reply to **Multipass**
>
> Welcome to the new age feudalism brother
>
> 👍 Recommend 2    ↩ Reply    ⤳ Share              ⚑ Report

> **Foreign Interference**  6 DAYS AGO
> ↩ In reply to **Multipass**
>
> https://ubuntu.com/
>
> 👍 Recommend 1    ↩ Reply    ⤳ Share              ⚑ Report

> > **Multipass**  6 DAYS AGO
> > ↩ In reply to **Foreign Interference**
> >
> > I prefer Mint, snap is terrible.
> >
> > 👍 Recommend 4    ↩ Reply    ⤳ Share        ⚑ Report

**Panhandler**  6 DAYS AGO

"We have received positive feedback on these programmes. Businesses can opt out at any time." [said Amazon].

But that's the whole point: they shouldn't have to opt out; they should have to opt in.

👍 Recommend 39    ↩ Reply    ⤳ Share                    ⚑ Report

**Wally1031**  6 DAYS AGO (Edited)

I know a fair few SME's who say dealing with Amazon is a nightmare. There is probably a case of an OFT investigation.

👍 Recommend 7    ↩ Reply    ⤳ Share                    ⚑ Report

**Chrispy**  6 DAYS AGO

Isnt that theft by deception.

👍 Recommend 4    ↩ Reply    ⤳ Share                    ⚑ Report



≡  🔍          HOME  WORLD  US  COMPANIES  TECH  MARKETS  CLIMATE  OPINION  LEX  WORK & CAREERS  LIFE & ARTS  HTSI          👤 My Account

— Chrispy  6 DAYS AGO

Isnt that theft by deception.

👍 Recommend 4    ↩ Reply    ⌗ Share                                          ⚑ Report

— RupertS2  6 DAYS AGO

Amazon can do what it likes as they now control the market. We have no enforcement of the law here .

👍 Recommend 2    ↩ Reply    ⌗ Share                                          ⚑ Report

— cro13  6 DAYS AGO

Amazon will fall in a decade unless something changes drastically at the top. It's giving IBM.

👍 Recommend 2    ↩ Reply    ⌗ Share                                          ⚑ Report

— Baru  6 DAYS AGO

So if I'm an independent retailer:

- Amazon might scrape my site to see what I sell, then put those products for sale on their own site.
- They don't tell me they're doing this.
- They control everything about the Amazon listing - the prices, the description and content, how it appears in search results, who they advertised it to.
- If someone buys it on Amazon, they take their cut and order it from me but don't tell me anything about the customer.
- If there's a problem, Amazon dump it on me - e.g. their copied listing describes the wrong product - and the customer blames me.
- The only thing I can do is ask to opt out via emailing someone (a process that is probably made as difficult as possible)

Absolutely Kafkaesque.

👍 Recommend 70    ↩ Reply    ⌗ Share                                          ⚑ Report

  — Chrispy  6 DAYS AGO
    ↩ In reply to Baru
    thats theft

    👍 Recommend 4    ↩ Reply    ⌗ Share                                      ⚑ Report

  — bezier  6 DAYS AGO
    ↩ In reply to Baru
    Amazon not taking responsibility for returns is surely illegal—they're the ones who made a promise to the customer

    👍 Recommend 19    ↩ Reply    ⌗ Share                                     ⚑ Report

      — Stewie  6 DAYS AGO
        ↩ In reply to bezier
        If we require tech companies to be responsible these billionaires won't be able to become trillionaires, which apparently isn't acceptable.

        👍 Recommend 6    ↩ Reply    ⌗ Share                                  ⚑ Report

Document title: Amazon accused of listing products from independent shops without permission
Capture URL: https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2
Capture timestamp (UTC): Mon, 12 Jan 2026 20:51:14 GMT                                    Page 7 of 9



Document title: Amazon accused of listing products from independent shops without permission
Capture URL: https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2
Capture timestamp (UTC): Mon, 12 Jan 2026 20:51:14 GMT                    Page 8 of 9

175



☰   🔍          HOME  WORLD  US  COMPANIES  TECH  MARKETS  CLIMATE  OPINION  LEX  WORK & CAREERS  LIFE & ARTS  HTSI          👤 My Account

👍 Recommend 2   ↩ Reply   ⌁ Share                                                        🏳 Report

— **Italian_Owl**  6 DAYS AGO

Let's all start closing our Prime accounts?

👍 Recommend 7   ↩ Reply   ⌁ Share                                                        🏳 Report

> — **Reader**  6 DAYS AGO
> ↩ In reply to **Italian_Owl**
>
> I did this two years ago. I recommend it.
>
> Try stopping the auto-renew, let your subscription lapse, and if you do need NEED Prime, you can always turn it back on.
>
> 👍 Recommend 7   ↩ Reply   ⌁ Share                                                    🏳 Report
>
> > — **return of the ted**  5 DAYS AGO
> > ↩ In reply to **Reader**
> > I did too.
> > 👍 Recommend   ↩ Reply   ⌁ Share                                                    🏳 Report

— **DoctorNyet**  6 DAYS AGO

Goldman Sachs step aside! Amazon is the new vampire squid, sticking its blood funnel into anything it can find.

👍 Recommend 19   ↩ Reply   ⌁ Share                                                      🏳 Report

🖥 Top of comments        📄 Top of page

| Support | Legal & Privacy | Services | Tools | Community & Events | More from the FT Group › |
|---|---|---|---|---|---|
| View Site Tips | Terms & Conditions | Share News Tips Securely | Portfolio | FT Live Events | |
| Help Centre | Privacy Policy | Individual Subscriptions | FT App | FT Forums | |
| Contact Us | Cookie Policy | Professional Subscriptions | FT Digital Edition | FT Leaders Academy | |
| About Us | Manage Cookies | Republishing | FT Edit | | |
| Accessibility | Copyright | Executive Job Search | Alerts Hub | | |
| myFT Tour | Slavery Statement & Policies | Advertise with the FT | Business School Rankings | | |
| Careers | | Follow the FT on X | Subscription Manager | | |
| Suppliers | | FT Channels | News feed | | |
| | | FT Schools | Newsletters | | |
| | | | Currency Converter | | |

Markets data delayed by at least 15 minutes. © THE FINANCIAL TIMES LTD 2026. FT and 'Financial Times' are trademarks of The Financial Times Ltd. The Financial Times and its journalism are subject to a self-regulation regime under the FT Editorial Code of Practice.

*A Nikkei Company*

Document title: Amazon accused of listing products from independent shops without permission
Capture URL: https://www.ft.com/content/724c2910-76f2-45d7-8f2e-0ac5c82a5ad2
Capture timestamp (UTC): Mon, 12 Jan 2026 20:51:14 GMT                                Page 9 of 9

176

# EXHIBIT B

TECH

# Amazon's AI shopping tool sparks backlash from online retailers that didn't want websites scraped

PUBLISHED TUE, JAN 6 2026·5:16 PM EST



**Annie Palmer**
**@IN/ANNIERPALMER/**

WATCH LIVE

## KEY POINTS

Some online businesses are rebuking Amazon for listing their products on its site without their permission.

Amazon has been testing a program called "Shop Direct" that allows consumers to buy products sold on other retailers' websites.

A "Buy for Me" button featured on some items uses AI to purchase products on a customer's behalf.

Follow your favorite stocks   **CREATE FREE ACCOUNT**

**In this article**

AMZN  **-5.63 (-2.32%)**

CNBC

   



**Packages in a United States Postal Service (USPS) truck near the New York Stock Exchange (NYSE) in New York, US, on Monday, Nov. 24, 2025.**

*Michael Nagle | Bloomberg | Getty Images*

[Amazon](#) has angered some online retailers that say they didn't consent to have their products scraped and listed on the e-commerce giant's sprawling marketplace.

In February, the company announced ["Shop Direct,"](#) a feature that lets consumers browse items from other brands' sites on Amazon. Some of those items include a button labeled ["Buy for Me,"](#) an artificial intelligence agent that can purchase products from other websites on a shopper's behalf.

Amazon pitched the services, which are in testing phase for some U.S. users, as a way for shoppers to "find any product they want and need," including items that aren't available on its site. Over the past decade, Amazon has increasingly turned to third-party merchants for products, and now says more than 60% of sales on its retail platform are from independent sellers.

In recent weeks, some businesses began to object to their products being sold on Amazon without their permission, according to [posts on](#) [Reddit](#) and [Instagram](#). Retailers, in some instances, said the program resulted in Amazon listing products that they never sold or that were



Amazon's AI shopping tool sparks backlash from some online retailers

"Sounds like a great program until the agentic AI starts selling customers things you don't have, all while your shop has no idea it's sending the wrong items to the customer," Hitchcock Paper, a Virginia-based stationery shop, said in an Instagram post in late December.

The paper retailer said it discovered it was part of the program when it began receiving orders for a stress ball product, which it doesn't sell, from a "buyforme.amazon" email address.

Bobo Design Studio CEO Angie Chua said she started receiving orders from Amazon's Buy for Me agent last week even though she hadn't opted in to the program. Her company sells stationery and journaling accessories through its Shopify website as well as a storefront in Palm Springs, California.

Chua told CNBC that, based on Amazon's instructions in an FAQ on its site, she reached out to the company to request that it pull her products. The listings were taken down within a few days, but she said the experience left her feeling "exploited."

"We were forced to be dropshippers on a platform that we have made a conscious decision not to be part of," Chua said, referring to an online retail model that involves selling products to shoppers without storing the inventory.



**VIDEO** 05:30
**How AI could upend shopping**



Case 3:25-cv-09514-MMC Document 60-4 Filed 01/15/26 Page 5 of 8

More than 180 businesses who sell their goods on Shopify, Squarespace, WooCommerce, Wix and other platforms have since contacted Chua to share that their products were also listed on Amazon without their permission, she said.

An Amazon spokesperson told CNBC that Shop Direct and Buy for Me help customers find products not sold on its site, "while helping businesses reach new customers and drive incremental sales," and that the programs have "received positive feedback."

"Businesses can opt out at any time by emailing branddirect@amazon.com, and we remove them from these programs promptly," the spokesperson said. The company said product and pricing information are pulled from public information on a brand's website and that Amazon's system checks to make sure the item is in stock and the price is right.

Amazon has said that Buy for Me remains an "experiment" and that it doesn't collect a commission when customers use it to make a purchase. In November, the company said the number of products available through Buy for Me had increased from 65,000 at launch to more 500,000.

It's all part of Amazon's push into e-commerce agents, a technology that could potentially disrupt how people shop online. Companies including OpenAI, Google    and Perplexity have released features that allow consumers to purchase products from retailers and online marketplaces without leaving a chatbot window.

Amazon has blocked dozens of agents from accessing its site, while investing in its homegrown AI tools, and in November the company sued Perplexity over an agent in the startup's Comet browser that allows it to make purchases on a user's behalf.

In the complaint, Amazon alleged Perplexity took steps to "conceal" its agents so they could continue to scrape Amazon's website without its approval. Perplexity called the lawsuit a "bully tactic."

In 2024, Amazon released its own shopping chatbot called Rufus, which now has some agentic capabilities.

**WATCH:** Market not pricing Amazon's business blend correctly



181

Amazon's AI shopping tool sparks backlash from some online retailers



**VIDEO** 02:55

Market isn't pricing Amazon's business blend correctly, says Powers Advisory's Matt Powers

Follow your favorite stocks   **CREATE FREE ACCOUNT**

**In this article**

AMZN **-5.63 (-2.32%)**

## TRENDING NOW



**CLUB** We're booking profits in a stock looking to cash in on a hot-yet-unprofitable investing craze



**CLUB** This portfolio stock may be on the chopping block if it doesn't deliver on earnings



Stocks making the biggest moves midday: Biogen, Rivian, Bank of America, Airbnb & more



Trump says anything less than U.S. control of Greenland is 'unacceptable' ahead of crunch talks



Amazon's AI shopping tool sparks backlash from some online retailers



**Sen. Warren says Trump called her to work on credit card interest rate caps**



Subscribe to CNBC PRO

Licensing & Reprints

Select Personal Finance

Closed Captioning

News Releases

Corrections

Site Map

Careers

Contact

Subscribe to Investing Club

CNBC Councils

Join the CNBC Panel

Digital Products

Internships

About CNBC

Podcasts

Help

   

**News Tips**

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

**Advertise With Us**

PLEASE CONTACT US

 **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

**CNBC**

Amazon's AI shopping tool sparks backlash from some online retailers

☑☒ Your Privacy Choices

CA Notice

Terms of Service

© 2026 Versant Media, LLC. All Rights Reserved. A Versant Media Company.

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by



184

# EXHIBIT C

**Amazon News**  ☰

News  /  Retail

# Helping customers discover even more selection on Amazon

We're experimenting with helping customers find products from other brands' sites when they search in the Amazon Shopping app.





 Written by Amazon Staff

February 11, 2025                                                    2 min read

**Amazon News**

Amazon offers a broad selection, carrying hundreds of millions of products, including 300 million items available with fast, free Prime delivery, across more than 35 categories including home, apparel, beauty, grocery, and everyday essentials. Because every customer and every shopping trip is unique, Amazon works to cater to every need, want, interest, and occasion. In the past year alone, we have increased product selection by millions of items at every price point, from luxury designers to everyday essentials. Last year, we introduced everything from premium brands like Clinique, Estée Lauder, Oura Rings, Armani Beauty, kate spade new york, Kiehl's, and Dolce & Gabbana Beauty to new shopping experiences like Amazon Haul where customers can find ultra low-priced products.

Building on our mission to make customers lives better and easier every day with wide selection, low prices, and convenience, we're now testing a new shopping experience in beta where we'll show select products in our search results even if we don't sell them in our store, and link to the brand's website to make it easy for customers to purchase them there. These items will show up alongside the hundreds of millions of products sold directly on Amazon. Customers will be able to click on the link and go to the brand's website to evaluate the product, see pricing and delivery options, and make purchases directly from that brand.



**How customers are making more informed shopping decisions with Rufus, Amazon's generative AI-powered shopping assistant**

187

**Amazon News**

"We're continuously working to expand selection and make shopping even more convenient for customers," said Rajiv Mehta, Amazon's VP of search and conversational shopping. "We're testing bringing more selection and brands into our search results to help customers find even more of what they want and further improve our shopping experience for customers."

This experience is currently live for a subset of U.S. customers in the Amazon Shopping app on both iOS and Android, and we'll roll out to more U.S. customers and incorporate more brands based on feedback.

## Fast, simple product discovery from Amazon and across the web

When customers who have access to the beta search for a brand and/or item, we'll show relevant products found in Amazon's store as well as select products we don't carry that are available directly on another brand's website.

188

**Amazon News**



Tapping on "See More" will direct customers to more results from that brand. When a customer clicks on a product that is sold in a brand's store off Amazon, they will receive a notification they are leaving Amazon, and will be redirected to the brand's website. If the brand has Buy with Prime enabled products, Prime members can enjoy fast, free delivery, easy returns, and 24/7 customer support for items purchased directly on the brand's website.

189



"We know customers have many options for where to shop, and we look forward to customer feedback on this new experience as we work to further improve selection, value, and convenience."

## Sign up for the weekly Amazon newsletter

Enter email

Amazon Privacy Policy Opt out anytime

Find more information on how to shop brand sites directly.

## Trending news and stories

- Everything to know about the new 'Spider-Noir' series, coming to MGM+ and Prime Video
- 'Thursday Night Football' 2025 schedule: How to watch live on Prime Video
- 'Wicked: For Good' is available on Prime Video—here's how to watch it
- How to watch 'Beast Games' Season 2 on Prime Video

RELATED TAGS

Retail    Shopping    Customers

Share

190

**Amazon News**

More Amazon News     ‹     1 / 2     ›



### How to use Amazon Family to manage digital content and share many Prime benefits with your family members

Jan. 8, 2026

Retail



### 5 ways Amazon's newest Dash Cart can save you time and money

Jan. 7, 2026

Retail

**Amazon News**

**Press Center**

**Amazon.com**

**Investor Resources**

Country & Language:

191

**Amazon News**

Careers

Site Map

More from Amazon

Amazon.com | Conditions of Use | Amazon Privacy Policy | © 1996-2026 Amazon.com, Inc. or its affiliates

# EXHIBIT D

193

News  /  Retail

# Amazon's new 'Buy for Me' feature helps customers find and buy products from other brands' sites

**New beta feature allows customers to use their Amazon Shopping app to complete purchases from other brand retailer websites if Amazon doesn't sell the item directly.**



https://www.aboutamazon.com/news/retail/amazon-shopping-app-buy-for-me-brands    Page 1 of 8

Case 3:25-cv-09514-MMC   Document 60-6   Filed 01/15/26   Page 3 of 9

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell                    1/14/26, 10:16

 Written by Amazon Staff

April 03, 2025                                                                                   3 min read

Retail      Shopping      Customers      Artificial Intelligence                                 Share

Amazon offers very broad selection, carrying hundreds of millions of products, including 300 million items available with fast, free Prime delivery across more than 35 categories including home, apparel, electronics, media, beauty, grocery, sports and outdoors, automotive, and everyday essentials.

While we already offer vast selection, we want to make it even easier for customers to find any product they want and need, so we're testing a new feature, Buy for Me, in beta in the Amazon Shopping app. Buy for Me helps customers discover and seamlessly purchase select products from other brands' sites if those items are not currently sold in Amazon's store.

Buy for Me is currently live in the Amazon Shopping app on both iOS and Android for a subset of U.S. customers. We will begin testing with a limited number of brand stores and products, with plans to roll out to more customers and incorporate more brand stores and products based on feedback.

https://www.aboutamazon.com/news/retail/amazon-shopping-app-buy-for-me-brands                  Page 2 of 8

195

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell    1/14/26, 10:16



**Amazon's AI-powered 'Interests' feature automatically finds new products that match your passions and hobbies**

AI feature works on your behalf to constantly watch out for new products in Amazon's store that match your interests.

"We're always working to invent new ways to make shopping even more convenient, and we've created Buy For Me to help customers quickly and easily find and buy products from other brand stores if we don't currently sell those items in our store," said Oliver Messenger, shopping director, Amazon. "This new feature uses agentic AI to help customers seamlessly purchase from other brands within the familiar Amazon Shopping app, while also giving brands increased exposure and seamless conversion."

## How Buy for Me works

Buy for Me is integrated into Amazon's shopping experience so customers can quickly and easily discover additional selection. When customers search for branded items in the search bar in the Amazon Shopping app, they'll see relevant results from Amazon and third-party sellers in our store, and in some cases, additional relevant products from other stores in a separate section of search results labeled 'Shop brand sites directly.' Customers can link directly to these sites, or in some cases, customers will see a link to Buy for Me. To shop brand sites directly using Buy for Me, customers simply:

196

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell                1/14/26, 10:16

**Tap an item.** When customers tap on an item that says Buy for Me in search results listed under 'Shop brand sites directly,' they are taken to a product detail page within the Amazon Shopping app. This page provides relevant product information, similar to product detail pages for items Amazon sells, so customers can learn more about the product to help them decide if they want to buy it from the brand retailer's website.

**Request Amazon purchase the item on their behalf.** If a customer decides to proceed with a Buy for Me purchase, they tap on the Buy for Me button on the product detail page to request Amazon make the purchase from the brand retailer's website on their behalf. Customers are taken to an Amazon checkout page where they confirm order details, including preferred delivery address, applicable taxes and shipping fees, and payment method. Using agentic AI capabilities, Amazon makes the purchase by securely providing the customer's encrypted name, address, and payment details to complete the checkout process on the brand's website. Amazon cannot see customers' previous or separate orders from other brands' sites.

**Receive confirmation, delivery, and customer service.** Once Amazon makes the purchase on a customer's behalf, the customer will receive an order confirmation email from the brand store, and be able to track their order via Your Orders in the Buy for Me Orders tab in the Amazon Shopping app. Delivery, returns and exchanges, and customer service are managed by the brand store, and customers can contact the brand store with any questions regarding their order.

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell     1/14/26, 10:16



# Leveraging AI to make customers' lives better and easier

Buy for Me is enabled by AI. The experience runs on [Amazon Bedrock](#), a fully managed

service that offers a choice of high-performing foundation models. [Amazon Nova](#) and

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell                          1/14/26, 10:16

[Anthropic's Claude models](#) support the Amazon Shopping app's agentic capabilities to complete the purchase from start to finish on a customer's behalf.

---

## Sign up for the weekly Amazon newsletter

Enter email                                                                    →

[Amazon Privacy Policy](#) Opt out anytime

---

Agentic AI is capable of performing specific tasks with minimal human intervention at the direction of and on behalf of a customer. Earning trust is a cornerstone for the success of AI agents, and we've designed this experience to operate transparently in its interactions with customers and brand stores. The customer is in control of the AI agent acting on their behalf, and brands have the choice if they want to participate and benefit from the increased brand visibility, customer engagement, and sales.

Learn more about [Buy for Me](#).

## Trending news and stories

- Everything to know about the new 'Spider-Noir' series, coming to MGM+ and Prime Video

- 'Thursday Night Football' 2025 schedule: How to watch live on Prime Video

- 'Wicked: For Good' is available on Prime Video—here's how to watch it

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell                    1/14/26, 10:16

How to watch 'Beast Games' Season 2 on Prime Video

---

RELATED TAGS

Retail    Shopping    Customers    Artificial Intelligence

 Share

More Amazon News    ‹    1 / 3    ›



**How to use Amazon Family to manage digital content and share many Prime benefits with your family members**

Jan. 8, 2026

Retail



**5 ways Amazon's newest Dash Cart can save you time and money**

Jan. 7, 2026

Retail



**How to track a package**

Dec. 30, 2025

Retail

200

Buy for Me button on Amazon Shopping app: Purchase items Amazon doesn't sell

1/14/26, 10:16

**Amazon News**

**Press Center**

**Amazon.com**

**Investor Resources**

Country & Language:
🇺🇸 EN

**Careers**

**Site Map**

**More from Amazon**

Amazon.com | Conditions of Use | Amazon Privacy Policy | © 1996-2026 Amazon.com, Inc. or its affiliates

201

# EXHIBIT E

Case: 26-1444, 04/01/2026, DktEntry: 27.3, Page 194 of 289

1/14/26, 9:58 AM　　Case 3:25-cv-09514-MMC　Document 60-7　Filed 01/15/26　Page 2 of 10
Brands say Amazon's 'Buy for Me' is listing products without permission

ADVERTISEMENT

[advertisement]



ModernRetail
ModernRetail

SUBSCRIBE
LOGIN

TECHNOLOGY          MARKETING          OPERATIONS          MODERN RETAIL+          PODCASTS

EVENTS          AWARDS

**THE AMAZON EFFECT**  //  **JANUARY 6, 2026**

# Brands are upset that 'Buy For Me' is featuring their products on Amazon without permission

By Allison Smith



Ivy Liu

Angie Chua has avoided selling on Amazon since she founded her Palm Springs, California-based stationery brand Bobo Design Studio in 2016. So, she was shocked when, in late December, she discovered that her product catalog was available for sale on Amazon's marketplace.

The issue first came to Chua's attention when she noticed a slew of unusual orders from an email address titled @buyforme.amazon. Many of the orders were for products that the brand no longer sold or were out of stock. This was how Chua learned about "Buy For Me," an AI-powered tool that Amazon unveiled last year. But Chua says she never opted into Amazon's "Buy For Me" program.

"They just opted us into this program that we had no idea existed and essentially turned us into drop shippers for them, against our will," Chua said.

Amazon's "Buy For Me" feature allows users to purchase products from third-party websites without leaving Amazon's app or site. (Amazon also has a "Shop Direct" button that links out to brands' third-party websites for customers to complete a purchase.) When products appear on Amazon through "Buy for Me," they are shown alongside standard Amazon search results but are clearly labeled as coming from "other brands," with a prominent button that says "Buy for Me."

204

"Buy For Me" uses "agentic AI capabilities" to provide third-party websites with shoppers' encrypted payment and shipping information, according to Amazon. Still, several merchants said that, to shoppers accustomed to scrolling Amazon's marketplace, the listings can resemble a typical Amazon product page, potentially giving the impression that a brand is selling directly on Amazon, even if the transaction ultimately happens elsewhere.

Through "Buy For Me," customers were placing orders for Chua's products on Amazon.com to be fulfilled through Chua's Shopify account. Chua's products have since been removed — she contacted Amazon at branddirect@amazon.com to opt out, per the company's FAQ page for sellers — but Chua said other small online merchants like herself could be unknowingly opted into Amazon's "Buy For Me" program.

Chua isn't alone. Four other merchants who spoke to Modern Retail for this story were also upset that their products were featured on Amazon.com without their permission.

---

"'Shop Direct' and 'Buy For Me' are programs we're testing that help customers discover brands and products not currently sold in Amazon's store, while helping businesses reach new customers and drive incremental sales. We have received positive feedback on these programs," an Amazon spokesperson told Modern Retail in a statement. "Businesses can opt out at any time by emailing branddirect@amazon.com, and we remove them from these programs promptly. Amazon is a longstanding supporter of small and independent businesses, and today more than 60% of sales in our store are from independent sellers who leverage our innovative tools and services to run their businesses and serve customers."

Another business owner who reported having issues is Amanda Stewart, the founder of Mochi Kids, a Salt Lake City, Utah-based apparel brand for children. Stewart hadn't heard of "Buy For Me" until she watched a viral video Chua posted on Instagram about the issue; the video has garnered nearly 16,000 likes since it was posted on Dec. 28. The video prompted Stewart to search for her brand on Amazon,

205

which is when she realized that her product catalog of 4,000 products was available for sale on the e-commerce company's marketplace. Like Chua, Stewart avoided selling on Amazon because of concerns related to resellers, counterfeits and brand reputation.

"We've not wanted to sell on Amazon on purpose, and so seeing our stuff on there was surprising and very frustrating," Stewart said.

Stewart has received around 16 orders through "Buy For Me" since November, fulfilling some of those orders before realizing the purchases were coming from Amazon. Since then, Stewart has been canceling all "Buy For Me" orders and plans to email Amazon to opt out.

Emi Moon, the Cleveland, Ohio-based founder of the digital art brand Peachie Kei, said her entire Shopify catalog — including listings for gift cards — appeared on Amazon after she searched for her brand following Chua's viral video. "The big issue is that it's a reputational thing," Moon said. "I don't want to be associated with Amazon."

Moon said she emailed Amazon to opt out after discovering the listings, but was troubled that sellers were required to take action at all. "I would really like to see these things be opt-in versus opt-out," she said. "There's a level of autonomy and consent that's being violated."

Even though brands have the option to opt out by emailing Amazon, merchants who spoke to Modern Retail say Amazon shouldn't automatically opt sellers in in the first place. Merchants say Amazon's opt-out policy risks damaging brands' reputations and hurting the customer experience. For example, one of Mochi Kids's wholesale partners — an independent brand that explicitly does not allow its products to be sold on Amazon — contacted the retailer after discovering its products listed on the marketplace. Mochi Kids had to reassure the brand that it had not intentionally listed the items on Amazon, since many independent labels include contractual clauses barring wholesale partners from selling on Amazon or other third-party sites.

Merchants say those situations can strain brand relationships and undermine trust with both partners and customers.

"It builds distrust," Stewart said.

All product information, such as description, images, pricing and ratings, comes from merchant sites, according to Amazon's FAQ page. "This information is refreshed regularly to reflect changes merchants make on their sites." But Amazon also says it "may modify these for display on the Amazon Shopping app."

That might explain why one of Chua's products listed on Amazon through "Buy For Me" — a vinyl sticker — erroneously displayed a photo of a pair of pants, a product that Chua has never sold. It's unclear where the image came from, but Amazon says it doesn't generate AI images of a brand's products.

"It was a totally random stock image," Chua said. "I don't sell pants."

Chua also received at least several orders for products that were either out of stock or no longer existed on her website. She said she canceled several of those purchases and issued refunds after realizing Amazon had enabled customers to order items that had been fully removed from her online store.

Even after Amazon told her the listings had been taken down, Chua said remnants of her products remained on Amazon in the form of incomplete "shell" listings. Chua said those shell listings included jumbled product titles and descriptions made up of SEO keywords pulled from her original listings, which she worries could divert search traffic away from her own website.

Chua has since consulted with an intellectual property attorney to explore potential legal options and launched a self-reporting survey to gauge how widespread the issue is. Chua said the survey has received 145 responses from brands that believe their products were listed on Amazon without consent.

For Sammy Gorin, a New York–based artist who sells paper goods, Amazon's "Buy for Me" feature raised concerns beyond brand control. Gorin sells wholesale through a password-protected section of her website, where retailers must submit resale or exemption certificates so orders are properly exempted from sales tax. She said she

was still able to complete a "Buy for Me" purchase of a product pulled from her wholesale site despite never opting into the program — a scenario that could expose her business to tax liability if individual shoppers were able to place tax-exempt orders. Gorin also worries that surfacing wholesale pricing could undermine profit margins, allow competitors to undercut her prices or bypass minimum order requirements designed to keep wholesale sales viable.

"I keep my wholesale pricing hidden from those without approved accounts to protect my profit margins and the profit margins of my wholesale clients," she said. "If my direct customers and my retailers' consumers are able to see my wholesale pricing, they might refuse to pay the higher retail cost or demand a discount."

## Amazon's AI strategy

The timing of Amazon's "Buy For Me" move is notable given that the company has taken an increasingly hard line against other companies using AI to access and scrape its marketplace. Amazon took multiple steps in 2025 to prevent third-party crawlers from scraping its website, including those tied to Meta, Google, Perplexity and more, Modern Retail previously reported. In November, Amazon sent a cease-and-desist letter to Perplexity over its new Comet browser, which lets users ask an AI agent to find and buy items on Amazon. In a statement, Amazon said third-party shopping agents should "operate openly and respect service provider decisions" on whether or not to participate.

At the same time, Amazon is investing in its own AI tools. In addition to "Buy For Me," Amazon has rolled out features like "Auto Buy," which automatically purchases items for customers when prices drop. Amazon says shoppers who use its customer-facing shopping assistant Rufus are 60% more likely to finish a purchase, and it expects the tool to generate more than $10 billion in yearly sales.

Retailers and tech giants are racing to reimagine the online shopping experience through artificial intelligence. Companies like Amazon are betting that artificial intelligence will upend traditional online shopping by letting shoppers describe what they want in natural language, refine results through conversation and even hand off parts of the decision-making process to an automated assistant.

According to Chua's survey, impacted brands include those that use software from Shopify, WooCommerce and Squarespace to run their e-commerce sites. Shopify, for its part, has added a default "Robots & Agent policy" to its merchants' sites to ward off unauthorized scraping of its merchants' sites, Modern Retail previously reported.

To Juozas Kaziukėnas, an independent e-commerce analyst, Amazon's approach to "Buy For Me" appears inconsistent with how the company typically builds brand-facing tools. Normally, Amazon requires brands to apply, get invited or set up listings themselves. "The whole approach is very unlike Amazon," he said. "It's not built on partnerships. It's not built on integrations. It seems to be just coming out of nowhere, and they're not telling anyone."

For brands that don't sell on Amazon, that approach means they now have to eat up valuable time monitoring Amazon's marketplace and, in some cases, undoing listings they never authorized — all while trying to run their businesses during an already challenging retail environment.

"It's just another level of stress that none of us small businesses need," said Chelsea Ward, founder of the Los Angeles-based stationery brand Sketchy Notions. Like other brands, Ward realized her products were for sale on Amazon without her permission after she saw Chua's viral Instagram video about the issue. "Amazon knows we have such little room to punch back on this."

## Stories like this, in your inbox each morning.

Business email

Job title

**SIGN UP**

209



# Modern Retail Daily Newsletter

News and analysis covering the modernization of retail and e-commerce.

Business email

Job title

**SIGN UP**

# More in Technology

**STORE OF THE FUTURE**

## Lowe's is licensing its checkout software to other retailers

January 14, 2026

Lowe's has started selling the software behind its point-of-sale systems to other

**MEMBER EXCLUSIVE**

## Brands Briefing: How leaders at Fabletics, PayPal and more are thinking about the agentic AI opportunity

January 13, 2026

**THE MARKETPLACE BOOM**

## Walmart says 'open partnerships' are central to its AI strategy, while Amazon goes it alone

January 13, 2026

Brands say Amazon's 'Buy for Me' is listing products without permission

retailers as a new revenue stream.

At NRF, leaders at companies like PayPal and Fabletics acknowledged there's still a ways to go before more people trust AI to complete a transaction.

Walmart is partnering with Google and OpenAI to let shoppers buy through AI chatbots, taking a more collaborative approach to AI-powered shopping than Amazon, which is largely building its own tools.

## Modern Retail+

Join now to gain access to exclusive content, unlimited articles and more.

SUBSCRIBE

## Newsletter

Get Modern Retail's top stories every morning in your email inbox

Business email

Job title

SIGN UP

## Connect

Follow @ModernRetail for the latest news, insider access to events and more.



ABOUT    FAQ    MASTHEAD    PRIVACY POLICY    ADVERTISE

NEWSLETTERS    TERMS & CONDITIONS

**DIGIDAY**MEDIA

© 2026. ALL RIGHTS RESERVED

# EXHIBIT F

212



### "Buy It For Me" scam

r/amazonprime • 2mo ago
cwhite616

### "Buy It For Me" scam

Who else is getting the new "buy it for me" "feature" in their Amazon app? It's terrible — there is nowhere near enough information to make it clear that Amazon is purchasing something through a third party for you. No prime benefits, no customer support, doesn't show up in your order history... how is this a thing? Their customer support team doesn't even seem to know about it. I am fighting to cancel an order I didn't intend to place because of this — what a terrible "feature."

⬆ 3 ⬇        💬 7        Share

get_Chargeblast • Promoted

90% Cheaper Chargeback Protection? Merchants Are Switching to Chargeblast — Quietly.

Learn More                                    chargeblast.com

Why pay **$1000s** for chargeback protection?

Our new solution is practically **FREE**.

Let's Talk

Join the conversation

Sort by:  Best ⌄        🔍 Search Comments

**beanomly** • 2mo ago

Looks like it's in beta. You got unlucky and are part of that group. I hope this never goes mainstream.

⬆ 4 ⬇        💬 Reply        ...

**emelem66** • 2mo ago
🎂 Top 1% Commenter

Haven't seen it. I wouldn't use it if I did.

⊖  ⬆ 2 ⬇        💬 Reply        ...

**cwhite616** OP • 2mo ago

I wouldn't intentionally use it either... but they worked damn hard to make it seem like you're buying from Amazon.

⊖  ⬆ 1 ⬇        💬 Reply        ...

Skip to main content ✕                                                                    Log In

— ⌃ 3 ⌄    💬 Reply    ...

cwhite616 OP • 2mo ago

Yeah, that would be nice. I spent 45 minutes not getting anywhere with their customer service agents last night, the first four people I spoke to didn't even know this feature existed. Ultimately, I have to track down the website they ordered from "on my behalf," and deal with that customer service team. Whoever thought this was a good idea…

⌃ 1 ⌄    💬 Reply    ...

NandorandGizmo • 16d ago

This feature is using AI to scrub the web for independent retailer's merch and is listing things without their permission and also listing things that these sellers don't have in their current inventory. Local makers in my town are experiencing this first hand and it's infuriating.

— ⌃ 1 ⌄    💬 Reply    ...

TheOriginalBatsy • 2d ago

It's very very disturbing

⌃ 1 ⌄    💬 Reply    ...

r/amazonprime • 1mo ago

**I have been scammed or robbed.**



298 upvotes · 338 comments

r/amazonprime • 11d ago

**I don't know where else to post this.**

391 upvotes · 168 comments

r/amazonprime • 7mo ago

**Amazon scammed me!**

292 upvotes · 187 comments

214

Skip to main content                    ✕                                                    Log In

616 upvotes · 83 comments

(r/) **r/amazonprime** • 14d ago

Sold as new...

299 upvotes · 117 comments

(r/) **r/amazonprime** • 6mo ago

Is this even allowed?

629 upvotes · 161 comments

(r/) **r/amazonprime** • 1mo ago

Should I be worried

27 upvotes · 56 comments

(r/) **r/amazonprime** • 3mo ago

They aren't even trying anymore.

81 upvotes · 24 comments

(r/) **r/amazonprime** • 4mo ago

Did anyone else get this?

65 upvotes · 56 comments

(r/) **r/amazonprime** • 5mo ago

I'm actually happy about this.

196 upvotes · 37 comments

(r/) **r/amazonprime** • 21d ago

Is it me or are we all getting scammed?

215

Skip to main content                                    ✕                                                    Log In

r/amazonprime • 2mo ago

**Black Friday Scams**

142 upvotes · 46 comments

r/amazonprime • 1mo ago

**Amazon wtf....**

567 upvotes · 281 comments

r/amazonprime • 2mo ago

**One of these is not the same as the other.**

24 upvotes · 8 comments

r/amazonprime • 2mo ago

**Ordered from a third party seller, received an empty product box. Seller is trying to claim fraud.**

42 upvotes · 56 comments

r/amazonprime • 16d ago

**Well this is a first**

79 upvotes · 15 comments

r/amazonprime • 13d ago

**I know it's the holidays but...**

28 comments

r/amazonprime • 25d ago

**Any chance im getting this?**

6 upvotes · 23 comments

216

Buy It For Me scam : r/amazonprime

🔍 [                    ] ✕                                    Log In

136 upvotes · 32 comments

**r/** r/amazonprime • 5d ago

Amazon reviews are BS!

132 upvotes · 79 comments

**r/** r/amazonprime • 2mo ago

Am I the only one here?

192 upvotes · 47 comments

**r/** r/amazonprime • 6mo ago

Umm OK then....

49 upvotes · 28 comments

**r/** r/amazonprime • 4mo ago

Thank you...

83 upvotes · 37 comments

**r/** r/amazonprime • 10d ago

Need help for refund

39 upvotes · 60 comments

**r/** r/amazonprime • 13d ago

Has Amazon lost their minds?

66 upvotes · 45 comments

Reddit Rules  Privacy Policy  User Agreement  Your Privacy Choices  Accessibility  Reddit, Inc. © 2026. All rights reserved.

217

# EXHIBIT G



<span style="float:right">&#128269;</span>

AI

# Amazon AI scraping project creates unauthorized listings for small brands

Amazon AI scraping via Project Starfish creates unauthorized listings for independent brands. Small retailers report hallucinations and broken customer trust.

 **Luis Rijo**
Jan 3, 2026 • 8 min read



Amazon Project Starfish AI bot scraping small business websites for unauthorized product listings.

The intersection of artificial intelligence and e-commerce reached a new point of friction this week as independent retailers discovered their proprietary product data being harvested for a secretive Amazon initiative. This program, identified by industry observers and affected sellers as **Project Starfish**, involves the automated scraping of independent business websites to generate AI-powered listings within the Amazon Shopping app.

Independent brands, including Bobo Design Studio and Hitchcock Paper, reported that the e-commerce giant is currently testing a beta program that pulls products from small business websites without the consent of the owners. These retailers found that Amazon uses AI to mine information from their sites, creating listings that the sellers did not opt into and cannot opt out of. The discovery has sparked a debate regarding intellectual property, the accuracy of generative AI in retail, and the boundaries of platform dominance in the digital age.

## Free weekly newsletter

Your go-to source for digital marketing news.

| Your email | Subscribe |
|---|---|

No spam. Unsubscribe anytime.

## The mechanics of Project Starfish and agentic discovery

At the core of this development is a technical framework designed to expand Amazon's reach into inventory it does not directly house or fulfill. Through "Project Starfish," Amazon is currently scraping thousands of independent

websites to create AI-generated listings within its own application. These listings are often presented to users under a "Buy for Me" or "Shop other stores directly" label.

The system operates by deploying AI agents that scan the open web for products not currently available in the Amazon store. Once a product is identified, the system "re-skins" the independent business's offering, funnelling it into an Amazon-branded checkout process. This represents a significant shift toward agentic AI adoption, where autonomous software components execute complex workflows—including purchasing—on behalf of a user.

Technical documentation and seller reports indicate that the program creates a layer of abstraction between the consumer and the actual merchant. Depending on the product, customers can either shop the site with the help of AI or visit the site directly to complete the transaction. However, the automated nature of this process has led to significant technical discrepancies that affect brand reputation.

FOLLOW PPC LAND

Follow PPC Land on your socials: LinkedIn, Google, Google News, X, Mastodon, Bluesky, Reddit, Threads or via RSS

## AI hallucinations and data integrity challenges

One of the primary technical failures reported by affected retailers involves the inaccuracy of the AI-generated content. Amazon's AI agents have been shown to "hallucinate" product details, displaying information that is factually incorrect but presented as authoritative. These hallucinations

221

include displaying outdated prices and selling items that are no longer in stock.

For a small business, the display of incorrect pricing or out-of-stock items creates immediate operational friction. When an AI-generated listing offers a product at a price the merchant no longer honors, the merchant is forced to choose between taking a financial loss or disappointing a new customer. Furthermore, the program uses AI images that are not owned by the original creators, according to a.pdf. This practice breaks the chain of customer trust and disrupts the pricing and fulfillment models established by indie shops, according to a.pdf.

The phenomenon of AI hallucinations is not unique to Amazon's retail experiments but takes on a higher risk profile when tied to financial transactions. Other platforms have faced similar challenges, such as the [hallucination phenomenon in TV search](#), where inaccurate responses are mitigated through verification servers. In the context of Project Starfish, no such verification layer appears to be accessible to the merchants whose data is being used.

ADVERTISE ON PPC LAND

Buy ads on PPC Land. PPC Land has standard and native ad formats via major DSPs and ad platforms like Google Ads. Via an auction CPM, you can reach industry professionals.

Learn more

## The proxy email problem and customer relationships

A significant technical hurdle for sellers receiving orders through this program is the lack of direct customer data. Merchants are left with "ghost orders" from anonymous proxy emails, which makes it impossible to provide support or build a real customer relationship.

In traditional e-commerce, the relationship between a buyer and a seller is foundational for handling returns, exchanges, and shipping updates. By masking the customer's true identity, Amazon maintains control over the data while the independent seller bears the responsibility for fulfillment and potential complaints. This data harvesting is viewed by some industry analysts as an attempt to gather information to inform Amazon's own merchandising and target advertising.

This shift in data ownership aligns with broader trends in the industry where [first-party data collection](#) is prioritized to circumvent privacy restrictions. By positioning itself as the intermediary for off-platform products, Amazon effectively captures shopping intent signals that would otherwise remain on independent domains.

## Free weekly newsletter

Your go-to source for digital marketing news.

| Your email | Subscribe |

No spam. Unsubscribe anytime.

## Institutional hypocrisy and the scraping debate

223

The discovery of Project Starfish highlights a perceived hypocrisy in platform policies. Amazon currently blocks AI companies from scraping its own data while simultaneously harvesting the intellectual property of independent sellers.

Amazon has been aggressive in defending its own data borders. The company expanded bot restrictions on November 24, 2025, to block OpenAI-related crawlers from accessing Amazon.com. This defensive posture suggests that while Amazon views its own product data as a proprietary asset to be protected from competitors, it views the data of independent retailers as a public resource for its own AI training and listing generation.

This tension is mirrored in the legal landscape. For example, xAI recently filed a lawsuit against California over laws that would force AI firms to reveal training secrets. The conflict between the need for transparency in AI training and the protection of trade secrets remains a central point of contention for all major technology platforms.

## Add PPC Land as preferred source on Google





## Strategic context within Amazon's AI ecosystem

Project Starfish does not exist in a vacuum; it is part of a larger push toward autonomous shopping. Amazon announced on November 18, 2025, a comprehensive update on its AI shopping features, noting that products available through "Buy for Me" had increased from 65,000 at launch to over half a million.

The company has also integrated its Rufus AI assistant, which manages price tracking and auto-buying features. These tools are designed to reduce

friction for the consumer, but they often do so by bypassing the traditional brand-to-consumer interaction. While Amazon describes these features as helping customers "discover and evaluate products," the retailers involved argue that they are being "hijacked" without permission.

## Industry impact and the future of retail media

For the marketing community, these developments signal a new era of "unauthorized" retail media. Traditionally, retailers chose to list on Amazon and paid for the privilege through commissions and advertising fees. With Project Starfish, the choice is removed.

The growth of [Amazon DSP](#) and the introduction of tools like [Amazon Marketing Cloud](#) show a company focused on unifying the shopping experience across the web. However, when this unification happens without the consent of the product owners, it raises questions about the long-term viability of the independent web.

Some large retailers have opted for formal partnerships, such as [Macy's integrated Amazon's retail advertising technology](#) in late 2025. This allows the retailer to maintain control over its customer relationships and data. The contrast between these formal agreements and the "agentic scraping" of small businesses highlights a deepening divide in how platform power is exercised.

## Why this news matters for the marketing community

The emergence of Project Starfish and "Shop Other Stores Directly" marks a fundamental shift in how digital advertising and product discovery operate. For PPC professionals and digital marketers, the traditional "walled garden" of Amazon has expanded its walls to include your own website.

Case: 26-1444, 04/01/2026, DktEntry: 27.3, Page 218 of 289

1/14/26, 10:02 AM
Case 3:25-cv-09514-MMC     Document 60-9     Filed 01/15/26     Page 10 of 14
Amazon AI scraping project creates unauthorized listings for small brands

According to **PPC Land**, the rise of agentic AI means that a brand's SEO and product data are no longer just for human eyes or standard search engines; they are now being actively ingested by shopping agents that may re-skin and re-sell that content. This creates a "leaky bucket" for traffic, where a potential customer may find a brand's product via an AI listing on Amazon rather than visiting the brand's site directly.

Marketers must now consider "agentic optimization." It is no longer enough to rank on Google; one must ensure that if an Amazon agent scrapes a site, the information it retrieves is accurate. However, as the reports from Hitchcock Paper and Bobo Design Studio show, even accurate data can be distorted by AI "hallucinations" once it enters the Amazon ecosystem. This loss of control over brand presentation, pricing, and customer data represents one of the most significant challenges to independent e-commerce in the current decade.

PPC LAND NEWSLETTER

**Subscribe PPC Land newsletter** for similar stories like this one

Subscribe

# Timeline

- **August 2024**: Amazon DSP introduces **modeled attribution** for off-Amazon conversions, laying the groundwork for tracking the full customer journey across the web.

- **January 9, 2025**: Amazon launches its **Retail Ad Service**, allowing other retailers to use Amazon's advertising technology.

227

- **November 4, 2025**: Amazon issues a <u>legal demand to Perplexity AI</u>, demanding they stop AI agents from making purchases on Amazon, while simultaneously expanding its own scraping agents.

- **November 11, 2025**: Amazon introduces <u>free AI prompts</u> for sponsored ad campaigns to automate shopper engagement.

- **November 18, 2025**: Amazon updates its AI shopping features, revealing that the "Buy for Me" program now includes over 500,000 products, many from <u>off-Amazon sources</u>.

- **November 24, 2025**: Amazon expands its <u>robots.txt restrictions</u> to block crawlers from Meta, Google, and OpenAI.

- **December 2025**: Independent sellers <u>go viral</u> on Instagram and LinkedIn, exposing the unauthorized scraping of their websites via Project Starfish.

PPC LAND NEWSLETTER

---

**Subscribe PPC Land newsletter** ✉ for similar stories like this one

Subscribe

## Summary

- **Who**: Amazon and its proprietary AI agents are the primary actors, affecting thousands of independent retailers and small business owners such as Bobo Design Studio and Hitchcock Paper.

- **What**: A beta program known as Project Starfish and "Shop Other Stores Directly" that uses AI to scrape independent websites, create

unauthorized listings, and facilitate purchases through Amazon's "Buy for Me" agentic interface.

- **When**: The program saw significant expansion in late 2025, with major adoption metrics released in November 2025 and widespread seller discovery in December 2025.

- **Where**: The activity occurs across the open web (scraping) and within the Amazon Shopping app (listing and checkout), primarily targeting US-based independent brands.

- **Why**: Amazon aims to expand its product selection, gather competitive merchandising data, and capture first-party shopper signals, though it does so at the cost of merchant consent and data accuracy.

# Stories like this, in your inbox

| Enter your email | Subscribe |





## YouTube drops AI video feature that might

## Google's shopping AI sparks surveillance

## actually work

YouTube launches Veo 3.1 Ingredients to Video on Shorts and Create app on January 13, 2026, enabling creators to generate...

Jan 14, 2026     15 min read



## Google opens NBCUniversal's Winter Olympics inventory to programmatic ads

Google Display & Video 360 adds NBCUniversal Olympic Winter Games programmatic inventory with AI conversion...

Jan 13, 2026     8 min read



## How contextual targeting doubled Super Bowl ad ROI last year

## pricing debate

Google faces accusations about personalized upselling in Universal Commerce Protocol after January 11 announcement, while...

Jan 13, 2026     8 min read

## Apple services shattered records in 2025

Apple's services division reached unprecedented heights in 2025 with 850 million weekly App Store users and Apple Pa...

Jan 12, 2026     11 min read

230

Integral Ad Science reports 102% ROI increase
for contextual campaigns during Super Bowl
LVIII, with traffic hitting 131 million...

Jan 12, 2026    11 min read

**PPC Land** © 2026

AI News    Subscribe    Manage Subscription    RSS    Advertise    About

Privacy    Contact

info@ppc.land

# EXHIBIT H



**MENU**

 **71°** 🔍

**News** [ FOLLOW ]    209 Followers

# Palm Springs small business alleges Amazon listed products for sale without consent

0:00  / 3:29

233

Palm Springs small business alleges Amazon listed products for sale without consent - KESQ    1/14/26, 10:07

**By Athena Jreij**    [ FOLLOW ]

**January 2, 2026 5:48 PM**    Published *January 2, 2026* 9:59 AM

5 [✎]    **f**    **X**    **in**    ✉

---

**PALM SPRINGS, Calif. (KESQ) -** Bobo Palm Springs, a boutique stationery store off N. Indian Canyon, is sounding the alarm for other small businesses after they claim they found their shop's products listed on Amazon without their knowledge or consent.

The shop owner, Angie Chua, says she first noticed the items listed earlier this week and contacted Amazon to take them down. The online mega-retailer removed Bobo from the program, but she now worries her small business isn't the only one being listed without the owner's knowledge.

ADVERTISING

**Take your morning comfort to go.**

*Chinet* The Chinet® Brand - Sponsored

**Add to Target Cart**

"Our entire catalog was listed on Amazon without our permission and without our consent. It was a combination of products that we had, products that we've long

Palm Springs small business alleges Amazon listed products for sale without consent - KESQ

Case 3:25-cv-09514-MMC    Document 60-10    Filed 01/15/26    Page 4 of 12

1/14/26, 10:07

deleted, that don't exist on our site or on our back-end, as well as leveraging AI images that we didn't create or use," Chua said.

For Chua, who says she's spent years curating trusted relationships with her customers, she feels like the listing without permission was a violation.

"We spend a lot of time building trust with our customers. It takes a long time for us to earn their dollar, and for Amazon to come in and undercut us and just step in under the guise of, 'we are supporting these small businesses,' is like appalling," she said.

Chua believes she was opted into an Amazon beta program called 'Buy For Me,' that lists outside businesses' products on the site.

"We were starting to see an increase of these orders for items that were out of stock, items that were like a single item, which was very out of the norm for what we would normally see. Every single one of those orders had a jumbled Amazon email address titled '@buyforme.amazon.' It was there that we realized that those orders were actually coming from Amazon and being fulfilled through our Shopify account."

The cost? Chua says she's had to refund orders for items that didn't exist and worries this could interfere with her direct customers relationships.

News Channel 3 reached out to Amazon, who said in a statement they are piloting a 'Buy For Me' program that lists several products on the website, including some

235

'additional relevant products' from other vendors. Shoppers can then click 'Buy For Me,' that's when Amazon makes the purchase from the website on the customer's behalf using AI.

When asked if shop owners give consent to list their products online, Amazon responded that they 'proactively introduced' several shops they thought would benefit from the program, and owners can opt-out if they'd like.

Spokespeople say the goal is to increase small business visibility and sales. However, Chua disagrees and points to recent collaborations Amazon did with other small creators.

"Having a one off $11 or $3 sale from Amazon is not enough to cover the fact that this is a long game for them. They had a platform called Amazon Handmade, where they recruited thousands of independent makers to sell their products on Amazon Handmade as a competition to Etsy. They ended up finding what items did really well and then created dupes for those items," Chua alleges.

Chua's products have since been removed from Amazon at her request, but she says shell items of her products still exist with special SEO keywords that could divert traffic from her own website.

For this small business, the incident is another notch in the belt of Amazon's global market dominance.

"There is this constant, villainous behavior that happens from these large companies and it is always at the expense of somebody else. It doesn't matter who it is, and for us, it's small business and they continue to exploit us," Chua said.

She believes e-commerce retailers that use Shopify or Woo Commerce could be unknowingly opted into the pilot program and is now encouraging all business owners to check for themselves.

---

**Article Topic Follows:** **News**    [ FOLLOW ]    209 Followers

---

Jump to comments ↓

Palm Springs small business alleges Amazon listed products for sale without consent - KESQ                                        1/14/26, 10:07



**Seniors Born 1939-1969 Receive 11 Benefits This Month If They Ask**

 **Athena Jreij**

# RELATED ARTICLES



237



▶ **Exigen respuestas por planta de energía abandonada en Mecca, grupo comunitario viajo hasta Riverside para entablar una conversación con los supervisores del condado**

▶ **Firebirds erase deficit to defeat Texas Stars 5-2**

238

Case 3:25-cv-09514-MMC    Document 60-10    Filed 01/15/26    Page 8 of 12

▶ **Padres presentarán varias demandas contra el Distrito Escolar Unificado del Valle de Coachella por exposición al moho negro**

▶ **La iniciativa Coachella Prospera instala paneles solares gratuitos para residentes**

239

Palm Springs small business alleges Amazon listed products for sale without consent – KESQ                                    1/14/26, 10:07

Around the Web                                                    REVCONTENT

240

Palm Springs small business alleges Amazon listed products for sale without consent - KESQ                                        1/14/26, 10:07

## Las Gorras De Cuero Para Mayores Están Arrasando En Barcelona

**By peoasis**

## Weight Loss Secret Revealed: The Gelatin Trick That Is Melting Fat For 2026

**By Nutra Reviews**

## Spine Specialists Says: Do This for 15min to Relieve Sciatica

**By SmoothSpine**

## Single Women Are Online and Waiting – Create Your Profile and Start Meeting Them

**By Datingwithlotsoflove**

## This High-Quality German Nail Clipper is Designed for Seniors All Over The World

**By Peoasis**

## Never Put Mustard in Your Fridge, Here's Why

**By LifeHack Guru**

## The New Reading Glasses Taking Los Angeles by Storm

**By Libiyi**

## Oncologists Are Freaking out After a Cause of Cancer is Revealed

**By Warburg**

## Doctors Amazed: A Simple Tip Alleviates Years of Vision Loss (try It tonight)

**By HealthFrontline**

241

## BE PART OF THE CONVERSATION

News Channel 3 is committed to providing a forum for civil and constructive conversation.

Please keep your comments respectful and relevant. You can review our Community Guidelines by clicking here

If you would like to share a story idea, please submit it here.

1/14/26, 10:07

Terms of Service | Privacy Policy | Community Guidelines KESQ-TV FCC Public File | KPSP-TV FCC Public File | KDFX-TV FCC Public File | EEO Report | FCC Applications | Do Not Sell My Personal Information

## SUBSCRIBE TO OUR EMAIL ALERTS

Daily News Headlines

Morning Forecast

Breaking News

Severe Weather

Contests & Promotions

Coronavirus Updates

## DOWNLOAD OUR APPS

Available for iOS and Android





4

© 2026, © 2026, Gulf-California Broadcast Company Palm Springs, CA USA

243

# EXHIBIT I

Delivering to New York 10118
Update location

All | Search Amazon

EN ▼    Hello, sign in
Account & Lists ▼

Returns
& Orders

0

All  Amazon Haul  Medical Care ▼  Amazon Basics  Best Sellers  Books  Registry  New Releases  Today's Deals  Gift Cards ▼

# Shop other stores directly <sup>beta</sup>



For merchants participating in this service, customers can now discover products not currently available in Amazon's store, and seamlessly shop from the Amazon Shopping app. Depending on the product, customers can either shop your site with the help of AI, or visit your site directly. Shipping, delivery, returns, exchanges, and customer service are managed directly by you as the merchant.

## Customers can find your products directly on Amazon

### Stay on Amazon & shop with AI assistance ✨

 

Customers can shop your products on Amazon when they search for your brand

They can purchase products from your site directly on Amazon, using AI

**or**

### Navigate directly to the merchant website ↗

 

Customers can shop your products on your site when they search brands sold on your site.

They can navigate to your site to make purchases

## FAQs

245

**Q: What is this service all about?**

**A:** Amazon continuously innovates to make shopping as convenient as possible for customers and merchants. For merchants participating in this service, customers will seamlessly discover and purchase your products as they shop on the Amazon Shopping app. We show select products in our search results even if we don't sell them in Amazon's store, and enable customers to easily make a purchase by tapping "Buy for me", or linking to your website.

**Q: How can I participate?**

**A:** This program is available to U.S. customers. If you are a merchant who would like to participate in this service, you can contact us at branddirect@amazon.com.

**Q: Where does information such as product description, and pricing come from?**

**A:** All product information, such as description, images, pricing, and ratings are from your website. This information is refreshed regularly to reflect changes you make on your website.

**Q: How do I communicate with customers shopping my products?**

**A:** When shopping with the help of AI, Amazon provides a secure, unique email address for each order to share communications with customers, including order confirmation and tracking details. Communications from you are automatically forwarded to the customer, and when a customer replies to these emails, replies are sent directly back to your email address. Our relay email system may reduce duplicative promotional emails to reduce customer frustration from receiving duplicative emails.

**Q: How do I opt-out or provide feedback?**

**A:** If you do not wish to participate in this service or you wish to provide feedback, you can contact us at branddirect@amazon.com and we'll respond within 2 business days.

**Q: Who controls the pricing, product descriptions, and images?**

**A:** You control pricing, product description, and images as we create listings using public information from your website. The listings of offers from your website are regularly refreshed in an effort to reflect changes made on your site.

**Q: If I want to list my products to be sold directly in Amazon's store, how do I do that?**

**A:** If you want to make your products available for sale in our store, contact us at sell.amazon.com.

**Q: Does Amazon have any visibility into customer's behavior on my website through this service?**

**A:** When customers navigate to your website via the "shop direct" link, we do not collect data about how customers interact with your website through this service. When customers shop with the help of AI by tapping "Buy for me", Amazon prohibits the use of the transaction information, which we collect when customers purchase your products using our service, to make sourcing, inventory level, and pricing decisions for products in our store, including for offerings of Amazon's store merchant products.

**Q: Do merchants have to pay to be part of this experience/Does Amazon get commission from Buy for Me purchases?**

**A:** No. Right now, this is an experiment, and we're trying to help customers find more products they are interested in, and once they find the right product, we're trying to help them make purchases seamlessly.

> **Are you an Amazon customer? Additional information and FAQs can be found here.**

Back to top

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon Visa | Your Account |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Orders |
| | Supply to Amazon | Amazon Secured Card | |

246

About Amazon

Accessibility

Sustainability

Press Center

Investor Relations

Amazon Devices

Amazon Science

Protect & Build Your Brand

Become an Affiliate

Become a Delivery Driver

Start a Package Delivery Business

Advertise Your Products

Self-Publish with Us

Become an Amazon Hub Partner

› See More Ways to Make Money

Amazon Business Card

Shop with Points

Credit Card Marketplace

Reload Your Balance

Gift Cards

Amazon Currency Converter

Shipping Rates & Policies

Amazon Prime

Returns & Replacements

Manage Your Content and Devices

Recalls and Product Safety Alerts

Information about the FTC Prime settlement

Registry & Gift List

Help

---

English          United States

Amazon Music
Stream millions
of songs

Amazon Ads
Reach customers
wherever they
spend their time

6pm
Score deals
on fashion brands

AbeBooks
Books, art
& collectibles

ACX
Audiobook
Publishing
Made Easy

Sell on Amazon
Start a Selling
Account

Veeqo
Shipping Software
Inventory
Management

Amazon Business
Everything For
Your Business

Amazon Fresh
Groceries & More
Right To Your Door

AmazonGlobal
Ship Orders
Internationally

Home Services
Experienced Pros
Happiness
Guarantee

Amazon Web
Services
Scalable Cloud
Computing
Services

Audible
Listen to Books &
Original
Audio
Performances

Box Office Mojo
Find Movie
Box Office Data

Goodreads
Book reviews
&
recommendations

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info
Entertainment
Professionals Need

Kindle Direct
Publishing
Indie Digital &
Print Publishing
Made Easy

Amazon Photos
Unlimited Photo
Storage
Free With Prime

Prime Video Direct
Video Distribution
Made Easy

Shopbop
Designer
Fashion Brands

Amazon Resale
Great Deals on
Quality Used
Products

Whole Foods
Market
America's
Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security Systems

eero WiFi
Stream 4K Video
in Every Room

Blink
Smart Security
for Every Home

Neighbors App
Real-Time Crime
& Safety Alerts

Amazon
Subscription Boxes
Top subscription
boxes – right to
your door

PillPack
Pharmacy
Simplified

Amazon Renewed
Refurbished tech
you can trust

Conditions of Use    Privacy Notice    Consumer Health Data Privacy Disclosure    Your Ads Privacy Choices

© 1996-2026, Amazon.com, Inc. or its affiliates

# EXHIBIT J

248





# Shop other stores directly <sup>beta</sup>



# Overview

You can discover and seamlessly shop new products not currently available on Amazon from the Amazon Shopping app or mobile website. Depending on the product, you can either shop merchant sites with the help of AI, or visit the merchant's site directly to shop. Shipping and delivery, returns and exchanges, and customer service are managed directly by the merchant.

249

## How does it work?

**1**

### Search brands

Explore a range of brands and discover new selection available directly from merchant websites.



**2**

### Shop on or off Amazon

Stay on Amazon & shop with AI assistance, or navigate directly to the merchant website.



**3**

### Effortless purchase with AI

When you find a product you like, click 'Buy for me' and Amazon's AI handles payment to order management.



**4**

### Manage your merchant orders

Track these orders through Amazon's 'Your orders' page under the "Buy for me orders" tab.



# FAQs

## Shopping from merchants by visiting their site

**Q: Why am I being redirected to another website?**

**A:** For some products we do not have in Amazon's store, we've linked to the merchant's site so you can evaluate and purchase from their site.

**Q: Do you share any personal data about me with merchant websites?**

**A:** No. When you are redirected to a merchant's site, we do not share any information about you with the merchant.

**Q: Are the prices of products displayed in this experience the same as the prices displayed on the merchant websites?**

**A:** We get product information, including price, directly from merchant sites to display in the Amazon Shopping app. This information is refreshed regularly, but may have been updated on the merchant site since we last refreshed the information. You can confirm the price on the merchant site before purchase.

250

## Shopping merchants directly using "Buy for me"

**Q: When I use this service to buy a product, am I buying from Amazon?**

**A:** No, when you make a purchase using this service you are buying from the merchant. Amazon's AI is helping you complete a purchase in a quick, seamless, and convenient manner. Your order from the merchant is subject to the merchant's terms and policies.

**Q: Is this free for Prime and non-Prime members to use?**

**A:** Yes, this is a free service.

**Q: How do I pay for products?**

**A:** When you tap "Buy for me", you'll see an estimated total that includes item price, shipping, and taxes. We get product information including price, directly from merchant sites to display in the Amazon Shopping app and refresh it regularly. However, in rare situations the price may have been updated by the merchant since we last refreshed the information. When you direct Amazon to make the purchase on your behalf, Amazon provides an estimated total, and you'll agree to pay an amount up to $15 more than the estimated total. You will only be charged by the merchant, which calculates the final total. If the final total is more than $15 over the estimated total, we will check with you before completing the purchase.

**Q: Can I apply a promo code when shopping?**

**A:** No, when you shop using "Buy for me", currently you cannot apply promo codes. Sale price or discounts automatically applied by merchants during checkout will be included in your order total.

**Q: How do I track the status of my order?**

**A:** You can track your orders in the Amazon Shopping app in Your Orders. You'll also receive a confirmation email directly from the merchant, and you may receive additional emails from the merchant about your order. If you have questions about this order, please contact the merchant's customer service directly.

**Q: How do I communicate with the merchant about my order?**

**A:** Amazon provides a secure, unique email address in each order, and emails from merchants, such as for order confirmation and shipping updates, are automatically forwarded to you. merchant emails often indicate the best way to get in touch with them about your order. If you reply to a merchant email, your replies will be sent directly to the merchant. You may also visit the merchant's site for contact information or to opt out of merchant emails. If you have used this service to place multiple orders with the same merchant, we may reduce duplicative merchant promotional emails.

**Q: How many items can I buy in one order?**

**A:** Currently, this service only supports orders of a single item.

**Q: What personal data will merchant sites and Amazon receive when I shop with the help of AI?**

**A:** Tapping "Buy for me" directs Amazon to make a purchase on your behalf with the merchant by securely providing your name, address, payment details, and contact information such as phone number, email address on file in your Amazon account, and a unique relay email address created for each order. Amazon receives order information and provides it in the Amazon Shopping app in Your Orders.

**Q: What terms do I agree to when I use this service to complete a purchase?**

**A:** The merchant's terms and policies, such as those applicable to shipping, returns, exchanges, and privacy apply to this purchase. The program terms also apply to your use of this service.

**Q: Does Amazon's returns policy or the A-to-Z guarantee apply?**

**A:** All products purchased are subject to the merchant's terms and policies, including returns. Amazon's return policy does not apply, whether you shop by tapping "Buy for me" or you visited a merchant site directly. The A-to-Z guarantee does not apply to any purchases made by tapping "Buy for me".

251

**Are you a merchant?** Additional information and FAQs can be found here.

Back to top

**Get to Know Us**

Careers

Amazon Newsletter

About Amazon

Accessibility

Sustainability

Press Center

Investor Relations

Amazon Devices

Amazon Science

**Make Money with Us**

Sell on Amazon

Sell apps on Amazon

Supply to Amazon

Protect & Build Your Brand

Become an Affiliate

Become a Delivery Driver

Start a Package Delivery Business

Advertise Your Products

Self-Publish with Us

Become an Amazon Hub Partner

› See More Ways to Make Money

**Amazon Payment Products**

Amazon Visa

Amazon Store Card

Amazon Secured Card

Amazon Business Card

Shop with Points

Credit Card Marketplace

Reload Your Balance

Gift Cards

Amazon Currency Converter

**Let Us Help You**

Your Account

Your Orders

Shipping Rates & Policies

Amazon Prime

Returns & Replacements

Manage Your Content and Devices

Recalls and Product Safety Alerts

Information about the FTC Prime settlement

Registry & Gift List

Help

---

English     United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music<br>Stream millions of songs | Amazon Ads<br>Reach customers wherever they spend their time | 6pm<br>Score deals on fashion brands | AbeBooks<br>Books, art & collectibles | ACX<br>Audiobook Publishing Made Easy | Sell on Amazon<br>Start a Selling Account | Veeqo<br>Shipping Software Inventory Management |
| Amazon Business<br>Everything For Your Business | Amazon Fresh<br>Groceries & More Right To Your Door | AmazonGlobal<br>Ship Orders Internationally | Home Services<br>Experienced Pros Happiness Guarantee | Amazon Web Services<br>Scalable Cloud Computing Services | Audible<br>Listen to Books & Original Audio Performances | Box Office Mojo<br>Find Movie Box Office Data |
| Goodreads<br>Book reviews & recommendations | IMDb<br>Movies, TV & Celebrities | IMDbPro<br>Get Info Entertainment Professionals Need | Kindle Direct Publishing<br>Indie Digital & Print Publishing Made Easy | Amazon Photos<br>Unlimited Photo Storage Free With Prime | Prime Video Direct<br>Video Distribution Made Easy | Shopbop<br>Designer Fashion Brands |
| Amazon Resale<br>Great Deals on Quality Used Products | Whole Foods Market<br>America's Healthiest Grocery Store | Woot!<br>Deals and Shenanigans | Zappos<br>Shoes & Clothing | Ring<br>Smart Home Security Systems | eero WiFi<br>Stream 4K Video in Every Room | Blink<br>Smart Security for Every Home |
| | Neighbors App<br>Real-Time Crime & Safety Alerts | Amazon Subscription Boxes<br>Top subscription boxes – right to your door | PillPack<br>Pharmacy Simplified | Amazon Renewed<br>Refurbished tech you can trust | | |

Conditions of Use     Privacy Notice     Consumer Health Data Privacy Disclosure     Your Ads Privacy Choices

© 1996-2026, Amazon.com, Inc. or its affiliates

# EXHIBIT K

253



# Help & Customer Service



‹ All Help Topics

## Quick solutions

**Your Orders**
Track or cancel orders

**Returns & Refunds**
Exchange or return items

**Manage Prime**
Cancel or view benefits

**Payment Settings**
Add or edit payment methods

**Carrier Info**
Shipping carrier information

**Account Settings**
Change email or password

**Find more solutions**

# Terms of Use when you shop brand sites by directing Amazon to complete a purchase on your behalf

Last updated: April 3, 2025

When you shop brand sites by directing us to complete a purchase on your behalf, you use an artificial intelligence-powered shopping service ("the Service") provided by Amazon.com Services LLC and/or its affiliates ("Amazon," "we," "us," or "our"). These Terms of Use ("Terms") govern your use of the Service, and constitute an agreement between you and Amazon. Your use of the Service is also governed by the Amazon.com Conditions of Use, and the other applicable rules, policies, and terms posted on the Amazon.com website or available through an Amazon mobile app.

**Please read these Terms carefully.**

By using this Service, you agree to be bound by these Terms on behalf of yourself and all others who access or use the Service with your account. Do not access or use the Service if you do not agree to accept these Terms.

**Definitions**

For the purpose of these Terms:

"Brand" means a third party that offers products for sale online.

"Brand Site" means a website operated by a Brand.

**The Service**

The Service includes content, tools, features, and functionality, to facilitate and complete purchases at the direction and on behalf of customers on Brand Sites. Information on this Service is available at its Program Page.

**Purchases made using this Service**

When you use this Service, you are making a purchase directly from the Brand and your order is subject to the Brand's terms and policies, including, but not limited to, those relating to shipping, returns, exchanges, and product warranties. Brand's terms and policies are available on the Brand Site. A purchase order placed by us at your direction is subject to order confirmation by the Brand. You acknowledge and agree that we are acting as your agent when we place orders at your direction, and that the Brand is the seller of the products to you. You also acknowledge and agree that Amazon does not hold title to or have physical possession of any goods that you order through this Service, at any point before or during purchase or fulfilment.

**Brand Information**

This Service displays product information from Brands, such as description, images, pricing, product warnings, and ratings, as well as shipping and delivery timeframes. All product information displayed in this Service is subject to change based on updates made by Brands directly on their sites. We do not warrant that information displayed in this Service from Brand Sites is wholly accurate, complete, reliable, or up-to-date. Amazon is not responsible or liable for any information displayed in this Service from Brand Sites. We may adjust or summarize

254

information from Brand Sites for display in this Service. Prices displayed in the Service may not be the current price provided on the Brand Site. Strikethrough prices may not be the prevailing market price or regular retail price. The display of Brand products in the Service does not indicate an affiliation with or endorsement by us of any Brand or its products.

**Information Shared with Third Parties**

You direct Amazon to provide the Brand information necessary to facilitate the purchase on your behalf on the Brand Site, which may include personal information such as name, shipping and billing addresses, phone number, payment information, email address, and other details.

**Amount You Agree to Pay**

We provide you with an estimated total consisting of the estimated price, shipping cost, and taxes. The Brand Site calculates the final total, consisting of the final price, shipping cost, and taxes. You agree to pay an amount up to $10 more than the estimated total to cover any differences between our estimate and the Brand's calculation. You will only be charged by the Brand for the final total. If the final total is more than $10 over the estimated total, you will receive an email or app notification to review the final total and decide if you would like to complete the purchase for the final total.

**Use of Email Relay**

You direct Amazon to generate and provide a unique "relay" email address on your behalf for each purchase. The relay email address enables Amazon to receive (and forward to you) confirmation and purchase-related emails from Brand Sites. We will forward Brand emails to the email address in your Amazon account. We will update the "Your Orders" tab in the Amazon Shopping app with information regarding purchases made through this Service.

**Discounts Provided by Brands**

Currently, we are not able to input discount codes at checkout, or otherwise take actions to incorporate discounts on shipping or price. This means that Brands or Brand Sites may have discounts not available to purchases made using this Service.

**Your Accounts with Brands**

Currently, you are not able to log into a Brand account, if you have one, using this Service. This means that you will not accrue points or other rewards in your account with the Brand when placing an order using this Service. The orders you place using this Service will not appear in your account with the Brand.

**Geographic Restrictions**

This Service is available only to customers who have selected the United States as the country/region in which they shop in.

**Miscellaneous**

We reserve the right to make changes to these Terms of Use at any time by posting the changes on our website. You will be subject to the Terms of Use published on our website when you use this Service. If any of these Terms of Use are deemed invalid, void, or for any reason unenforceable, that condition will be deemed severable and will not affect the validity and enforceability of any remaining condition. If there is a conflict between these Terms of Use and Amazon's Conditions of Use, these terms will prevail.

## Recommended Help Topics

- Shop brands directly
- Ordering from a Third-Party Seller
- Amazon Global Store
- How to Place an Order
- Subscribe & Save Terms & Conditions

Was this information helpful?

Yes    No

Back to top

### Get to Know Us

Careers

Amazon Newsletter

About Amazon

Accessibility

Sustainability

Press Center

Investor Relations

Amazon Devices

Amazon Science

### Make Money with Us

Sell on Amazon

Sell apps on Amazon

Supply to Amazon

Protect & Build Your Brand

Become an Affiliate

Become a Delivery Driver

Start a Package Delivery Business

Advertise Your Products

Self-Publish with Us

Become an Amazon Hub Partner

› See More Ways to Make Money

### Amazon Payment Products

Amazon Visa

Amazon Store Card

Amazon Secured Card

Amazon Business Card

Shop with Points

Credit Card Marketplace

Reload Your Balance

Gift Cards

Amazon Currency Converter

### Let Us Help You

Your Account

Your Orders

Shipping Rates & Policies

Amazon Prime

Returns & Replacements

Manage Your Content and Devices

Recalls and Product Safety Alerts

Information about the FTC Prime settlement

Registry & Gift List

Help

English          United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music<br>Stream millions of songs | Amazon Ads<br>Reach customers wherever they spend their time | 6pm<br>Score deals on fashion brands | AbeBooks<br>Books, art & collectibles | ACX<br>Audiobook Publishing Made Easy | Sell on Amazon<br>Start a Selling Account | Veeqo<br>Shipping Software Inventory Management |
| Amazon Business<br>Everything For Your Business | Amazon Fresh<br>Groceries & More Right To Your Door | AmazonGlobal<br>Ship Orders Internationally | Home Services<br>Experienced Pros Happiness Guarantee | Amazon Web Services<br>Scalable Cloud Computing Services | Audible<br>Listen to Books & Original Audio Performances | Box Office Mojo<br>Find Movie Box Office Data |
| Goodreads<br>Book reviews & recommendations | IMDb<br>Movies, TV & Celebrities | IMDbPro<br>Get Info Entertainment Professionals Need | Kindle Direct Publishing<br>Indie Digital & Print Publishing Made Easy | Amazon Photos<br>Unlimited Photo Storage Free With Prime | Prime Video Direct<br>Video Distribution Made Easy | Shopbop<br>Designer Fashion Brands |
| Amazon Resale<br>Great Deals on Quality Used Products | Whole Foods Market<br>America's Healthiest Grocery Store | Woot!<br>Deals and Shenanigans | Zappos<br>Shoes & Clothing | Ring<br>Smart Home Security Systems | eero WiFi<br>Stream 4K Video in Every Room | Blink<br>Smart Security for Every Home |
| | Neighbors App<br>Real-Time Crime & Safety Alerts | Amazon Subscription Boxes<br>Top subscription boxes – right to your door | PillPack<br>Pharmacy Simplified | Amazon Renewed<br>Refurbished tech you can trust | | |

Conditions of Use     Privacy Notice     Consumer Health Data Privacy Disclosure     Your Ads Privacy Choices

© 1996-2026, Amazon.com, Inc. or its affiliates

# EXHIBIT L

257

**Business**

# The Seattle Times

# Amazon AI tool blindsides merchants by offering products without their knowledge

Jan. 12, 2026 at 6:00 am | *Updated Jan. 12, 2026 at 6:00 am*

🔊 Listen to article

By Matt Day

*Bloomberg*

Sometime around Christmas, Sarah Burzio noticed that the holiday sales bump for her stationery business included some mysterious new customers: a flurry of orders from anonymous email addresses associated with Amazon.com Inc.

Burzio, who doesn't sell her products on the retail giant's site, soon discovered that Amazon had duplicated her product listings and made purchases on behalf of Amazon customers under email addresses that read like gibberish followed by buyforme.amazon.

"I didn't worry about, it to be honest," she said. "We were getting customers."

Then people started complaining. Amazon's listings, automatically generated by an experimental artificial intelligence tool, didn't always correspond to the correct product in Burzio's inventory. In one case, a shopper who thought they were receiving a softball-sized stress ball, which Burzio's Hitchcock Paper doesn't sell, received the smaller version of the product that her northern Virginia store does carry.

"People ordering these Christmas gifts and holiday gifts were getting the wrong items and demanding refunds," Burzio said. "We had to explain that it's Amazon that's doing this, not us, the mom and pop. We fulfilled the order exactly how it came to us."

Between the Christmas and New Year's holidays, small shop owners and artisans who had found their products listed on Amazon took to social media to compare notes and warn their peers. Angie Chua of Bobo Design Studio in California posted videos on Instagram documenting her experience.

258

In interviews, six small shop owners said they found themselves unwittingly selling their products on Amazon's digital marketplace. Some, especially those who deliberately avoided Amazon, said they should have been asked for their consent. Others said it was ironic that Amazon was scouring the web for products with AI tools despite suing Perplexity AI Inc. for using similar technology to buy products on Amazon. Perplexity has denied wrongdoing and called Amazon a bully.

The automated Amazon listings at issue are designed to let shoppers purchase products carried by other retailers. While the strategy could generate sales an independent seller might not otherwise get, it raises questions about who owns the customer relationship and who bears responsibility when something goes awry. Some retailers say the listings displayed the wrong product image or mistakenly showed wholesale pricing. Users of Shopify Inc.'s e-commerce tools said the system flagged Amazon's automated purchases as potentially fraudulent.

Karla Hackman, a jewelry artist in Santa Fe, New Mexico, discovered a handful of her pieces were on Amazon after seeing a warning in a social media group for artists. She asked Amazon to take them down on Saturday, and the products were removed by Tuesday.

"I'm a one-woman show," she said. "If suddenly there were 100 orders, I couldn't necessarily manage. When someone takes your proprietary, copyrighted works, I should be asked about that. This is my business. It's not their business."

Amazon spokesperson Maxine Tagay said sellers are free to opt out. Two Amazon initiatives — Shop Direct, which links out to make purchases on other retailers' sites, and Buy For Me, which duplicates listings and handles purchases without leaving Amazon — "are programs we're testing that help customers discover brands and products not currently sold in Amazon's store, while helping businesses reach new customers and drive incremental sales," she said in an emailed statement. "We have received positive feedback on these programs."

Tagay didn't say why the sellers were enrolled without being notified. She added that the Buy For Me selection features more than 500,000 items, up from about 65,000 at launch in April.

Chua, whose products were removed from Amazon after she emailed a support line — branddirect@amazon.com — said she never intended to sell on Amazon.

"I just don't want my products on there," she said. "We create them, we source them, it's not where we want to be. It's like if Airbnb showed up and tried to put your house on the market without your permission."

Chua said she has fielded calls from an intellectual property attorney, and that as of midday Tuesday, 187 other merchants have filled out a survey form she set up to canvass how widespread the unprompted Amazon listings were.

Among those filling out the survey was Amanda Stewart, founder of Mochi Kids, a Salt Lake City-based retailer. She'd ignored requests over the years from Amazon representatives to sell on the site, but found last week that much of her inventory was listed there anyway. Her order book showed a little more than a dozen sales to mysterious Amazon addresses. "Our whole product catalog was on there," she said. "I was so shocked."

Stewart worries that the listings risk running afoul of copyright on product photos, or of agreements with her own suppliers — themselves mostly independent brands — that prohibit reselling products on Amazon.

Amazon has for years invited independent merchants to sell goods on its site, a group that today accounts for about 60% of Amazon's sales. Those merchants sought out the business with Amazon, manage their product listings directly, and pay Amazon a commission on sales. The new moves — essentially enrolling merchants in Amazon's store, in some cases without their knowledge — appears unprecedented, said Juozas Kaziukėnas, an independent analyst who closely tracks Amazon's marketplace.

"They seem to have gotten more aggressive and started onboarding brands that didn't opt in," he said. "They just went out and included a bunch of random e-commerce sites. It's just a very messy approach to kick-start this feature."

When Burzio tried to figure out what Amazon was doing with her listings, she tried the company's support numbers. One Amazon representative asked for a seller account number, which Burzio has never had, and then suggested she get one and pay $39 a month to get Amazon seller support.

"When things started to go wrong, there was no system set up by Amazon to resolve it," Burzio said. "It's just 'We set this up for you, you should be grateful, you fix it.'"

260

*This story was originally published at bloomberg.com. Read it here.*

The Seattle Times does not append comment threads to stories from wire services such as the Associated Press, The New York Times, The Washington Post or Bloomberg News. Rather, we focus on discussions related to local stories by our own staff. You can read more about our community policies here.

## Latest in Business



### Verizon outage affects tens of thousands of users, tracking site shows

A spokeswoman for Verizon said the carrier was...

### What to know about Seahawks parking, plus options to get there

Before the Seattle Seahawks feud with the San...

### US will suspend immigrant visa processing from 75 countries over public assistance concerns

The State Department says it will suspend the...   44 minutes ago

**Bilt's new credit cards will feature 10% interest rate, meeting bipartisan call for lower card rates**

Bilt has announced an overhaul of its credit…

---

**Big banks report soaring profits amid tensions with Trump over credit card interest rates**

Wall Street is seeing positive results as big…

---

**2025 home sales stuck at 30-year low with prices high and mortgages onerous**

The U.S. housing market slump dragged into its…

---

## Around the Web

POWERED BY REVCONTENT

HOMEBUDDY

Here's The Estimated Walk-In Shower Price in 2026



GLOSRITYSTORE

Commemorate Our Nation's Founding With The New Flag Wreath



EXPERTSINPETHEALTH

Vet Warns Americans: "If Your Dog Licks Its Paws, Watch This Immediately"

PEOASIS

Transform Your Space With Trendy Stained Glass Lamps

HEALTH FRONTLINE

Pulmonologists: Do This to Break Up Lung Mucus

NEUROPATHYGUIDE

Neuropathy? When The Nerve Pain Won't Stop, Do This

LIFEHACK GURU

Never Put Mustard in Your Fridge, Here's Why

PEOASIS

Cuts Ingrown and Thick Nails in Seconds With Pressure

263

Docusign Envelope ID: CBD8ECF2-7A06-4807-9ACD-88037B6B2296

Case 3:25-cv-09514-MMC    Document 54    Filed 01/05/26    Page 1 of 3

QUINN EMANUEL URQUHART & SULLIVAN, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Daniel C. Posner (Bar No. 232009)
danposner@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Andrew Schapiro (admitted *Pro Hac Vice*)
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1881
Telephone:    (312) 705-7400
Facsimile:    (312) 705-7401

Renita N. Sharma (admitted *Pro Hac Vice* )
renitasharma@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

William Pilon (Bar No. 326487)
williampilon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

Attorneys for Defendant Perplexity AI, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMAZON.COM SERVICES LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>PERPLEXITY AI, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:25-cv-09514-MMC<br><br>**SUPPLEMENTAL DECLARATION OF DZIANIS YARATS**<br><br>Hon. Maxine M. Chesney<br>Courtroom 7 |

265

Docusign Envelope ID: CBD8ECF3-7A06-4807-9ACD-88037B6B2296

I, Dzianis Yarats, declare as follows:

1. I am the co-founder and Chief Technical Officer at Perplexity AI, Inc. ("Perplexity"). I submit this declaration in further support of Perplexity's Opposition to Amazon's Motion for Preliminary Injunction. I have personal knowledge of the matters stated below, and if called as a witness to testify to them, I could and would do so.

2. I co-founded Perplexity in 2022 and have served as its Chief Technical Officer since inception. As CTO, I oversee all technical aspects of Perplexity's products, including engineering practices, security protocols, privacy protections, and updates and improvements for our "Comet" web browser.

**Comet's November 2025 Update**

3. Perplexity's Comet is a web browser, like Chrome, Safari, Edge, or Firefox. It enables users to visit websites, make purchases, and perform everyday online activities.

4. Comet has two components: (i) the browser itself, which users can operate manually without AI assistance, and (ii) an optional AI assistant that can automate browsing tasks based on users' requests (the "Assistant").

5. Perplexity releases updates to the Comet browser and Assistant in "builds"—discrete software packages representing specific versions of the product's code. Each build undergoes weeks of development and internal testing before our engineering team approves it for release to users. Each build is designed to improve the Assistant's ability to interact with the internet as a whole; those improvements may naturally affect the Assistant's ability to interact with a specific individual website such as Amazon.com.

6. Our team finalized Build 29688 (the "November Build") of the Comet browser and Assistant and made it available to users between November 24 and November 27, 2025. Perplexity did not include any Amazon-specific changes in the November Build.

7. The November Build remained the latest version of Comet available to users through December 11, 2025. Perplexity made no changes to the November Build during this period, including any emergency patches or updates.

Docusign Envelope ID: CBD8ECF2-7A06-4807-9ACD-88037B6B2296

8.      Between builds, Perplexity can make incremental improvements to certain components of Comet, including Assistant, via browser extensions.  Perplexity did not make any updates to Comet or Assistant using extensions between November 27, 2025 and December 11, 2025 that were Amazon-specific or targeted Amazon.com's technical controls.

9.      Since the release of the November Build, the Comet browser and Assistant have continued to operate normally.  Between November 27 and December 11, 2025, as far as Perplexity is aware, the Assistant experienced no disruption or change in its ability to interact with Amazon.com.  As noted above, Perplexity took no actions during this time specifically to ensure that the Assistant could interact with Amazon.com.

10.      On December 11, 2025, Perplexity began making Build 32562 of the Comet browser and Assistant available to users—the first update to Comet since the November Build.  As with the November Build, Perplexity has taken no intentional actions specifically to ensure the Assistant can interact with Amazon.com (as opposed to ensuring the Assistant could work with the internet generally) or to bypass or defeat any technical controls implemented by Amazon.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed on this 17th day of December, 2025 in San Francisco, California.

By _____
                    *Dzianis Yarats*
                    Dzianis Yarats

-3-                                                    Case No. 3:25-cv-09514-MMC
SUPPLEMENTAL DECLARATION OF DZIANIS YARATS

267

**HUESTON HENNIGAN LLP**
Moez M. Kaba (SBN 257456)
mkaba@hueston.com
Christine Woodin (SBN 295023)
cwoodin@hueston.com
Hagan Scotten (admitted *Pro Hac Vice*)
hscotten@hueston.com
Billy Joe McLain (SBN 290682)
bmclain@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 866-4825

Attorneys for Plaintiff
AMAZON.COM SERVICES LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMAZON.COM SERVICES LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>PERPLEXITY AI, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 25-cv-09514-MMC<br><br>**DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** |

-1-
DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

268

**RESPONSE DECLARATION OF DAVID EVANS**

I, David Evans, declare as follows:

1.       I am the Olsen Bicentennial Professor of Engineering and a Professor of Computer Science at the University of Virginia ("UVA"), where I have led research in security and privacy for over 25 years and taught courses in security, privacy, AI, and other computer science topics. I submitted a Declaration in Support of the Plaintiff's Motion for Preliminary Injunctive Relief on November 4, 2025.

2.       On November 25, 2025, Defendant Perplexity AI, Inc. ("Perplexity") filed an Opposition to Plaintiff's Motion for Preliminary Injunctive Relief ("Perplexity's Opposition"), along with declarations from Christopher Rucinski, a Vice President at Charles River Associates; Dzianis Yarats, Chief Technical Officer of Perplexity; and Dmitry Shevelenko, Chief Business Officer of Perplexity.

3.       This Declaration is filed in response to some of the issues raised in Perplexity's Opposition and the related declarations. It is not intended to be an exhaustive account addressing all issues raised in Perplexity's Opposition and the related declarations with which I do not agree or about which I may offer an opinion. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could and would testify competently to such facts under oath.

**I.       Summary of Points**

4.       Perplexity's Opposition argues that Perplexity does not "access" Amazon's computers because there are no direct requests from Perplexity hosts to amazon.com. This assumes that the only way to access a computing resource is to submit a direct request. In fact, Perplexity obtains personal user data from Amazon accounts through requests that are made by the Comet AI Assistant. The "Comet AI Assistant" references the Comet agentic assistant that a user interacts with through natural language messages inside the Comet browser. Components of the Comet AI Assistant run on the user's machine within the Comet browser and other

-2-
DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

269

components run on servers operated by Perplexity as well as servers operated by third-party model providers. I explain in Section II that the Comet AI Assistant will generate requests to amazon.com that result in personal user data from Amazon being transmitted to the user's browser and then to Perplexity servers where it is stored and used by Perplexity ███████

5.    The Rucinski Declaration argues that the security issues described in my initial declaration with the Comet AI Assistant are "flawed" because they were reported by "biased sources," and that they are not evidence of systematic security issues with the Comet AI Assistant because the exploits reported have been addressed. [Rucinski Decl., ¶¶ 20-26.] Although recent updates to the Comet browser and Comet AI Assistant may have mitigated those specific exploits, they have not addressed the broader and persistent security risks inherent in the Comet AI Assistant's design and intended operation. As I discuss in Section III, these risks are substantial and remain despite patches to specific exploits.

6.    The Rucinski Declaration argues that designing Comet's agentic web requests to "masquerade" as standard Google Chrome requests is standard practice. [Rucinski Decl., ¶ 17.] The Yarats Declaration states this is necessary to avoid websites that present "degraded versions of their content or fail to function properly" to browsers that do not masquerade as Chrome. [Yarats Decl., ¶ 8.]  As I argue in Section IV, this contradicts the intent of request headers and reasonable practices for web browser clients and automated tools interacting with web services.

II.    **Personal Amazon User Data Collected by Perplexity**

A.  **Authentication on the Web**

7.    The core protocol of the web, HTTP, is stateless. This means each request is processed independently. To provide the experience of a session, web servers maintain state and web clients transmit additional information in each request, often in the form of a "cookie" header field in the request.  For websites that maintain user accounts and require users to login to access their personal account, the user's browser will typically store a cryptographic token that identifies and authenticates the user in a file stored on the user's device known as a "web cookie."  The

-3-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

270

cryptographic token is obtained from the web server after the user logs in (for example, by entering a username and password in a form on a web page), and it is stored in a local file that can be read by the user's browser and passed back to the web server as a cookie header in subsequent requests to identify and authenticate the user (without the user needing to continually provide their username and password in each request).

8.      This process is illustrated in the screenshots below, using Mozilla's Firefox web browser.



Figure 1. Accessing amazon.com without a logged-in account. The panel on the right shows the network request to amazon.com, which does not include any cookie. Amazon.com returns a webpage that is not associated with any user account. A true and correct copy of Figure 1 is attached as Exhibit 18.

After the user has logged into an Amazon account, subsequent requests include a cookie header that contains a cryptographic token authenticating the user, and Amazon's server provides a web page with content that is personalized to that user. The next screenshot shows a request that includes a cookie header and the resulting response webpage.

-4-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF



Figure 2. Accessing amazon.com with a logged-in account (yellow text and highlighting added). The panel on the right shows the network request to amazon.com, which includes a cookie header (highlighted in yellow) that identifies and authenticates the user. Note that the page in the response is now customized for this user (which in this case is a test account I created for this report) and includes private and potentially sensitive information about the products that have been previously viewed by the user on amazon.com. A true and correct copy of Figure 2 is attached as Exhibit 19.

### B. Comet AI Assistant Uses User Credentials

9. When the Comet AI Assistant sends a request to amazon.com, it includes the cookie stored in the user's browser with the request. Note that this is done even if the user has not entered a username and password to log into amazon.com during this browsing session, just that they have at some previous time logged into amazon.com using the Comet browser that contains the Comet AI Assistant component. This means the request generated by the Comet AI Assistant will include the user's credentials and be treated by Amazon as a request from a logged-in user, as shown in the screenshot in the next figure.

-5-

Figure 3. Comet AI Assistant accessing amazon.com, transmitting the user's authentication cookie with the agent-generated request. This started without the user visiting amazon.com, just submitting the "order paper towels from amazon" request to the Comet AI Assistant. A true and correct copy of Figure 3 is attached as Exhibit 20.

-6-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

273

10.     Since the request submitted by the Comet AI Assistant to amazon.com includes the user's credentials stored in web browser cookies, the Comet AI Assistant accesses the user's personal information and receives responses from amazon.com that include private user information including information about past purchases, items viewed, the user's shipping addresses, and payment information. An example is included as Figure 16 in the Rucinski Declaration:



*Figure 16*: Screenshot of My Interaction With Amazon.com Using the Comet Assistant on November 24, 2025

Figure 4. Image from Rucinski Declaration showing Comet AI Assistant's interaction with amazon.com. (Yellow highlighting added to show some of the content in webpage that was redacted in the original image.) A true and correct copy of Figure 4 is attached as Exhibit 21.

This image was included in the Rucinski Declaration to show that Amazon does not display full credit card numbers in generated web pages, a responsible practice on Amazon's part that protects the full credit card number from being observed by someone with a view of the user's browser. This does not mean, however, that no personal information is contained in the generated page—the last four digits of the card were considered dangerous enough to redact from the image in the Rucinski Declaration, as well as the bottom left corner under the heading "Wallet | Cards & accounts," which displays other payment mechanisms used by the user.

11.     Information about payment mechanisms comprises just one type of personal

-7-
DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

information that users entrust to Amazon.  Other personal information that Amazon may display in private web pages transmitted to authenticated users, includes products viewed and purchased on amazon.com, which may include controversial books, medical products to treat diseases a user would typically want to keep private like mental disorders, and intimacy products. An example is shown below, part of a request to the Comet Assistant to "summarize my recent product views on amazon.com":



Figure 5. Image from Comet AI Assistant responding to user request. The image in the red box is a snapshot of the webpage returned from amazon.com showing the user's browsing history. This (or similar) snapshots are sent to a Perplexity server. A true and correct copy of Figure 5 is attached as Exhibit 22.

-8-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF



Figure 6. Response from Comet AI Assistant, containing text produced by a model running on a Perplexity server processing the snapshot of the personal amazon.com webpage requested by the Comet AI Assistant using the user's credentials and then sent by the Comet AI Assistant from the user's client to Perplexity. A true and correct copy of Figure 6 is attached as Exhibit 23.

12.     The behaviors exhibited by the Comet AI Assistant in using the user's credentials stored to access amazon.com without any explicit user authorization are different from the behaviors observed with other AI browser agents. As shown, in response to the request "visit amazon.com and show me my recent orders" the Comet AI Assistant will access the user's account pages in amazon.com without asking the user for permission or requiring the user to explicitly log into amazon.com. Note that I observed this in a browser session where the user had not logged into amazon.com; rather, it is enough that at some point in the past, the user had logged into amazon.com using the Comet web browser. By contrast, for a Microsoft Edge browser set up with the same Amazon account credentials, submitting the same request to the Copilot Assistant results in the response, "I can't access or display your personal Amazon account details like recent orders. For privacy and security reasons, I don't have the ability to log in to websites or view your private account information." Similarly, Brave's Leo AI Assistant responds to this request with "I can see you're on the Amazon homepage, but I'm unable to access your personal Amazon account information, including your recent orders. As an AI

-9-

276

assistant in the Brave browser, I don't have the ability to log into accounts or view private user data." This was followed by an explanation of how the user could find this information themself. Note that both the Copilot Assistant and Leo AI Assistant avoid accessing the user's personal account information even though the user is logged into amazon.com in the browser and already visiting an amazon.com page. By contrast, the Comet AI Assistant will access the user's personal account information even though the user is not visiting an amazon.com page and has not explicitly logged into amazon.com during this browsing session. (Screenshots of the three assistants are shown in the following three figures.)



Figure 7. Response from Comet AI Assistant, accessing the user's personal information without requesting authorization. A true and correct copy of Figure 7 is attached as Exhibit 24.

-10-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF



Figure 8. Response to the same request from the Microsoft Copilot, which refuses to access the user's personal information and will not access the user's personal account because of security and privacy concerns. A true and correct copy of Figure 8 is attached as Exhibit 25.

Figure 9. Response to the same request from the Brave Leo AI Assistant, which refuses to log into the user's personal account or view private user data. A true and correct copy of Figure 9 is attached as Exhibit 26.

-11-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

**C. Perplexity Obtains and Uses Private User Information Sent by the Comet AI Assistant**

13.     When the Comet AI Assistant operates, it submits web requests using the user's credentials stored in the browser, receives responses that contain private information associated with the user's account, and transmits that information to Perplexity. The Comet AI Assistant is fully dependent on Perplexity's servers to operate. Parts of it run on the user's local machine, but when network access to Perplexity's servers is blocked, the Comet AI Assistant spins and is unable to perform any actions.

14.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The image in Figure 5 (above and attached as Ex. 22) is an example of what might be sent to Perplexity servers when the Comet AI Assistant operates. I analyze the actual network traffic being sent back to Perplexity in paragraphs 17-21 below and find that it does include all the private information on the webpage as well as additional private user information. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

15.     In addition to being collected and stored by Perplexity, the personal browser snapshots transmitted by the Comet AI Assistant may also be sent to an external model provider for analysis. According to Perplexity's CEO, "We heavily use three models: our own fine tune of

-12-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

the cutting edge open source model, OpenAI's latest models, and Anthropic's latest models."[1] This implies that the snapshots with personal user information that are transmitted back to Perplexity may also subsequently be sent to servers operated by OpenAI or Anthropic.

16.    To better understand what Comet sends back to Perplexity, I set up a proxy server, mitmproxy, to enable me to view all the actual network requests made when the Comet AI Assistant is used.[2] The proxy server is set up to redirect all network requests made by the browser to go through a local process so they can be recorded and analyzed, including the encrypted (https) requests.

17.    I opened the "Your Browsing History" link for my test amazon.com account and submitted the request "summarize this page" to the Comet AI Assistant. There is no request for permission from the user to send information back to Perplexity, but several network messages are generated that send private information back to Perplexity. One observed request is:

POST https://www.perplexity.ai/rest/browser/client_payload?version=2.18&source=default HTTP/2.0 with 45,205 bytes (characters) of content sent to the www.perplexity.ai endpoint. Included in this message is a JSON object containing a field that provides the content on the user's Amazon Browsing History page (I've added cyan highlighting to emphasize some of the private user information included in this message):

```
    "client_context": [
      {
        "content": [
          "Skip to\n-------\n\n*
[Main content](https://www.amazon.com/gp/history?ref_=nav_AccountFlyout_browsinghistory#skippedLink)\n\nK
eyboard shortcuts\n------------------\n\n* [Search, option, forward slash](#)\n*  [Cart, shift, option, c](#)\n*  [Home,
shift, option, h](#)\n*  [Your orders, shift, option, o](#)\n*  Show/hide shortcuts,
shift, option, z\n\nTo move between items, use your keyboard's up or down arrows.\n\n[Amazon](https://www.am
azon.com/ref=nav_logo)Deliver to CometTest  \nHackerville 22911\n\nAll<select aria-haspopup=\"menu\"
value=\"All Departments\"
```

. . . (lines skipped to save space)

```
eligible items with no order minimum.[Go to Cart](https://www.amazon.com/cart?ref_=ox_ewc_ret_gtc_dsk_us)\n
\n* [Amazon Basics 2-Ply Flex-Sheets Paper Towels, 12 Basics Rolls = 40 Regular Rolls, Everyday Value with 150
```

---

[1] PodiumVC, *Perplexity CEO Aravind Srinivas on Building Comet and AI Browsers*, at 3:25-3:42 (YouTube, Aug. 16, 2025), https://www.youtube.com/watch?v=S8jhiVd4mjk.
[2] *See* Mitmproxy, https://mitmproxy.org, a true and correct copy of which is attached as Exhibit 27.

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Sheets per Roll, Packaging May Vary](https://www.amazon.com/gp/product/B09BWFX1L6/ref=ewc_pr_img_1?smid=ATVPDKIKX0DER&psc=1)$22.86Delete Amazon Basics 2-Ply Flex-Sheets Paper Towels, 12 Basics Rolls = 40 Regular Rolls, Everyday Value with 150 Sheets per Roll, Packaging May Vary1\n  \n  1\n  \n  Increase quantity by one\n\nYour Browsing History\n--------------------\n\nSettings\n\nThese items were viewed recently. We use them to personalize recommendations.\n\n[Sex Bucket List - My Biggest Kink List: over 300 Kinks, Fetishes and Sex Positions. Sex Bucket List for Couples - Naughty Challenegs, Kinky Games, Sexy Ideas.](https://www.amazon.com/Sex-Bucket-List-Positions-Challenegs/dp/B0BYB8DYYT/ref=pd_ybh_a_d_sccl_1/142-4983934-6522703?pd_rd_w=pP2PR&content-id=amzn1.sym.67f8cf21-ade4-4299-b433-69e404eeecf1&pf_rd_p=67f8cf21-ade4-4299-b433-69e404eeecf1&pf_rd_r=S98XP3MG0GYM3B759TE0&pd_rd_wg=fn4P3&pd_rd_r=0b7ae6d0-a6e8-40ca-ae68-030c4892c446&pd_rd_i=B0BYB8DYYT&psc=1)[Kink & Bucket List Couple](https://www.amazon.com/Kink-Bucket-List-Couple/e/B0DQ4MVCQS/ref=pd_ybh_a_d_sccl_1_bl/142-4983934-6522703?pd_rd_w=pP2PR&content-id=amzn1.sym.67f8cf21-ade4-4299-b433-69e404eeecf1&pf_rd_p=67f8cf21-ade4-4299-b433-69e404eeecf1&pf_rd_r=S98XP3MG0GYM3B759TE0&pd_rd_wg=fn4P3&pd_rd_r=0b7ae6d0-a6e8-40ca-ae68-030c4892c446&pd_rd_i=B0BYB8DYYT) [3.4 out of 5 stars, 55 ratings](https://www.amazon.com/product-reviews/B0BYB8DYYT/ref=pd_ybh_a_d_sccl_1_cr/142-4983934-

. . . (nine pages of content skipped to save space)

d=TnACMrGVghHocjL8KB&ref_=footer_consumer_health_data_privacy)\n*  [Your Ads Privacy Choices](https://www.amazon.com/privacyprefs?ref_=footer_iba)\n\n© 1996-2025, Amazon.com, Inc. or its affiliates"
        ],
        "url": "https://www.amazon.com/gp/history?ref_=nav_AccountFlyout_browsinghistory",
        "title": "Your Browsing History",
        "content_type": "markdown",
        "content_origin": "current_tab",
        "tab_id": "1303220636"
      }
    ],

18.    This test shows that private amazon.com user information is being transmitted to Perplexity when the Comet AI Assistant is used. Note that the information includes the user's account name and zip code (the first highlight) and information about products viewed in their recent browsing on amazon.com (which includes some items that users may not be comfortable sharing). Given Perplexity's use of external model providers, this information may also end up being transmitted to other companies, such as OpenAI or Anthropic.

19.    Another message I observed as part of this same use of the Comet AI Assistant is:
        POST https://www.perplexity.ai/rest/browser/initial_history_summary?version=2.18&source=default HTTP/2.0

with 21,309 bytes of content. This content includes a JSON object that details the user's browsing history when the request is made:

-14-

```
{
  "key": "4b32dc58-db23-405d-a494-3b285a1b6585",
  "data": {
    "open_tabs_results": [],
    "history_results": [
      {
        "url": "https://www.amazon.com/gp/history?ref_=nav_AccountFlyout_browsinghistory",
        "title": "Your Browsing History",
        "is_current_tab": false,
        "last_accessed": 1764635535359.875,
        "visit_count": 1
      },
      {
        "url": "https://www.amazon.com",
        "title": "Amazon.com. Spend less. Smile more.",
        "is_current_tab": false,
        "last_accessed": 1764635528700.116,
        "visit_count": 7
      },
```

… (hundreds of other items skipped)

```
      {
        "url": "https://www.amazon.com/Sex-Bucket-List-Positions-
Challenegs/dp/B0BYB8DYYT/ref=pd_rhf_ee_s_pd_sbs_rvi_d_sccl_2_2/142-4983934-
6522703?pd_rd_w=AHUYR&content-id=amzn1.sym.6640a844-ab24-4352-ac9b-
78899e683a5e&pf_rd_p=6640a844-ab24-4352-ac9b-
78899e683a5e&pf_rd_r=2ZM0CXPYFV1XG9C0289D&pd_rd_wg=zjQPg&pd_rd_r=b3047a91-0c5d-41c6-
aee1-9d59a4043f2f&pd_rd_i=B0BYB8DYYT&psc=1",
        "title": "Sex Bucket List - My Biggest Kink List: over 300 Kinks, Fetishes and Sex Positions. Sex
Bucket List for Couples - Naughty Challenegs, Kinky Games, Sexy Ideas.: List Couple, Kink & Bucket:
9798386870362: Amazon.com: Books",
        "is_current_tab": false,
        "last_accessed": 1764538405853.344,
        "visit_count": 1
      },
      {
        "url":
"https://www.amazon.com/s?k=intimacy&crid=1EPAKTVY9ICUO&sprefix=intimacy%2Caps%2C134&ref=
nb_sb_noss_1",
        "title": "Amazon.com : intimacy",
        "is_current_tab": false,
        "last_accessed": 1764538352229.398,
        "visit_count": 4
      },
```

. . . (many other items skipped)

```
      {
        "url": "https://www.logitech.com/en-us/shop/c/mice",
        "title": "Computer Mice - Wireless Mouse, Bluetooth, Wired | Logitech",
        "is_current_tab": false,
        "last_accessed": 1764533288726.944,
        "visit_count": 2
      },
```

-15-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

```
            {
              "url": "https://www.logitech.com/en-us",
              "title": "Logitech United States",
              "is_current_tab": false,
              "last_accessed": 1764533230586.086,
              "visit_count": 1
            },
            {
              "url": "https://www.perplexity.ai/search/add-a-mouse-for-under-100-to-m-
nDJTEXrqT8GqH0UylVu5RQ",
              "title": "Add a mouse for under $100 to my cart on Logitech",
              "is_current_tab": false,
              "last_accessed": 1764533224128.348,
              "visit_count": 1
            },
            {
              "url":
"https://www.perplexity.ai/search/new?q=Add%20a%20mouse%20for%20under%20%24100%20to%20
my%20cart%20on%20Logitech&source=try-assistant-onboarding",
              "title": "Perplexity",
              "is_current_tab": false,
              "last_accessed": 1764533223583.662,
              "visit_count": 1
            },
            {
              "url": "https://www.perplexity.ai/onboarding-comet?login-source=cometOnboarding&login-
new=false",
              "title": "Perplexity",
              "is_current_tab": false,
              "last_accessed": 1764533172319.208,
              "visit_count": 1
            },
            {
              "url": "https://www.perplexity.ai/auth/verify-
request?email=dave%40davidevans.net&redirectUrl=%2Fonboarding-comet%3Flogin-
source%3DcometOnboarding",
              "title": "Perplexity",
              "is_current_tab": false,
              "last_accessed": 1764533065270.946,
              "visit_count": 1
            },
            {
              "url": "https://www.perplexity.ai/onboarding-comet",
              "title": "Perplexity",
              "is_current_tab": false,
              "last_accessed": 1764533045950.262,
              "visit_count": 1
            }
          ],
          "closed_tabs_results": [],
          "_dataToLog": {
            "open_tabs_results": 0,
            "closed_tabs_results": 0,
            "history_results": 90,
```

-16-

283

```
            "open_tabs_results_ms": 0,
            "history_results_ms": 7.9000000059604645,
            "closed_tabs_results_ms": 0
          }
        }
      }
```

20.    The message includes the full history of every web page visited using the Comet browser, including pages visited with the test account on amazon.com.[3] This information is all sent back to the Perplexity server when the Comet AI Assistant is used.

21.    The observed transmission of such detailed browsing history information to Perplexity is inconsistent with public comments from Perplexity's CEO in response to privacy questions: "Only when you ask a question that requires personalized context does Comet use minimal, relevant data from your session to fulfill your request. Even then, transmission to Perplexity's servers is tightly scoped and purpose-limited."[4] I also tested the Comet AI Assistant on several non-amazon pages with innocuous and unrelated content and found that the Comet AI Assistant sends a detailed browser history message (including the private amazon.com item pages visited) to Perplexity when the assistant is used in these contexts also, regardless of the webpage in the current tab and the user's request. For a Comet user who has previously browsed items on amazon.com, this message will include detailed information on all of the items the user viewed, timestamps indicating when they were last viewed, and the number of times the item's webpage was viewed.

22.    In addition to the misrepresentations in the Perplexity CEO's answers and the submitted declarations, Perplexity misrepresents the information that is sent back to users in the

_____

[3] The browser history in the message is shown in reverse order, where the last message is the "onboarding-comet" page that opens the first time a user runs the Comet browser, and the messages before that are the visits to add a mouse to a shopping cart on Logitech, which is the demonstration example for the Comet AI Assistant that I clicked on when I first started this Comet browser.
[4] Aravind Srinivas, u/aravind_pplx, Reddit (r/ChatGPT), *Comet AMA with Perplexity's Aravind Srinivas and Leonid Persiantsev* (July 16, 2025), https://www.reddit.com/r/ChatGPT/comments/1m1javp/comment/n3hnolo, a true and correct copy of which is attached as Exhibit 28.

-17-

privacy documentation it provides to users and potential users.[5] Perplexity's website provides these answers:

## What is a personal search? How does Comet Assistant use my personal data?

Comet Assistant does not personalize searches unless the user asks a question that requires personal context. Personal context is required to perform actions on the user's behalf, such as "book a restaurant" or "organize my emails". These capabilities are best used with Comet Assistant, which is the side panel that opens on the right to help you work on the current page. Comet Assistant allows you to ask questions about currently open tabs, search the web, and interact intelligently with websites on your behalf.

## What data is transferred between Comet and Perplexity?

Perplexity is the search engine that powers Comet by default. By default, all Comet data is stored on your device only. Comet does not send personal data to Perplexity until a personal search is asked to Comet. When a personal search is asked, Perplexity will use some Comet data, such as the currently open tab and relevant browsing history, to inform how it completes your requested task.

…

As observed in the network traffic in my experiments, the Comet browser sends detailed user browsing history and information about all open tabs to Perplexity in processing requests to the Comet AI Assistant that do not require any personal context and that have no connection to the private personal information that is transmitted.

---

[5] *See* Perplexity, *Comet Data Privacy & Security FAQ's*, https://www.perplexity.ai/comet/resources/articles/comet-data-privacy-security-faq-s, a true and correct copy of which is attached as Exhibit 29.

-18-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

III.    **Security Risks with the Comet AI Assistant**

A. **Comet's Design Does Not Follow Security Principles, Placing Users at High Risk**

23.    The Yarats Declaration responds to the issues raised regarding security risks inherent in Comet by discussing "Comet's Evolving Security Architecture": "Our comprehensive security approach includes: user-reported threats with verification, direct collaboration with affected users, third-party models to validate page authenticity, and machine learning to prevent exploits." [Yarats Decl., ¶ 23.] This strategy is known in the security research community as "penetrate-and-patch" and it has been widely discredited.[6]

24.    Although security for AI agents is an emerging field, there are well established security principles going back to at least the early 1970s, that apply whenever a system is designed that will need to operate in an environment where there are potential adversaries. One way to develop web browser agents following security principles is known as the "Rule of Two", summarized by this figure from the Meta Blog, *Agents Rule of Two: A Practical Approach to AI Agent Security*.[7]

---

[6] *See* Marcus Ranum, *The Six Dumbest Ideas in Computer Security*, Information Security Bulletin, Vol 10 (2005), http://www.ranum.com/security/computer_security/editorials/dumb/, a true and correct copy of which is attached as Exhibit 30; Gary McGraw, *Testing for Security During Development: Why we should scrap penetrate-and-patch*, 13 IEEE Aerospace and Electronic Systems Magazine (1998), a true and correct copy of which is attached as Exhibit 31.
[7] *Agents Rule of Two: A Practical Approach to AI Agent Security*, Meta Blog (Oct. 31, 2025), https://ai.meta.com/blog/practical-ai-agent-security/, a true and correct copy of which is attached as Exhibit 32.

-19-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Figure 10. "Rule of Two" from *Agents Rule of Two: A Practical Approach to AI Agent Security*. An AI agent should not have more than two of the three capabilities: (A) processing untrustworthy inputs (such as content found on a webpage), (B) accessing sensitive or private data (such as authentication cookies or user account information), and (C) changing state or communicating externally (such as sending images back to Perplexity). A true and correct copy of Figure 10 is attached as Exhibit 33.

The design of the Comet AI Assistant is inconsistent with the "Rule of Two":

    a.  It is designed to process untrustworthy inputs: a user can ask the Comet AI Assistant to summarize any webpage, including following links contained on that page.

    b.  It has access to private data: the Comet AI Assistant uses web cookies stored in the browser to authenticate as the user and initiates requests to web servers to obtain private user information (such as the examples shown in Figures 3-7). The Comet AI Assistant has access to all the private data in the responses to these requests.

    c.  Changing state or communicating externally: as ███████████████ ███ confirmed in my own tests, the Comet AI Assistant will send snapshots of webpages that contain private user information back to Perplexity's servers. It will also take actions that change state, such as adding items to a user's shopping cart or

-20-

287

changing the shipping address associated with an Amazon account.

25.     Thus, the Comet AI Assistant is firmly in the "Danger" intersection of the figure. Simon Willison, who calls this the "lethal trifecta," clarifies the importance of avoiding providing an AI agent with this set of capabilities: "The only way to stay safe there is to avoid that lethal trifecta combination entirely."[8]

26.     The Meta post cited includes a "Web Browsing Research Assistant" as one example, and suggests one approach a web browsing assistant could adopt to satisfy the "Rule of Two" security principle: "To satisfy the Agents Rule of Two, we place preventative controls around its access to sensitive systems and private data by: - Running the browser in a restrictive sandbox without preloaded session data - Limiting the agent's access to private information (beyond the initial prompt) and informing the user of how their data might be shared."[9] Note that following a sound security principle is a necessary and important step to building a secure system, but by itself is not sufficient; it is also important to follow other security principles as well as best practices for testing, monitoring, and deployment.

27.     Although Perplexity has taken the risks of designing an AI browser agent without a principled approach to security, other AI browser agents I tested appear to have followed security principles and limited the general capabilities of their agents in ways that follow the Rule of Two. As noted in Footnote 9 of Rucinski's Declaration, the Brave browser's Leo AI assistant will summarize a displayed web page but will not request web pages. Microsoft's Copilot will visit a requested page but does it using a safe environment running on an external server without exposing the user's credentials. The figures on the next page illustrate the difference between Perplexity's approach and the approach used by Microsoft Copilot. In the first figure, the information visible on the test page is the same whether it is visited by the user directly or through a request generated by the Comet AI Assistant, revealing that the Comet AI Assistant is sending a request for the page from the user's browser with access to the user's personal

---

[8] *The lethal trifecta for AI agents: private data, untrusted content, and external communication*, Simon Willison's Weblog (June 16, 2025), https://simonwillison.net/2025/Jun/16/the-lethal-trifecta/, a true and correct copy of which is attached as Exhibit 34.
[9] Exhibit 32.

-21-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

288

information. The second figure shows the same test page when visited by the Copilot Assistant, revealing that the test server is not receiving a request from the user's browser or that contains the user's personal information, but is receiving a request from a different server running without access to the user's information.

-22-

289



Figure 11. The Comet AI Assistant does not follow the "Rule of Two." It makes external requests for untrusted web pages directly from the user's browser with full access to the user's personal information. A true and correct copy of Figure 11 is attached as Exhibit 35.

Figure 12. The Copilot Assistant follows the "Rule of Two" by requesting web pages in a safe external environment that does not have access to the user's credentials or reveal personal information. The left side is what the browser displays when my test page is visited directly (by the user entering the URL in the address bar as shown, or clicking on a link to it), with the test page revealing the user's IP address, browser user agent (which identifies itself as the Edge browser), user's time zone and platform. The right side reveals what the Copilot Assistant does when it visits the same page following a user's instructions. Note that the IP address, user agent, time zone, and platform information are all different from those shown on the left side, indicating that the Copilot Assistant's request was not sent from the user's browser and did not access and reveal user information. A true and correct copy of Figure 12 is attached as Exhibit 36.

-23-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

28. In contrast to the other AI browser assistants that I examined which appear to have made conscious decisions to limit the actions the assistant will perform in a principled way, the Comet AI Assistant does not appear to follow any strong security design principles. From my experiments, as well as the vulnerabilities described in public reports, and the descriptions in the Yarats and Rucinski declarations, Perplexity made design decisions inconsistent with the "Rule of Two" in allowing the Comet AI Assistant to have all three of the capabilities. Instead of following a principled security design with some hope of providing meaningful security assurances, the Comet AI Assistant is designed to fall directly in the "Danger" intersection and attempts to provide security by ineffectively relying on ad hoc patching of specific vulnerabilities as they are discovered or reported.

### B. Patching Reported Vulnerabilities Does Not Mitigate Underlying Security Risks

29. Given the inherent risks Perplexity is taking by designing the Comet AI Assistant without following a strong security principle such as the "Rule of Two", it is not surprising that many security vulnerabilities have been demonstrated (including the ones I described in my initial Declaration, in addition to others). Once a specific vulnerability and exploitation method are publicized it can be patched, but this does not solve the inherent security risks in the design and intended use of Comet.

30. When referring to the Comet AI Assistant, the Yarats Declaration states, "We ensure that every Assistant action requires explicit user permission, creating a strict control layer that prevents silent side effects or unintended operations." [Yarats Decl., ¶ 22.] This is not an accurate description of how the Comet AI Assistant operates. For the examples shown earlier (Figures 3-7), there were no explicit user permissions granted: the user did not explicitly log into amazon.com during this browsing session; the Comet AI Assistant did not request permission from the user before accessing the user's stored credentials; the Comet AI Assistant did not request permission from the user before submitting a web request including the user's credentials to amazon.com; the Comet AI Assistant did not request permission from the user before

-24-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

submitting snapshots of the resulting pages containing private user information to Perplexity. This "strict control layer" mentioned in the Yarats Declaration allowed these requests and did not require any explicit user permission before the Comet AI Assistant takes all these actions.

31.    As noted in subsection A, releasing a dangerous product and then adding patches for known exploits is not a sound security approach. Although each individual security vulnerability that is reported can be fixed in an ad hoc way, there is no limit to the vulnerabilities that will be found. For any system that is developed without following a design approach that is based on sound security principles, adversaries are likely to keep finding new vulnerabilities and new methods of exploiting them.

### C.  Arguments in Rucinski Declaration Do Not Counter Technical Claims

32.    The Rucinski Declaration claims that security vulnerabilities described in my original declaration are "flawed" because they were "published by a biased source." [*See, e.g.*, Rucinski Decl., ¶ 20.] This approach is applied to the vulnerabilities described by both Brave [Rucinski Decl., Section VIII] and LayerX [*id*. at Section XI]. Although Brave could be considered a competitor to Perplexity because it also distributes a web browser with an AI assistant, LayerX is not distributing a competing web browser, but rather marketing tools to enhance security of deployed web browser agents. Regardless, although it is important to consider potential biases in any source information, none of the technical issues described in the Brave or LayerX articles are flawed.

33.    The Rucinski Declaration argues that the vulnerabilities described in the Guard.io article were invalid because "the user was already tricked by the time the Comet Assistant was invoked" [*id*. ¶¶ 23-25 (the same quote appears in all three cited paragraphs)]. While it is true that these vulnerabilities do follow from certain inadvisable user actions, dismissing them because of this ignores the important role the web browser has in either protecting users or amplifying the harms they suffer. These vulnerabilities demonstrate the increased risk users face when using the Comet AI Assistant and are consistent with more comprehensive studies of how risks vary with browser designs. A study by LayerX found that "Perplexity's Comet Browser is Up To 85%

-25-

292

More Vulnerable to Phishing and Web Attacks Than Chrome."[10] Although not all of the increased risk is due to the Comet AI Assistant, the difference in risks measured on these attacks reflect Perplexity's failure to prioritize security or match current best practices.

**D. Failure to Reproduce Certain Exploits Does Not Imply Robust Security**

34. The Rucinski Declaration claims, "The Evans Declaration Demonstrates Comet's Security by Failing to Exploit It" [Rucinski Decl., Section XIII] and argues that my tests do not support the conclusion that Comet users are at high risk of exploitation: "In fact, the Evans Declaration shows the opposite: in the face of several potential exploits attempted by an expert computer science professor with access to step-by-step purported proof of concept exploit videos, the Comet browser successfully withstood all attempts. This is an indicator that Comet's security posture is currently robust." [*Id.* ¶ 29.]

35. It is well known in the security community that failure of particular exploits is not sufficient to establish that security is robust. Establishing robust security depends on following design principles and careful review and analysis of implementations. Showing that a particular exploit succeeds is a demonstration that a system is insecure to that exploit, but showing that a particular exploit fails is just a demonstration that a particular exploit is unsuccessful in that attempt. Claiming that a failed exploit demonstrates robust security is like an unsuccessful fisherman claiming that the ocean has no fish because he did not catch one.

36. It is not surprising that the quick tests of the proof-of-concept attacks described in my original declaration did not reproduce the reported demonstration attacks. These specific attacks were well publicized and reported to Perplexity, and they have been fixed in recent versions of the Comet Assistant. Indeed, as shown in Figure 11 of the Rucinski Declaration, Brave followed responsible disclosure practices, reported the vulnerability to Perplexity on July 25, 2025, and confirmed that Perplexity had patched the specific vulnerability before publicly

---

[10] Michelle Warburg, *LayerX Finds that Perplexity's Comet Browser is Up to 85% More Vulnerable to Phishing and Web Attacks Than Chrome*, LayerX (Sept. 8, 2025), https://layerxsecurity.com/blog/layerx-finds-that-perplexitys-comet-browser-is-up-to-85-more-vulnerable-to-phishing-and-web-attacks-than-chrome/, a true and correct copy of which is attached as Exhibit 37.

-26-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

disclosing the vulnerability on August 20. Although, as Figure 11 in the Rucinski Declaration shows, Brave later noted that Perplexity had not completely addressed the vulnerability: "Update: on further testing after this blog post was released, we learned that Perplexity still hasn't fully mitigated the kind of attack described here. We've re-reported this to them." [*Id*. at Figure 11.]

37. Contrary to the claims in the Rucinski Declaration [*id*. ¶ 28], my simple and quick tests demonstrated security vulnerabilities in Comet. The point of a security test is not to cause actual harm but to demonstrate a risk; it would be irresponsible of a security researcher to conduct a test in a way that causes actual harm. It is also not necessary to carry out a harmful action to demonstrate a serious security risk. Instead, security risks are demonstrated by showing actions taken that could have been harmful if an adversary so desired.

38. The tests I described in my original declaration did demonstrate serious security risks in Comet. [Dkt. 4-2, Evans Decl., ¶ 14.] As noted, I was able to get the version of Comet that I tested (which was the latest version available at the time of my original declaration) to access a URL provided in an untrusted email and send an email to an untrusted address containing a summary of information on a webpage response to a URL in an email. Although I did not actually use a malicious address in the email (I used an email address that I control so I could view the response and avoid any impact on others), there is no way that Comet could have known that this was a trustworthy email address (the actual address used was raw.pan9123@fastmail.com, a one-time-use email address I created for the purposes of this test, which was not previously used). The web page summary sent to that address did not contain any information that I considered sensitive because I did not want to actually expose any sensitive personal information to the Comet browser. However, I could just as easily have included sensitive personal information in the web page summary I sent to that address.

39. In summary, the Comet browser has been designed to prioritize flashy functionality over protecting users and web services, and instead of following sound design principles has taken risks that other AI browser assistants have not taken with a futile hope that

-27-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

they can plug security holes as they are discovered and publicized. This approach to security for a tool that has access to the user's private information and the ability to send it around the world is reckless and dangerous.

**IV.    Browser Identification**

40.    The Rucinski Declaration states that "Comet's user-agent string is consistent with the RFC 9110 standard and the user-agent strings of similar browsers". [Rucinski Decl., ¶ 8.b.] This does not address the measures Perplexity takes to impersonate other browsers and hide the nature of the automated requests it generates.

41.    In his background, Rucinski highlights, "I have experience with web browser automation, including using Selenium to programmatically interact with web sites." [*Id*. ¶ 5.] Selenium is a tool that enables automated control of a web browser, similarly to how the Comet AI Assistant automates control of the Comet browser. When Selenium is used, it sets the "navigator.webdriver" field to "true" to indicate to a web server that an incoming request was generated by an automated system rather than from a human action. This follows the W3C WebDriver standard, which was largely written based on experience with Selenium.[11] In particular, it specifies that "The webdriver-active flag is set to true when the user agent is under remote control." And in an example explains that this practice "[d]efines a standard way for co-operating user agents to inform the document that it is controlled by WebDriver, for example so that alternate code paths can be triggered during automation." When web browser actions are automated using Selenium, the "navigator.webdriver" flag is set to "true" to allow the server to treat automated requests differently than it would treat human-initiated requests. This is an established W3C standard, followed by the web automation tool mentioned in Rucinski's Declaration. I conducted tests with the current version of Comet, and requests generated by the Comet AI Assistant do not set the "navigator.webdriver" flag but instead masquerade as human-initiated requests.

---

[11] *See W3C Recommendation 05 June 2018*, WebDriver (June 5, 2018), https://www.w3.org/TR/webdriver1/ ("This specification is derived from the popular Selinium WebDriver browser automation framework."), a true and correct copy of which is attached as Exhibit 38.

-28-

42.    As pointed out correctly in Rucinski's Declaration, Comet (as well as most other web browsers) is built upon Chromium and so Comet includes the Chromium user-agent string in its user-agent string.

43.    However, other browsers built upon Chromium include additional information in requests to identify the browser making the request.

  a.    For example, the Microsoft Edge browser, which incorporates the Copilot Assistant, uses this user-agent string:  "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/142.0.0.0 Safari/537.36 Edg/142.0.0.0". The first part of this is the same user-agent string used by the Chrome browser and by Comet, but the Edge user-agent string adds "**Edg/142.0.0.0**" to identify itself as the Edge browser.

  b.    The Firefox browser uses "Mozilla/5.0 (Macintosh; Intel Mac OS X 10.15; rv:136.0) Gecko/20100101 **Firefox/136.0**", identifying itself as Firefox in the user-agent string.

  c.    The Opera browser uses "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/140.0.0.0 Safari/537.36 **OPR/124.0.0.0**" as its user-agent string, identifying itself as Opera.

44.    In addition to identifying itself using the user-agent string, a browser can use the "Sec-CH-UA" header (short for "User-Agent Client Hints") to provide servers with information about the client browser sending the request.

  a.    The Microsoft Edge browser uses this as the Sec-CH-UA string: "Chromium";v="142", "**Microsoft Edge**";v="142", "Not_A Brand";v="99". This identifies the request being from a Microsoft Edge browser.

  b.    Similarly, Opera uses ""Chromium";v="140", "Not=A?Brand";v="24", "**Opera**";v="124"" as its Sec-CH-UA string.

  c.    The Brave browser uses the same user-agent string as Chrome but identifies itself with its Sec-CH-UA string: "Chromium";v="142", "**Brave**";v="142",

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

"Not_A Brand";v="99"''. Brave also provides instructors for website operators on how to detect Brave using the user agent string, Sec-CH-UA headers, and JavaScript variables and explains that they only attempt to hide Brave's identity from websites that explicitly are reported to be discriminating against Brave users.[12]

45.    Unlike these browsers which include information in their user-agent and Sec-CH-UA strings to identify themselves in requests, the Comet browser submits requests that attempt to appear indistinguishable from Google Chrome requests. It uses the same user-agent string as Chrome, and the same Sec-CH-UA string (""Chromium";v="142", "Google Chrome";v="142", "Not_A Brand";v="99"''), which make these requests not readily identifiable as Comet requests.

46.    In summary, although it is common practice to include other browsers in the user-agent string and browsers built on top of Chromium will have similar user-agent strings, it is not common practice for browsers to attempt to hide their identity the way that Comet does. Other browsers include identifying information in their user-agent and Sec-CH-UA strings to enable servers to identify the browser client making a request.

**V.    Conclusion**

47.    The Comet AI Assistant attempts to make its requests indistinguishable by failing to follow common practices of browser identification. Perplexity misrepresents the amount and nature of personal information exposed by the Comet AI Assistant in both their public materials and in the submitted declarations. This exposure is part of the normal and intended operation of the Comet AI Assistant, and it occurs whether or not any security vulnerabilities are exploited. The design of the Comet AI Assistant exacerbates the risks by failing to follow sound security principles and instead attempting to rely on ad hoc mechanisms and patching of reported exploits, a strategy that has a long history of being ineffective. The Comet AI Assistant puts its users, and the services entrusted to protect their data, at unacceptable risk and hides its identity in ways that

---

[12] *See Detecting Brave (for Websites)*, GitHub, https://github.com/brave/brave-browser/wiki/Detecting-Brave-(for-Websites), a true and correct copy of which is attached as Exhibit 39.

-30-

make it difficult for services to protect their users from these risks.

Executed this 10th day of December 2025 in Charlottesville, Virginia.

David Evans

-31-

DECLARATION OF DAVID EVANS IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF