No. 26-1444

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AMAZON.COM SERVICES LLC, a Delaware
limited liability company,

*Plaintiff-Appellee*,

v.

PERPLEXITY AI, INC., a Delaware
corporation,

*Defendant-Appellant*.

---

On Appeal from the United States District Court
For the Northern District of California
No. 3:25-cv-09514

Hon. Maxine M. Chesney, District Judge

---

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, AND KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

---

Jake Karr
Ramya Krishnan
Alex Abdo
KNIGHT FIRST AMENDMENT INSTITUTE
   AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jake.karr@knightcolumbia.org

Esha Bhandari
Lauren Yu
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org

Shilpi Agarwal
Jacob A. Snow
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
   CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
sagarwal@aclunc.org

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amici curiae* state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Date: April 8, 2026

<u>/s/Esha Bhandari</u>
Esha Bhandari

*Counsel for* Amici Curiae

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................ ii

INTEREST OF *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT.........................................................................2

ARGUMENT ....................................................................................................4

    I.   Modern Journalism and Research Require the Use of Automated
        Digital Tools to Make Sense of Online Platforms and to Hold
        Them to Account .....................................................................................4

    II.  The CFAA Should Not Be Read to Impose Liabilty on the
        Automated Digital Tool Used Here Because Doing So Would Chill
        Critical Journalism and Research in the Public Interest...........................12

CONCLUSION................................................................................................19

i

# TABLE OF AUTHORITIES

**Cases**

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016)................................................................14

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ........................................ 4, 13, 14, 15

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009)................................................................12

*Packingham v. North Carolina*,
582 U.S. 98 (2017)................................................................................4

*Reno v. ACLU*,
521 U.S. 844 (1997)................................................................15

*South Carolina State Conference of NAACP v. Kohn*,
No. CV 3:22-01007-MGL, 2023 WL 144447 (D.S.C. Jan. 10, 2023)................1

*Sandvig v. Barr*,
451 F. Supp. 3d 73 (D.D.C. 2020)........................................ 1, 15, 16

*Sandvig v. Sessions*,
315 F. Supp. 3d 1 (D.D.C. 2018) .......................................... 3, 7, 8

*United States v. Nosal,*
676 F.3d 854 (9th Cir. 2012)........................................ 13, 16

*United States v. Nosal*,
844 F.3d 1024 (9th Cir. 2016)................................................13

*Van Buren v. United States*,
593 U.S. 374 (2021)................................ 1, 2, 13, 14, 16

*X Corp. v. Center for Countering Digital Hate, Inc.*,
724 F. Supp. 3d 948 (N.D. Cal. 2024)................................................17

*X Corp. v. Center for Countering Digital Hate, Inc.*,
No. 24-2643 (9th Cir.) ................................................................. 1, 2, 17

*Zuckerman v. Meta Platforms, Inc.*,
No. 3:24-CV-02596 (N.D. Cal.) .................................................................2

**Other Authorities**

Alex Luscombe et al., *Algorithmic Thinking in the Public Interest: Navigating Technical, Legal, and Ethical Hurdles to Web Scraping in the Social Sciences*, 56 Quality & Quantity 1023 (2022)............................................6

Andrew M. Guess et al., *Exposure to Untrustworthy Websites in the 2016 Election*, 4 Nature Hum. Behav. 472 (2020) ....................................................7, 11

Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372 (2018) ....................................................6

Angie Waller & Colin Lecher, *Facebook Promised to Remove "Sensitive" Ads. Here's What It Left Behind*, The Markup (May 12, 2022), https://perma.cc/WP38-7GX2....................................................................5

Annie Y. Chen et al., *Subscriptions and External Links Help Drive Resentful Users to Alternative and Extremist YouTube Channels*, Sci. Advances, Sep. 2023....................................................................11

Benjamin Edelman et al., *Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment*, 9 Am. Econ. J. Applied Econ. 1 (2017)....................................................................7

Charles Ornstein, *How ProPublica Uses AI Responsibly in Its Investigations, ProPublica* (Mar. 13, 2025), https://perma.cc/QSL9-F8HC ..............................9

Chris Lu et al., *Towards End-to-End Automation of AI Research*, 651 Nature 914 (2026)....................................................................9

Christopher A. Bail et al., *Exposure to Opposing Views on Social Media Can Increase Political Polarization*, 115 Procs. Nat'l Acad. Scis. U.S. Am. 9216 (2018)....................................................................8

Cole Stryker, *What Is Agentic AI?*, IBM, https://perma.cc/SWQ3-ZHEL ..............10

Cybersecurity for Democracy, *Researchers, NYU, Knight Institute Condemn Facebook's Effort to Squelch Independent Research About Misinformation*, Medium (Aug. 4, 2021), https://perma.cc/VR6Z-9Z2D..........16

Emillie de Keulenaar et al., *Modulating Moderation: A History of Objectionability in Twitter Moderation Practices*, 73 J. Commc'n 273 (2023).................................................................................................7

Gretel Kahn, *From AI Tools to Prince Andrew's Arrest: How Newsrooms Are Digging into the Jeffrey Epstein Files*, Reuters Inst. for the Study of Journalism (Feb. 19, 2026), https://perma.cc/Q584-98U2 ............................6, 10

Hang Do Thi Duc, *Public by Default* (July 2018), https://publicbydefault.fyi .........7

J. Nathan Mathias, *Preventing Harassment and Increasing Group Participation Through Social Norms in 2,190 Online Science Discussions*, 116 Procs. Nat'l Acad. Scis. U.S. Am. 9785 (2019).......................8

John Ruwitch, *Building AI Bots Becomes the Latest Viral Craze in China*, NPR (Apr. 7, 2026), https://perma.cc/4TNN-5QM5 ...........................................10

Karissa Bell, *The Fight to Study What Happens on Facebook*, Engadget (Sep. 7, 2021), https://perma.cc/2S3C-CG32 ....................................................5

Katie Benner et al., *Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says*, N.Y. Times (Mar. 28, 2019), https://perma.cc/VNF6-P3XG ..................................................................5

Laura Edelson & Damon McCoy, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. Times (Aug. 10, 2021), https://perma.cc/ZRC5-4G9M ........................................................5, 7

Marina Adami et al., *How Will AI Reshape the News in 2026? Forecasts by 17 Experts from around the World*, Reuters Inst. for the Study of Journalism (Jan. 5, 2026), https://perma.cc/Z8DD-QUPZ...............................10

Mary Walrath-Holdridge, *Amazon Prime Day Is Full of 'Fake Sales,' Lawsuit Alleges*, USA Today (Oct. 20, 2025), https://perma.cc/N8P4-9PLE ............................................................................5

iv

Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM on Human-Computer Interaction 1 (2019) ................................................................7

Nathaniel Persily & Joshua A. Tucker, *Conclusion: The Challenges and Opportunities for Social Media Research*, *in Social Media and Democracy* (Nathaniel Persily & Joshua A. Tucker eds., 2020) ..........................5

Patrick Healy, *How the Times Is Digging into Millions of Pages of Epstein Files*, N.Y. Times (Feb. 12, 2026), https://perma.cc/MK8J-SCK4 ....................10

Press Release, Nicole Meir, Associated Press, AP, AppliedXL to Deliver AI-Powered News Tips to Local Newsrooms (Sep. 17, 2024), https://perma.cc/U4VF-XQMC ...............................................................10

*Pulitzer Prize for Explanatory Reporting, Finalist*, ProPublica (May 6, 2024), https://perma.cc/49C6-XAD4.......................................................9

Samuel Levine, *Letter from Acting Director of the Bureau of Consumer Protection Samuel Levine to Facebook*, Fed. Trade Comm'n (Aug. 5, 2021), https://perma.cc/K3C9-PJG8.................................................16

Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06 .....................................17

*The Citizen Browser Project – Auditing the Algorithms of Disinformation*, The Markup (Oct. 16, 2020), https://perma.cc/MK3A-2BXM ..........................11

Will Knight, *I Loved My OpenClaw AI Agent—Until It Turned on Me*, Wired (Feb. 11, 2026), https://www.wired.com/story/malevolent-ai-agent-openclaw-clawdbot ...............................................................10

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization dedicated to defending the principles of liberty and equality embodied in the Constitution. The American Civil Liberties Union Foundation of Northern California is an affiliate of the national ACLU. The ACLU was counsel for the plaintiffs in *Sandvig v. Barr*, a lawsuit raising researchers' First Amendment right to engage in digital journalism techniques to study online platforms. 451 F. Supp. 3d 73 (D.D.C. 2020). The ACLU and its affiliates share a longstanding commitment to freedom of speech and digital rights and have served as counsel or *amicus curiae* in multiple cases concerning the rights of academic researchers and data journalists to conduct critical investigative work about online platforms that is essential to informing the public. *See, e.g.*, *Van Buren v. United States*, 593 U.S. 374 (2021) (*amicus*); *X Corp. v. Ctr. for Countering Digit. Hate, Inc.*, No. 24-2643 (9th Cir.) (*amicus*); *S.C. State Conf. of NAACP v. Kohn*, No. CV 3:22-01007-MGL, 2023 WL 144447 (D.S.C. Jan. 10, 2023) (counsel).

---

[1] *Amici* submit this brief with the consent of all parties. Fed. R. App. P. 29(a)(2). *Amici* declare that no party or party's counsel authored the brief in whole or in part, and no one other than *amici*, their members, or their counsel contributed money intended to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E).

The Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute") is a nonpartisan, nonprofit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute is particularly committed to illuminating the forces that are shaping public discourse online. It represents journalists and researchers who fear legal liability for violating the terms of service of Facebook and other major social media platforms in the course of studying the ways in which these platforms influence public discourse. *See Van Buren v. United States*, 593 U.S. 374 (2021) (*amicus*); *X Corp. v. Ctr. for Countering Digit. Hate, Inc.*, No. 24-2643 (9th Cir.) (*amicus*); *Zuckerman v. Meta Platforms, Inc.*, No. 3:24-CV-02596 (N.D. Cal.) (counsel). In an effort to mitigate these fears, the Knight Institute has proposed that Congress establish a legislative safe harbor for privacy-preserving research that is in the public interest.

## SUMMARY OF ARGUMENT

Journalists and researchers regularly use tools to automate the process of accessing and gathering information online. These automated digital tools— including web scrapers, browser extensions, and artificial intelligence ("AI")-based tools—help make sense of our new digital world and thereby enable public interest

reporting about the role that online platforms play in shaping public discourse and economic activity. Indeed, using these tools is often the only way to investigate platforms at the scale they operate. *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018).

Amazon's overbroad interpretation of the Computer Fraud and Abuse Act ("CFAA") and its California analogue, however, would threaten this public interest journalism and research. Amazon argues that Perplexity may be held liable under the CFAA because it offers to users an AI-powered browser that, at the users' behest and with their consent, accesses information that Amazon users are allowed to access. In doing so, Perplexity's tool appears to resemble other automated digital tools on which much public interest journalism and research rely. But as this Court has held, computer crime laws were intended to apply only to online conduct that is akin to breaking and entering. And that is, of course, not what journalists and researchers do when they interact with online platforms as part of their work. Imposing liability on Perplexity for the alleged conduct at issue here would expose journalists and researchers to civil and criminal penalties for using the digital tools of their trade. This Court should decline Amazon's invitation to apply computer crime laws so broadly because doing so would chill critical independent journalism and research in the public interest.

## ARGUMENT

**I.      Modern Journalism and Research Require the Use of Automated Digital Tools to Make Sense of Online Platforms and to Hold Them to Account.**

Public discourse and economic activity increasingly take place on online platforms operated by private companies. People rely on online platforms to keep up to date on the news, engage with elected officials and religious leaders, connect with friends, create art, and search for and apply for jobs, housing, and educational opportunities. For many, social media platforms are the "principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

At the same time, powerful technology companies control the ways that people can interact on and with the platforms. And as this Court has warned, giving these companies full control over the data on their platforms "risks the possible creation of information monopolies that would disserve the public interest." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022). In fact, these risks are already being borne out. Meta, in an effort to show that Facebook is not full of political content, released a report claiming that the most viewed webpage was from an obscure website associated with former football players, but the *New York Times* found that an earlier version of the report said that the most viewed webpage was a

4

news story about a death allegedly linked to the COVID-19 vaccine.[2] And Amazon is facing allegations of inflating listing prices to make its Prime Day discounts seem more appealing.[3]

As these examples show, journalism and research play a vital role in illuminating the ways in which large technology platforms are shaping our lives.[4] Journalism and research have shed crucial light on a panoply of concerns that platforms have failed to independently monitor and correct, such as online discrimination,[5] and have provided important information for regulators to take enforcement action.[6]

---

[2] Karissa Bell, *The Fight to Study What Happens on Facebook*, Engadget (Sep. 7, 2021), https://perma.cc/2S3C-CG32.

[3] Mary Walrath-Holdridge, *Amazon Prime Day Is Full of 'Fake Sales,' Lawsuit Alleges*, USA Today (Oct. 20, 2025), https://perma.cc/N8P4-9PLE.

[4] Nathaniel Persily & Joshua A. Tucker, *Conclusion: The Challenges and Opportunities for Social Media Research*, *in Social Media and Democracy* 313–14, 321–22 (Nathaniel Persily & Joshua A. Tucker eds., 2020).

[5] *See*, *e.g.*, Laura Edelson & Damon McCoy, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. Times (Aug. 10, 2021), https://perma.cc/ZRC5-4G9M; Angie Waller & Colin Lecher, *Facebook Promised to Remove "Sensitive" Ads. Here's What It Left Behind*, The Markup (May 12, 2022), https://perma.cc/WP38-7GX2.

[6] *See*, *e.g.*, Katie Benner et al., *Facebook Engages in Housing Discrimination with Its Ad Practices, U.S. Says*, N.Y. Times (Mar. 28, 2019), https://perma.cc/VNF6-P3XG (noting that a Department of Housing and Urban Development lawsuit followed "nearly three years of scrutiny of Facebook's ad-targeting practices that started with a 2016 investigation by ProPublica, whose reporters showed that the

Investigating the operation of online platforms requires techniques and tools suited to the complexity and scale of the platforms' operation. Critically, this includes the use of software that automates what would otherwise be prohibitively time-consuming processes.[7] Many of these investigative techniques are relatively new, but in most cases they involve no discrete activity that could not be accomplished manually.[8] Automated digital tools simply provide systematic access to a platform or website.[9]

A common online research method is the automated collection of data, a practice often referred to as scraping.[10] "Scraping is merely a technological advance

---

company made it simple for marketers to exclude specific ethnic groups for advertising purposes").

[7] *See, e.g.*, Alex Luscombe et al., *Algorithmic Thinking in the Public Interest: Navigating Technical, Legal, and Ethical Hurdles to Web Scraping in the Social Sciences*, 56 Quality & Quantity 1023, 1024 (2022) ("[I]t is becoming increasingly necessary to turn to innovative tools like scraping to carry the social sciences forward into the twenty-first century."); Gretel Kahn, *From AI Tools to Prince Andrew's Arrest: How Newsrooms Are Digging into the Jeffrey Epstein Files*, Reuters Inst. for the Study of Journalism (Feb. 19, 2026), https://perma.cc/Q584-98U2 (surveying methods used to analyze the over 3.5 million documents, 180,000 images, and 2,000 videos in the Jeffrey Esptein files released by the U.S. Department of Justice).

[8] *See* Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372, 386–88 (2018).

[9] *Id.*

[10] *See id.* at 373, 414–15 (noting that scraping often, but not always, involves automation and emphasizing that scraping "should not be thought of as inherently more invasive or dangerous than a person at a web browser").

that makes information collection easier; it is not meaningfully different from using a tape recorder instead of taking written notes, or using the panorama function on a smartphone instead of taking a series of photos from different positions." *Sandvig*, 315 F. Supp. 3d at 16. Scraping is important for research on issues ranging from online discrimination,[11] to misinformation about elections and vaccines,[12] to social media advertising policies.[13] Indeed, systematic collection of public data can serve as an important counterweight to the consolidation of control by large platforms over information, and as a key accountability mechanism to reveal the platforms' choices about what they show users[14] and about their privacy policies and practices.[15]

---

[11] *See, e.g.*, Benjamin Edelman et al., *Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment*, 9 Am. Econ. J. Applied Econ. 1, 1–3 (2017).

[12] *See*, *e.g.*, Edelson & McCoy, *supra* note 5; Andrew M. Guess et al., *Exposure to Untrustworthy Websites in the 2016 Election*, 4 Nature Hum. Behav. 472 (2020).

[13] *See, e.g.*, Muhammad Ali et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM on Human-Computer Interaction 1, 3–4 (2019).

[14] *See, e.g.*, Emillie de Keulenaar et al., *Modulating Moderation: A History of Objectionability in Twitter Moderation Practices*, 73 J. Commc'n 273 (2023) (using scraping techniques to analyze Twitter moderation practices from 2006–22).

[15] *See, e.g.*, Hang Do Thi Duc, *Public by Default* (July 2018), https://publicbydefault.fyi (using scraping to illustrate how transaction information exposed by default via Venmo can reveal intimate details of specific users' daily lives and routines).

Other research methods for investigating online platforms include automating more than just data collection. For example, the researchers in *Sandvig v. Sessions* sought to study race- and gender-based discrimination on housing and employment websites by creating tester profiles. 315 F. Supp. 3d at 8–9. The researchers would then use the tester profiles to systematically search for properties on real estate sites, and to create and apply to jobs on hiring sites, all in the service of detecting whether online housing and employment platforms discriminated on the basis of race and gender in providing opportunities. *Id.* The methodology resembled analog-era civil-rights testing, but digitized and automated to function at the scale at which the industries now operate. Similarly, researchers conducting a study on how exposure to opposing political views on social media can impact political polarization created Twitter bots designed to show participants content with opposing political views.[16] Another researcher exploring how to improve participation in Reddit threads designed an experiment around a bot that would post a comment with information about community norms; in total, the study examined 2,190 discussion threads.[17]

---

[16] Christopher A. Bail et al., *Exposure to Opposing Views on Social Media Can Increase Political Polarization*, 115 Procs. Nat'l Acad. Scis. U.S. Am. 9216, 9217 (2018).

[17] J. Nathan Mathias, *Preventing Harassment and Increasing Group Participation Through Social Norms in 2,190 Online Science Discussions*, 116 Procs. Nat'l Acad. Scis. U.S. Am. 9785, 9786 (2019).

Journalists and researchers also use AI tools, such as large language models ("LLMs"), to help them process information, perform literature reviews, generate hypotheses, and conduct experiments.[18] For example, the news sites ProPublica and the Texas Tribune obtained a trove of raw materials collected during the state of Texas's investigation into the 2022 school shooting in Uvalde.[19] The trove included hundreds of hours of audio and video recordings that were not organized or clearly labeled, and some of it was highly disturbing for humans to watch. The journalists used an LLM to help make sense of it all. Their detailed analysis of the flawed law enforcement response to that shooting was selected as a finalist for the Pulitzer Prize for explanatory reporting.[20] When the federal government released over 3.5 million documents and many photos and videos in connection with Jeffrey Epstein, journalists both scraped the data and applied AI-based tools (in addition to other

---

[18] *See, e.g.*, Chris Lu et al., *Towards End-to-End Automation of AI Research*, 651 Nature 914 (2026).

[19] Charles Ornstein, *How ProPublica Uses AI Responsibly in Its Investigations, ProPublica* (Mar. 13, 2025), https://perma.cc/QSL9-F8HC.

[20] *Pulitzer Prize for Explanatory Reporting, Finalist*, ProPublica (May 6, 2024), https://perma.cc/49C6-XAD4.

software tools) to search and analyze the documents to enable reporting in the public interest.[21]

Journalists and researchers increasingly rely on AI tools that resemble the AI "agents" that Perplexity offers users of its Comet browser.[22] "Agentic" AI is a term typically used to describe software that combines an LLM able to translate a user's prompts into commands with code that can then execute those commands on the user's behalf.[23] For example, if a user gives an AI "agent" access to their email account, the agent may—at the user's request—not only draft emails, but also send them.[24] Here, Perplexity provides an AI agent as part of its browser, Comet, that users of the browser can use to process information that appears on the tabs they have open, in addition to the information that the AI agent may retrieve on its own

---

[21] Kahn, *supra* note 7; Patrick Healy, *How the Times Is Digging into Millions of Pages of Epstein Files*, N.Y. Times (Feb. 12, 2026), https://perma.cc/MK8J-SCK4.

[22] *See, e.g.*, Press Release, Nicole Meir, Associated Press, AP, AppliedXL to Deliver AI-Powered News Tips to Local Newsrooms (Sep. 17, 2024), https://perma.cc/U4VF-XQMC; Marina Adami et al., *How Will AI Reshape the News in 2026? Forecasts by 17 Experts from around the World*, Reuters Inst. for the Study of Journalism (Jan. 5, 2026), https://perma.cc/Z8DD-QUPZ.

[23] Cole Stryker, *What Is Agentic AI?*, IBM, https://perma.cc/SWQ3-ZHEL.

[24] John Ruwitch, *Building AI Bots Becomes the Latest Viral Craze in China*, NPR (Apr. 7, 2026), https://perma.cc/4TNN-5QM5; *see also* Will Knight, *I Loved My OpenClaw AI Agent—Until It Turned on Me*, Wired (Feb. 11, 2026), https://www.wired.com/story/malevolent-ai-agent-openclaw-clawdbot.

based on the user's prompts and with the user's permission. Appellant's Opening Br. 8–9. At its core—and as relevant to the dispute in this case—Comet's AI agent provides users with an automated way of interacting with websites.

The automated investigative tools used in journalism and research can take different forms, including browsers—which Perplexity has apparently chosen for housing its AI agent—browser extensions, and standalone applications. For example, the Citizen Browser Project created a browser that allows users to voluntarily share data with researchers who then study what users see in their Facebook and YouTube feeds.[25] Other researchers, examining how people are exposed to potentially extremist or harmful content on YouTube, created a browser extension that monitored willing participants' web browsing behavior.[26] Another study, evaluating the degree to which Facebook drove traffic to websites that published misinformation in the final weeks before the 2016 election, relied on volunteers who installed a separate computer application that—with express permission—tracked their web traffic across all browsers on their computers.[27]

---

[25] *The Citizen Browser Project – Auditing the Algorithms of Disinformation*, The Markup (Oct. 16, 2020), https://perma.cc/MK3A-2BXM.

[26] Annie Y. Chen et al., *Subscriptions and External Links Help Drive Resentful Users to Alternative and Extremist YouTube Channels*, Sci. Advances, Sep. 2023, at 1, 2.

[27] Guess et al. *supra* note 12.

The ability to systematically access platforms and websites enables journalism and research that match the scale of modern online platforms. Online platforms, and the companies behind them, increasingly control commerce, public discourse, and social interactions—and information about the platforms themselves—so it is important to understand how these platforms operate and to be able to hold them accountable. Automated investigative techniques and tools are crucial to enabling journalism and research into these platforms that serve the public interest.

## II. The CFAA Should Not Be Read to Impose Liability on the Automated Digital Tool Used Here Because Doing So Would Chill Critical Journalism and Research in the Public Interest.

Amazon's theory of CFAA liability would open the door to imposing civil and criminal penalties under the statute on a wide range of innocuous conduct online, including the use of automated digital tools for journalism and research that serve the public interest.[28] Amazon seeks to impose CFAA liability on Perplexity for providing users with a tool that technically operates in a similar way to the journalism and research described above—by systematically accessing or interacting with a website at the users' behest and with their consent—and for refusing to stop doing so after receiving a cease-and-desist letter. This conduct is a

---

[28] The CFAA's substantive liability provisions have been interpreted the same in civil and criminal contexts. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134–35 (9th Cir. 2009).

far cry from the digital "breaking and entering" prohibited by the CFAA. *hiQ Labs*, 31 F.4th at 1197–200.

This Court has consistently expressed a need to be "mindful" that the CFAA's "ill-defined terms may capture arguably innocuous conduct, such as password sharing among friends and family, inadvertently making criminals of large groups of people who would have little reason to suspect they are committing a federal crime." *United States v. Nosal*, 844 F.3d 1024, 1038 (9th Cir. 2016) ("*Nosal II*") (cleaned up) (interpreting access "without authorization"); *see also United States v. Nosal,* 676 F.3d 854, 859–60 (9th Cir. 2012) ("*Nosal I*") (broad construction of "exceeds authorized access" would "transform whole categories of otherwise innocuous behavior into federal crimes simply because a computer is involved"). The Supreme Court has sounded a similar warning, rejecting a broad interpretation of the CFAA because it "would attach criminal penalties to a breathtaking amount of commonplace computer activity." *See Van Buren v. United States*, 593 U.S. 374, 393 (2021).

But to adopt Amazon's expansive reading of the statute in this case would provide online platforms with "free rein to decide, on any basis, who can collect and use data." *hiQ Labs*, 31 F.4th at 1202. This would dramatically circumscribe public interest journalism and research into our online world for three key reasons.

13

First, Amazon's position would undermine the ability of journalists and researchers to gather data, including via users who voluntarily share their data, or otherwise systematically interact with websites to support journalism and research in the public interest. When a third-party service accesses information that a user is permitted to access, and does so at the user's behest and with their consent, the service stands in the user's shoes. It does not act "without authorization" within the meaning of the CFAA. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). Indeed, it does not act at all for purposes of the CFAA; it is the user who acts, albeit with the assistance of the tool. That is why the scope of the CFAA "turns on whether a user's credentials allow him to proceed past a computer's access gate, rather than on other, scope-based restrictions." *Van Buren*, 593 U.S. at 390 n.9. Logging into their Amazon accounts does give users access to their order histories, favorites, shopping carts, and the like, but it is the user's choice to share this information with Perplexity. *See hiQ Labs, Inc.*, 31 F.4th at 1201 ("The data hiQ seeks to access is not owned by LinkedIn and has not been demarcated by LinkedIn as private using such an authorization system."). Amazon may disagree with a user's choice to share data the user has authorized access to, or with a user's use of a browser extension while shopping on its website, but it may not invoke the CFAA to impose liability on that choice. If the CFAA barred third-party access to information that users wanted to share and could access through their accounts, a platform could

14

unilaterally decide exactly which information to keep under lock and key and which information could make it into the hands of journalists and researchers.

Second, Amazon's position would stymie even journalism and research that rely on purely public information, simply because that information was accessed by users logged in to their accounts. Amazon concedes that the CFAA does not apply to public websites, *see* Appellee's Opp'n to Stay Mot. 11–12; Pl.'s Reply in Supp. of Prelim. Inj. at 14, *Amazon.com Servs. LLC v. Perplexity AI, Inc.*, No. 3:25-cv-09514-MMC (N.D. Cal. Dec. 10. 2025), but nonetheless suggests that Perplexity violated the law by accessing public information when Comet users are logged in to their Amazon accounts. One need not have an account to view Amazon listings and product information that registered users see. "Instead, those sections are open to anyone with a web browser." *hiQ Labs*, 31 F.4th at 1199. "[M]ost Internet forums" are similarly "open to all comers," *Sandvig*, 451 F. Supp. 3d at 88 (quoting *Reno v. ACLU*, 521 U.S. 844, 880 (1997)), and the public-facing information that they offer is the foundation of journalism and research on the internet.

Third, Amazon's position would arm it—and any other platform—with a weapon of civil and criminal liability to shut down journalism and research it does not like by sending a cease-and-desist letter. Amazon argues that Perplexity's browser, by allowing individuals to search for products and make purchases without manually clicking on the website themselves, violates the CFAA because Amazon

15

told Perplexity not to assist this user-directed activity. This Court has never condoned CFAA liability based on a defendant's mere awareness of a written computer use policy. *See Nosal I*, 676 F.3d at 859–60. Making lack of authorization turn on a cease-and-desist letter would similarly "inject arbitrariness into the assessment of criminal liability," delegating the definition and scope of illegal activity to private entities and inviting arbitrary enforcement. *Van Buren*, 593 U.S. at 376; *see also Sandvig*, 451 F. Supp. 3d at 88 (criminalizing terms-of-service violations risks turning "each website into its own criminal jurisdiction and each webmaster into his own legislature.").

Platforms have leveraged the legal system in the past to target journalists and researchers whose work has portrayed them negatively. For example, Meta threatened NYU's Ad Observatory with legal action over its research into political ads shown on Facebook, which included the distribution of a browser extension for Facebook users to voluntarily share what ads they were shown when logged in.[29]

---

[29] Cybersecurity for Democracy, *Researchers, NYU, Knight Institute Condemn Facebook's Effort to Squelch Independent Research About Misinformation*, Medium (Aug. 4, 2021), https://perma.cc/VR6Z-9Z2D. To justify the decision, Meta pointed to its consent decree with the Federal Trade Commission ("FTC") to justify the decision. The FTC later condemned Meta's actions, noting that the decree did not bar Meta from "creating exceptions for good-faith research in the public interest." Samuel Levine, *Letter from Acting Director of the Bureau of Consumer Protection Samuel Levine to Facebook*, Fed. Trade Comm'n (Aug. 5, 2021), https://perma.cc/K3C9-PJG8.

And X sued the Center for Countering Digital Hate for scraping content as part of its research into what it considered hate speech and misinformation posted on the platform. *See X Corp. v. Ctr. for Countering Digit. Hate, Inc.*, 724 F. Supp. 3d 948, 956 (N.D. Cal. 2024), *appeal docketed*, No. 24-2643 (9th Cir. 2024).

The mere threat of legal action from these corporations chills research about online platforms. A survey of 167 academics and researchers found that over 100 studies about X have been diverted, stalled, or canceled, with over half of those interviewed citing a fear of being sued by X over their findings or data.[30] Affected studies include those about child safety, how the subject of rape is discussed on the platform, and the platform's content moderation decisions. *Id.* Critical research of this nature, often reliant on automation to aggregate and analyze content, is important to understanding how major online platforms operate and interact with users at scale. Yet this type of research is being stifled by the prospect of lawsuits, liability in the millions of dollars, or potentially criminal charges under the CFAA or similar computer crime laws. The result is a more opaque internet in which powerful platforms can control what the public knows about them. The use of automated tools that scrape webpages or use AI to analyze that information for

---

[30] Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, Reuters (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06.

research in the public interest is a foundational part of understanding the digital world around us. To allow civil and criminal liability under computer crime laws to turn solely on whether a platform objects to the manner in which information it otherwise makes available is collected and used would significantly deter journalism and research that are independent and often adversarial.

Holding Perplexity liable under the CFAA because of its use of an AI agent as described here would exacerbate these legal threats, imperiling the work of journalists and researchers who rely on similar automated digital tools and techniques. If a journalist is looking for evidence of fraud or a researcher for signs of illegal discrimination—findings that could put a platform in legal jeopardy—the target platform might decide that it would be better not to be scrutinized at all. It could send a cease-and-desist letter and invoke the specter of both civil and criminal liability. An expansive reading of CFAA liability would hand website owners like Amazon a powerful weapon to wield against individuals who conduct online research and investigations using information that platforms make available to their users. The CFAA and computer crime laws should not become a means for shutting down important research in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should decline to adopt a broad reading of computer crime laws that would impose civil and criminal liability on public interest journalism and research using the same methods as the conduct at issue here.

Dated: April 8, 2026

Jake Karr
Ramya Krishnan
Alex Abdo
KNIGHT FIRST AMENDMENT INSTITUTE
    AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jake.karr@knightcolumbia.org

Respectfully submitted,

/s/ Esha Bhandari
Esha Bhandari
Lauren Yu
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18 Floor
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org

Shilpi Agarwal
Jacob A. Snow
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
    CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
sagarwal@aclunc.org

*Counsel for* Amici Curiae

19

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that on April 8, 2026, I electronically filed the foregoing Brief of *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system, which effects service upon all counsel of record.

Dated: April 8, 2026                         Respectfully submitted,

/s/ Esha Bhandai
Esha Bhandari

*Counsel for* Amici Curiae

20

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1444

I am the attorney or self-represented party.

**This brief contains** 4,394 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Esha Bhandari **Date** 4/8/26

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*