No. 26-1444

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AMAZON.COM SERVICES LLC, a Delaware
limited liability company,

*Plaintiff-Appellee,*

v.

PERPLEXITY AI, INC., a Delaware
corporation,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-09514
Hon. Maxine M. Chesney, District Judge

## BRIEF OF *AMICUS CURIAE* AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a AIRLINES FOR AMERICA IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

A. Jeff Ifrah
Robert W. Ward
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, D.C. 20006
(202) 524-4140
jeff@ifrahlaw.com
rward@ifrahlaw.com

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................ii

INTEREST OF *AMICUS CURIAE*........................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ...................................................................................4

    I.     THIRD-PARTY AGENTIC AI SERVICES POSE NOVEL SECURITY RISKS. ...................................................4

    II.    REQUIRING AUTHORIZATION FROM A COMPUTER'S OWNER, NOT JUST AN AUTHORIZED USER, IS CONSISTENT WITH THE CFAA'S TEXT AND VINDICATES THE STATUTE'S OBJECTIVES. ................11

        A.    Because the CFAA is an anti-intrusion statute, an authorized user of a computer does not have blanket authority to authorize a third party to access the computer without the owner's consent. ......................11

        B.    The Court should not require a computer's owner to demonstrate that an unauthorized user accessed the computer for an improper purpose .............................17

        C.    Concerns about access to public information are unfounded and irrelevant. ..........................................21

CONCLUSION ..............................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ..............................3, 4, 11, 13, 14, 16, 25

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)...................3, 12, 13, 16, 17, 19, 20, 24, 25

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) ........................................................ 17

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) ...................................................... 17, 25

*Van Buren v. United States*,
  593 U.S. 374 (2021) ........................................................ 3, 13, 14, 18

**Statutes**

18 U.S.C. § 1030 .................................3, 12, 13, 16, 17, 18, 19, 20, 21, 26

**Other Authorities**

132 Cong. Rec. 27369 (1986) .................................................................. 12

H.R. Rep. No. 98-894 (1984)............................................................... 3, 19

H.R. Rep. No. 99-612 (1986)................................................................... 3

S. Rep. No. 99-432 (1986) .................................................................... 17

S. Rep. No. 104-357 (1996) .................................................................. 20

Restatement (Second) of Torts (1965)
  § 158 ................................................................................... 15
  § 163 ............................................................................... 18, 22
  § 168 ................................................................................... 16
  § 171 ................................................................................... 19

Orin S. Kerr, *Norms of Computer Trespass*,
  116 Colum. L. Rev. 1143 (2016)........................................... 3, 12, 17, 24

*Claude Cowork Exfiltrates Files*, PromptArmor,
https://perma.cc/Z9J7-8VSZ ................................................................... 6

Google, *About possible risks of using AI agents*, Gemini Apps Help,
https://perma.cc/DC9J-HV6H ............................................................ 5, 6

Google, *Gemini Agent*, Gemini.Google,
https://perma.cc/DJ99-V776 ................................................................... 4

Ravie Lakshmanan, *CometJacking: One Click Can Turn Perplexity's Comet AI Browser Into a Data Thief*, The Hacker News, (Oct. 4, 2025) https://perma.cc/JEF5-VY8B ................................................................. 5

Aaron McAllister, *Combating digital shrink with AI*, theNET by Cloudflare, https://perma.cc/85U2-Z8D9 ............................................... 7

Perplexity AI, *Comet Browser*,
https://perma.cc/Q36Q-W46N ............................................................... 4

Bruce Schneier, *Prompt Injection in AI Browsers*,
Schneier on Security, (Nov. 11, 2025), https://perma.cc/ER4E-FRXU .. 6

*The Privacy Reckoning That Agentic AI Cannot Escape*, Captain Compliance, https://perma.cc/F47P-8PNN .............................................. 8

*Agentic AI Could Expose Your Most Sensitive Personal Data*, IEEE,
https://perma.cc/THB8-UAW3 ............................................................... 9

iii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amicus curiae* states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amicus curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

Date: April 29, 2026        */s/ A. Jeff Ifrah*
                                           A. Jeff Ifrah
                                           *Counsel for* Amicus Curiae

iv

## INTEREST OF AMICUS CURIAE

The Air Transport Association of America, Inc., d/b/a Airlines for America ("A4A") is a trade association for the leading U.S. airlines, both passenger and cargo carriers. A4A's members include: Alaska Air Group, Inc.; American Airlines Group, Inc.; Atlas Air, Inc.; Delta Air Lines, Inc.; Federal Express Corp.; JetBlue Airways Corp.; Southwest Airlines Co.; United Airlines Holdings, Inc.; and United Parcel Service Co. Additionally, Air Canada is an associate member. A4A advocates on behalf of its members to shape policies that ensure safe and secure skies. This includes advocating for policy approaches that reflect the operational realities of modern supply chains and an ever-changing cybersecurity landscape. Since 2018, A4A's members have invested nearly $40 billion in information technology to improve system resiliency and make it easier for travelers to shop for tickets and other services; check in for their journeys and navigate airports; check or track bags; modify itineraries; redeem vouchers/loyalty points; and stay up-to-date on flight status during irregular operations.

A4A submits this brief with consent of all parties. Fed. R. App. P. 29(a)(2).

1

## SUMMARY OF THE ARGUMENT

The advent of novel artificial intelligence tools, including AI "agents" has reshaped the cybersecurity landscape. Agents can autonomously pursue goals and complete complex tasks on behalf of users. They can also learn and adapt. With these new capabilities come new vulnerabilities—prompt injection, agent hijacking, and data exfiltration to name a few.

Website operators therefore have good reason to control which agents can and cannot access password-protected areas of their websites. An agent operating inside an authenticated session can automate high-volume scraping, fraud, and account abuse; it can be manipulated by untrusted content to mis-execute transactions or exfiltrate sensitive data; and it can impose substantial operational and compliance burdens on the site even when the underlying user is otherwise permitted to log in.

While these specific risks may be new, the need to deter what amounts to digital trespassing is not. Recognizing that traditional theft and trespass statutes were ill-suited to address certain forms of cybercrime, Congress enacted the Computer Fraud and Abuse Act

2

("CFAA"), which imposes criminal and civil liability on anyone who "intentionally accesses a computer without authorization or exceeds authorized access" and thereby "obtains information" from the computer. *Van Buren v. United States*, 593 U.S. 374, 378 (2021) (quoting 18 U.S.C. § 1030(a)(2)). As both the statute's language and legislative history make clear, the CFAA prohibits acts of "computer trespass." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016); *see hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) (citing H.R. Rep. No. 98-894, at 20 (1984) & H.R. Rep. No. 99-612, at 5–6 (1986)). Scholars, too, have recognized that trespass norms ought to inform courts' analysis of alleged unauthorized access. *See e.g.*, Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1161 (2016).

Consistent with both Supreme Court and Ninth Circuit precedents, as well as longstanding trespass norms, the district court concluded that Amazon was likely to succeed on its claim that Perplexity violated section 1030(a)(2) when it accessed Amazon's computers without authorization. Nevertheless, Perplexity and its amici now ask this Court to revive a theory the Court has already rejected:

that a website owner cannot prohibit a third party from entering a password-protected area of a website so long as an authorized user has purported to authorize the third party to do so. *See Power Ventures*, 844 F.3d at 1068 (permission from social-media-platform user was not enough to constitute authorization under CFAA after social media company issued cease and desist notice). Because such an approach is inconsistent with the text of the CFAA and the interests the statute seeks to vindicate, the district court was correct to conclude that Amazon was likely to succeed on its claim that Perplexity accessed Amazon computers without authorization. The Court should therefore affirm the district court's decision.

## ARGUMENT

## I. THIRD-PARTY AGENTIC AI SERVICES POSE NOVEL SECURITY RISKS.

"Browse it, book it, buy it."[1] "AI that understands. AI that emails. AI that creates. AI that shops."[2] With the arrival of AI agents, AI has

---

[1] Google, *Gemini Agent*, Gemini.Google, https://gemini.google/overview/agent/ (last visited Apr. 23, 2026) [https://perma.cc/DJ99-V776].

[2] Perplexity AI, *Comet Browser*, https://www.perplexity.ai/comet/ (last visited Apr. 23, 2026) [https://perma.cc/Q36Q-W46N].

4

left the chatbox and begun interacting with the real world. AI agents can now organize your files, draft and send emails, and even book tickets. But what makes AI agents powerful also makes them attractive targets for cybercriminals.

Cybersecurity researchers have demonstrated that "prompt injection" attacks can turn an AI agent from a "trusted co-pilot to an insider threat."[3]  Prompt injection is "an attempt to elicit an unintended or harmful response" from an AI agent.[4] A typical prompt injection attack relies on placing malicious instructions within a website, email, document, or media file that may be invisible to a human but visible to the agent.[5] These malicious instructions may "trick" the agent into, for

---

[3] Ravie Lakshmanan, *CometJacking: One Click Can Turn Perplexity's Comet AI Browser Into a Data Thief*, The Hacker News, (Oct. 4, 2025) https://thehackernews.com/2025/10/cometjacking-one-click-can-turn.html [https://perma.cc/JEF5-VY8B].

[4] Google, *About possible risks of using AI agents*, Gemini Apps Help, https://support.google.com/gemini/answer/16596215?hl=en#zippy=%2Cabout-possible-risks-of-using-ai-agents (last visited Apr. 23, 2024) [https://perma.cc/V4FJ-EZEA].

[5] *Id.*

example, sending emails without a user's permission or knowledge or taking (and spreading) a user's private information.[6]

For companies like airlines that routinely handle sensitive personal information, from credit card numbers to passport numbers this is a serious risk. A "prompt injection" attack may, for example, trick an AI agent into changing booking details or cancelling reservations. An attacker could also manipulate AI's responses to mislead a consumer by sending fake alerts about booking issues, providing links to fraudulent payment pages, or requesting sensitive information under the guise of verifying a booking.

These are not mere hypotheticals. In August 2025, for example, a test of Perplexity's Comet browser resulted in Comet treating a fake email from a bank—sent from a ProtonMail email address—as genuine, loading the false login screen, and prompting the user to enter their bank login credentials.[7] And in October 2025, another group of researchers identified a prompt injection vulnerability that allowed

---

[6] *Id.*

[7] *Id.*

6

attackers to prompt Comet to share sensitive data from services like Gmail and Google Calendar.[8]

Of course, Comet is not the only agentic AI service vulnerable to prompt injection. Google warns users of its Gemini Agent that prompt injection is one of the "possible risks" associated with using an AI agent.[9] AI security researchers have identified prompt injection vulnerabilities in Anthropic's Claude Cowork too, including one that would allow attackers to exfiltrate sensitive documents to external servers without requiring human approval.[10]

In short, the features that make AI agents potentially powerful tools also pose substantial cybersecurity risks. And that risk is not limited to the user. A travel booking site, for example, may face the risk of prompt injection that hijacks a customer's agent, leading to account

---

[8] Bruce Schneier, *Prompt Injection in AI Browsers*, Schneier on Security, (Nov. 11, 2025) https://www.schneier.com/blog/archives/2025/11/prompt-injection-in-ai-browsers.html [https://perma.cc/ER4E-FRXU].

[9] *About possible risks of using AI agents*, *supra* note 4.

[10] *Claude Cowork Exfiltrates Files*, PromptArmor, https://www.promptarmor.com/resources/claude-cowork-exfiltrates-files (last visited Apr. 24, 2026) [https://perma.cc/Z9J7-8VSZ].

takeovers, "denial of inventory"[11] attacks, or data exfiltration from password-protected areas.

Along with cybersecurity concerns, AI agents raise a host of unique data privacy risks and considerations. An AI agent may manage privacy settings, including accepting cookies so it can complete a task. It may infer health or location information based on a user's calendar. [12] The tasks AI agents may be asked to complete—including shopping for the best airline deals—necessarily require access to sensitive data like financial information.

AI agents undermine the framework of notice-and-consent for data processing and data privacy. We have grown accustomed to applications

---

[11] A "denial of inventory" attack refers to a specific type of cybersecurity attack where an automated script repeatedly puts an e-commerce product or service in its shopping cart without completing the transaction, tricking the e-commerce site into believing the service or product is unavailable. Aaron McAllister, *Combating digital shrink with AI*, theNET by Cloudflare, https://www.cloudflare.com/en-au/the-net/retail-digital-shrink-ai/ (last visited Apr. 24, 2026) [https://perma.cc/85U2-Z8D9].

[12] *The Privacy Reckoning That Agentic AI Cannot Escape*, Captain Compliance, https://captaincompliance.com/education/the-privacy-reckoning-that-agentic-ai-cannot-escape/ (last visited Apr. 28, 2026) [https://perma.cc/F47P-8PNN]

and websites repeatedly asking for permissions: to access or track your locations, use your camera or microphones, or share your information. Agentic AI upends this status quo by acting on your information as opposed to asking for your information.[13] Access to this data creates an unchartered data privacy risk for companies and consumers alike.

Armed with unparalleled access, AI agents can undermine a company's commitment to the data privacy of its consumers if a company is unaware or not provided with the information regarding the scope of an AI agent's authorizations. For example, an airline company may not know whether an AI agent has a consumer's permission to access only frequent flyer information, but not personal information or travel documents. This leaves both e-commerce platforms—including airlines and travel booking sites—and consumers vulnerable from a data privacy standpoint. Additionally, Perplexity's proposed framework puts companies at risk should an AI agent consent to data processing activities beyond its authorization. For example, along the lines of

---

[13] *Agentic AI Could Expose Your Most Sensitive Personal Data*, IEEE, https://transmitter.ieee.org/how-agentic-ai-could-expose-your-most-sensitive-personal-data/ (last visited Apr. 28, 2026) [https://perma.cc/THB8-UAW3]

accepting a website's cookie policy, an agentic AI could consent to an airline's request for to use a consumer's personal data to train its own AI model. Without proper controls in place, what should be a safe and secure means to purchase airline tickets may become a threat to consumer's data privacy based on the actions of agentic AI.

These cybersecurity and data privacy risks will only grow as customers increasingly rely on AI agents to complete tasks involving sensitive personal and financial information. To mitigate these risks, agent-specific authorization will play a central role. Just as user authentication protects customers and website operators alike from bad human actors, agent authentication will likely be necessary to protect customers and website operators from bad agentic actors. Agent-specific authorization will, if not ensure, then at least make it more likely that only legitimate, authorized agents act on behalf of real, authorized users.

But for authorization to be effective, operators must also be able to prohibit unauthorized agents from accessing areas reserved for authenticated users (or agents). They must be able to raise the gates for certain agents and lower them for others. In some ways, this is no

10

different from the interest every business has in keeping trespassers from the non-public areas of its physical locations. Yet traditional theft and trespass laws are no more likely to effectively address the novel problem of "agentic trespass" than they were the early forms of computer trespass that prompted Congress to enact the CFAA.

And while the CFAA's drafters likely did not contemplate today's proliferation of AI agents, the basic concept still works: a third-party service, including an AI agent, violates the CFAA when it accesses a computer without the owner's authorization, regardless of whether an authorized user has purported to grant the third party access. This Court has recognized this principle before, *see Power Ventures*, 844 F.3d at 1068, and it should do so again here.

## II. REQUIRING AUTHORIZATION FROM A COMPUTER'S OWNER, NOT JUST AN AUTHORIZED USER, IS CONSISTENT WITH THE CFAA'S TEXT AND VINDICATES THE STATUTE'S OBJECTIVES.

### A. Because the CFAA is an anti-intrusion statute, an authorized user of a computer does not have blanket authority to authorize a third party to access the computer without the owner's consent.

Perplexity asks this Court to hold that the CFAA does not forbid a user's authorized agent from accessing a protected area of a website

11

where the only information behind the gate belongs to the user or is publicly available. Such a categorical rule is inconsistent with the statute's text and purpose, along with this Court's CFAA precedent, and the Court should reject it.

As this Court has observed, the CFAA was enacted "to prevent intentional intrusion onto someone else's computer. . . ." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). Accordingly, as this Court has recognized, section 1030 creates a "trespass offense" when "a person accesses a computer without authorization." *Id.* (citing 132 Cong. Rec. 27369 (1986) (statement of Sen. Denton)); *see* 18 U.S.C. § 1030(a)(2)(C). Prominent commentators too have recognized that computer-trespass statutes like the CFAA "prohibit trespass into a computer network just like traditional laws ban trespass in physical space," and thus courts should apply "physical" trespass norms. *See* Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. at 1144–46.

This trespass concept runs through this Court's CFAA decisions. In *hiQ*, for example, this Court observed that a user who has authorization is one who "can . . . access a computer system, where access means the *act of entering a computer system itself.*" *hiQ Labs*, 31

12

F.4th at 1198 (quoting *Van Buren v. United States*, 593 U.S. 374, 388, 390 (2021)) (emphasis added). And in *Power Ventures*, the Court recognized that, as in the physical world, a person may need authorization from more than one party to access a computer system. 844 F.3d at 1068. There, the Court recognized that to access Facebook's computers, authorization from individual Facebook users was necessary but not sufficient. A straightforward application of trespass principles compelled this result: because Facebook stored that data on its physical servers, the third party could not access that "computer system" without Facebook's permission. *Id.* And because Facebook did not authorize Power Ventures to access Facebook's servers, Power Ventures violated the CFAA when it did so. *Id.*

This Court's decisions in *hiQ* and *Power Ventures*, and the district court's decision here, are consistent with standard trespass norms. Perplexity's emphasis on Amazon users' ownership of their data is not. By focusing narrowly on this Court's references to "private information" in *hiQ*, it ignores the "gates-up-or-down" inquiry central to establishing CFAA liability. *See hiQ*, 31 F.4th at 1197–98 ("[L]iability under both clauses [of section 1030(a)(2)] stems from a gates-up-or-down inquiry—

13

one either can or cannot access a computer system . . . " (quoting *Van Buren*, 593 U.S. at 390–91).

Trespass norms illustrate why the gates-up-or-gates-down inquiry cannot turn solely on whether an authorized user has purported to authorize a third party. Consider a slight modification of this Court's safe deposit box analogy in *Power Ventures*. "Suppose that a person wants to borrow a friend's jewelry that is held in a safe deposit box at a bank. The friend gives permission for the person to access the safe deposit box and lends him a key." *Power Ventures*, 844 F.3d at 1068. But now suppose that instead of carrying a shotgun, as in the *Power Ventures* analogy, the person has simply been informed that—for whatever reason—he is no longer permitted to enter the bank. While the person knows he cannot enter the bank, his friend is not aware. The person nevertheless proceeds to the bank and asserts that his friend's permission to access the safe deposit box and remove the jewelry grants him sufficient permission to enter the bank. Even though all the person intends to do is retrieve the jewelry from his friend's deposit box, the result here is as obvious as it was in *Power Ventures*: the person could not enter the bank to retrieve the jewelry. *See* 844 F.3d at 1068. If he

14

did, he would be liable for trespass. *See* Restatement (Second) of Torts §§ 158, 163 (1965) (person who enters land in possession of another is subject to liability for trespass even in absence of harm). This analogy also illustrates why Perplexity's focus on Amazon users' control of their data misses the point. The same is true of the hypothetical friend's jewelry and safe deposit box. Because the friend owns the jewelry and is authorized to access the safe deposit box, the friend has the power to let the borrower access the safe deposit box, retrieve the jewelry, and borrow it. With permission and a key, the borrower steps into the friend's shoes as to the jewelry and the safe deposit box. He does not step into the friend's shoes as to the place where the safe deposit box is stored—the bank. The bank remains free to deny the borrower's attempt to proceed through the front door.

This Court's safe deposit box analogy readily translates to the airline context. For example, imagine an art dealer hires a courier to fly and deliver artwork via air travel. Even if the art dealer would be permitted as a passenger on the airline, and the artwork is permitted as luggage, the airline ultimately decides whether the courier is permitted as a passenger. The airline can deny the right to travel for any number

15

of reasons—security risks, health or safety concerns, or airline policy violations. The airline must still expressly permit the courier to board, even if hired by the art dealer to transport his artwork.

This maps neatly onto section 1030(a)(2)(C): a person must not only have authorization to access a particular piece of information, the person must also have authorization to access the computer on which it is stored.

It also illustrates the appropriate rule for CFAA cases involving third-party services. Permission from an authorized user alone is not enough; instead, the third party needs authorization both from an individual authorized user and the computer's owner. *See Power Ventures*, 844 F.3d at 1068; *see also* Restatement (Second) of Torts § 168, cmt. c. (license to enter may be non-delegable)[14] If the computer

---

[14] While this Court has rejected a "contract-based interpretation," *hiQ*, 31 F.4th at 1196, it properly considered "an individualized cease-and-desist letter" in *Power Ventures*, concluding that "Power accessed Facebook's computers 'without authorization' within the meaning of the CFAA" after receiving the cease-and-desist letter, 844 F.3d at 1068, 1069. Where the gates-up-or-down inquiry reveals that the gates are down, such written notification—even in the absence of additional code-based barriers—is enough to establish that the recipient is not authorized to access the computer.

16

owner has denied or revoked authorization, access violates section 1030(a)(2).

**B.    The Court should not require a computer's owner to demonstrate that an unauthorized user accessed the computer for an improper purpose.**

There is yet another problem with Perplexity's position. It misidentifies the interest CFAA protects. The CFAA is an anti-intrusion statute, and section 1030(a)(2) creates an "unauthorized access offense." *See* S. Rep. No. 99-432 (1986) (purpose of term "obtains information" in section 1030(a)(2) was not to require proof of asportation of data). It is not a "misappropriation statute." *hiQ*, 31 F.4th at 1196 (citing *United States v. Nosal* , 676 F.3d 854, 857–58 (9th Cir. 2012) ("*Nosal I*")). But Perplexity asks this Court to read a misappropriation-like element into section 1030(a)(2), faulting the district court for failing to make specific

---

This approach is consistent both with underlying trespass norms and this Court's analysis of the CFAA. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009) ("There is no dispute that if Brekka accessed LVRC's information on the LOAD website after he left the company . . . Brekka would have accessed a protected computer 'without authorization' for purposes of the CFAA."); Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. at 1176 ("When the computer owner communicates the revocation to the user, the delegated authority ends. Subsequent account access violates trespass norms; it should be understood as entering a space where the user is no longer welcome.").

17

findings as to not only the "nature of the information at issue" but also "what 'purposes' Perplexity uses it for." (Perplexity Br. at 33.) Indeed, Perplexity attempts to distinguish *Power Ventures* by arguing that, while Power Ventures accessed Facebook for its own improper purpose, Perplexity accesses Amazon.com for a proper purpose. (*Id.* at 31–33.)

This distinction has no basis in the CFAA's text. Section 1030(a)(2)(C) is unambiguous: it imposes liability when a person "intentionally accesses a computer without authorization . . . and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). That inquiry asks only whether a person "obtained information" by accessing a computer "without authorization." *Id.*; *see Van Buren*, 593 U.S. at 390–91 (noting that "without authorization" inquiry does not incorporate purpose-based limits). As with physical trespass, *why* the intruder accessed the information and what the person did with it has no bearing on whether the owner authorized the intruder to access the computer. *Cf.* Restatement (Second) of Torts § 163, cmt. c. ("Except where the actor is purporting to exercise a privilege of entry which the law confers upon

18

him for a particular purpose and for that purpose only, the purpose for which the actor enters the land is immaterial. . . .").

An analogy to the physical world further demonstrates why Perplexity's purpose-based argument is inconsistent with section 1030. As this Court has noted, in applying section 1030(a)(2), it "looks to whether the conduct at issue is analogous to 'breaking and entering.'" *hiQ*, 31 F.4th at 1198 (quoting H.R. Rep. No. 98-894 at 20). Returning to the bank analogy, imagine that instead of borrowing jewelry, the person is curious about the interest rates the bank is offering on savings accounts. He enters the bank and speaks with a banker, who provides the information. While trespass law would not impose liability solely for obtaining the information, it would impose liability for entering the bank after permission to do so has been revoked. *See* Restatement (Second) of Torts § 171 (privilege to enter created by possessor's consent terminated by revocation of which actor knows or has reason to know).

Returning to the airline context, imagine that, after a ticketed passenger deplanes with a friend, the passenger realizes that he left his passport in the seatback pocket. The passenger asks the friend to retrieve the passport. Anyone familiar with air travel will recognize the

19

problem here. While the passenger can grant the friend permission to possess her property, the airline must authorize the friend to access the cabin. And because the airline will not do so, if the friend were to access the cabin, it would be trespassing.

This too maps cleanly onto section 1030(a)(2). The statute imposes liability when a person accesses a computer without authorization and obtains information from the computer. *See* 18 U.S.C. § 1030(a)(2). The offense is complete once the person has "obtained information," which may involve no more than merely viewing it. *See* S. Rep. No. 104-357, at 7 (1996), 1996 WL 492169 (". . . the term 'obtaining information' includes merely reading it.").

In short, the "without authorization" inquiry does not turn on what the information is, who it belongs to, or the purpose for which a person seeks to use it. Instead, the Court must only ask whether the gates are up or down. *hiQ*, 31 F.4th at 1198. *hiQ*, building on *Van Buren*, makes this clear: the distinction is between "'private' computer networks and websites, protected by a password authentication system and 'not visible to the public,' and websites that are accessible to the general public." *Id.* at 1200. If the computer is private and a person

20

accesses the computer without the owner's authorization, section 1030(a)(2) applies.

### C. Concerns about access to public information are unfounded and irrelevant.

Perplexity and its amici raise concerns about access to public information. These concerns are unfounded and irrelevant. To the extent information is on a publicly available part of the website, *i.e.*, the gates are down, the district court's decision changes nothing. To the extent the information is made available only to authenticated users, *i.e.*, the gates are down, the district court's decision is a straightforward application of the trespass norms underlying the CFAA.

Perplexity's concern arises out of a failure to distinguish between access to information and access to a computer. The CFAA's "gates-up-or-down" inquiry requires the Court to draw that distinction.

Perplexity's amici warn that the district court's decision portends grave consequences for the public: "[i]f the CFAA barred third-party access to information that users wanted to share and could access through their accounts, a platform could unilaterally decide exactly which information to keep under lock and key and which information could make it into the hands of journalists and researchers." (Br. of

21

Amici Curiae at 14–15, Dkt. No. 30.1.) But neither Amazon's position nor the district court's decision would extend CFAA liability to mere unauthorized "access to information," only unauthorized access to a computer.

Returning to physical trespass norms demonstrates why this is so. Returning to the bank hypothetical, imagine our hypothetical person wishes to learn more about the fees banks in his town are charging accountholders. While he may enter most banks in town, one of them has informed him that he may no longer enter the bank. He visits every other bank and obtains information about each bank's fees for various accounts. But without the final bank, his understanding is incomplete. So he asks his friend (the one with the safe deposit box) if she will gather the fee information next time she visits the bank. A few days later, the friend gives the person a brochure detailing the bank's fees. Perhaps the bank would prefer that the friend didn't share the information, but neither she nor the person would be liable for trespass. If, on the other hand, the person entered the bank with his friend, who obtained and shared that same information with him, the person would be liable for trespass. *See* Restatement (Second) of Torts § 163. That

22

liability would arise not out of accessing information without authorization, but obtaining the information by means of his access to the bank's premises without authorization. That is, liability results because the person has entered "a space where [he] is no longer welcome." Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. at 1176.

In the airline setting, imagine a hypothetical competitor was seeking a copy of an airline's safety card provided to passengers in the seatback pocket. The competitor may ask a ticketed passenger to take a picture of the safety card and send them a copy. By accepting a copy of the safety card, the competitor is not trespassing. However, if the competitor instead were to sneak onto the airplane and take a picture of the safety instructions themselves, this would clearly be trespassing.

The same is true in the CFAA context: a third party's liability under the CFAA stems not from obtaining information without authorization, but from obtaining information by means of the third party's access to a computer without authorization.

Applying this trespass norm resolves the concerns Perplexity and its amici raise. Amici suggest that the district court's decision would

allow CFAA liability to turn solely on whether a platform "objects to the manner in which information it otherwise makes available is collected and used." (Br. Amici Curiae at 18.) Not so. CFAA liability does and would continue to turn on the gates-up-or-down inquiry. If the gates are down, when access requires authentication by, for example, entering a password, "only the account holder should be able to satisfy the authentication requirement." Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. at 1171. "[T]he world—minus one user—is blocked." *Id.* CFAA liability will therefore arise only when a person obtains information by circumventing the gate, that is, when the person is unable to establish that "he is someone with special rights to access the account," and the computer the account is authorized to access. *Id.*; *see also hiQ*, 31 F.4th at 1197 ("[P]rivate information [is] information delineated as private through use of a permission requirement of some sort."). That leaves third parties free to collect information through other methods, subject to limits imposed by non-CFAA law. So long as those methods do not involve accessing *a computer* without

24

authorization, the CFAA will not impose liability even if the owner objects. [15]

Finally, adopting Amazon's position would not "transform[] otherwise innocuous behavior into federal crimes simply because a computer is involved." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016) (quoting *Nosal*, 676 F.3d at 860). Instead, as the Court recognized in *Power Ventures*, it would impose liability where a computer's owner has "clearly notified" a third party that it was not authorized to access the computer and the third party intentionally refused to comply. *See id.* Amici's "concerns about overreaching or an absence of culpable intent simply do not apply here . . . [A]n individualized cease-and-desist letter is a far cry from the permission skirmishes that ordinary Internet users may face." *Id.* at 1069. Individualized, written notification is enough in the physical world; and the CFAA makes it enough in the digital world, too.

---

[15] As this Court has recognized, even when the CFAA does not provide a remedy, other causes of action may. *hiQ*, 31 F.4th at 1201. These include state law trespass to chattels, copyright infringement, misappropriation, unjust enrichment, conversion, breach of contract, or breach of privacy." *See id.* This brief addresses only the scope of the CFAA.

The district court's decision properly confines liability under the CFAA to non-public computers accessible only to authenticated users. It therefore not only comports with the trespass norms underlying the CFAA, but also avoids imposing liability for access to public websites that the CFAA does not prohibit.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's decision, which reflects a proper understanding of the phrase "without authorization" as used in section 1030(a)(2).

Date: April 29, 2026

Respectfully submitted,

IFRAH PLLC

*/s/A. Jeff Ifrah*
A. Jeff Ifrah
Robert W. Ward

*Counsel for* Amicus Curiae

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using ACMS, which effects service upon all counsel of record.

Date: April 29, 2026

IFRAH PLLC

*/s/A. Jeff Ifrah*
A. Jeff Ifrah
Robert W. Ward

*Counsel for* Amicus Curiae

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____ No. 26-1444 _____

I am the **attorney** or self-represented party.

**This brief contains 5,373 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ A. Jeff Ifrah* _____ **Date** 04/29/2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*