**No. 26-1444**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Amazon.com Services LLC,
*Plaintiff-Appellee,*

v.

Perplexity AI, Inc.,
*Defendant-Appellant.*

On Appeal from the United States District Court
Northern District of California, No. 3:25-cv-09514
The Honorable Maxine M. Chesney

## *AMICUS CURIAE* BRIEF OF
## THE SOFTWARE & INFORMATION INDUSTRY ASSOCIATION
## IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Tod Cohen, TCohen@Manatt.com
Annie Nguyen, ANguyen@Manatt.com
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
(415) 291-7400 / Fax: (415) 291-7474

*Counsel for Amicus Curiae*
SOFTWARE & INFORMATION INDUSTRY ASSOCIATION

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................... iv

INTEREST OF *AMICUS CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT ........................................................................................... 4

I.    The District Court Correctly Applied *Power Ventures*, and Its
      Hesitation Confirms Why a Clear Rule is Needed ......................... 4

      a.    Perplexity Owes an Independent Legal Obligation .............. 7

II.   In the Absence of a Negotiated Standard, Control Defaults to
      the Platform ................................................................................... 9

      a.    The Industry Standard Forecloses Perplexity's
            Argument .......................................................................... 10

      b.    Perplexity's Own Terms of Service Confirm the
            Industry Standard it Seeks to Repudiate ........................... 12

      c.    The Operating Standard Has Been and Must Be
            Neutral .............................................................................. 18

III.  Perplexity's Theory Would Harm SIIA's Members and Chill
      Responsible Innovation ............................................................... 19

IV.   The Injunction is Sufficiently Narrow, Legally Grounded,
      and Necessary to Preserve the Conditions for Responsible
      Innovation .................................................................................... 23

CONCLUSION ...................................................................................... 25

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*EF Cultural Travel BV v. Zefer Corp.*,
318 F.3d 58 (1st Cir. 2003) ............................................................... 18

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ........................... 3, 4, 5, 7, 8, 9, 18, 20, 23

*Field v. Google Inc.*,
412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................. 10

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ...................................................... 6, 7, 20

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
315 F. Supp. 3d 1147 (C.D. Cal. 2018) ........................................ 6, 9, 22

*Van Buren v. United States*,
593 U.S. 374 (2021) ............................................................................ 6

## STATUTES

Computer Fraud and Abuse Act,
18 U.S.C. § 1030(a)(2) .......................... 4, 5, 6, 12, 14, 20, 21, 22, 23, 24

Controlling the Assault of Non-Solicited Pornography and
Marketing Act of 2003 (CAN-SPAM Act) ........................................... 24

## OTHER AUTHORITIES

AMAZON, *Conditions of Use* (last updated May 30, 2025),
https://www.amazon.com/gp/help/customer/display.html?nodeId
=GLSBYFE9MGKKQXXM ................................................................ 16

ANTHROPIC, *Consumer Terms of Service* (effective Oct. 8, 2025),
https://www.anthropic.com/legal/consumer-terms ............................. 15

ANTHROPIC, *Introducing the Model Context Protocol*, (Nov. 25,
2024),
https://modelcontextprotocol.io/docs/getting-started/intro ........... 2 n.2

# TABLE OF AUTHORITIES (continued)

Page(s)

Claburn, Thomas, *Anthropic Clarifies Ban on Third-Party Tool Access to Claude*, THE REGISTER (Feb. 20, 2026), https://www.theregister.com/2026/02/20/anthropic_clarifies_ban _third_party_claude_access/ .......................................................... 15

COMET, *Terms of Service* (last updated July 8, 2025), https://www.perplexity.ai/hub/legal/comet-terms-of-service ............. 14

Handa, Amit & Ashish Gupta, *Under the Hood: Universal Commerce Protocol (UCP)*, GOOGLE (Jan. 11, 2026), https://developers.googleblog.com/under-the-hood-universal-commerce-protocol-ucp/ ............................................................ 16 n.5

OPENAI, *Buy it in ChatGPT: Instant Checkout and the Agentic Commerce Protocol* (September 29, 2025), https://openai.com/index/buy-it-in-chatgpt/ ...................................... 20

OPENAI, *Terms of Use* (effective Jan. 1, 2026), https://openai.com/policies/row-terms-of-use/ ................................... 15

OPENAI DEVELOPERS, *Agentic Commerce Protocol*, https://developers.openai.com/commerce ...................................... 2 n.2

OPENAI DEVELOPERS, *App Submission Guidelines*, https://developers.openai.com/apps-sdk/app-submission-guidelines ....................................................................................... 15

Parikh, Stavan & Rao Surapaneni, *Powering AI Commerce with the new Agent Payments Protocol (AP2)*, GOOGLE (Sep. 16, 2025), https://cloud.google.com/blog/products/ai-machine-learning/announcing-agents-to-payments-ap2-protocol ............. 16 n.5

PERPLEXITY, *Terms of Service* (last updated Jan. 23, 2026), https://www.perplexity.ai/hub/legal/terms-of-service ....................... 13

Restatement (Third) of Agency § 7.01 (Am. L. Inst. 2006) ...................... 8

/ROBOTS.TXT, *About /robots.txt*, https://www.robotstxt.org/robotstxt .html ................................................................................................. 24 n.7

SIIA, *About Us*, https://www.siia.net/about-us/member-companies/ ...................... 2 n.2

ii

## TABLE OF AUTHORITIES (continued)

Page(s)

Weinstein, Jeff & Steve Kaliski, *Developing an Open Standard for Agentic Commerce*, STRIPE (September 29, 2025), https://stripe.com/blog/developing-an-open-standard-for-agentic-commerce ...........................................................................21

iii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae the Software & Information Industry Association states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: April 29, 2026                    By: s/ Tod Cohen
                                                          Tod Cohen

iv

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae*, the Software & Information Industry Association (SIIA), is a global trade association representing nearly 400 firms involved in the business of information.[2] SIIA's membership includes software companies, search engine providers, data and analytics firms, and digital publishers that serve nearly every segment of society—including business, education, government, health care, and consumers. Through its divisions, events, and advocacy, SIIA engages industry leaders and policymakers to ensure a vibrant information ecosystem: one that fosters creation, dissemination, and productive use. SIIA and its members work proactively to address issues and challenges that impact their industry segments with the goal of driving innovation and growth of the information economy.

SIIA's members are artificial intelligence (AI) optimists. SIIA strongly supports the responsible development and use of AI and the significant benefits for consumers, governments, and businesses. SIIA's members include platform operators, licensed database providers, scientific and technical publishers, market data services, educational technology firms, and financial information providers—as well as AI

---

[1] Counsel for both appellants and appellee consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no person, including any party or party's counsel, contributed money that was intended to fund preparing or submitting this brief.

[2] *See* SIIA, *About Us*, https://www.siia.net/about-us/member-companies/.

1

developers actively building and deploying agentic AI products in compliance with existing access standards. SIIA members reflect a balanced and practical perspective on the issues presented here and have a direct stake in the outcome.

SIIA advocates for the legal clarity and certainty that enables a sustainable and competitive agentic AI ecosystem. Many of SIIA's AI developer members already comply with the agentic AI transparency and disclosure standards that have emerged across the industry—including the Agentic Commerce Protocol ("ACP") and the Model Context Protocol ("MCP").[3] SIIA's members who build and deploy agentic products are already designing to these standards and are disadvantaged by Perplexity's evasive conduct. Allowing Perplexity's evasion would not expand access or innovation. Instead, platforms would be forced to impose broader and more restrictive limitations on AI use—including against compliant, transparent agents—thereby chilling responsible use across the digital ecosystem.

For these reasons, SIIA submits this brief to promote clear, enforceable rules that protect platform control, reward responsible AI

---

[3] Those standards include the ACP developed by OpenAI and Stripe, which requires agents to present verifiable identities and honor platform opt-out and revocation signals, and the MCP developed by Anthropic, which establishes permissioned, authenticated agent-to-tool connections as a baseline. *See* OPENAI DEVELOPERS, *Agentic Commerce Protocol*, https://developers.openai.com/commerce; ANTHROPIC, *Introducing the Model Context Protocol* (Nov. 25, 2024), https://modelcontextprotocol.io/docs/getting-started/intro.

development, and preserve an innovation ecosystem in which both platform operators and compliant agent developers can invest with confidence.

## SUMMARY OF ARGUMENT

This case presents a single, technology-neutral legal question: when a party has been explicitly told it is not authorized to access a secured computer system and continues to do so anyway, has it violated the law? Decades of case law and industry practice point to the district court's answer: yes. The technology of agentic AI does not change this clear legal precedent.

Instead, and under the guise of innovation rhetoric, Perplexity attempts to escape accountability and liability by claiming its Comet AI agent exists in a legal "no man's land." Since Comet acts on behalf of a user, Perplexity argues, Amazon's rights are subordinated to the user's delegation decision and Perplexity owes no independent legal obligations to Amazon.

Perplexity is wrong for four reasons. First, there is controlling legal precedent that counters its position. This Court held in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016) that user consent does not and cannot override explicit platform revocation of authorization. Second, the universal technology industry standard provides that the default control of access to data belongs to the platform

3

website, app or any other computer system, not the uninvited and disinvited agent operator. Reversing the district court's decision would upend decades of common practice and create confusion, uncertainty, and harm across the digital ecosystem. Third, clear, legally enforceable rules and standards of behavior enable, promote, and foster innovation. Legal ambiguity promoted by Perplexity enables evasion and punishes compliant developers and deployers. If Perplexity succeeds, any agent operator would be able to exploit any platform's authenticated systems without accountability to the platform. Lastly, the district court properly limited Perplexity's access only to private information, as protected by the Computer Fraud and Abuse Act ("CFAA") and Perplexity retains the ability to access the open and public internet. Once a platform expressly revokes authorization to access a password-protected system, continued knowing access by an intermediary—regardless of user consent or asserted purpose—constitutes access "without authorization." 18 U.S.C. § 1030(a)(2).

The district court's judgment should be affirmed.

## ARGUMENT

### I. The District Court Correctly Applied *Power Ventures*, and Its Hesitation Confirms Why a Clear Rule is Needed

The grant of a preliminary injunction is reviewed for abuse of discretion, with underlying legal questions reviewed de novo. The district court correctly applied *Power Ventures*' technology-neutral access

4

framework. SIIA writes separately not to relitigate that application—Amazon has addressed each element exhaustively—but to address the broader legal significance of the rule the district court applied and the ecosystem consequences if it is disturbed.

At the preliminary injunction hearing, the district court itself acknowledged its hesitation. The district court observed that Perplexity's conduct appeared "as if what they're doing shouldn't be covered" by the CFAA, that the statute is "so broad" it covers actors who "may be performing a beneficial act," and that the court was "kind of stuck with it." 2-ER-145, 148. This Court should address that hesitation directly, because it reflects the precise argument Perplexity has pressed on appeal—and because the correct answer is not that the law should be bent for "beneficial" agents, but that the law's brightline rule is the right answer for exactly the reasons the district court intuited.

The rule the district court was "stuck with" is not an accident of broad statutory language. It is the only workable rule. *Power Ventures*, 844 F.3d at 1067–68, held that access to password-protected systems requires both user consent and platform authorization—and that once a platform expressly revokes permission, no amount of user consent can

5

substitute. As this Court explained in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1199–1201 (9th Cir. 2022), the access-based rule preserves both administrability and innovation. Courts avoid entanglement in policy judgments about whether a particular automated use is "beneficial," whether liability anchors to objective access controls rather than intent, and whether platforms remain free to invite automated access under negotiated terms. The CFAA enforces that structural choice. *See also Van Buren v. United States*, 593 U.S. 374, 381–83 (2021) (distinguishing insider misuse from access to off-limits areas, the latter of which constitutes classic computer trespass regardless of purpose).

A purpose-based exception—under which "good" agents assisting users with shopping are treated differently from "bad" agents—would be unworkable. Courts would be required to evaluate the benevolence of each agent's purpose on a case-by-case basis, a standard that provides no guidance to platform operators, no predictability to agent developers, and no clear rule for future litigation. *See, e.g.*, *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1171 (C.D. Cal. 2018) (CFAA liability turns exclusively on authorization and defendants' purported commercial benefits from using bots are not a defense). More fundamentally, the

platform is entitled to exclude based on its own access-control decisions—not because the agent is bad, but because the platform has the right to define the terms of entry to its own systems. That right does not depend on proving malice.

What the district court was "stuck with"—a clear rule that focuses on access controls rather than agent purpose—is precisely the rule SIIA's members need. The information economy depends on predictable, enforceable access standards. Authenticated environments are how both publishers and platforms protect users, manage risk, and generate the revenue that funds content creation and service delivery. If the law instead requires a case-by-case assessment of whether each automated actor is "beneficial," platforms will respond not by opening their systems but by locking them down entirely—a far worse outcome for innovation than the clear, administrable rule this Court applied in *Power Ventures* and reaffirmed in *hiQ*.

### a. Perplexity Owes an Independent Legal Obligation

Delegation by a user is not a blanket license for an intermediary to disregard the rights, boundaries, and security controls imposed by a platform operator. So, even if Perplexity had access from both the user

and Amazon, Perplexity is not insulated from liability to Amazon and other third parties. Under settled agency principles, an agent acting on behalf of another is not absolved of independent legal obligations to third parties. To the contrary, "[a]n agent is subject to liability to a third party harmed by the agent's tortious conduct[,]" even when that conduct is performed within the scope of the agency relationship and pursuant to the principal's instructions. Restatement (Third) of Agency § 7.01 (Am. L. Inst. 2006). Agency law does not transfer authorization; it imposes independent liability.

Perplexity's framing would invert this principle, transforming every user into a universal delegator entitled to override platform-level access controls and impose third party agents on unwilling system owners. No doctrine of agency law supports that result. A locksmith hired to open a door does not escape trespass or conversion liability by asserting that a store customer requested entry. *See Power Ventures*, 844 F.3d at 1068. A bot user does not avoid liability for circumventing access controls by pointing to commercial benefits of that access. *See, e.g., Ticketmaster*, 315 F. Supp. 3d at 1171. And an agentic AI operator does not gain immunity to third party claims merely because it characterizes its

8

product as a "tool" acting at user direction.

Even if user delegation were relevant, Perplexity cannot excuse deliberate evasion of technical barriers after authorization has been expressly revoked. *See Power Ventures*, 844 F.3d at 1068. The record here reflects conduct that goes well beyond passive tool provision. Perplexity relaunched a new version of its Comet agent to disguise its identity, re-enter Amazon's restricted spaces, and route around blocks within hours of Amazon's deployment of enhanced protective measures directly aimed at stopping Comet. These are affirmative acts of Perplexity's evasion of Amazon's express decision to preclude access, making Perplexity's liability independent and complete, regardless of user authorization.

## II. In the Absence of a Negotiated Standard, Control Defaults to the Platform

Perplexity proposes a legal "no man's land." Perplexity claims there is no legal standard explicitly governing agent operators, and as a result, such entities are entitled to operate without restriction. This proposal not only ignores strong precedent by this Court that clearly applies restrictions upon any unauthorized accessor, *see Power Ventures*, 844 F.3d at 1067-69, but also runs counter to foundational principles of internet and industry governance and settled precedent. The established

industry standard is that in the absence of permission, control defaults to the platform operator.

### a. The Industry Standard Forecloses Perplexity's Argument

Adopting Perplexity's proposed standard, under which agent operators enjoy default authorization to access password-protected systems, would profoundly destabilize the information ecosystem. Authenticated environments are the principal mechanism by which platforms manage risk, protect users, and structure access to high-value data and services. If Comet or similar agents were permitted to continue accessing password-protected environments after authorization has been revoked, platform operators would lose their only leverage to negotiate controlled, transparent access with third-party developers.

Perplexity's approach would replace a long-standing industry principle—access by permission—with a novel rule of access by unilateral delegation. *See, e.g., Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) (access is not automatically granted where websites permitted crawling in exchange for Google indexing—a quid pro quo reflecting the baseline principle that automated access requires platform consent). That shift would upend well-established business practices built around

10

authentication barriers, licensing models, and tiered access to content and services.

After decades of settled expectations in which platforms invest with the understanding that they can control access on their own systems, this sudden reversal would create significant uncertainty and deter investment and innovation in markets where negotiated access underpins sustainable business models. SIIA's members and the millions of users who rely on their services would directly suffer from such a departure from industry norm.

The predictable result would not be open access, but shutdown. To prevent malicious or unaccountable use of their data, platforms would respond by categorically foreclosing agents, users, or entire classes of automated interactions. Such defensive measures would reduce functionality, suppress innovation, and degrade user experience across the internet, especially in sectors involving sensitive or proprietary data, regulated services, or critical information.

In contrast, the district court's rule of law is simple: revocation controls. Once authorization to use a password-protected area is withdrawn, further access to a protected system is "without

11

authorization," regardless of user delegation. 18 U.S.C. § 1030(a)(2). Affirming the district court's injunction will reinforce the conditions necessary to foster innovation and cooperation. When the law clearly establishes that unauthorized access to authenticated environments is unlawful, parties are incentivized to negotiate on more equal footing. Platform operators can offer controlled access programs tailored to security and business needs, while agent developers are encouraged to design tools that provide transparency, auditability, and compliance assurances. This permission-based evolution, rather than unilateral access, reflects how core elements of the internet infrastructure have matured for decades and remains the most reliable path to sustainable growth in agentic AI.

### b. Perplexity's Own Terms of Service Confirm the Industry Standard it Seeks to Repudiate

Perplexity asks this Court to hold that platforms may not enforce access controls against automated agents that operate with user authorization. That is a rule Perplexity categorically refuses to apply to its own platform—a fact that both confirms the industry consensus and exposes the asymmetry at the heart of its legal theory.

Perplexity's own Terms of Service, governing access to its websites and services, expressly prohibit users and third parties from using:

> [A]ny robot, spider, crawlers, scraper, or other automatic device, process, software or queries that intercepts, "mines," scrapes, extracts, or otherwise accesses the Services to monitor, extract, copy or collect information or data from or through the Services. . .

PERPLEXITY, *Terms of Service* § 5.2 (last updated Jan. 23, 2026), https://www.perplexity.ai/hub/legal/terms-of-service. The same terms forbid users from attempting "to gain unauthorized access to, interfere with, damage or disrupt the Services" and from circumventing "any technological measure or content protections of the Services, third-party systems or third-party content." *Id.*

The Comet Terms of Service—the very product at issue in this litigation—go further still. In the section governing "Connections with Third Party Services," Perplexity purports to shift all responsibility for Comet's interactions with third-party platforms onto the user, declaring that "[a]ny exchange of data or other interaction between you and a third party provider . . . is solely between you and such third party provider, and we will have no liability or obligation with respect to such exchange or interaction." COMET, *Terms of Service* § 6 (last updated July 8, 2025),

13

https://www.perplexity.ai/hub/legal/comet-terms-of-service (emphasis removed). Perplexity thus contractually disclaims responsibility to third-party platforms—the very platforms whose access controls it simultaneously argues it is entitled to bypass—while simultaneously invoking the user-delegation theory to escape liability to Amazon in this case.

The circularity is remarkable. Perplexity's theory, translated into plain terms, is this: when an automated agent accesses Perplexity's own platform without authorization, Perplexity may enforce its access controls and hold the operator liable. But when Perplexity's own agent accesses Amazon's platform without authorization, Amazon may not enforce its access controls and may not hold Perplexity liable. There is no principled legal basis for that asymmetry. The CFAA does not draw distinctions based on which company's servers are at issue.

Nor is Perplexity an outlier in protecting its own systems through exactly these kinds of controls. The same permission-based access norms appear throughout the agentic AI industry.

OpenAI's Terms of Use expressly prohibit "[a]utomatically or programmatically extracting data or Output" from its services, and its

14

App Submission Guidelines for agentic products require developers to "not scrape external websites, relay queries, or integrate with third-party application programming interfaces ("APIs") without proper authorization and compliance with that party's terms of service"—and explicitly forbid "[c]ircumvention" of "API restrictions, rate limits, or access controls imposed by the third party." OPENAI, *Terms of Use* (effective Jan. 1, 2026), https://openai.com/policies/row-terms-of-use/; OPENAI DEVELOPERS, *App Submission Guidelines*, https://developers.op enai.com/apps-sdk/app-submission-guidelines.

Anthropic's Consumer Terms of Service similarly prohibit accessing its services "through automated or non-human means, whether through a bot, script, or otherwise" except through authorized API channels, and Anthropic has actively enforced that prohibition—including revoking access credentials, deploying technical barriers, and terminating accounts of operators that circumvented those controls after notice. ANTHROPIC, *Consumer Terms of Service* § 3.7 (effective Oct. 8, 2025), https://www.anthropic.com/legal/consumer-terms; *see also* Thomas Claburn, *Anthropic Clarifies Ban on Third-Party Tool Access to Claude*,

THE REGISTER (Feb. 20, 2026), https://www.theregister.com/2026/02/20/a nthropic_clarifies_ban_third_party_claude_access/.

Amazon's own Conditions of Use similarly prohibit unauthorized automated access to its systems. *See* AMAZON, *Conditions of Use* (last updated May 30, 2025), https://www.amazon.com/gp/help/customer/disp lay.html?nodeId=GLSBYFE9MGKKQXXM. The access controls Amazon has deployed here, and which Perplexity has repeatedly circumvented, are of exactly the same character as the controls these companies— including Perplexity itself—enforce against unauthorized agents on their own platforms.

This convergence of contractual practice is not coincidental. It is confirmed by the emerging technical standards for agentic commerce that the industry has developed specifically to govern AI agents operating across third-party systems. Every major emerging framework—OpenAI and Stripe's Agentic Commerce Protocol[4], Google's Universal Commerce Protocol ("UCP") and Agent Payments Protocol ("AP2")[5], Anthropic's

---

[4] *See supra* note 3, at 2.

[5] *See* Amit Handa & Ashish Gupta, *Under the Hood: Universal Commerce Protocol (UCP)*, GOOGLE (Jan. 11, 2026), https://developers.googleblog.com/under-the-hood-universal-commerce-protocol-ucp/; and Stavan Parikh & Rao Surapaneni, *Powering AI*

Model Context Protocol[6]—is built around permissioned access, cryptographic agent identity, and explicit opt-out and revocation mechanisms that agents are required to honor. The industry has built revocation compliance into the architecture of responsible agentic commerce from the ground up.

This convergence of contractual practice and technical standards reflects a shared and settled understanding across the information economy: access to platform systems—particularly authenticated, password-protected environments—proceeds by permission, not by default, and revocations must be respected. Every major participant in this ecosystem, including Perplexity itself, has adopted that understanding in the contracts it presents to its own users and in the technical standards it purports to support. Perplexity's legal theory is not simply wrong as applied to Amazon—it would undermine the contractual and technical architecture on which Perplexity's own business model

---

*Commerce with the new Agent Payments Protocol (AP2)*, GOOGLE (Sep. 16, 2025), https://cloud.google.com/blog/products/ai-machine-learning/announcing-agents-to-payments-ap2-protocol.

[6] *See supra* note 3, at 2.

depends and would destabilize the permission-based framework that responsible agentic AI development requires.

### c. The Operating Standard Has Been and Must Be Neutral

Industry standards governing automated access did not emerge because the internet was unregulated, but because unilateral access was legally constrained, forcing cooperation and negotiation. Well-established mechanisms—including robots.txt, API licensing, OAuth authentication, and rate-limiting protocols—arose precisely because automated actors could not presume blanket access to others' systems. Website operators reserved the right to exclude, and intermediaries that wanted access had to adapt. *See, e.g.*, *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62–63 (1st Cir. 2003) (recognizing robots.txt and holding platform operators had a right to deny access to automated bots).

These conventions reflect a shared understanding that automated access to platforms proceeds by permission, not by default. Courts should continue this pattern and affirm this brightline, neutral rule that is consistent with *Power Ventures*. The law presently entitles system owners to draw a brightline at the gate—regardless of the purpose or perceived benevolence of the actor seeking entry. Granting platforms the

18

ability to define, monitor, and revoke access allows them to manage security risks, comply with legal and regulatory obligations, and ensure accountability when access is abused. A platform is not required to tolerate one category of automated agent in order to exclude another, nor must it engage in after-the-fact assessments of whether a particular agent behaved benignly on a particular visit.

## III. Perplexity's Theory Would Harm SIIA's Members and Chill Responsible Innovation

As a collective of information publishers and platform operators, SIIA has a direct and substantial interest in preserving settled industry standards governing access to online systems. Weakening those standards would undermine security and privacy while chilling responsible innovation across the industries SIIA represents.

Amazon's retail environment, while economically significant, is not the only context implicated by Perplexity's theory where the stakes are substantial. Other SIIA members operate platforms where the consequences of unauthorized agent activity are often even more severe. Market data providers, scientific and medical publishers, educational technology platforms, and professional information services all rely on authenticated systems as a cornerstone of compliance, reliability, and

19

trust. In these contexts, unchecked automation presents risks not merely to competition, but to data integrity, regulatory compliance, and individual privacy—particularly where minors, confidential research, or sensitive professional information are involved.

This Court has recognized that password gates and comparable technical controls mark legally protected boundaries, the circumvention of which constitutes the kind of "digital trespass" the CFAA was enacted to prevent. *See hiQ*, 31 F.4th at 1197–99; *Power Ventures*, 844 F.3d at 1067–69. Perplexity's position departs sharply from this precedent and longstanding industry norms. Responsible actors seeking to deploy automated agents in authenticated environments do not rely on user delegation as a substitute for authorization. Instead, they pursue licenses, APIs, approved access programs, and technical integration models that respect platform controls and assign accountability to the operator. These negotiated arrangements reflect widely accepted commercial practices across the information economy.

Emerging industry standards for agentic commerce confirm this consensus. OpenAI and Stripe's ACP, Google's UCP and AP2, and Anthropic's MCP, are all built around permissioned access, cryptographic

agent identity verification, and explicit revocation mechanisms that agents are required to honor. *See* OPENAI, *Buy it in ChatGPT: Instant Checkout and the Agentic Commerce Protocol* (September 29, 2025), https://openai.com/index/buy-it-in-chatgpt/; Jeff Weinstein & Steve Kaliski, *Developing an Open Standard for Agentic Commerce*, STRIPE (September 29, 2025), https://stripe.com/blog/developing-an-open-standard-for-agentic-commerce. Under these standards—the standards Perplexity's own competitors have adopted—a platform's opt-out or revocation signal is a mandatory compliance requirement, not an obstacle to be engineered around.

If Perplexity were to prevail, the foreseeable risks would include systemic extraction from licensed databases at machine scale, unauthorized harvesting of scientific and professional content, competitive displacement of licensed offerings through AI-generated outputs, and amplification of individual credentials into enterprise-level access—all outcomes fundamentally inconsistent with accepted commercial practice and CFAA doctrine. More broadly, endorsing Perplexity's theory would empower intermediaries to externalize risk onto platforms, weaken cybersecurity norms, and force system owners to

21

tolerate opaque automation in their most sensitive environments. Operators of authenticated systems—banks, health care providers, educational institutions, cloud services—would face the same dilemma: either accept all third-party agents acting "for users," or abandon meaningful access controls altogether.

Perplexity's attempt to shift responsibility onto individual users is neither equitable nor workable. The law does not require platforms to pursue millions of individual account holders for access violations orchestrated and scaled by a commercial operator. *See, e.g.*, *Ticketmaster*, 315 F. Supp. 3d at 1171 (finding the CFAA is not intended to impose liability on "ordinary internet users" or "innocuous behavior"). Assigning liability to the agent operator—the party that determines system architecture, automation logic, and deployment strategy—aligns with both agency law principles and the CFAA's emphasis on responsibility for unauthorized access.

Rejecting Perplexity's theory would not stifle innovation but would promote responsible innovation. Many SIIA members are investing in permissioned agent frameworks, APIs, and access-by-design models that enable automation while respecting security, privacy, and intellectual

22

property constraints. Such investments depend on the legal certainty that access controls in authenticated environments will be respected and enforceable. This Court's precedent provides that certainty and affirming it here would reward compliance-based innovation rather than opportunistic circumvention. *See Power Ventures*, 844 F.3d at 1068-69.

For these reasons, the public interest strongly disfavors Perplexity's request to continue accessing Amazon's password-protected systems and supports reaffirming the settled rule that agents remain independently accountable to third parties for unauthorized access, regardless of asserted user consent.

## IV. The Injunction is Sufficiently Narrow, Legally Grounded, and Necessary to Preserve the Conditions for Responsible Innovation

The district court's injunction is carefully tailored to the precise category of conduct the CFAA prohibits—access to non-public, password-protected systems after express revocation and through deliberate technical circumvention. Perplexity retains full access to the public internet, including public portions of Amazon's platform. The order restrains nothing Amazon has not been legally entitled to restrict.

From SIIA's perspective, the value of the injunction extends beyond

23

this dispute. The internet has never been ungoverned. The self-regulated Robots Exclusion Protocol ("robots.txt"),[7], the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), and two decades of CFAA enforcement against unauthorized crawlers and scrapers all coexisted with extraordinary innovation. Legal enforcement of access boundaries is not what constrains the ecosystem—it is what creates the conditions for negotiated, sustainable access. Foreclosing covert access is precisely what gives both sides a reason to negotiate. Standards do not emerge despite legal enforcement; they emerge because of it.

The evolving agentic commerce standards confirm this dynamic. The ACP, the UCP, the AP2, and the MCP, all developed as structured alternatives to unilateral access—because their architects understood that permissioned, authenticated access is the only foundation on which scalable, trusted agentic commerce can be built. The injunction accelerates that development by making clear that the alternative—covert access after explicit revocation—is not legally available.

---

[7] *See* /ROBOTS.TXT, *About /robots.txt*, https://www.robotstxt.org/robotstxt.html.

24

Perplexity's argument that the injunction chills innovation has it exactly backwards. It is legal ambiguity that chills investment in the compliant access frameworks SIIA's members are building. The injunction removes that ambiguity.

## CONCLUSION

The district court applied a clear, technology-neutral rule that is already reflected in the access policies of every responsible actor in the agentic AI ecosystem—and even in the policies of Perplexity itself. Confirming that rule rewards compliance-based innovation, protects the SIIA members' platforms, whose authenticated systems and licensed content underpin the information economy, and ensures that the emerging framework for agentic commerce can develop on a foundation of permissioned access rather than unilateral circumvention. SIIA urges affirmance of the judgment.

Dated: April 29, 2026

Respectfully submitted,

**MANATT, PHELPS & PHILLIPS, LLP**

By: s/ Tod Cohen
Tod Cohen
Annie Nguyen

*Attorneys for Amicus Curiae*
Software & Information
Industry Association

25

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1444

I am the attorney or self-represented party.

**This brief contains** 4,429 **words, including** 0 **words**

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Tod Cohen **Date** 4/29/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*