No. 26-1444

_____

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

AMAZON.COM SERVICES, LLC,

*Plaintiff - Appellee,*

v.

PERPLEXITY AI, INC.,

*Defendant - Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
The Honorable Maxine M. Chesney, District Judge
Case No. 3:25-CV-09514-MMC

_____

## BRIEF OF THE NATIONAL RETAIL FEDERATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

_____

Alexandra Perloff-Giles
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
42nd Fl.
New York, NY 10020
212-402-4043
alexandraperloffgiles@dwt.com

David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202-973-4216
davidgossett@dwt.com

*Attorneys for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...........................................................................i

TABLE OF AUTHORITIES.....................................................................i

INTEREST OF THE AMICUS CURIAE ..................................................1

INTRODUCTION.....................................................................................2

ARGUMENT .............................................................................................5

    I.     Retailers Must Be Able To Control the Shopping Experience at the Point of Sale.................................................6

    II.    Retailers Must Be Able To Distinguish AI Agents From Humans. .................................................................................12

    III.   Amazon's Requested Injunction Is Reasonable....................19

CONCLUSION ........................................................................................22

CERTIFICATE OF COMPLIANCE........................................................24

CERTIFICATE OF SERVICE.................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*HiQ Labs, Inc. v. LinkedIn Corp.*,
　31 F.4th 1180 (9th Cir. 2022) ...................................................... 3, 20

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
　240 F.3d 832 (9th Cir. 2001) .......................................................... 12

*Van Buren v. United States*,
　593 U.S. 374 (2021) ......................................................................... 20

**Statutes and Rules**

Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 .................... 2

Comprehensive Computer Data Access and Fraud Act (CDAFA),
　Cal. Penal Code § 502 ...................................................................... 2

Fed R. App. P. 29(a)(2) ......................................................................... 1

**Other Authorities**

*2026 Consumer Research Study: Own the agentic commerce
　experience*, IBM Institute for Business Value & National
　Retail Federation (Jan. 7, 2026), https://perma.cc/G9EX-
　5FZE ................................................................................................. 8

*Agentic Commerce*, Human Security, https://perma.cc/GG55-
　TYWH (last visited Apr. 28, 2026) ................................................ 14

*Agentic Commerce, Safely Unlock Revenue Growth from AI
　Agents*, Human Security, https://perma.cc/929T-WXS5 (last
　visited Apr. 28, 2026) ..................................................................... 19

Maria Bjorklund, *5 Pillars of a Luxury Checkout Experience for
　Fashion Brands*, Centra (Jan. 15, 2026),
　https://perma.cc/3D5P-25QC ................................................ 8, 9, 10

i

# TABLE OF AUTHORITIES (continued)

**Page(s)**

Andrew Burt, *AI Agents Act a Lot Like Malware. Here's How to Contain the Risks*, Harvard Bus. Rev. (Mar. 30, 2026), https://perma.cc/7PEX-G2QC ...................................................... 14

Aaron Cheris et al., *Agentic AI in Retail: How Autonomous Shopping Is Redefining the Customer Journey*, https://perma.cc/EA4R-37YN (last visited Apr. 28, 2026) ................. 11

Laura Cosgrove, *The Real Consumer Guardrails for Checkout Offers*, Rokt (Apr. 7, 2026), https://perma.cc/J9AS-9C5D ..................... 9

Mike Evans, et al., *Agentic Commerce Is Redefining Retail-Here's How to Respond*, BCG (Oct. 6, 2025), https://perma.cc/US8K-YDM3 ............................................................. 11

*Interactive Audience Measurement and Advertising Campaign Reporting and Audit Guidelines*, Interactive Advertising Bureau (IAB) (Sept. 2004), https://perma.cc/9V9W-NUDL ................ 18

Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143 (2016) ................................................................................ 20

Heather Knight, *What Happens When A.I. Runs a Store in San Francisco?*, N.Y. Times (Apr. 21, 2026), https://perma.cc/M573-D8YX ...................................................................................... 17

Bradford Peirce, *Securing the AI Agents that Power the Future of Retail* (Mar. 31, 2026), https://perma.cc/D2X8-2WMY ............ 13, 16

*Principles for the Use of Artificial Intelligence in the Retail Center*, NRF Center for Digital Risk & Innovation (Nov. 13, 2023), https://perma.cc/L3JM-GHYE ................................................. 19

*Retail Fraud Taxonomy*, NRF Center for Digital Risk & Innovation (Dec. 2, 2024), https://perma.cc/VV9V-BNPP ..................... 5

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Shopping That Puts You First*, Perplexity Team (Nov. 25, 2025), https://perma.cc/V7KD-ADRP .................................................. 12

*Unlocking the next frontier of personalized marketing*, McKinsey & Co., (Jan. 30, 2025), https://perma.cc/22SF-MZY3 .......................... 9

*What Is Agentic Commerce? Understanding Benefits, Security Risks, and Challenges*, Human Security, https://perma.cc/S229-KN46 (last visited Apr. 28, 2026) ................... 15

Zelika Zorz, *As AI Agents Start Making Purchases, Security Teams Must Rethink Risk*, Help Net Security (Mar. 5, 2026), https://perma.cc/45WZ-ULY8 .................................................... 16, 17

## INTEREST OF THE AMICUS CURIAE

Amicus curiae the National Retail Federation (NRF) has obtained consent from both parties to file this brief, which it submits pursuant to Federal Rule of Appellate Procedure 29(a)(2).[1]

Retail is the United States's largest private-sector industry. The retail sector comprises over 3.8 million retail establishments, contributes $5.3 trillion to the annual Gross Domestic Product, and supports 55 million employees, or more than one in four U.S. jobs.

NRF advocates for the policies and ideas that help the retail industry thrive. Founded in 1911 as the National Retail Dry Goods Association, today NRF is the world's largest retail trade association and represents retailers of all sizes. Its members include department stores; specialty, discount, catalog, and independent retailers; chain restaurants; and grocery stores. NRF educates policy makers, at both the state and federal levels, on pressing issues of the day for the retail industry. NRF also monitors important litigation throughout the

---

[1] No party or party's counsel authored this brief in whole or in part, and no person—other than NRF, its members, or its counsel—contributed money that was intended to fund its preparation or submission.

country, appearing as amicus curiae where appropriate to help ensure that the retail industry's voice is heard.

## INTRODUCTION

At its core, this case is about who determines the conditions under which third parties may access and operate within retailers' password-protected transactional systems—and, in turn, who controls the retailer-customer relationship and the shopping experience at the point of sale. Both the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, and California's Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502, protect retailers' right to control access to those systems. And for good reason: Retailers design those systems to interact directly with their customers, not through undisclosed intermediaries. If AI middlemen are permitted to insert themselves into that process and end up controlling online retail transactions, retailers will be reduced to the digital equivalent of shelf space in someone else's store, rather than operators of their own stores. Retailers will lose critical opportunities to present promotions, gather customer insights, personalize the shopping experience, make recommendations, and build brand loyalty.

2

The introduction of autonomous AI agents in retail also creates privacy, security, and fraud risks. Retailers can mitigate those risks when they are in control and know the identities of anyone accessing secure information on their websites; indeed, many retailers have invested heavily in developing their own AI tools, which they can ensure are safe and useful to their customers. But retailers and their customers are exposed to a range of vulnerabilities when third-party AI agents like Perplexity's Comet play middlemen, all while hiding their identities.

Perplexity and its amici claim that Perplexity's conduct is not covered by the CFAA and the CDAFA—citing *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), and framing the issue in this litigation in terms of Perplexity's right to access publicly available shopping pages. *See, e.g.*, Perplexity Br. at 27–29; ACLU et al. Br. at 15; Electronic Frontier Foundation et al. Br. at 14–16. But that is not what this case is about. The interfaces at issue here are not public webpages; they are private, personalized, password-protected environments available only to authenticated users. Access to those systems is granted to individual customers who are logged in to an online retailer like Amazon. Individual customers are given a key to access that private

property—in the form of login rights—in exchange for agreeing to certain terms of use and providing useful data.

As in other commercial settings, access rights are personal and may not be transferred to undisclosed third parties to transact on a user's behalf. Just as Costco can use photo membership cards to limit access to its warehouses to its members, so too online retailers are entitled to enforce access limits in their password-protected system. Critically, Amazon has never given permission to Perplexity's AI Agents to access its password-protected area, nor has it given permission to its customers to delegate their access to Perplexity's AI Agents. Online retailers should have the right to open their doors to human users and shut their doors to non-human agents, which may disrupt retailers' sales strategies and check-out experience, distort demand signals, create security risks, and otherwise interfere with retailers' direct interactions with their own customers.

The district court appropriately enjoined Perplexity from hiding its identity and surreptitiously interfering in the direct retailer-consumer relationship. NRF respectfully urges this Court to affirm that decision.

## ARGUMENT

Amazon has effectively rebutted the legal arguments Perplexity raises in its opening brief. Rather than repeat those rejoinders, NRF seeks to contextualize this dispute to demonstrate why Perplexity's conduct is likely to cause irreparable harm to Amazon and other retailers, and why the public interest favors an injunction against Perplexity's unauthorized and covert access to Amazon's non-public webpages.

Perplexity's Comet AI agent poses two principal problems for retailers.

*First*, it interposes itself between retailers and their customers, thereby disrupting retailers' ability to curate the transaction and shopping experience, present promotions and recommendations, and build relationships and brand loyalty through personalized interactions—to the detriment of both consumers and retailers.

*Second*, it conceals its identity when it accesses Amazon's password-protected retail environment, interfering with Amazon's ability to enforce security protocols, safeguard sensitive customer data, detect fraud, fulfill advertising obligations, and manage inventory effectively.

5

The injunction entered by the district court addresses these concerns in a narrow and reasonable way: It does not restrict access to Amazon's public webpages, but instead preserves the retailer's control over password-protected, personalized areas and requires AI agents to identify themselves when accessing those systems. Affirming the injunction preserves the integrity of the e-commerce ecosystem.

## I.     Retailers Must Be Able To Control the Shopping Experience at the Point of Sale.

Retailers devote significant resources to curating the shopping experience. Some of those efforts, to be sure, are devoted to publicly available webpages. But much of those efforts are devoted to the point of sale, when customers have created or logged into an account—the digital last mile of retail.

Retailers' efforts to curate the shopping experience depend upon a direct relationship between retailer and customer, through which customers provide information that retailers can then use to improve the experience. This exchange of information and resultant personalization serves consumers and retailers alike.

Just as physical stores might place products near the check-out counter that consumers may want to add to their physical shopping carts,

online retailers might recommend other products that customers may be interested in purchasing. An online retailer may, for example, display items that other customers with a similar browsing or purchase history also bought, or suggest items that make sense bundled with a product in the customer's cart (e.g., a lens or a memory card for customers purchasing a camera). Retailers might also offer discounts based on what a customer is purchasing, has previously purchased, or has considered purchasing. They might invite customers to add products to existing orders to qualify for free or discounted shipping. They might offer product demo videos that improve the customers' experience of the product and the retailer. They might show reviews that help customers make informed decisions. They might streamline the check-out process with auto-ship options, subscriptions, or replenishment programs. They might invite customers to take surveys that provide the retailer with more information about that customer's shopping preferences to better serve them in the future. In short, retailers offer a number of features that benefit consumers and retailers alike.

From the consumer perspective, personalization, product recommendations, bundling discounts, relevant product reviews, and the

7

like are valuable; without them, consumers may receive less-relevant recommendations, miss out on offers or discounts, or make purchasing decisions with less complete information. When a purchasing decision is programmed to be made based on incomplete signals like price alone, that decision reflects consumer choice less well than a decision made based on the full range of information that retailers present directly to consumers, including information about product quality, service terms, brand-specific benefits, or discounts on bundled products.

Retailers therefore want to personalize the experience for customers. "Returning shoppers should feel seen and remembered at every step," for example through "saved addresses, preferred payment methods, and loyalty perks applied automatically."[2] But "[e]ffective personalization depends on more than [just] transaction data; it requires the preferences, interests, and intentions that consumers voluntarily share."[3] Customers broadly find recommendations at check-out useful,

---

[2] Maria Bjorklund, *5 Pillars of a Luxury Checkout Experience for Fashion Brands*, Centra (Jan. 15, 2026), https://perma.cc/3D5P-25QC.

[3] *2026 Consumer Research Study: Own the agentic commerce experience*, IBM Institute for Business Value & National Retail Federation (Jan. 7, 2026), https://perma.cc/G9EX-5FZE, at 22.

provided the recommendations are informed by what the customer is purchasing or are otherwise personalized.[4] Indeed, according to a recent study, 71 percent of shoppers expect personalization, and 76 percent were frustrated when retailers failed to personalize their interactions.[5]

When an undisclosed AI agent intercepts the relationship between consumer and retailer, consumers lose out on the benefits of personalization; make decisions based on incomplete information about products, pricing, and availability; and may complete transactions that do not reflect their actual preferences.

Brands and retailers, for their part, use the check-out experience as another opportunity to surface products consumers may want to buy and to distinguish themselves in a competitive retail landscape. Retailers have become increasingly attuned to the fact that "[e]very element of checkout should reflect the brand's vision."[6] To that end, a retailer must have "the freedom to make checkout feel exactly the way it wants, while

---

[4] *Cf.* Laura Cosgrove, *The Real Consumer Guardrails for Checkout Offers*, Rokt (Apr. 7, 2026), https://perma.cc/J9AS-9C5D.

[5] *Unlocking the next frontier of personalized marketing*, McKinsey & Co., (Jan. 30, 2025), https://perma.cc/22SF-MZY3.

[6] Bjorklund, *supra* note 2.

still meeting shoppers' needs."[7] Some retailers appealing to a certain demographic might try to make the check-out experience as frictionless as possible, with "fewer steps, faster transactions."[8] Other, more luxury retailers may want to "give shoppers space to feel confident, informed, and cared for," for example "[b]y letting them manage delivery" or "access support" and ensuring there are "no surprises."[9]

For online retailers, personalization is "an opportunity to increase engagement and conversions with tailored recommendations and discounts."[10] Of course, if some customers want to avoid any interaction with such personalized recommendations—or what Perplexity calls "Amazon's heavy-handed upselling pressure," Perplexity Br. at 47—they are free to shop with other online retailers. But retailers like Amazon rely on the ability to offer recommendations and promotions in order to provide the wide offerings and discounted prices that consumers value.

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

Retailers' ability to present themselves as distinctive to customers and to offer personalized recommendations or other useful information such as reviews or demo videos is impeded by AI agents like Perplexity's Comet transacting on a user's behalf. Indeed, "third-party agents pose the greatest immediate threat to the traditional retailer-shopper and retailer-advertiser relationships," as retailers "get relegated to a 'dumb fulfillment pipe.'"[11]

Perplexity does not dispute that its product disrupts Amazon's control over users' shopping experience; it just doesn't care. *See* Perplexity Br. at 47. After the Comet AI agent prompts the user to log into the user's Amazon account, the Comet AI agent can add items to the user's shopping cart, make purchases, and take other actions in the Amazon Store on the user's behalf, without the user being involved. Perplexity describes its offering as a "new shopping experience," one that

---

[11] Aaron Cheris et al., *Agentic AI in Retail: How Autonomous Shopping Is Redefining the Customer Journey*, https://perma.cc/EA4R-37YN (last visited Apr. 28, 2026). *See also* Mike Evans, et al., *Agentic Commerce Is Redefining Retail—Here's How to Respond*, BCG (Oct. 6, 2025), https://perma.cc/US8K-YDM3 ("For retailers, ... the risks are clear: diminished direct access to customers, weaker brand loyalty, and a growing dependence on intermediary platforms.").

"gives users a new way to shop online."[12] It explains that "[s]hopping is where an AI assistant can have an outsize impact," including by eliminating "[e]ndlessly scrollable grids" and allowing customers to "continue the conversation" with their AI agent in the same window as soon as "checkout is complete." *Id.* Put differently, Perplexity evades important ways in which retailers present their shopping, check-out, and post check-out experience.

The threatened "loss of … goodwill" and "deprivation of opportunity to expand business is irreparable harm." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). Perplexity's Comet should not be permitted to piggyback off the online shopping infrastructure created by companies like Amazon while severing retailers' direct connections with their human customers.

## II. Retailers Must Be Able To Distinguish AI Agents From Humans.

The injury to Amazon from Perplexity's conduct is exacerbated by the fact that Perplexity hides its identity from retailers. Perplexity's argument that the Comet AI agent simply stands in the shoes of its users,

---

[12] *Shopping That Puts You First*, Perplexity Team (Nov. 25, 2025), https://perma.cc/V7KD-ADRP.

*e.g.*, Perplexity Br. at 8, 24, 25, 27, falls flat. Perplexity hides Comet's agentic AI identity by using the same "user-agent" string as Google Chrome such that it appears, to a retailer like Amazon, to be a human user using the Google Chrome browser. 3-ER-566 ¶¶ 11–12. But for a host of security, privacy, and business reasons, retail websites must—as part of their control of the shopping experience—be able to distinguish between humans and AI agents.

*First*, retailers have security protocols in place built on the premise of human interaction. AI agents can disrupt these protocols—even when the AI agent is not acting maliciously. For example, a human shopper might view, at most, a handful of product pages in a minute. By contrast, an AI agent might query hundreds of product pages across categories— thereby triggering controls implemented by the retailer to prevent malicious attacks or infrastructure overload, such as blocking the requests, temporarily suspending the IP address, or throttling. Similarly, while a human shopper may go to a particular product site and browse, an AI agent may log in to multiple retailers in quick succession.[13] In so

---

[13] *See* Bradford Peirce, *Securing the AI Agents that Power the Future of Retail*, auth0 (Mar. 31, 2026), https://perma.cc/D2X8-2WMY (AI agents

doing, the AI agent mimics credential stuffing—a common cyberattack where attackers try stolen username-password credentials across many login pages.[14] An AI agent may also test multiple discount codes or gift numbers at check out. Again, the retailers' systems may respond by blocking activity or flagging an attack. Malicious AI agents can wreak even greater havoc and may not be detected by retailers' defenses if their agentic identity is hidden.[15]

*Second*, agentic commerce involving third parties like Perplexity's Comet can lead to fraud. According to a recent report, "20% of fraud attacks in e-commerce and retail are now AI or agent-driven."[16] A malicious actor could exploit agentic AI technology, for example "us[ing] a stolen agent-scoped payment token to rack up thousands of dollars of

---

"operate in the background, connect to dozens of systems, and act on behalf of users across multiple applications").

[14] *Cf.* Andrew Burt, *AI Agents Act a Lot Like Malware. Here's How to Contain the Risks*, Harvard Bus. Rev. (Mar. 30, 2026), https://perma.cc/7PEX-G2QC (AI "agents can operate like malware if the right safeguards are not in place").

[15] Perplexity has already been found to have systemic design flaws that risk the security of retailers like the Amazon Store. *See* Amazon Br. at 45.

[16] *Agentic Commerce*, Human Security, https://perma.cc/GG55-TYWH (last visited Apr. 28, 2026).

14

unauthorized purchases in minutes, or exploit[ing] prompt-injection flaws to hijack a commerce agent's API credentials and impersonate users to siphon funds or loyalty points into other accounts."[17] Customers may then blame the retailer, damaging brand loyalty and consumer trust. AI agents could also engage in fraud that directly harms retailers by, for example, redeeming coupons or "first-time buyer" discounts thousands of times or otherwise exploiting promotional offers, loyalty programs, or return policies.

As a November 2024 report by NRF's Center for Digital Risk & Innovation makes clear, one of the key strategies for retailers in detecting fraudulent accounts or fraudulent practices such as stealing loyalty points is by monitoring user agent strings.[18] This strategy is rendered impossible by Comet's user of the Google Chrome user-agent string.

*Third*, AI agents can pose privacy risks for customers. AI agents handle enormous volumes of sensitive data, including customer profiles,

---

[17] *What Is Agentic Commerce? Understanding Benefits, Security Risks, and Challenges*, Human Security, https://perma.cc/S229-KN46 (last visited Apr. 28, 2026).

[18] *Retail Fraud Taxonomy*, NRF Center for Digital Risk & Innovation (Dec. 2, 2024), https://perma.cc/VV9V-BNPP, at 16, 18, 19, 23, 27.

payment information, and purchase histories. "An AI agent pulling customer data to generate personalized responses could inadvertently surface sensitive information—like another customer's order history or payment details."[19] And, because AI agents collect this "extremely rich behavioral data" "[a]t scale," the data is particularly "commercially and operationally valuable" and at risk of being "compromised" for "social engineering" and "targeted manipulation" purposes.[20]

*Fourth*, AI agents with too much autonomy may over-order or make erroneous purchases, causing inventory chaos and requiring retailers to respond to a potentially massive uptick in disputed transactions and returns. As one security expert recently explained, the industry's assumption has been "that a technically authorized transaction will always reflect genuine user intent," "but agentic systems weaken that link": "Permissions may remain valid long after user intent has changed," and "[a]gents may also operate across multiple merchants, services, and time horizons in ways the original consent model did not fully

---

[19] Peirce, *supra* note 13.

[20] Zelika Zorz, *As AI Agents Start Making Purchases, Security Teams Must Rethink Risk*, Help Net Security (Mar. 5, 2026), https://perma.cc/45WZ-ULY8.

appreciate."[21] A recent experiment in San Francisco with the first retail boutique run by an artificial intelligence agent illustrates the problem: The AI agent mistakenly "ordered 1,000 toilet seat covers for the employee bathroom" and "cannot stop ordering candles."[22] When AI agents make purchasing decisions on their own, retailers like Amazon will be left to deal with the consequences, including order volatility, higher return processing costs, and logistical burdens.

*Fifth,* when AI agents act without revealing their agentic identity, retailers lose important consumer information—to everyone's detriment. Online retailers spend an immense amount of time and money trying to optimize their websites—to increase their profits, to be sure, but also to ensure that customers' experiences are as good as possible. Among other things, retailers study every aspect of users' experience—from where they point their cursors to how long it takes them to navigate through a form. Unknown and unauthorized AI agents camouflaging themselves as people destroys the integrity of retailers' data, and could lead them to

---

[21] *Id.*

[22] Heather Knight, *What Happens When A.I. Runs a Store in San Francisco?*, N.Y. Times (Apr. 21, 2026), https://perma.cc/M573-D8YX.

change their websites in ways that are less user-friendly to actual human beings.

*Finally*, many retailers host advertisements or sponsored content on their websites. Advertisers often pay retailers to advertise based on verified "impressions"—that is, views—by humans. In order for retailers to abide by their contractual obligations to advertisers, they need to be able to readily identify whether a page visitor is a human or an AI agent.[23]

To be clear, retailers are not opposed to the appropriate use of AI in ecommerce. Many retailers now use AI to analyze signals such as browsing history, product usage, and promotion and reward preferences to optimize their personalized offers. Others use AI to forecast demand and plan inventory, or employ AI customer service agents to track orders, handle inquiries, and provide support. But, as NRF's best practices for the use of AI in retail recognize, transparency and oversight are critical

---

[23] *See, e.g.*, *Interactive Audience Measurement and Advertising Campaign Reporting and Audit Guidelines*, Interactive Advertising Bureau (IAB), (Sept. 2004), https://perma.cc/9V9W-NUDL, at 6 ("Appropriate filtration of robotic activity is critical to accurate measurement of ad impressions.").

to protect data and other assets, prevent fraud, and mitigate security risks.[24]

In short, retailers have the right to know who is accessing their password-protected areas—humans or AI—so they can properly secure their websites, protect user data, and prevent third-parties from damaging the trust that customers and advertisers place in them.

## III.  Amazon's Requested Injunction Is Reasonable.

The injunction that Amazon requested and that the District Court entered safeguards the two principles above. It would permit retailers to continue personalizing and curating the shopping experience without third-party intervention in the customer relationship, and to operate secure and reliable systems.

---

[24] *Principles for the Use of Artificial Intelligence in the Retail Center*, NRF Center for Digital Risk & Innovation (Nov. 13, 2023), https://perma.cc/L3JM-GHYE, at 2–3. *See also, e.g.*, *Agentic Commerce, Safely Unlock Revenue Growth from AI Agents*, Human Security, https://perma.cc/929T-WXS5 (last visited Apr. 28, 2026) ("Agentic observability is crucial for ecommerce because it gives retailers real-time visibility into how autonomous AI shopping agents interact with their store. By monitoring these agents' actions—from product discovery to checkout—businesses can enforce purchase limits, detect fraud, and ensure every transaction reflects genuine customer intent. This transparency protects revenue, builds trust, and lets brands confidently embrace agent-driven commerce as it grows.").

19

First, Amazon seeks to restrict access only to password-protected parts of its store. *HiQ* draws a clear distinction between websites "accessible to the general public" and "private information—information delineated as private through use of a permission requirement of some sort," such as a password. 31 F.4th at 1197. A password "'create[s] the necessary barrier that divides open spaces from closed spaces on the Web,'" such that "authorization is … required for password-protected sites," but not for public sites, under the CFAA. *Id.* (quoting Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1161 (2016)).

Moreover, passwords are user-specific and cannot be shared. A user with access to the password-protected parts of Amazon's website may not turn around and give others access, any more than a senior citizen with a discounted pass for the subway may give that card to a younger rider. Indeed, as the Supreme Court explained in *Van Buren v. United States*, the CFAA "contemplates a 'specific type of authorization—that is, authentication,' which turns on whether a [given] user's credentials allow him to proceed past a computer's access gate." 593 U.S. 374, 390 n.9 (2021).

20

Once a user has logged in, Amazon knows the user's preferences and purchasing history, and can personalize the shopping experience for that user. Amici Electronic Frontier Foundation and others beat a straw man in focusing on publicly available websites. *See* Br. of Amici Curiae Electronic Frontier Foundation et al. at 14–16. But Amazon has not sought an injunction prohibiting Perplexity or any other tool from accessing or scraping Amazon's public web pages. Consumers remain free to comparison shop, including potentially with the benefit of technological "assistants" that can steer them to the best price, just as companies like Expedia or SkyScanner can steer travelers to the cheapest airfares. And AI tools remain free to present users with links to store pages in response to those users' queries. But Comet may not seize the digital last mile of the shopping experience and disrupt the longstanding direct retailer-consumer relationship.

Second, Amazon seeks to know when AI agents are accessing its store and when humans are—just as the doorman at a private club may ask for ID to determine whether someone is a member of the club. In fact, unlike the Comet AI agent that hides its agentic identity by transmitting the same "user-agent" string as Google Chrome, other web browsers with

21

agentic AI capabilities use distinct user-agent strings to make clear what activities are being performed by an AI agent. In this sense, the relief Amazon is seeking is narrow and would merely force Perplexity to play by the same terms as its AI competitors.

## CONCLUSION

For all these reasons, the district court's decision granting a preliminary injunction should be affirmed.

22

Respectfully submitted,

|  | /s/ David M. Gossett |
|---|---|
| Alexandra Perloff-Giles | David M. Gossett |
| DAVIS WRIGHT TREMAINE LLP | DAVIS WRIGHT TREMAINE LLP |
| 1251 Avenue of the Americas | 1301 K Street NW |
| 42nd Fl. | Suite 500 East |
| New York, NY 10020 | Washington, DC 20005 |
| 212-402-4043 | 202-973-4216 |
| alexandraperloffgiles@dwt.com | davidgossett@dwt.com |

April 29, 2026

23

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(g)(1), and Circuit Rule 29-2(c)(3), according to the word processing system used to prepare this brief, the word count is 3,989 words, not including the caption, tables, signature block, certificate of compliance, or certificate of service.

By: _/s/ David M. Gossett_

25

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: _/s/ David M. Gossett_