# No. 26-1444

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AMAZON.COM SERVICES LLC,

*Plaintiff-Appellee,*

v.

PERPLEXITY AI, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California,
No. 3:25-cv-09514
Hon. Maxine M. Chesney

---

## BRIEF OF AMICUS CURIAE DIGITAL CONTENT NEXT
## IN SUPPORT OF PLAINTIFF-APPELLEE

---

Karl Huth
Matthew Reynolds
J. Lee Hill
Jack Mitchell
HUTH REYNOLDS LLP
41 Cannon Court
Huntington, NY 11743
(631) 263-3648
*Counsel for Amicus Curiae*
*Digital Content Next*

# CORPORATE DISCLOSURE STATEMENT

No. 26-1444

AMAZON.COM SERVICES LLC,
*Plaintiff-Appellee,*

v.

PERPLEXITY AI, INC.,
*Defendant-Appellant.*

Under Federal Rule of Appellate Procedure 26.1, Digital Content Next certifies that it has no parent corporation, and that no publicly held company owns 10% or more of its stock.

Date: April 29, 2026

HUTH REYNOLDS LLP

*/s/ Karl Huth*

Karl Huth
*Counsel for Amicus Curiae*
*Digital Content Next*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF AMICUS CURIAE ............................................................1

INTRODUCTION ....................................................................................3

ARGUMENT ...........................................................................................6

I. Giving AI Agents Unregulated Access to Protected Content and Systems Threatens Public Access to Information by Undermining Investments in Journalism...................................................................................6

II. Publishers Need Tools to Prevent Unauthorized Commercial Use and Manipulation of their Content by AI Agents. ...................................13

CONCLUSION .......................................................................................23

i

## TABLE OF AUTHORITIES

**Cases**

*Abu v. Dickson*, 107 F.4th 508 (6th Cir. 2024) ........................................................19

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016)............14, 18

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022).........................4, 18

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ...............................................19

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) ..............................18

*United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) .............................................18

**Statutes**

18 U.S.C. § 1030 ...........................................................................10, 11, 14, 18

Cal. Penal Code § 502 ........................................................................10, 11, 14

Digital Content Next ("DCN") submits this brief[1] as amicus curiae in support of Appellee Amazon.com Services LLC ("Amazon").[2]

## INTEREST OF AMICUS CURIAE

Founded in 2001, DCN is the leading trade organization that represents digital content companies. DCN members, the corporate logos of which are displayed on the next page, include many of the most trusted and well-respected publishing brands in the United States.[3] Together, DCN members have an unduplicated audience of 259 million unique visitors and reach 95 percent of the U.S. online population. Consumers seek out DCN member brands because they value trustworthy information that has gone through a rigorous editorial process, and publishers are held to account for the quality and trustworthiness of their news and entertainment by audiences who have high expectations.

News reporting by DCN members has profoundly impacted public policy and altered the nation's history. Millions of Americans rely on news and entertainment

---

[1] Amazon and Appellant Perplexity AI, Inc. ("Perplexity") consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than DCN or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] Unless indicated otherwise, all defined terms take on the meaning given to them in Appellee's Answering Brief ("Amazon Brief" or "Amazon Br."), Dkt. No. 36-1.

[3] *See* https://digitalcontentnext.org/membership/members/ for a listing of current DCN members (last accessed April 29, 2026).

1

published by DCN members to stay informed and engage in public debate. DCN has an interest in ensuring that its members can continue to invest in high-quality journalism and engage in First Amendment activities without having their work unfairly misappropriated or exploited by others. DCN submits this brief to offer the perspective of the nation's premier news and content organizations on what is at stake in this appeal.

## DCN Member Organizations



## INTRODUCTION

Affirming the preliminary injunction will advance, not harm, journalism. "Spoofing" by AI agents to gain access to private systems injures publishers by corrupting ad metrics, eroding subscription models, and extracting commercially valuable data used to train AI large-language models (LLMs) and operate AI-powered tools. Unauthorized access harms customer relationships and goodwill that publishers have spent decades building while permanently devaluing publishers' property. If legal protections fail, the result may be a weakened press and publishing industry. The public interest thus strongly favors affirming the preliminary injunction, which helps support a robust publishing industry and free press.

Publisher investment in high-quality journalism depends, in large part, on ad and subscription revenue. Content-protection mechanisms, whether in the form of paywalls, Web Application Firewalls (WAFs), Content Delivery Networks (CDNs), bot software, or otherwise, are important tools for publishers because they help protect websites from malicious or burdensome bot traffic, in addition to providing an entry point for paid subscriptions and helping many publishers preserve "free" ad-supported content alongside paywalled offerings. Cloaked, unauthorized intrusions by AI agents into protected content will hamper publishers' ability to protect their digital infrastructure and optimize the experience for audiences, and frustrate publishers' efforts to attract advertisers and subscribers. AI agents that

3

choose to engage in deception instead of operating with transparency deprive publishers of accurate audience size and user data, which is crucial for advertising and building the kind of engagement that leads readers to become paying subscribers. And the ability of AI agents to repackage protected publisher content—without paying a cent to the content's owners—risks causing an even greater fall-off in digital subscriptions. Reduced ad and subscriber revenue, in turn, presages a broader diminution of news reporting available to the public and, thus, an impoverishment of the marketplace of ideas.

All publishers, not just news organizations, are entitled to control access to their content. Publishers' online systems contain troves of non-public, valuable content that is created at great expense. In today's digital ecosystem, publishers who hope to continue to have a viable business model must have opportunities to monetize this content while maintaining trusted relationships with consumers and honoring privacy obligations. Publishers should not be forced to open their "gates" to AI agents (particularly those which have taken steps to obscure their identity and purpose), that seek to exploit protected digital content and publisher data for the secondary, commercial purposes of the firm behind the AI agent.[4] AI firms should

---

[4] *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1198-99 (9th Cir. 2022).

4

not be able to masquerade as human users to exploit—for the AI firms' own benefit—content and data that the firms would otherwise have to pay for.

AI firms, like any other business, are fully capable of negotiating agreements with publishers and platforms in arms-length business deals, and some have begun to do so.[5] Perplexity's appeal seeks to undo this emerging licensing market, incentivizing AI firms to employ false pretenses to obtain data instead of lawfully paying for it. Such a reversal would create grave risks for the future of journalism, as well as content creation more broadly. Nor are the harms limited to paywalled systems, as illicit AI agent scraping threatens to push out publishers from an entire playing field of AI licensing opportunities. Without a viable business model that enables publishers to create new work, news publishers will lose their ability to

---

[5] *See*, *e.g.*, Todd Spangler, *Disney Inks Blockbuster OpenAI Deal to Bring More Than 200 Characters to Sora Video Platform, Will Invest $1 Billion in AI Company*, Variety (Dec. 11, 2025), https://variety.com/2025/digital/news/disney-openai-deal-200-characters-to-sora-video-invests-1-billion-1236606401/ (last accessed April 29, 2026); Alexandra Bruell, *News Corp, Meta in AI Content Licensing Deal Worth Up to $50 Million a Year*, Wall St. J. (March 3, 2026), https://www.wsj.com/business/media/news-corp-meta-in-ai-content-licensing-deal-worth-up-to-50-million-a-year-d4fbf244 (last accessed April 29, 2026); Michael M. Grynbaum & Cade Metz, *The Times and Amazon Announce an A.I. Licensing Deal*, N.Y. Times (May 29, 2025), https://www.nytimes.com/2025/05/29/ business/media/new-york-times-amazon-ai-licensing.html (last accessed April 29, 2026); Hayden Field, *ChatGPT adds Washington Post content to growing list of OpenAI media deals*, CNBC (Apr. 22, 2025), https://www.cnbc.com/ 2025/04/22/chatgpt-adds-washington-post-openai-media-bezos-altman.html (last accessed April 29, 2026).

reveal the unknown, hold power to account, and enrich the public discourse on major issues facing society.

**ARGUMENT**

**I. Giving AI Agents Unregulated Access to Protected Content and Systems Threatens Public Access to Information by Undermining Investments in Journalism**

DCN's news publisher members invest immense resources to create high-quality journalism and take steps to protect that content. If publishers cannot effectively prevent access by AI agents deployed by third-party commercial actors, publishers will be unable to protect the income streams that support journalism. In the current digital landscape, content providers need to be able to secure access to their content in order to attract advertisers and grow the number of paid digital subscriptions. [6] The business task facing publishers is to carefully balance advertising-based and subscription-based approaches, each with its own pros and cons, to most effectively build revenue for their businesses.[7] The implications of

---

[6] Nonprofit journalism is not immune from the pressures faced by for-profit news outlets, either. Nonprofit news organizations often rely on subscription and advertising revenue in addition to donations, and donations themselves are often prompted by direct engagement between the news publisher and its readers. *See, e.g.*, Sara Fischer, *NPR doubling down on podcast subscriptions*, Axios (Jan. 4, 2022), https://www.axios.com/2022/01/04/npr-podcast-subscriptions-memberships (last accessed April 29, 2026).

[7] *See* Imtiaz Patel, *The paywall paradox: finding revenue growth in both ads and subscriptions*, Editor & Publisher, (July 9, 2025),

Perplexity's arguments on appeal here threaten the foundations of both sides of this balancing act.

*First*, unauthorized agentic AI access to user account information and other protected content threatens advertising revenue in several major ways. To state the obvious, advertisers pay for their ads to be seen by *humans*, not AI agents. If publishers cannot distinguish between an AI agent and a human subscriber, they will not be able to measure audiences accurately.[8] (Perplexity's AI agent exemplifies this problem: it refuses to identify itself as an AI agent.) Without the ability to provide advertisers with an accurate picture of their actual *human* audience, publishers will have a harder time selling ad space. For example, in one publicly reported case, digital publisher Salon lost the ad business of a mid-size buyer who was concerned with the alarming rise of general invalid traffic ("GIVT")—non-human visits from bots, scrapers, and crawlers.[9] As this example illustrates, unrestricted AI agent

---

https://www.editorandpublisher.com/stories/subscription-revenue-or-bust,256498 (last accessed April 29, 2026).

[8] For example, even ad-supported content "in front" of a paywall often becomes paywalled after a user exceeds a fixed number of "free articles". These "soft" paywalls are important tools for some publishers to convert engaged readers into paying digital subscribers without losing out on web traffic from casual readers. *See* Faisal Kalim, *How publishers are growing subscribers via free content*, The Fix (Sept. 29, 2021) https://thefix.media/2021/09/29/how-publishers-are-growing-subscribers-via-free-content/ (last accessed April 29, 2026).

[9] Jessica Davies, *When bots look like buyers: agentic traffic causing new publisher headaches*, Digiday (Nov. 12, 2025), https://digiday.com/media/when-bots-look-

access thus forces publishers into a difficult choice: either sink valuable time, money, and focus into technical countermeasures to detect and filter out non-human ad impressions, or allow undisclosed AI agents (and thus those AI agents' parent companies) silently to access (and appropriate for their own uses) publisher content without viewing or engaging with the advertisements that fund the creation of such content.[10] Either way, publishers will be unfairly forced to pay for AI agents' attempts at free access.

Publishers are already grappling with the rise of "agentic" visitors to their sites and the ever-rising "invalid traffic" (or "IVT") rate. According to a study commissioned by the Association of National Advertisers (ANA), across all media channels that rate today already stands at 8.5 percent, translating to $63 billion lost to invalid traffic—a figure "expected to grow significantly this year amid the

---

like-buyers-agentic-traffic-causing-new-publisher-headaches (last accessed April 29, 2026).

[10] When bot traffic causes publishers' websites to go offline, that loss of service also costs money. *See* Bron Maher, *AI Bot Traffic's Effect on Publishers: The Indirect Costs Adding Up*, A Media Operator (Apr. 23, 2026), https://www.amediaoperator.com/analysis/ai-bots-crawlers-web-hosting-costs-indirect/ (last accessed April 29, 2026); Charlotte Tobitt, *AI bots bombard publisher websites with 'no meaningful value exchange'*, Press Gazette (Sept. 5, 2025), https://pressgazette.co.uk/publishers/digital-journalism/ai-bots-bombard-publisher-websites-with-no-meaningful-value-exchange/ (last accessed April 29, 2026).

ongoing rise of AI agents and bot traffic."[11] This reflects an ongoing explosive growth rate in general invalid traffic (or "GIVT"). According to data from DoubleVerify, a media analytics firm, GIVT increased by eighty-six percent year-over-year in the second half of the 2024, and for the first time ever, monthly volumes attributable to GIVT traffic surpassed two billion requests.[12] Sixteen percent of GIVT from known-bot impressions in 2024 was associated with AI scrapers.[13] Relatedly, operators of click farms and similar schemes, are suspected of using on AI to further such "ad fraud", an immense global problem that is projected to grow.[14]

If other AI firms' agents are permitted to interface with publishers' protected web assets the same way as Perplexity's Comet AI agent interfaces with Amazon, it will be even harder for publishers to measure actual human audience size, and thus their entitlement to ad revenue, accurately—at least not without being drawn into an

---

[11] Matthew Schwartz, *Report: Ad Spending Wasted on Invalid Traffic Reaches $63 Billion, ANA* (Jan. 21, 2026), https://www.ana.net/magazines/show/id/news-2026-01-21-global-invalid-traffic-report-2026 (last accessed April 29, 2026).

[12] *AI Crawlers and Scrapers Are Contributing to an 86% Increase in General Invalid Traffic*, DoubleVerify Blog (Jan. 9, 2025), https://doubleverify.com/blog/web/verify/ai-crawlers-and-scrapers-are-contributing-to-an-increase-in-general-invalid-traffic#xd_co_f=Y2U1NTEzMTctYWYzOC00ZWQ2LThmZjctZDJmM2E2M2RhMjQz~ (last accessed April 29, 2026).

[13] *Id.*

[14] *See* Juniper Research, Quantifying the Cost of Ad Fraud: 2023-2028 (2023) at 4, 6, 11, https://fraudblocker.com/wp-content/uploads/2023/09/Ad-Fraud-Whitepaper_Juniper-Research.pdf (last accessed April 29, 2026).

open-ended "arms race" to stay ahead of agentic AI developments that make those agents more and more difficult to detect. This development would necessarily draw resources away from publishers' core missions, and thus further corrode the public's access to the important journalism and other content DCN members provide.

Publishers also rely on data from user activity to develop sophisticated marketing strategies that attract new subscribers. The intrusion of AI agents into protected publisher web assets may render this user data unreliable or unusable. To determine whether to grant access in light of this risk, website owners need transparency—including requiring AI agents to clearly identify themselves as AI agents. As shown in its motion, Amazon's policies for AI agents included this very requirement.[15] Perplexity refused to comply with it and instead impersonated a human user.[16] An impersonation tactic to gain access to protected sites and data is a classic example of a computer practice that can trigger violations of the Computer Fraud and Abuse Act ("CFAA") and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), akin to using "Muppet" accounts on social media to mine a social media platform for data.[17] By contrast, features that Amazon states

---

[15] *See* Pl. Mot. Preliminary Injunctive Relief at 2-3, 6, *Amazon.com Services LLC v. Perplexity AI, Inc.*, No. 3:25-cv-09513 (N.D. Cal. Nov. 4, 2025), ECF No. 4 ("Plaintiff's Motion").

[16] *Id.*

[17] *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1266-68 (finding party's use of "Muppet" accounts set up with fake user credentials to

are incorporated into its "Buy for Me" AI agent—clearly identifying itself as an AI agent, not using user login credentials, not circumventing authentication requirements, and honoring websites' crawling instructions—offer an example of what AI agent transparency might look like in the publisher space.[18]

When it comes to business ties between publishers and advertisers, Perplexity is not a neutral bystander. It *is* an aspiring ad publisher. Perplexity plans to use the data it scrapes and captures to sell premium, "hyper personalized" ads that it publishes on its own AI-powered browser.[19] Through this appeal, Perplexity seeks the ability to commercialize publishers' content and then use that same content to compete directly with those publishers for advertisements. For example, Perplexity's Comet AI agent can deliver content to users within Perplexity's own browser, removing any advertising that publishers would otherwise display to users accessing content. Perplexity could present its own advertisements alongside content that it improperly obtained from the protected publisher website—essentially pirating the

---

directly access password-protected areas of Meta's platforms violated the CFAA and the CDAFA). In fact, the impersonation strategy at issue in this case is even more extreme than "Muppet" accounts, which are at least sometimes run by humans.

[18] Amazon Br. at 54.

[19] *See* Julie Bort, *Perplexity CEO says its browser will track everything users do online to sell 'hyper personalized' ads*, TechCrunch (Apr. 24, 2025), https://techcrunch.com/2025/04/24/perplexity-ceo-says-its-browser-will-track-everything-users-do-online-to-sell-hyper-personalized-ads/ (last accessed April 29, 2026).

publisher's content to generate ad revenue for Perplexity. Perplexity could also create its own affiliate links program using the same expropriated content, depriving publishers of another key source of revenue with ultimate consequences for the public interest in a free press threatened as well.[20]

*Second*, AI agents' unauthorized access to protected content allows those agents and their parent firms to misappropriate and summarize or replicate content without providing any attribution. Many advertisers choose to place ads with particular publications for specific commercial and substantive reasons, but AI agents, by potentially stripping out the association between advertisements and the high-quality media brand and/or content in which they appear, may weaken brand reputation and awareness—and in turn, reduce the incentives for sophisticated brand-conscious advertising. If left unchecked, this unauthorized access may reduce incentives to invest in resource-intensive investigative or foreign reporting, or other high-quality journalistic activities.

*Third*, AI agents undermine another pillar of news publishers' revenue: subscriptions. Here, Perplexity seeks to allow AI agents to gain access to protected

---

[20] *See, e.g.*, Charlotte Tobitt, *Guardian moves into e-commerce amid revenue shortfall for 2023/2024*, Press Gazette (Sept. 5, 2024), https://pressgazette.co.uk/media_business/guardian-moves-into-e-commerce-amid-revenue-shortfall-for-2023-2024/ ("The Guardian will begin making product recommendations . . . with the aim of making revenue through affiliate links.") (last accessed April 29, 2026).

content—against the wishes of the owner of that content—using only a single subscriber's login. Once "in the door", the AI agent and its parent firm could extract all content to which that subscriber has access, and then summarize, repackage, strip of attribution, and distribute it for their own profit. This scenario creates a substantial risk of incentivizing subscribers to cancel their paid subscriptions (or never subscribe in the first place) in order to access publisher content for free. The misappropriation of protected content by Perplexity's Comet AI or other AI agents that refuse to follow reasonable policies governing their access thus threatens digital subscriptions, the "stabilizing core" of many news publishers' businesses.[21]

## II. Publishers Need Tools to Prevent Unauthorized Commercial Use and Manipulation of their Content by AI Agents.

A website operator's right to control access to protected systems is fundamental for publishers. First, it is fundamental from a security standpoint. Second, the ability to take action against digital trespassers is a necessary precondition to preventing bad actors from arrogating to themselves valuable opportunities to monetize publishers' proprietary content for AI products. Third, developing successful policies for welcoming and cooperating with AI agents

---

[21] Sara Guaglione, *In Graphic Detail: Subscriptions are rising at big news publishers – even as traffic shrinks*, Digiday (Feb. 17, 2026), https://digiday.com/media/in-graphic-detail-subscriptions-are-rising-at-big-news-publishers-even-as-traffic-shrinks/ (last accessed April 29, 2026).

ultimately depends on the ability to control unauthorized access by such agents.[22]

These points are expanded below.

*First*, AI agents that disguise themselves as human users compromise system security and the safety of sensitive consumer data that publishers maintain. Publishers dedicate significant resources toward cybersecurity measures, which is important to maintaining their customers' trust.[23] Many publishers are entrusted with keeping customers' personally identifiable information (PII), such as addresses and customer payment data, safe. Because publishers are responsible for guarding customers' private data, they are concerned that AI agents that evade detection and refuse to identify themselves as AI agents create a security risk to this data.[24] As

---

[22] Circuit precedent demonstrates why the CFAA (like the CDAFA)—important recourses website owners have against unauthorized access to their protected systems—applies: in *HiQ* and *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), this Court distinguished a computer user that accesses public data for which no login is required (generally no CFAA violation) from a user that accesses password-protected systems, receives a cease-and-desist letter, and continues access after this express revocation (violates the CFAA's "without authorization" provision). *Compare HiQ*, 31 F.4th at 1200-01 *with Power Ventures*, 844 F.3d at 1068. This case is a replica of that second fact pattern.

[23] *See, e.g.*, New York Times Company 2025 Annual Report at 25-26, https://nytco-assets.nytimes.com/2026/03/The-New-York-Times-Company-2025-Annual-Report.pdf (noting ongoing investments in a cybersecurity program); *see also* Isabella Jenkins, *User privacy and revenue are directly links for publishers*, Digital Content Next Blog (Oct. 14, 2022), https://digitalcontentnext.org/blog/2022/10/14/user-privacy-and-revenue-are-directly-linked-for-publishers/ (last accessed April 29, 2026).

[24] *See* Amazon Br. at 10; Pl. Mot. at 2, 21-22.

Perplexity demonstrates, AI agents pose a security threat because they may not patch security vulnerabilities until after those vulnerabilities become public knowledge, a so-called "penetrate-and-patch" response that is discredited in the security engineering field.[25] If a breach occurs that results in the exposure of customers' data, the damage to customer relationships may be irreparable, because some customers will never again trust the publisher with their data. That is why publishers take this concern so seriously.

*Second*, unscrupulous actors could deploy AI agents to misappropriate content and datasets for use in developing a range of AI technologies, including model training, retrieval-augmented generation ("RAG"), and "grounding", and to deliver AI-generated responses to users—with stolen publisher content.[26] The statements and behavior of Perplexity only heighten this fear. As already mentioned, Perplexity seeks an order permitting AI agents cloaked as individual human subscribers to systematically extract, summarize, repackage, and distribute paywalled content to any number of non-subscribers. Startlingly, Perplexity seeks carte blanche for AI

---

[25] Amazon Br. at 45.

[26] *See* Kim Martineau, *What is retrieval-augmented generation?*, IBM Research (Aug. 22, 2023), https://research.ibm.com/blog/retrieval-augmented-generation-RAG ("Retrieval-augmented generation (RAG) is an AI framework for improving the quality of LLM-generated responses by grounding the model on external sources of knowledge to supplement the LLM's internal representation of information") (last accessed April 29, 2026).

firms to continue mining for content and data even *after* receiving a cease-and-desist letter "expressly" revoking any permission the AI agent (or its parent company) might claim to possess by virtue of subscriber consent.[27] Perplexity admits that its Comet AI agent takes "snapshots" of webpages and transmits them to Perplexity's servers, eliminating even a publisher's ability to durably remove or correct proprietary content.[28] Perplexity, a significant player in the AI space, could take the content that its Comet AI agent captures from publishers and use it in its own AI products, including potentially building ad-supported products, or resell it to other AI firms.[29]

The content that Perplexity procures from publishers for its sole benefit through its Comet AI agent might otherwise cost Perplexity millions of dollars. AI content licensing deals for model training, RAG, or other AI development purposes command a high value in the marketplace.[30] And publishers that negotiate content

---

[27] *Powers Ventures*, 844 F.3d at 1067.

[28] Perplexity Br. at 9.

[29] *See* Engadget, *Snap and Perplexity sign $400 million deal to put AI search directly in Snapchat*, Yahoo Finance (Nov. 5, 2025), https://finance.yahoo.com/news/snap-perplexity-sign-400-million-221101256.html (last accessed April 29, 2026).

[30] *See* AI Deals and Disputes Tracker, Tow Center for Digital Journalism, Columbia Journalism School, https://tow.cjr.org/ai-deals-lawsuits/ (last accessed April 29, 2026).

16

licenses frequently gain a recurring, annual income stream.[31] An AI agent that commercializes publisher content for AI products without authorization effectively commandeers a perpetual license of unlimited scope without paying a cent to the publisher who created the content, and thereby deprives the publisher of an important, regular source of revenue. This is simply not sustainable.

The misappropriation of human-created, copyrighted work by illicit bots, agentic AI, or other similar technologies injures all DCN members and the public at large. Producers or owners of creative content risk having their content purloined by generative AI to make derivative works based on these original works. And for all content publishers, the availability of scraped data "for free" or at a discount from AI firms like Perplexity would chill the publishers' ability to negotiate a fair price to access or license their proprietary content. This threat is not hypothetical. Today, digital publishers are increasingly finding that the audience for their articles is being siphoned off by AI tools like Perplexity's Comet AI that copy those same articles to deliver competing substitutes. For all these reasons, publishers' ability to manage access to their protected content is a fundamental safeguard to protect publishers' rights.

---

[31] *Id.*; *see also* Alexandra Bruell, *Marketplaces Are the Next Frontier in Publisher Deals With AI Companies*, Wall St. J. (Feb. 16, 2026), https://www.wsj.com/business/media/marketplaces-are-the-next-frontier-in-publisher-deals-with-ai-companies-11515b00 (last accessed April 29, 2026).

*Third*, publishers' legal right to exclude AI agents that do not play by the rules, is critical to publishers' efforts to build productive working relationships with AI companies to sustain and support their businesses. Just as a shopkeeper's right to refuse service enables them to develop and enforce rules for maintaining a pleasant, safe store environment, publishers' ability to control unauthorized access to sites, including content they have protected with a paywall or otherwise "demarcated . . . as private", such as through registration requirements, allows them to put mutually beneficial policies in place that foster transparency and minimize risks like data breaches.[32]

A website owner has the right to implement access restriction technology, including log-in screens, that limit who may visit portions of their website. Fighting a straw man, Perplexity states the CFAA does not apply to violations of private terms.[33] While a terms of service violation by itself usually does not run afoul of the

---

[32] *hiQ*, 31 F.4th at 1201.

[33] Appellant's Opening Brief ("Perplexity Brief" or "Perplexity Br.") at 28, Dkt. No. 26-1 (citing *HiQ*, 31 F.4th at 1196, 1201).

CFAA's "without authorization"[34] or "exceeds authorized access"[35] provisions, that is not the core issue in this case. Rather, the point is that publishers and website owners in general require the ability to respond to a rule violation by revoking an AI agent's "right to be in the [protected areas of the website]" in the first place.[36] And if access was granted under certain rules—such as when a *human* creates an account for their personal use—publishers should be entitled to enforce those rules. For example, if those rules prohibit access to an AI agent but the AI agent nevertheless continues to access private areas after its access "has been revoked", its continued presence there will be "without authorization" under the CFAA.[37] The problem of digital trespassers underscores the maxim that "right to exclude others" is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."[38] As publishers know firsthand, vindicating that right will support, not

---

[34] *Cf. LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) (employee who logged onto his employer's computer to take confidential files was not "without authorization" under the CFAA because the employee still had authorized access to the company's computers).

[35] *See Power Ventures*, 844 F.3d at 1066-67; *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (en banc) ("*Nosal I*") ("the phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions").

[36] *See Abu v. Dickson*, 107 F.4th 508, 514 (6th Cir. 2024).

[37] *See HiQ*, 31 F.4th at 1199 (contrasting cases where information is "presumptively open to all comers" to cases where authorization "has been revoked").

[38] *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).

19

stifle, digital innovation and AI partnerships, which fruits ultimately redound to the public interest.

*          *          *

Impactful journalism is expensive. Investigative journalism and foreign journalism, in particular, are labor-intensive, time-consuming, and often entail personal risk to journalists and their sources.[39] Investigative journalists may spend years covering a single story, and the scale of investigations can be massive.[40] The Panama Papers and Paradise Papers investigation, led by the International Consortium of Investigative Journalists (ICIJ), mobilized 300 reporters from newsrooms worldwide to collaborate on the project, costing the ICIJ $2 million, not including the collaborating reporters' salaries.[41] As for foreign reporting, as one veteran journalist put it, "Distant guesswork costs nothing," but "keeping competent,

---

[39] *See, e.g.*, Peter Osnos, *These Journalists Spent Two Years and $750,000 Covering One Story*, The Atlantic (Oct. 2, 2013), https://www.theatlantic.com/national/archive/2013/10/these-journalists-spent-two-years-and-750-000-covering-one-story/280151/ (last accessed April 29, 2026).

[40] *See, e.g.*, Emmett Lindner, *Reflecting on a Deep Investigation*, N.Y. Times (June 17, 2022), https://www.nytimes.com/2022/06/17/insider/reflecting-on-a-deep-investigation.html (describing how journalist Azmat Khan spent over five years on a Pulitzer Prize-winning investigation on civilian deaths from U.S. military campaigns in Afghanistan, Iraq and Syria) (last accessed April 29, 2026).

[41] Fiachra Gibbons & Frédéric Pouchot, *Crippling costs of war reporting and investigative journalism*, AFP (Aug. 28, 2018), https://sg.news.yahoo.com/crippling-costs-war-reporting-investigative-journalism-043619220.html (last accessed April 29, 2026).

20

seasoned reporters abroad and getting them close to stories they cover comes at a high price."[42] The cost of maintaining foreign bureaus, which even twenty years ago averaged between $200,000 and $300,000,[43] has only grown since then. Reporting from conflict zones is an especially resource-demanding (and of course, dangerous) form of international journalism.[44]

None of this investment would be possible if publishers were not able to effectively prevent third parties from gaining unauthorized access to (and thereby the ability to crawl and scrape) those publishers' protected online content, which those third parties then use to develop and operate commercial enterprises to compete with the original publishers.

---

[42] Mort Rosenblum, *Competent Foreign Reporting Comes at a High Price, Council on Foreign Relations* (Oct. 15, 2009), https://www.cfr.org/articles/competent-foreign-reporting-comes-high-price (last accessed April 29, 2026).

[43] Jill Carroll, *Foreign News Coverage: The US Media's Undervalued Asset*, The Shorenstein Center on Media, Politics and Public Policy-Harvard University (March 2007), https://shorensteincenter.org/wp-content/uploads/2012/03/2007_01_carroll.pdf (last accessed April 29, 2026).

[44] Alexey Kovalev, *Journalism Is an Increasingly Dangerous Job, But at What Cost?*, World Press Institute (Aug. 31, 2018), https://worldpressinstitute.org/journalism-is-an-increasingly-dangerous-job-but-at-what-cost/ (last accessed April 29, 2026).

A pro-Perplexity amicus brief asserts that AI is an important tool for journalists. [45] That absolutely *can* be true—and DCN supports ethical and responsible AI use by journalists. What is objectionable, however, is Perplexity's exploitation of protected content for *the commercial benefit of a third party (itself)*. The specter of burdening newsgathering activities is remote from the facts in this case. The record does not indicate that Amazon prohibited journalistic or research activities by AI agents, and the Court needs not reach such issues here.[46]

This Court should not bless deceptive conduct by a commercial actor that goes against the public interest. An AI agent that masquerades as a human user for the commercial benefit of a third party should not get a green light to access protected areas of a website without authorization from the website owner.

---

[45] Br. Amici Curiae Am. Civil Liberties Union, Am. Civil Liberties Union N. Cal., & Knight First Am. Inst. Colum. Univ. in Support of Def.-Appellant & Reversal ("ACLU Brief") at 9-10, Dkt. No. 30.1.

[46] DCN and its members support, in principle, the responsible use of technological innovations, like AI to facilitate reporting. However, the proposed ACLU Brief notably does not cite a single example of any reporting where a journalist used *any* AI agent, let alone Perplexity's AI agent, and in a way that circumvents a website owner's protections over proprietary or private information (as opposed to public information available to anyone but-for the task of analyzing that information). The ACLU Brief's examples instead appear to all be uses of generative AI and large-language model ("LLM") chatbots. *See id.* at 11. The notion that journalists will lose a key tool for data-driven research is therefore misplaced.

**CONCLUSION**

For the foregoing reasons, this Court should find that the district court did not abuse its discretion by issuing a preliminary injunction enjoining Perplexity from accessing password-protected systems without authorization.

Dated: April 29, 2026                    Respectfully submitted,

*/s/ Karl Huth*

Karl Huth

Matthew Reynolds

J. Lee Hill

Jack Mitchell

HUTH REYNOLDS LLP

41 Cannon Court

Huntington, NY 11743

(631) 263-3648

*Counsel for Amicus Curiae*
*Digital Content Next*

23

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system on April 29, 2026. All participants in the case are registered ACMS users, and service will be accomplished using the ACMS system.

*/s/ Karl Huth*
Karl Huth

*Counsel for Amicus Curiae*
*Digital Content Next*

24

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number 26-1444**

I am the attorney or self-represented party.

**This brief contains 4,929 words,** excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Karl C. Huth*      **Date** April 29, 2026

25