*Appeal No. 26-1444*

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

AMAZON.COM SERVICES LLC,

Plaintiff-Appellee,

v.

PERPLEXITY AI, INC.,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of California
Hon. Maxine M. Chesney, Case No. 3:25-CV-09514-MMC

# PETITION FOR REHEARING EN BANC

Moez M. Kaba (CA SBN 257456)
mkaba@hueston.com
Christine Woodin (CA SBN 295023)
cwoodin@hueston.com
Billy Joe McLain (CA SBN 290682)
bmclain@hueston.com
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 866-4825
Attorneys for Plaintiff-Appellee
Amazon.com Services LLC

Hagan Scotten (NY SBN 4909719)
hscotten@hueston.com
HUESTON HENNIGAN LLP
1 Little W 12th Street
New York, NY 10014
Telephone: (212) 268-8150
Facsimile: (888) 866-4825
Attorneys for Plaintiff-Appellee
Amazon.com Services LLC

# TABLE OF CONTENTS

INTRODUCTION AND RULE 40(b) STATEMENT....1

BACKGROUND....2

ARGUMENT....6

I. The Panel's CFAA Ruling Contravenes This Court's Precedent....6

A. The Panel Failed to Apply *Hinkson*....7

B. The Panel Failed to Apply *Power Ventures*....11

C. The Panel Misapplied This Court's Rule of Lenity Cases....13

II. The Panel Refused to Apply the CDAFA's Plain Language....15

III. These Errors Warrant the Full Court's Attention....16

CONCLUSION....18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997)....................16

*Developmental Servs. Network v. Douglas*,
666 F.3d 540 (9th Cir. 2011)....................8

*Gebardi v. United States*,
287 U.S. 112 (1932)....................15

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001)....................2, 17

*Klingebiel v. Lockheed Aircraft Corp.*,
494 F.2d 345 (9th Cir. 1974)....................16

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009)....................15

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000)....................9

*Rosemond v. United States*,
572 U.S. 65 (2014)....................14

*United States v. Freter*,
31 F.3d 783 (9th Cir. 1994)....................13

*United States v. Gasca-Ruiz*,
852 F.3d 1167 (9th Cir. 2017) (en banc)....................1, 2, 18

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) (en banc)....................1, 2, 6, 8, 13, 18

*United States v. Jingles*,
702 F.3d 494 (9th Cir. 2012)....................12

*United States v. LeCoe*,
936 F.2d 398 (9th Cir. 1991)....................13

*United States v. Lindsey*,
634 F.3d 541 (9th Cir. 2011) .......................................................................12

*United States v. Nosal*,
676 F.3d 854 (9th Cir. 2012) .......................................................................15

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020)..........................................................................................2, 9

*United States v. Walker*,
601 F.2d 1051 (9th Cir. 1979) .......................................................................9

*Van Buren v. United States*,
593 U.S. 374 (2021)..............................................................................13, 14, 17

**Statutes**

California Penal Code § 502 .......................................................6, 15, 16

18 U.S.C. § 1030 ..............................................................................*passim*

## INTRODUCTION AND RULE 40(b) STATEMENT

Artificial intelligence ("AI") is a tool of enormous potential. That potential promises many benefits but also poses great risks if not responsibly managed. Because Perplexity does not responsibly manage its Comet AI "Assistant"—but rather is uniquely reckless in deploying this powerful AI agent with demonstrated vulnerability to hacking—Amazon barred Perplexity from sending the Assistant into password-protected areas of the Amazon Store. Perplexity repeatedly evaded that ban, disguising the Assistant as a human user and circumventing technical barriers designed to keep the Assistant out of Amazon's private systems. The district court rightly enjoined Perplexity from continuing to do so, finding that its conduct likely violated federal and state laws prohibiting digital trespass. The panel erred in vacating the injunction. The panel wrongly substituted an amicus's inaccurate account of the facts for those the district court found after a painstaking hearing, and it disregarded this Court's precedents, stripping district courts of discretion to manage the novel risks of AI during pending litigation.

Rehearing en banc is warranted. Fed. R. App. P. 40(b)(2)(A), (D). This Court has gone en banc more than once to stop panels from substituting their judgment for a district court's. This Court did so in *Hinkson*, because a panel's disregard of the abuse of discretion standard had left "no effective limit on our power to substitute our judgment for that of the district court," and again in *Gasca-Ruiz*, where it

overruled a panel that had reviewed district courts de novo rather than deferentially. *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc); *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1172–73 (9th Cir. 2017) (en banc). This panel repeated that error and compounded it, resolving the appeal on an amicus's account of the technology rather than the record the parties developed, which the Supreme Court prohibits. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–80 (2020). In doing so, it degraded website owners' ability to set the terms on which powerful, fast-evolving, and potentially destructive AI agents may enter their secure systems, exposing owners and the public to the rogue actions and unintended consequences that website proprietors are entitled, and best positioned, to guard against.

Disputes over AI will be litigated first, and mostly, in this Circuit's district courts. Whether those courts have discretion to halt dangerous, illegal uses of AI while litigation proceeds is a question of "general importance likely to recur" and of "transcendent public significance." *Hart v. Massanari*, 266 F.3d 1155, 1172 n.29 (9th Cir. 2001).

## BACKGROUND

Amazon operates the Amazon Store, also known as Amazon.com. The store includes public webpages, but customers enter private accounts secured by unique login credentials to place and manage orders, store payment information and delivery addresses, receive personalized recommendations, track purchases, and

process returns. 3-ER-572 ¶¶ 3-5. Those password-protected accounts contain customers' shopping history, billing information, and other sensitive personal information. 3-ER-568-69 ¶ 24.

Perplexity operates Comet, a web browser with an AI "Assistant." The Assistant depends on Perplexity's servers to operate, such that "when network access to Perplexity's servers is blocked, the Assistant spins and is unable to perform any actions." 2-ER-279 ¶ 13. To act, the Assistant transmits data to Perplexity's servers, and "communicates with Perplexity's servers . . . to process natural language instructions and determine appropriate actions." 3-ER-525 ¶ 19. Perplexity supplies the "reasoning layer" that decides what actions the Assistant takes. 2-ER-77-79.

Because it takes its instructions from Perplexity, the Assistant does not depend on step-by-step human direction. According to Perplexity, "[w]hat sets Comet apart" is its ability to act "intelligently and autonomously," 1-SER-81, "actively conducting entire browsing sessions," and "execut[ing] complete workflows." 1-SER-157. As Perplexity states, the Assistant is nothing like ordinary browsers "passively displaying whatever content websites throw at a person." 4-ER-596 ¶ 6. Instead, the Assistant "behaves like an efficient human shopper" and "automates clicks within Amazon's user interface," including on Amazon's "secure web pages." 3-ER-524-25 ¶¶ 16, 20.

For example, a user may type only a generic request—"order paper towels"—and Perplexity will direct the Assistant into the Amazon Store and employ the user's stored credentials. 2-ER-273 (Fig. 3); 2-ER-272-78 ¶¶ 9-12. Once inside a password-protected account, Perplexity instructs the Assistant to send data from Amazon's secure pages, along with the user's full browsing history, "regardless of the webpage in the current tab and the user's request," to Perplexity's servers. 2-ER-284 ¶¶ 20-21.

Amazon repeatedly told Perplexity that the Assistant was not authorized to enter its password-protected spaces. Before the Assistant launched, Amazon informed Perplexity's CEO that Perplexity had no permission to deploy AI agents like the Assistant in the Amazon Store. 2-SER-301 ¶ 3. Perplexity directed the Assistant there anyway. Amazon then repeated the prohibition to Perplexity's senior management, 2-SER-301 ¶ 4; 3-ER-572-73 ¶ 6, and in a cease-and-desist letter, 3-ER-574. Perplexity publicly acknowledged the demand, stating that "Amazon . . . [is] demanding we prohibit Comet users from using their AI assistants on Amazon." 3-ER-496. Nevertheless, Perplexity continued to instruct the Assistant to enter the Amazon Store, prompting Amazon to sue for violations of the Computer Fraud and Abuse Act ("CFAA") and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), and to seek a preliminary injunction barring the Assistant's continued, unauthorized access. 2-SER-351-53 ¶¶ 64-81.

On a record of eight briefs, sixteen declarations, seventy-five exhibits, and a three-and-a-half-hour hearing, the district court found "strong evidence" that "Perplexity, *through its Comet browser*, accesses . . . without authorization by Amazon, the user's password-protected account." 1-ER-4 (emphasis added). The district court rejected the suggestion that "Comet's some kind of free agent that has nothing to do with Perplexity." 2-ER-97. It explained that "Comet [acts] on behalf of Perplexity because Comet is just a thing"; as the district court put it, when a car malfunctions, plaintiffs "don't sue the car." 2-ER-81. The district court further found that Perplexity obtains information from the "password protected part" of the Amazon Store, including customers' "buying habits" and payment information. 2-ER-104-05. The district court therefore enjoined the Assistant from accessing the password-protected areas of the Amazon Store. 1-ER-8-9.

The panel vacated, but not because the district court adopted the wrong legal rule. Like the district court and Amazon, the panel correctly understood that "access" under the CFAA means "entering a computer system." Op. 15 (quoting *Van Buren v. United States*, 593 U.S. 374, 388 (2021)). The panel also rightly framed the dispositive question as "whether Perplexity uses a tool (the Assistant) to 'access' Amazon's computers." *Id.* But rather than addressing the facts the district court found, the panel relied on a block quote from an amicus brief, never seen by the district court, for its factual narrative. *Id.* at 14. Based on that incomplete and

untested account, the panel concluded that "Perplexity may receive screenshots of the user's browser and may communicate instructions to the Assistant. But those activities, by themselves, do not mean that Perplexity has 'accessed' (gained entry) to Amazon's servers." *Id.* at 15. Thus, "[o]n the facts before us," the panel found Amazon unlikely to succeed on the merits, even if "on a different record or new facts, Perplexity may exercise control over the Assistant in such a way as to gain entry to Amazon's servers." *Id.* at 15-16. At no point did the panel question the facts showing that Perplexity controls the Assistant. Nor did the panel identify anything "illogical, implausible, or without support in inferences that may be drawn from the facts in the record" about the district court's conclusion that "Perplexity, through its Comet browser, accesses" the password-protected areas of Amazon.com under the CFAA and the broader CDAFA. 1-ER-4; *Hinkson*, 585 F.3d at 1262.[1]

## ARGUMENT

### I. The Panel's CFAA Ruling Contravenes This Court's Precedent

The panel's CFAA analysis rejected the legal arguments Perplexity pressed on appeal. Declining to adopt Perplexity's effort to equate "access" with physical break-ins, the panel explained that "access" is merely "the act of entering a computer

[1] The panel opinion is entirely dependent on its interpretation of access. It did not address any other aspects of the CFAA or CDAFA, and although it briefly discussed the other preliminary injunction factors, its analysis turned on its belief that the district court erred on the merits. *See* Op. 18-21.

system itself." Op. 15 (citing Van Buren, 593 U.S. at 388). The panel likewise rejected Perplexity's novel rule that only a direct server-to-server connection constitutes "access." See id. at 14-15. Instead, the panel correctly recognized that the dispositive question is "whether Perplexity uses a tool (the Assistant) to 'access' Amazon's computers." Id. at 15. That is exactly the right question because, as the panel and the district court recognized, the CFAA contemplates access by persons—which includes corporations like Perplexity—and "[h]owever advanced the Assistant currently is, it is a tool, not a person." Id.; 2-ER-97 (district court rejecting Perplexity's arguments that it was not accountable for the Assistant's actions).

Despite its agreement on the legal standard, the panel reversed the district court in a series of errors, each of which contradicts this Court's precedents. The panel: (1) refused to defer to the district court's factfinding, instead relying on an amicus brief first submitted on appeal; (2) refused to apply a previous decision of this Court, Facebook, Inc. v. Power Ventures, Inc., 844 F.3d 1058, 1067 (9th Cir. 2016), which already found the CFAA's access element satisfied on similar facts; and (3) applied the rule of lenity—which is solely a principle of statutory interpretation—to its understanding of the facts.

### A The Panel Failed to Apply *Hinkson*

Because the panel did not find that the district court identified the wrong legal rule, it could reverse only under the "limited and deferential" abuse of discretion

standard. *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011). The panel recited that standard but never applied it. *See* Op. 9 (quoting *Hinkson*, 585 F.3d at 1261–62).

Instead of asking whether the district court's view of the record was permissible, the panel re-found facts de novo, relying on a narrative the district court never saw. The panel introduced its dispositive discussion of "the nature of the system" by block-quoting an amicus brief filed for the first time on appeal. Op. 14. The amicus's account is contradicted by the record. The amicus asserted that the Assistant communicates with Perplexity's servers only "[i]f necessary to carry out the task requested by the user." *Id.* In fact, the Assistant is in constant contact with Perplexity's servers and cannot function without them. 2-ER-279 ¶ 13. The amicus asserted the Assistant merely "analyze[s] the contents of the page that has been displayed by the browser on the user's computer." Op. 14. Again, the record shows more: Perplexity directs the Assistant to transmit users' stored credentials to the Amazon Store, including in sessions that "started without the user visiting amazon.com." 2-ER-273 (Fig. 3); 2-ER-272-78 ¶¶ 9-12. And contrary to the amicus's account, the Assistant transmits the user's entire browsing history to Perplexity's servers "regardless of the webpage in the current tab and the user's request." 2-ER-284 ¶¶ 20-21.

Settled law forbids resolving appeals this way. Appellate review is concerned "only with the record before the trial judge when his decision was made." *United States v. Walker*, 601 F.2d 1051, 1055 (9th Cir. 1979). That rule applies with equal force to amici, whose assertions are never tested by cross-examination or responsive evidence. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 n.1 (9th Cir. 2000) (striking extra-record materials submitted with amicus brief). Thus, when one panel of this Court restructured an appeal around amici's submissions rather than "the case shaped by the parties," the Supreme Court unanimously vacated. *Sineneng-Smith*, 590 U.S. at 375–80.

The panel's extra-record framing proved to be fatal error. The panel reduced Perplexity's interaction with its Assistant to two facts: "Perplexity may receive screenshots of the user's browser and may communicate instructions to the Assistant." Op. 15. The panel then reasoned that, "those activities, by themselves, do not mean that Perplexity has 'accessed' (gained entry) to Amazon's servers." *Id.* If those were the only facts, that conclusion might follow. But the district court found much more, because the record showed much more. Perplexity does not merely "communicate instructions to" the Assistant as a middleman. Perplexity's "instructions" tell the Assistant *what* to access, *where* to access it, *how* to access the secure pages, and *what* to do with the information obtained. Perplexity admits that the Assistant "navigat[es] purposefully through" the Amazon Store, "automates

clicks within Amazon's user interface," and uses "its agentic capabilities . . . to find information and act on it intelligently and autonomously." 4-ER-609 ¶ 16; 3-ER-524-25 ¶¶ 16, 20; 1-SER-81. Perplexity's design and continuous instructions animate all the Assistant's actions. The Assistant cannot click, navigate, or log in without contemporaneous direction from Perplexity. 2-ER-279 ¶ 13; 3-ER-525 ¶ 19; 4-ER-610 ¶ 19. The district court thus aptly rejected Perplexity's attempts to construe the Assistant as a "free agent that has nothing to do with Perplexity." 2-ER-97.

The panel's contrary view ignores facts on which the district court relied, without finding them clearly erroneous. Users may or may not choose to access Amazon, but the Assistant will access Amazon regardless, acting under Perplexity's control. The record shows that users may make generic requests such as "order paper towels," yet Perplexity's "reasoning layer" will direct the Assistant to enter the Amazon Store, present the user's stored credentials, and click through secured pages. 2-ER-273 (Fig. 3); 2-ER-272-78 ¶¶ 9-12; 2-ER-77-79. In that sequence, the user never chose to visit the Amazon Store and therefore did not access or direct the Assistant to access the store. Perplexity made all the decisions and took all the actions.

Moreover, although never mentioned by the panel, Perplexity's role in captaining the Assistant's actions is further proven by Perplexity's decision to aim

its Assistant at the Amazon Store and redirect it there after every obstacle. Amazon told Perplexity's CEO that its agents were not permitted in the store; Perplexity launched its agent into password-protected customer accounts anyway. 2-SER-301 ¶ 3; 3-ER-565 ¶ 10. Amazon repeated its prohibition to senior management and by cease-and-desist letter; Perplexity publicly acknowledged the demand and continued. 2-SER-301 ¶ 4; 3-ER-574; 3-ER-496. Amazon blocked the Assistant; Perplexity devised a new version that defeated the block within twenty-four hours. 3-ER-566-67 ¶¶ 15-17. Amazon erected a second block and told Perplexity's lawyers about it; within two days the Assistant returned to the store. 3-ER-509; 3-ER-486 ¶ 7. All the while, Perplexity disguised the Assistant as a human user so Amazon could not tell machine from customer. 3-ER-566 ¶¶ 11-13. Perplexity thus repeatedly chose to "exercise control over the Assistant in such a way as to gain entry to Amazon's servers," Op. 15, no matter what Amazon said or did to stop it.

### B The Panel Failed to Apply *Power Ventures*

This Court has already held that similar conduct "accesses" a private website. *See Power Ventures,* 844 F.3d at 1067. In *Power Ventures*, as here, a corporation devised and operated a program that automatically performed actions inside the password-protected areas of a website based on users' general authorization. *Id.* at 1062–63. Because the website's owner (Facebook) had not authorized the corporation to do so, this Court affirmed a finding of CFAA and CDAFA violations.

*Id.* at 1068–69. There is no meaningful distinction between the defendant's access in *Power Ventures* and Perplexity's access here. *See* 1-ER-4.

The panel should have followed *Power Ventures*. It acknowledged that the case "implied that Power accessed Facebook's servers," yet declined to apply it because *Power Ventures* did not contain extensive reasoning on the access element. Op. 12-13. But *Power Ventures* did not *imply* this; it explicitly said that "Power accessed Facebook's computers." 844 F.3d at 1068. That it did so in the course of concluding that this access was unauthorized, *see* Op. 13, does not make this conclusion any less binding: *Power Ventures* could not have reasoned that Power engaged in unauthorized access without engaging in access, and reasoning is as binding as the holding it supports. *See United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011) (courts must "focus on the reasoning and analysis in support of a holding, rather than the holding alone"); *United States v. Jingles*, 702 F.3d 494, 502 (9th Cir. 2012) ("An argument is rejected by necessary implication when the holding stated or result reached is inconsistent with the argument." (internal quotation marks omitted)).[2] Thus, at a minimum, the district court's attribution of the Assistant's

[2] Power did far less to "exercise control," Op. 15, than Perplexity, because Power's program performed a relatively simple task explicitly commanded by the user. *See Power Ventures*, 844 F.3d at 1065. The panel seems to have gotten Amazon's argument here backward, describing Amazon as contending that "a 'relatively ministerial, user-directed task' can be ascribed to Perplexity." Op. 12. Amazon's point was the opposite: This Court attributed even Power's relatively ministerial,

access to Perplexity was a permissible inference from the record. Under *Hinkson*, that should have ended the appeal.

### C The Panel Misapplied This Court's Rule of Lenity Cases

The panel also disregarded this Court's precedent in invoking the rule of lenity. Lenity is a principle of statutory interpretation. *E.g.*, *United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991). The only statutory interpretation in which the panel engaged was rejecting Perplexity's claims that "access" meant server-to-server connection between plaintiff and defendants. AB 19-25 (invoking *Van Buren*'s definition of access as "gain entry"); Op. 11 (same); OB 24 (arguing that "Perplexity never 'gain[ed] entry to' an Amazon computer" because "there are 'no direct requests from Perplexity hosts to amazon.com'"). In other words, the panel did not use lenity to choose among competing statutory meanings.[3] Instead, it used lenity as a *factual* tiebreaker for whether the evidence was sufficient. That is a plainly erroneous application of a rule of statutory interpretation. *See United States v. Freter*, 31 F.3d 783, 786 n.3 (9th Cir. 1994) ("We are not faced with the interpretation of ambiguous statutory language, but instead with the question of

---

user-directed action to the company, making Perplexity's far more elaborate control of the Assistant plainly attributable to Perplexity. AB 23.

[3] To be sure, the opinion refers to "Amazon's approach" and "Amazon's interpretation of" the CFAA. Op. 16-17. But it is unclear what the panel meant by this, given that Amazon relied on the same language from *Van Buren* as the panel to define "access." AB 22.

whether evidence is sufficient to support a jury conviction. The rule of lenity is inapplicable.").[4]

The panel also erred in invoking lenity to mitigate concern that a finding that Perplexity accessed Amazon "could expose users themselves to criminal liability (under a conspiracy or aiding-and-abetting theory)." Op. 16. To start, the panel's reasoning centers on its conclusion that users "access" the Amazon Store with the Assistant, and so does not limit that term in any way that protects users. *Id.* at 15. Instead, Amazon's customers are protected because they have Amazon's permission to enter their own accounts—and always will if Amazon wishes to sell them goods. Thus, under *Van Buren* and the panel's framework, the gates are up for customers and down for Perplexity. Moreover, aiding and abetting requires an affirmative act taken "with the intent of facilitating the offense's commission," and "the intent must go to the specific and entire crime charged," meaning that the accomplice must "participate in it as in something that he wishes to bring about" and "seek by his action to make it succeed." *Rosemond v. United States*, 572 U.S. 65, 71, 76 (2014). Users who merely ask AI agents to buy paper towels, 2-ER-273, have none of the intent necessary to justify liability under the statute.

---

[4] The notice concerns addressed by lenity also "simply do not apply" where, as here, a defendant receives individualized warnings, a cease-and-desist letter, and is individually blocked. *Power Ventures*, 844 F.3d at 1069.

In any event, settled law forecloses the possibility that a user's conduct could be swept into the CFAA. Where Congress enacts an "affirmative legislative policy" choice to leave a participant's conduct unpunished, complicity doctrines may not effect a "withdrawal . . . of that immunity which the [statute] itself confers." *Gebardi v. United States*, 287 U.S. 112, 123 (1932). This Court has already construed the CFAA to recognize "that Congress will not unintentionally turn ordinary citizens into criminals," placing authorized users outside the statute's reach. *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009). Yet although authorized users have been placed outside the statute repeatedly, not once has that protection been thought to extend to unauthorized outsiders like Perplexity.

## II. The Panel Refused to Apply the CDAFA's Plain Language

The panel's state-law error is sharper still. California's CDAFA defines "access" more broadly than the CFAA, as the district court recognized. Section 502 of the CDAFA defines "access" as "to gain entry to, instruct, cause input to, cause output from, cause data processing with, *or communicate with*" a computer system. *Id.* § 502(b)(1) (emphasis added). Yet the panel quoted that definition only in part, reciting "caus[ing] input to [or] data processing with" while omitting "instruct" and "communicate with"—verbs that describe what the panel acknowledged Perplexity instructs the Assistant to do. Op. 18. On the panel's own account, Perplexity at least

"instructs" and "communicates with" Amazon's computers, which is "access" under the CDAFA.

The district court recognized that independent ground. It found that even if Amazon's CFAA claim failed, Amazon "still ha[d] shown a likelihood" of success because "you do have 502," 2-ER-140, and access is "broader under 502 than it is under 1030." 2-ER-138-39. The panel disposed of that independent ground in one paragraph, believing the two claims "rise and fall together," despite acknowledging that the "statutes are different," Op. 17-18. The panel gave that difference no effect, disregarding *United States v. Christensen*, which refused to "interpret the state statute consistent with the federal statute." 828 F.3d 763, 789 (9th Cir. 2015). No California decision collapses the CDAFA's access definition into the CFAA's definition. Where a question of state law drives the outcome, "a more cautious approach [is] in order," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77 (1997); *see also Klingebiel v. Lockheed Aircraft Corp.*, 494 F.2d 345, 346 (9th Cir. 1974) ("The proper fora in which to seek to change California law are the California legislature and the California courts, not the federal courts.").

## III. These Errors Warrant the Full Court's Attention

The panel opinion warrants rehearing en banc. The panel recognized that agentic AI is "an emerging technology" with "little to no existing caselaw" on how responsibility for AI agents is allocated. Op. 12. In such a field, the first published

opinion "occupies the field" and "its effects are not easily reversed." *Hart*, 266 F.3d at 1172, 1175. The panel's approach will thus be studied and applied throughout this Circuit, making it a quintessential question of exceptional importance. Fed. R. App. P. 40(b)(2)(D).

To be sure, the panel disclaimed "establish[ing] a new legal regime governing agentic AI." Op. 17. And Amazon is confident that it will eventually prevail under the standard set forth by the panel, given that it is the same standard Amazon sought, *Van Buren* imposed, and the district court applied. But Perplexity is taking every measure to delay a final resolution,[5] and in the interim sending its powerful yet unsafe "Assistant" to trespass in password-protected areas of a website used by millions of Americans.

The consequences go far beyond these parties, as amici on both sides confirm. Retailers, airlines, trade organizations, publishers, and the software industry all explained why computer owners' authority to control who enters their password-protected systems—and to distinguish automated agents from customers—underwrites the security of the systems on which their industries depend. *See* Dkts.

[5] After filing its Opening Brief here, Perplexity moved to stay all district court proceedings, extend its time to answer, vacate the case management conference, and defer the Rule 26(f) conference, effectively seeking to halt all forward progress in this case. D. Ct. Dkt. 95.

39.1, 40.1, 43.1, 47.1, 49.1. Although those submissions may establish the stakes of this case, they cannot establish the facts of this case. The district court resolved those factual questions after adversarial testing of sworn evidence, and this Court's precedents required that its findings be reviewed as findings, rather than displaced by an amicus's opinions. The full Court should ensure that when questions of this importance are answered, they are answered on evidence. En banc review is warranted to restore the abuse of discretion standard before the panel's error becomes the Circuit's first rule for agentic AI. *See Hinkson*, 585 F.3d at 1251, 1260–62 (overruling panel decision that failed to apply abuse of discretion standard); *Gasca-Ruiz*, 852 F.3d at 1170, 1173 (same).

## CONCLUSION

The petition for rehearing en banc should be granted, the panel's opinion vacated, and the district court's preliminary injunction reinstated.

Dated: August 18, 2026

HUESTON HENNIGAN LLP

By: ______________________________

Hagan Scotten
Moez M. Kaba
Christine Woodin
Billy Joe McLain
Attorneys for Plaintiff-Appellee
Amazon.com Services LLC

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 26-1444

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,174 **.**
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** /s/ Hagan Scotten **Date** August 18, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# ADDENDUM A
# PANEL OPINION

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMAZON.COM SERVICES, LLC,<br><br>*Plaintiff - Appellee*,<br><br>v.<br><br>PERPLEXITY AI, INC.,<br><br>*Defendant - Appellant*. | No. 26-1444<br><br>D.C. No. 3:25-cv-09514-MMC<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted June 11, 2026
Seattle, Washington

August 4, 2026

Before: MILAN D. SMITH, JR. AND ERIC C. TUNG, Circuit Judges, and JOHN CHARLES HINDERAKER, District Judge.*

* The Honorable John Charles Hinderaker, United States District Judge for the District of Arizona, sitting by designation.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY**

### Computer Fraud and Abuse Act

The panel (1) vacated the district court's preliminary injunction requested by Amazon.com Services, LLC, against Perplexity AI, Inc., an artificial intelligence company, to prevent the use of Perplexity's agentic web browser AI tool on Amazon.com in violation of the federal Computer Fraud and Abuse Act (CFAA) and its California state law analogue, the Comprehensive Computer Data Access and Fraud Act (CDAFA); and (2) remanded for further proceedings.

To succeed on a claim under the CFAA, a plaintiff must show that the defendant (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that the defendant (3) thereby obtained information (4) from any protected computer, and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value.

The panel concluded that Amazon was not entitled to a preliminary injunction because it was unlikely to succeed on the merits of its CFAA claims by showing that Perplexity "accessed" Amazon computers for CFAA purposes. On the facts before the panel, it concluded that Perplexity did not

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

use a tool to "access" Amazon's computers. Rather, it was the user who "accessed" Amazon's computers, with the help of Perplexity's AI agent, the "Assistant," to carry out specific acts on Amazon.com. The panel concluded that Amazon was unlikely to succeed on the merits of its CDAFA claim for the same reason that Amazon was unlikely to succeed on the merits of its CFAA claim: the user (not Perplexity) accessed Amazon using the Assistant as an AI tool.

The panel held that the district court erred in concluding that the remaining equitable factors favored Amazon. The remaining equitable factors favored Perplexity because (1) the potential harms Amazon faces do not weigh in favor of an injunction, (2) the balance of the equities favors Perplexity and weighs against an injunction, and (3) an injunction against conduct that likely does not violate the CFAA or the CDAFA would not serve the public interest. The panel therefore vacated the preliminary injunction and remanded for further proceedings.

---

## COUNSEL

Hagan Scotten (argued), Hueston Hennigan LLP, New York, New York; Christine M. Woodin, Moez M. Kaba, and Billy J. McLain, Hueston Hennigan LLP, Los Angeles, California; for Plaintiff-Appellee.

Christopher G. Michel (argued), Quinn Emanuel Urquhart & Sullivan LLP, Washington, D.C.; Lucas A. Hammill and Renita N. Sharma, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; Daniel C. Posner, Jonathan H. Kim, and John B. Quinn, Quinn Emanuel Urquhart &

Sullivan LLP, Los Angeles, California; Andrew H. Schapiro, Quinn Emanuel Urquhart & Sullivan LLP, Chicago, Illinois; for Defendant-Appellant.

Esha Bhandari and Lauren Yu, American Civil Liberties Union Foundation, New York, New York; Jake Karr, Ramya Krishnan, and Alex Abdo, Knight First Amendment Institute, Columbia University, New York, New York; for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Northern California, and Knight First Amendment Institute at Columbia University.

Corynne McSherry, Victoria Noble, and Andrew Crocker, Electronic Frontier Foundation, San Francisco, California, for Amici Curiae Electronic Frontier Foundation, Alliance for Responsible Data Collection, Mozilla Corporation, Digital Medusa, and Eleutherai.

Tod Cohen and Annie Nguyen, Manatt Phelps & Phillips LLP, San Francisco, California, for Amicus Curiae Software & Information Industry Association.

David M. Gossett, Davis Wright Tremaine LLP, Washington, D.C.; Alexandra Perloff-Giles, Davis Wright Tremaine LLP, New York, New York; for Amicus Curiae National Retail Federation.

Karl Huth, Matthew Reynolds, J. Lee Hill, and Jack Mitchell, Huth Reynolds LLP, Huntington, New York, for Amicus Curiae Digital Context Next.

Michael S. Elkin and Sean R. Anderson, Winston and Strawn LLP, New York, New York; Jennifer A. Golinveaux and Thomas J. Kearney, Winston and Strawn LLP, San Francisco, California; for Amicus Curiae News/Media Alliance.

A. Jeff Ifrah and Robert W. Ward, Ifrah PLLC, Washington, D.C., for Amicus Curiae Air Transport Association of America Inc. d/b/a Airlines for America.

---

## OPINION

M. SMITH, Circuit Judge:

This case concerns a preliminary injunction requested by Amazon.com Services, LLC (Amazon) against Perplexity AI, Inc. (Perplexity), an artificial intelligence (AI) company, to prevent the use of Perplexity's agentic web browser AI tool on Amazon.com in violation of the federal Computer Fraud and Abuse Act (CFAA) and its California state law analogue. Because Amazon is unlikely to succeed in showing that Perplexity "accessed" Amazon computers for CFAA purposes, we vacate the district court's preliminary injunction and remand for further proceedings.

## BACKGROUND

### I. Statutory Background

Congress originally enacted the CFAA as part of the Counterfeit Access Device and Computer Fraud and Abuse Act of 1984. Pub. L. No. 98-473, tit. II, ch. XXI, 98 Stat. 1837, 2190–92 (codified as amended at 18 U.S.C. § 1030). In enacting the CFAA, Congress aimed "to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). This initial version of the CFAA was limited to computers "containing national security information or financial data and those operated by or on behalf of the government." *Id.* at 1197. In

1996, Congress expanded the CFAA's scope to any "protected computer." *Id.* Now, § 1030 defines "protected computer" to include a computer (A) exclusively used by the federal government or a financial institution , (B) "used in or affecting interstate or foreign commerce or communication," or (C) used in a voting system either (I) to support a federal election, or (II) that "has moved in or otherwise affects interstate or foreign commerce." *See* 18 U.S.C. § 1030(e)(2). The CFAA also includes a private cause of action for anyone who "suffers damage or loss" aggregating at least $5,000 per year "by reason of a violation" of the statute's criminal provisions. *See id.* §§ 1030(c)(4)(A)(i)(I), (e)(11), (g).

California enacted the Comprehensive Computer Data Access and Fraud Act (CDAFA), a similar computer access law, in 1987. *See* Cal. Penal Code § 502. The state legislature's goal in passing the CDAFA was "to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." *Id.* § 502(a). The CDAFA criminalizes "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network," and also provides a private cause of action. *Id.* §§ 502(c)(7), (e)(1).

## II. Factual Background

### a. Perplexity and the Comet Browser

Perplexity is an AI startup and the creator of an AI-enabled web browser, Comet. After acquiring another browser company, Sidekick, Perplexity developed Comet and publicly released it in 2025. Comet is a web browser that operates like Google Chrome, running locally on a

user's machine and enabling the user to navigate the Internet. According to Perplexity, Comet's differentiating feature is an optional AI "agent" (the Assistant) that "can perform tasks at the user's direction, such as browsing websites like Amazon.com to shop for requested goods."

When a Comet user directs the Assistant to locate an item on Amazon.com, the Assistant takes screenshots of the browser view, sends those screenshots from the user's computer to Perplexity's servers, and receives instructions from Perplexity's servers on how to navigate Amazon.com. In other words, the Assistant cannot operate wholly independently; it relies on direction from the user and instructions from Perplexity's servers.

**b. Amazon and the Amazon Store**

Amazon owns and operates Amazon.com, also known as the Amazon Store. Customers may create Amazon.com accounts, which, according to Amazon, allow them to "manage orders, store payment information and delivery addresses, receive personalized recommendations, track purchases, and process returns within their password-protected accounts." Amazon also operates in the AI space and launched agentic AI products in 2025.

**c. The Comet Agent and the Amazon Store**

Before Comet's release, Amazon told Perplexity's CEO that Perplexity's AI products would not be permitted to access the Amazon Store. After Perplexity launched Comet and the Assistant accessed the Amazon Store, Amazon again informed Perplexity that it did not have authorization to do so. At the core of the dispute was Perplexity's decision not to use a "user-agent string," a mechanism "that would communicate that the user has activated an AI agent." That

Case: 26-1444, 03/04/2026, DktEntry: 61.1, (32 of 63)



user-agent string would allow Amazon to block the Assistant's access to the Amazon store.[1]

### d. Procedural History

Amazon filed its Complaint in November 2025, alleging violations of the CFAA and the CDAFA. Amazon also moved simultaneously for a preliminary injunction. In March 2026, the district court held a hearing on the motion and issued a tentative ruling in Amazon's favor, indicating that it was a close call. The district court soon after issued a written order granting Amazon's requested preliminary injunction on the grounds that Amazon had shown a likelihood of success on its CFAA claims under § 1030(a)(2) and its CDAFA claims.[2] The district court also held that Amazon had shown it would suffer irreparable harm absent an injunction and that the balance of the hardships and public interest favored Amazon.

The district court denied Perplexity's request that the court require Amazon to post a bond and Perplexity's request for a broader stay pending appeal, although it issued a seven-day administrative stay to allow Perplexity to seek a stay pending appeal with our court. Perplexity filed its Notice of Appeal the next day and simultaneously moved for an injunction pending appeal. A motions panel of this court initially entered an administrative stay and then

[1] The parties dispute whether Perplexity knowingly altered the Assistant's user-agent string once Amazon initially succeed in identifying and blocking the Assistant from the Amazon Store.

[2] The district court's written order did not address Amazon's § 1030(a)(4) claim, and Amazon does not raise any arguments regarding that provision on appeal.

subsequently issued a stay pending appeal, ordering expedited briefing and calendaring.

## ANALYSIS

### I. Standard of Review

We review the grant of a preliminary injunction for abuse of discretion. *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). In determining whether a district court has abused its discretion, we must first determine if the district court identified the correct legal rule and then determine whether the district court's "application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc) (internal quotation marks omitted) (emphasis omitted).

### II. The district court abused its discretion in granting the preliminary injunction.

The party requesting a preliminary injunction must show that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy*, 577 F.3d at 1021 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). We have "adopted a sliding-scale approach to the *Winter* factors," where "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024) (internal quotation marks omitted).

### a. Amazon is unlikely to succeed on the merits of its CFAA and CDAFA claims.

#### i. Amazon's CFAA Claim

To bring a successful § 1030(a)(2) claim pursuant to the CFAA private right of action, Amazon must show that Perplexity "(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that [Perplexity] (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009). We have cautioned against interpretations that "would transform the CFAA from an anti-hacking statute into an expansive misappropriation statute." *United States v. Nosal* (*Nosal I*), 676 F.3d 854, 857 (9th Cir. 2012) (en banc).

In its short written order, the district court stated: "Amazon has provided strong evidence that Perplexity, through its Comet browser, accesses with the Amazon user's permission but without authorization by Amazon, the user's password-protected account, thereby obtaining information as to the user's private Amazon account information, and that such information is transmitted to Perplexity's servers for the purpose of conducting said user's requested tasks," and "Amazon has submitted essentially undisputed evidence that it has expended significantly more than $5,000 in responding to such circumstances, including, for example, costs attributable to numerous hours spent by Amazon employees in developing tools to block Comet's access to its private customer accounts and detecting future unauthorized

access by Comet." The district court erred, however, in its "access" analysis.

Perplexity argues that "access" for CFAA purposes requires the defendant to have "gain[ed] entry" to the computer "system itself." *See Van Buren v. United States*, 593 U.S. 374, 388 & n.6 (2021). In Perplexity's view, it never "gain[ed] entry" to an Amazon computer because no Perplexity computer ever accessed Amazon's servers. Instead, Perplexity explains that any Amazon data was first transmitted to the user's computer and then to Perplexity's servers via browser screenshots.

This is most akin, Perplexity argues, to an Apple user accessing Amazon.com via the Safari web browser, even if "the Safari software automatically fills in the user's address and payment information at checkout on the user's behalf." Any arguable intent that the Assistant possesses should, Perplexity asserts, be ascribed to the user, not to Perplexity itself, because "the Assistant is mere computer software that has no 'intent' apart from what the user directs it to do on the user's behalf." Perplexity also points to *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022), for the proposition that access to data on a user's computer sent to that user by a company is not the same as access to that company's computer. *See id.* at 1232, 1260–61.

In Amazon's view, it suffices for CFAA purposes that the Assistant communicates with Perplexity's servers to, as Perplexity states, "determine appropriate actions" regarding the Amazon Store. Amazon argues that Perplexity itself admits that the Assistant proceeds autonomously and "behaves like an efficient human shopper," and that autonomous action should be ascribed to Perplexity because

it is the Perplexity servers that direct the Assistant. According to Amazon, this argument tracks our conclusion in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), and what Amazon describes as a "relatively ministerial, user-directed task" can be ascribed to Perplexity. *See id.* at 1066–68. This is different, Amazon argues, from Safari because the Assistant's agentic capabilities—i.e., its autonomous action—go beyond the passive displays of a traditional web browser. Amazon further argues that *BrandTotal* is distinguishable because the data there was collected passively through users' normal use of Facebook, as opposed to the Assistant actively navigating Amazon.com.

Agentic AI is an emerging technology. There is thus little to no existing caselaw directly dealing with how to ascribe responsibility for AI agents like the Assistant, let alone caselaw specifically dealing with agentic AI in the CFAA context. And CFAA cases dealing with more established technologies do not provide a perfect analogue to the case at hand. Take the parties' two main cited cases as examples.

In *Power Ventures*, Facebook sued Power Ventures under the CFAA for alleged violations of the same subsection at issue in this case. *See* 844 F.3d at 1066. Power Ventures operated a social media aggregation platform that allowed users to "see all contacts from many social networking sites on a single page." *Id.* at 1062. As part of a promotional campaign in which Power awarded users who invited others to the Power platform, "Power caused a message to be transmitted to the user's friends within the Facebook system." *Id.* at 1063. We held that Power was liable pursuant to the CFAA for continuing to cause such

messages to be sent on Facebook even after receiving a cease-and-desist letter. *See id.* at 1065–69.

But this case differs from *Power Ventures* in several respects. First, in *Power Ventures*, we assumed without discussion that Power "accessed" Facebook for CFAA purposes. *See id.* at 1066–69. The bulk of the analysis was devoted to authorization, not access, and we simply stated that "Power caused a message" to be sent on Facebook, indicating this was the result of "Power users t[aking] action akin to allowing a friend to use a computer or to log on to an e-mail account." *See id.* at 1063, 1067. Nevertheless, our description implied that Power accessed Facebook's servers. *See, e.g.*, *id.* at 1067 ("Power reasonably could have thought that consent from *Facebook users* to share the promotion was permission for Power to access *Facebook's* computers.").

Nor does *BrandTotal* provide a perfect analogue. In that case, Meta sued BrandTotal pursuant to the CFAA for its UpVoice 2021 browser extension, which passively logged and sent to BrandTotal "data that users receive from Facebook through their normal use of the website." *BrandTotal*, 605 F. Supp. 3d at 1260. The district court explained that UpVoice accessed only the "data that Meta has sent to the individual users," and that the program was "not proactively 'accessing' or 'communicating with' Meta's servers." *Id.* Relying on the rule of lenity then,[3] the

[3] We have previously explained that because the CFAA is "primarily a criminal statute" and interpretations of its provisions are "equally applicable" in the civil and criminal contexts, the rule of lenity should guide any interpretation of the statute, meaning that "any ambiguity" should be construed "against the government." *Brekka*, 581 F.3d at 1134–35 (internal quotation marks omitted).

district court declined to extend CFAA liability to such conduct. *See id.* at 1261. But here, the Assistant appears to do more than passive data collection.

The Amicus Brief of Electronic Frontier Foundation, Alliance for Responsible Data Collection, Mozilla Corporation, Digital Medusa, and EleutherAI articulates the nature of the system most clearly:

> When a user visits a website, only . . . the browser . . . communicates with the website's server. Specifically, when a user visits an Amazon.com webpage, the browser requests the contents of the page from Amazon's server and displays the page to the user. If the user activates the Assistant, the Assistant will analyze the contents of the page that has been displayed by the browser on the user's computer. . . . If necessary to carry out the task requested by the user, the Assistant may communicate the user's instructions, along with information received from the browser pertaining to the page accessed by the user and any potentially relevant browsing history, to Perplexity's AI servers. Perplexity's servers never directly access Amazon's servers.

What is clear from this description—and how the parties themselves describe the systems at issue—is that Perplexity itself does not directly communicate with Amazon's servers.

We must nevertheless determine whether Perplexity accesses Amazon.com through the Assistant. The CFAA's plain language suggests the Assistant itself cannot "access"

Amazon's servers. The relevant provision of the CFAA punishes "*[w]hoever* . . . intentionally accesses" a "protected computer." 18 U.S.C. § 1030(a)(2) (emphasis added). In other words, the CFAA contemplates access by a person. However advanced the Assistant currently is, it is a tool, not a person for statutory purposes. *See* 18 U.S.C. § 921(a)(1) ("The term . . . 'whoever' include[s] any individual, corporation, company, association, firm, partnership, society, or joint stock company."); *see also Whoever*, Cambridge English Dictionary, [https://perma.cc/YY3T-VTJF] (last visited July 16, 2026) ("[T]he *person* who" (emphasis added)).

The Supreme Court has instructed that, "in the computing context, 'access' references the act of entering a computer system itself or a particular part of a computer system, such as files, folders, or databases." *Van Buren*, 593 U.S. at 388 (internal quotation marks omitted). Our focus is thus to ask whether Perplexity uses a tool (the Assistant) to "access" Amazon's computers. On the facts before us, we answer no. It is the user who "accesses" Amazon's computers, with the help of the Assistant to carry out specific acts on Amazon.com. To be sure, Perplexity may receive screenshots of the user's browser and may communicate instructions to the Assistant. But those activities, by themselves, do not mean that Perplexity has "accessed" (gained entry) to Amazon's servers. We do not address whether, on a different record or new facts, Perplexity may exercise control over the Assistant in such a way as to gain entry to Amazon's servers. On the current record, Amazon

is not likely to succeed in proving the "access" prong of its CFAA claim.[4]

This conclusion is further reinforced by the rule of lenity. As previously discussed, the CFAA is "primarily a criminal statute" and courts' interpretation of its provisions are "equally applicable" in the civil and criminal contexts. *Brekka*, 581 F.3d at 1134. Thus, the rule of lenity guides our interpretation, meaning we construe "any ambiguity" as to statutory meaning against liability. *Id.* at 1135 (internal quotation marks omitted). To be sure, the rule of lenity applies only where the statute at issue "is truly ambiguous." *United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991); *see also Shular v. United States*, 589 U.S. 154, 165 (2020). Even accepting Amazon's approach as reasonable, imposing liability here would require a novel interpretation far afield from the statute's purpose "to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ*, 31 F.4th at 1196. Another note of caution: Amazon's approach, if accepted, could expose users themselves to criminal liability (under a conspiracy or aiding-and-abetting theory) for facilitating Perplexity's purported unauthorized access to Amazon's servers. We are conscious of precedent cautioning against "transform[ing] whole categories of otherwise innocuous behavior into federal crimes simply because a computer is involved" or "criminaliz[ing] a broad range of day-to-day activity." *Nosal I*, 676 F.3d at 860, 862 (internal quotation marks omitted). In our view, it is unlikely that Congress would

[4] We do not address the remainder of the CFAA factors, including the scope of the CFAA's loss provision, because they are "unnecessary to resolve this case." *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1178 n.1 (9th Cir. 2022).

have exposed individual users to criminal liability under the CFAA by using the Assistant and Comet browser to access Amazon.com under these facts. On these narrow facts and given the care with which we must interpret the CFAA to ensure defendants are on notice, we decline to adopt Amazon's interpretation of § 1030(a)(2).

Because we recognize that agentic AI is an emerging technology, we reiterate what this opinion is not. We do not establish a new legal regime governing agentic AI. We do not address whether in other contexts, including tort claims, Perplexity can avoid liability for the Assistant's actions. Our holding here is limited to "access" as contemplated by the CFAA and as applied to the Assistant's interactions with Amazon.com on the record before us, not the broader legal landscape surrounding agentic AI. The legal understanding of agentic AI will doubtless change as AI technology grows increasingly sophisticated. For now, this opinion reflects and applies to the state of technology only as presented in the filings in this case.

#### ii. Amazon's CDAFA Claim

The CDAFA, the California state law analogue to the CFAA, similarly focuses on "conduct such as hacking into and tampering with computer systems and data, and the disruptions and costs of such conduct to the business of public and private entities." *Teran v. Superior Ct.*, 334 Cal. Rptr. 3d 299, 308 (Cal. Ct. App. 2025). However, the "statutes are different" in certain ways. *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016). Amazon argues that the CDAFA has a broader definition of "access," simpler permission requirements, and no requirement that information is "obtained."

Ultimately, Amazon's CFAA and CDAFA claims rise and fall together. The CDAFA defines "access" to mean, among other things, "caus[ing] input to [or] data processing with . . . the logical, arithmetical, or memory functions of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1). And the relevant prohibition applies only to "any person" who causes unauthorized access. *Id.* § 502(c)(7). While Amazon might be correct that "access" under the CDAFA is broader than the CFAA's definition, the focus of the inquiry is still on the person accessing or causing the access. Accordingly, we arrive at the same conclusion: the user (not Perplexity) accesses Amazon using the Assistant as an AI tool, and thus Amazon is unlikely to succeed on the merits of its CDAFA claim.

**b. The district court erred in concluding that the remaining injunction factors favored Amazon.**

At the outset, the parties dispute whether the district court impermissibly substituted its likelihood of success finding for the remaining equitable factors. It is true that even if a plaintiff is likely to succeed on the merits, the district court must nonetheless consider irreparable injury, the balance of the equities, and the public interest—that is, likelihood of success is not sufficient on its own to warrant a preliminary injunction. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009). However, this is not a case where the district court entirely ignored the equitable factors after determining a likelihood of success on the merits. While much of the district court's equitable analysis was premised on the existence of a CFAA violation, it discussed each of the equitable factors.

#### i. Irreparable Harm

The district court reasoned that Amazon would suffer irreparable harm absent an injunction because Perplexity "will continue to engage in the above-referenced challenged conduct." While the district court might be correct that a showing of likelihood of success on the merits is sufficient to establish a likelihood of irreparable harm, *see Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019), Amazon failed to make that showing here. Irreparable harm is thus a closer question.

As a general matter, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). But Amazon puts forth only weak evidence as to the actual threat of such harm. It cites declarations claiming that the Assistant "may not select the best price, delivery method, or product recommendations for a customer when shopping in the Amazon Store," which suggest that the Assistant leads to a degraded shopping experience. These types of harms, though, are more attenuated than the harms recognized in other "threat of harm" cases. In *Stuhlbarg*, for example, the risk of harm arose from the United States Customs Service's detention of goods already promised to new customers with large orders. *Id.* at 840–41. The harm to goodwill was obvious because those customers would not receive the specific product they ordered. By comparison, the degradation of the overall Amazon.com shopping experience is more abstract, as is the degree to which users would hold the Assistant responsible for any such degradation given their choice to employ it.

Amazon's cyber-risk harm argument is also weak. Amazon asserts that "multiple security researchers corroborated the security risks posed by Perplexity," but Perplexity argues that Amazon's own expert stated that he was unable to fully replicate those risks and that Perplexity has addressed any such risks. Only one of the cyber risks Amazon points to in its expert's declaration involved a shopping website, and even that example did not involve Amazon.com specifically. While the expert's declaration thus provides some support for the idea that use of the Assistant may introduce cyber security risks to Amazon.com, Amazon's proffered evidence is limited and counteracted, at least in part, by Perplexity's asserted cyber improvements. Accordingly, the potential harms Amazon faces do not weigh in favor of an injunction.

**ii. Balance of the Equities and the Public Interest**

Because Amazon has failed to show a likelihood of success on the merits of its claims, its arguments regarding the harm to Perplexity from an injunction fall flat. An injunction here, where it is unlikely that Amazon will be able to establish statutory violations, needlessly imposes a burden on Perplexity by preventing it from fully operating a product that it spent large sums developing. As a result, the balance of the equities favors Perplexity and weighs against an injunction.

Similarly, an injunction against conduct that likely does not violate the CFAA or the CDAFA would not serve the public interest. Instead, such an injunction would impair consumer choice and needlessly limit development of a

nascent technology.[5] The public interest thus favors Perplexity.

## CONCLUSION

Because Amazon is unlikely to succeed on the merits of the "access" prong of the CFAA and CDAFA analysis and the equitable factors do not otherwise strongly favor an injunction, we **VACATE** the preliminary injunction granted by the district court and **REMAND** for further proceedings consistent with this opinion.[6]

---

[5] This outcome does not impair Amazon's ability to regulate access to Amazon.com via private terms of service for its users. On the facts before us, Amazon is simply unlikely to succeed in its attempt to regulate access by invoking the CFAA and the CDAFA.

[6] Perplexity's motion to file documents under seal, Dkt. 28, is **GRANTED.**

# ADDENDUM B
# STATUTORYADDENDUM

West's Ann.Cal.Penal Code § 502

# § 502. Unauthorized access to computers, computer systems and computer data

Effective: January 1, 2020
Currentness

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities.

(3) "Computer program or software" means a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network.

(5) "Computer system" means a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic,

data storage and retrieval, communication, and control. A "computer system" includes, without limitation, any such device or system that is located within, connected to, or otherwise integrated with, any motor vehicle as defined in Section 415 of the Vehicle Code.

(6) "Government computer system" means any computer system, or part thereof, that is owned, operated, or used by any federal, state, or local governmental entity.

(7) "Public safety infrastructure computer system" means any computer system, or part thereof, that is necessary for the health and safety of the public including computer systems owned, operated, or used by drinking water and wastewater treatment facilities, hospitals, emergency service providers, telecommunication companies, and gas and electric utility companies.

(8) "Data" means a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

(9) "Supporting documentation" includes, but is not limited to, all information, in any form, pertaining to the design, construction, classification, implementation, use, or modification of a computer, computer system, computer network, computer program, or computer software, which information is not generally available to the public and is necessary for the operation of a computer, computer system, computer network, computer program, or computer software.

(10) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(11) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(12) "Computer contaminant" means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network.

(13) "Internet domain name" means a globally unique, hierarchical reference to an internet host or service, assigned through centralized internet naming authorities, comprising a series of character strings separated by periods, with the rightmost character string specifying the top of the hierarchy.

(14) "Electronic mail" means an electronic message or computer file that is transmitted between two or more telecommunications devices; computers; computer networks, regardless of whether the network is a local, regional, or global network; or electronic devices capable of receiving electronic messages, regardless of whether the message is converted to hard copy format after receipt, viewed upon transmission, or stored for later retrieval.

(15) "Profile" means either of the following:

(A) A configuration of user data required by a computer so that the user may access programs or services and have the desired functionality on that computer.

(B) An Internet website user's personal page or section of a page that is made up of data, in text or graphical form, that displays significant, unique, or identifying information, including, but not limited to, listing acquaintances, interests, associations, activities, or personal statements.

(c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

(9) Knowingly and without permission uses the internet domain name or profile of another individual, corporation, or entity in connection with the sending of one or more electronic mail messages or posts and thereby damages or causes damage to a computer, computer data, computer system, or computer network.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(10) Knowingly and without permission disrupts or causes the disruption of government computer services or denies or causes the denial of government computer services to an authorized user of a government computer, computer system, or computer network.

(11) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a public safety infrastructure computer system computer, computer system, or computer network.

(12) Knowingly and without permission disrupts or causes the disruption of public safety infrastructure computer system computer services or denies or causes the denial of computer services to an authorized user of a public safety infrastructure computer system computer, computer system, or computer network.

(13) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or public safety infrastructure computer system computer, computer system, or computer network in violation of this section.

(14) Knowingly introduces any computer contaminant into any public safety infrastructure computer system computer, computer system, or computer network.

(d)(1) Any person who violates any of the provisions of paragraph (1), (2), (4), (5), (10), (11), or (12) of subdivision (c) is guilty of a felony, punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years and a fine not exceeding ten thousand dollars ($10,000), or a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, by a fine not exceeding five thousand dollars ($5,000), or by both that fine and imprisonment.

(2) Any person who violates paragraph (3) of subdivision (c) is punishable as follows:

(A) For the first violation that does not result in injury, and where the value of the computer services used does not exceed nine hundred fifty dollars ($950), by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000) or in an injury, or if the value of the computer services used exceeds nine hundred fifty dollars ($950), or for any second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(3) Any person who violates paragraph (6), (7), or (13) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B) For any violation that results in a victim expenditure in an amount not greater than five thousand dollars ($5,000), or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(C) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000), by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(4) Any person who violates paragraph (8) or (14) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, a misdemeanor punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(5) Any person who violates paragraph (9) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B) For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(e)(1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

(2) In any action brought pursuant to this subdivision the court may award reasonable attorney's fees.

(3) A community college, state university, or academic institution accredited in this state is required to include computer-related crimes as a specific violation of college or university student conduct policies and regulations that may subject a student to disciplinary sanctions up to and including dismissal from the academic institution. This paragraph shall not apply to the University of California unless the Board of Regents adopts a resolution to that effect.

(4) In any action brought pursuant to this subdivision for a willful violation of the provisions of subdivision (c), where it is proved by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice as defined in subdivision (c) of Section 3294 of the Civil Code, the court may additionally award punitive or exemplary damages.

(5) No action may be brought pursuant to this subdivision unless it is initiated within three years of the date of the act complained of, or the date of the discovery of the damage, whichever is later.

(f) This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any transaction, nor shall it make illegal any employee labor relations activities that are within the scope and protection of state or federal labor laws.

(g) Any computer, computer system, computer network, or any software or data, owned by the defendant, that is used during the commission of any public offense described in subdivision (c) or any computer, owned by the defendant, which is used as a repository for the storage of software or data illegally obtained in violation of subdivision (c) shall be subject to forfeiture, as specified in Section 502.01.

(h)(1) Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of lawful employment. For purposes of this section, a person acts within the scope of employment when the person performs acts which are reasonably necessary to the performance of their work assignment.

(2) Paragraph (3) of subdivision (c) does not apply to penalize any acts committed by a person acting outside of their lawful employment, provided that the employee's activities do not cause an injury, to the employer or another, or provided that the value of supplies or computer services which are used does not exceed an accumulated total of two hundred fifty dollars ($250).

(i) No activity exempted from prosecution under paragraph (2) of subdivision (h) which incidentally violates paragraph (2), (4), or (7) of subdivision (c) shall be prosecuted under those paragraphs.

(j) For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

(k) In determining the terms and conditions applicable to a person convicted of a violation of this section the court shall consider the following:

(1) The court shall consider prohibitions on access to and use of computers.

(2) Except as otherwise required by law, the court shall consider alternate sentencing, including community service, if the defendant shows remorse and recognition of the wrongdoing, and an inclination not to repeat the offense.

**Credits**

(Added by Stats.1987, c. 1499, § 3. Amended by Stats.1989, c. 1076, § 1; Stats.1989, c. 1110, § 1; Stats.1989, c. 1357, § 1.3; Stats.1998, c. 863 (A.B.1629), § 3; Stats.1999, c. 254 (A.B.451), § 3; Stats.2000, c. 634 (A.B.2232), § 1; Stats.2000, c. 635 (A.B.2727), § 2; Stats.2009, c. 70 (A.B.22), § 1; Stats.2009-2010, 3rd Ex.Sess., c. 28 (S.B.18), § 26, eff. Jan. 25, 2010; Stats.2011, c. 15 (A.B.109), § 378, eff. April 4, 2011, operative Oct. 1, 2011; Stats.2014, c. 379 (A.B.1649), § 1, eff. Jan. 1, 2015; Stats.2015, c. 614 (A.B.32), § 1, eff. Jan. 1, 2016; Stats.2019, c. 16 (A.B.814), § 1, eff. Jan. 1, 2020.)

Notes of Decisions (236)

West's Ann. Cal. Penal Code § 502, CA PENAL § 502
Current with urgency legislation through Ch. 107 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
Title 18. Crimes and Criminal Procedure (Refs & Annos)
Part I. Crimes (Refs & Annos)
Chapter 47. Fraud and False Statements (Refs & Annos)

18 U.S.C.A. § 1030

# § 1030. Fraud and related activity in connection with computers

Effective: October 20, 2020
Currentness

**(a)** Whoever--

**(1)** having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y. of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;

**(2)** intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--

**(A)** information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

**(B)** information from any department or agency of the United States; or

**(C)** information from any protected computer;

**(3)** intentionally, without authorization to access any nonpublic computer of a department or agency of the United States, accesses such a computer of that department or agency that is exclusively for the use of the Government of the United States or, in the case of a computer not exclusively for such use, is used by or for the Government of the United States and such conduct affects that use by or for the Government of the United States;

**(4)** knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

**(5)(A)** knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

**(B)** intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

**(C)** intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[1]

**(6)** knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if--

**(A)** such trafficking affects interstate or foreign commerce; or

**(B)** such computer is used by or for the Government of the United States;[2]

**(7)** with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any--

**(A)** threat to cause damage to a protected computer;

**(B)** threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

**(C)** demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;

shall be punished as provided in subsection (c) of this section.

**(b)** Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

**(c)** The punishment for an offense under subsection (a) or (b) of this section is--

**(1)(A)** a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

**(B)** a fine under this title or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(2)(A)** except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(B)** a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if--

**(i)** the offense was committed for purposes of commercial advantage or private financial gain;

**(ii)** the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

**(iii)** the value of the information obtained exceeds $5,000; and

**(C)** a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(3)(A)** a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

**(B)** a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4),[3] or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(4)(A)** except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of--

**(i)** an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)--

**(I)** loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

**(II)** the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

**(III)** physical injury to any person;

**(IV)** a threat to public health or safety;

**(V)** damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

**(VI)** damage affecting 10 or more protected computers during any 1-year period; or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(B)** except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

**(i)** an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) a harm provided in subclauses (I) through (VI) of subparagraph (A)(i); or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(C)** except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 20 years, or both, in the case of--

**(i)** an offense or an attempt to commit an offense under subparagraphs (A) or (B) of subsection (a)(5) that occurs after a conviction for another offense under this section; or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(D)** a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

**(i)** an offense or an attempt to commit an offense under subsection (a)(5)(C) that occurs after a conviction for another offense under this section; or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(E)** if the offender attempts to cause or knowingly or recklessly causes serious bodily injury from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for not more than 20 years, or both;

**(F)** if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for any term of years or for life, or both; or

**(G)** a fine under this title, imprisonment for not more than 1 year, or both, for--

**(i)** any other offense under subsection (a)(5); or

**(ii)** an attempt to commit an offense punishable under this subparagraph.

**[(5)** Repealed. Pub.L. 110-326, Title II, § 204(a)(2)(D), Sept. 26, 2008, 122 Stat. 3562]

**(d)(1)** The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

**(2)** The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

**(3)** Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

**(e)** As used in this section--

**(1)** the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

**(2)** the term "protected computer" means a computer--

**(A)** exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government;

**(B)** which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States; or

**(C)** that--

**(i)** is part of a voting system; and

**(ii)(I)** is used for the management, support, or administration of a Federal election; or

**(II)** has moved in or otherwise affects interstate or foreign commerce;

**(3)** the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession or territory of the United States;

**(4)** the term "financial institution" means--

**(A)** an institution, with deposits insured by the Federal Deposit Insurance Corporation;

**(B)** the Federal Reserve or a member of the Federal Reserve including any Federal Reserve Bank;

**(C)** a credit union with accounts insured by the National Credit Union Administration;

**(D)** a member of the Federal home loan bank system and any home loan bank;

**(E)** any institution of the Farm Credit System under the Farm Credit Act of 1971;

**(F)** a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934;

**(G)** the Securities Investor Protection Corporation;

**(H)** a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); and

**(I)** an organization operating under section 25 or section 25(a) of the Federal Reserve Act;

**(5)** the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution;

**(6)** the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

**(7)** the term "department of the United States" means the legislative or judicial branch of the Government or one of the executive departments enumerated in section 101 of title 5;

**(8)** the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

**(9)** the term "government entity" includes the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province, municipality, or other political subdivision of a foreign country;

**(10)** the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

**(11)** the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

**(12)** the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity;

**(13)** the term "Federal election" means any election (as defined in section 301(1) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(1))) for Federal office (as defined in section 301(3) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(3))); and

**(14)** the term "voting system" has the meaning given the term in section 301(b) of the Help America Vote Act of 2002 (52 U.S.C. 21081(b)).

**(f)** This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

**(g)** Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses[4] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

**(h)** The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection, concerning investigations and prosecutions under subsection (a)(5).

**(i)(1)** The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States--

**(A)** such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

**(B)** any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

**(2)** The criminal forfeiture of property under this subsection, any seizure and disposition thereof, and any judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except subsection (d) of that section.

**(j)** For purposes of subsection (i), the following shall be subject to forfeiture to the United States and no property right shall exist in them:

**(1)** Any personal property used or intended to be used to commit or to facilitate the commission of any violation of this section, or a conspiracy to violate this section.

**(2)** Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this section, or a conspiracy to violate this section[5]

**CREDIT(S)**

(Added Pub.L. 98-473, Title II, § 2102(a), Oct. 12, 1984, 98 Stat. 2190; amended Pub.L. 99-474, § 2, Oct. 16, 1986, 100 Stat. 1213; Pub.L. 100-690, Title VII, § 7065, Nov. 18, 1988, 102 Stat. 4404; Pub.L. 101-73, Title IX, § 962(a)(5), Aug. 9, 1989, 103 Stat. 502; Pub.L. 101-647, Title XII, § 1205(e), Title XXV, § 2597(j), Title XXXV, § 3533, Nov. 29, 1990, 104 Stat. 4831, 4910, 4925; Pub.L. 103-322, Title XXIX, § 290001(b) to (f), Sept. 13, 1994, 108 Stat. 2097-2099; Pub.L. 104-294, Title II, § 201, Title VI, § 604(b)(36), Oct. 11, 1996, 110 Stat. 3491, 3508; Pub.L. 107-56, Title V, § 506(a), Title VIII, § 814(a) to (e), Oct. 26, 2001, 115 Stat. 366, 382-384; Pub.L. 107-273, Div. B, Title IV, §§ 4002(b)(1), (12), 4005(a)(3), (d)(3), Nov. 2, 2002, 116 Stat. 1807, 1808, 1812, 1813; Pub.L. 107-296, Title XXII, § 2207(g), formerly Title II, § 225(g), Nov. 25, 2002, 116 Stat. 2158; renumbered § 2207(g), Pub.L. 115-278, § 2(g)(2)(I), Nov. 16, 2018, 132 Stat. 4178; amended Pub.L. 110-326, Title II, §§ 203, 204(a), 205 to 208, Sept. 26, 2008, 122 Stat. 3561, 3563; Pub.L. 116-179, § 2, Oct. 20, 2020, 134 Stat. 855.)

Notes of Decisions (435)

**O'CONNOR'S COMMENTS**

**United States Sentencing Guidelines**
§2B1.1 (basic economic offenses)

§§2B2.3, 2B3.2 (basic economic offenses)

§2M3.2 (offenses involving national defense & weapons of mass destruction)

§2X1.1 (other offenses)

Footnotes

1 So in original. The period probably should be a semicolon.

2 So in original. Probably should be followed by "or".

3 So in original. The comma probably should not appear.

4 So in original. Probably should be "subclause".

5 So in original. Probably should be followed by a period.

18 U.S.C.A. § 1030, 18 USCA § 1030
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**CERTIFICATE OF SERVICE**

I, Hagan Scotten, a member of the Bar of this Court, hereby certify that on August 18, 2026, I electronically filed the foregoing petition with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

By: ______________________
Hagan Scotten
Moez M. Kaba
Christine Woodin
Billy Joe McLain
Attorneys for Plaintiff-Appellee
Amazon.com Services LLC