No. 26-1444

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**AMAZON.COM SERVICES, LLC**,
*Plaintiff-Appellee,*

v.

**PERPLEXITY AI, INC.**,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-09514-MMC

Hon. Maxine M. Chesney

---

# BRIEF OF THE SOFTWARE & INFORMATION INDUSTRY ASSOCIATION AS AMICUS CURIAE SUPPORTING REHEARING EN BANC

---

**TOD COHEN**
**ALYSHA AGARWAL**
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, California 94111
Telephone: (415) 291-7469
tcohen@manatt.com
*Counsel for Amicus Curiae*

August 28, 2026

## DISCLOSURE STATEMENT

The Software & Information Industry Association has no parent company, issues no stock, and no publicly held company owns a ten percent or greater interest in it.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .......... 6
SUMMARY OF THE ARGUMENT .......... 8
ARGUMENT .......... 10
I. The Panel's Failure to Credit the Record Facts Establishing Perplexity's Control over the Assistant Creates Profound Uncertainty for the Agentic AI Industry .......... 10
   a. The Panel Did Not Credit the District Court's Findings That Perplexity Controlled and Directed the Assistant .......... 10
   b. The Panel Created Uncertainty by Departing from an Existing Standard .......... 12
   c. The Resulting Uncertainty Threatens the Entire Agentic AI Industry .......... 13
II. The Opinion Narrows Power Ventures Without Saying So .......... 14
III. The Panel's Rule Creates Uncertainty Around Liability That Hinges on a Software's Architecture, Rather Than the Party's Actions .......... 17
   a. The Panel's Reading Excuses Deliberate Evasion of a Platform's Revocation .......... 17
   b. The Panel Creates Uncertainty in Liability that Could Be Extended to Malicious Browser Extensions .......... 20
IV. The Panel's Treatment of the CDAFA Warrants the Full Court's Attention .......... 22
   a. The CDAFA Independently Reaches Perplexity, and the Panel Folded the Claim into Its CFAA Analysis .......... 22
   b. The Panel Read the CDAFA as Coextensive with the CFAA, Which This Court Has Declined to Do .......... 24
CONCLUSION .......... 25



405127050.1

## TABLE OF AUTHORITIES

### CASES

*Amazon.com Servs., LLC v. Perplexity AI, Inc.*,
No. 26-1444, slip op. (9th Cir. Aug. 4, 2026) .............................. passim

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) .......................................................................... 11

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ................................................... passim

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001) ..................................................... 14, 22

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ............................................................ 18

*In re Apple Inc. Device Performance Litigation*,
347 F. Supp. 3d 434 (N.D. Cal. 2018) .................................................. 23

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) ......................................... 19, 20

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc) .............................................. 16

*New York Cent. & Hudson River R.R. v. United States*,
212 U.S. 481 (1909) .......................................................................... 12

*Smith v. Rack Room Shoes, Inc.*,
No. 24-cv-06709-RFL, 2025 WL 2210002 (N.D. Cal. Aug. 4,
2025) ................................................................................................ 22

*Spinelli v. Gaughan*,
12 F.3d 853 (9th Cir. 1993) ................................................................ 16

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2016) .............................................................. 24

*United States v. Hilton Hotels Corp.*,
467 F.2d 1000 (9th Cir. 1972) ............................................................ 12

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) (en banc) ........................................ 11, 14

*United States v. Jingles*,
702 F.3d 494 (9th Cir. 2012) ........................................................... 15

*United States v. Lindsey*,
634 F.3d 541 (9th Cir. 2011) ........................................................... 15

## STATUTES

18 U.S.C. § 1030 ............................................................................ 9, 24

Cal. Penal Code § 7(a)(1) ..................................................................... 22

Cal. Penal Code § 502 ......................................................................... 9, 24

Cal. Penal Code § 502(b)(1) ................................................................ 23, 24

Cal. Penal Code § 502(c)(7) .................................................................... 24

Cal. Penal Code § 502(j) ........................................................................ 24

## OTHER AUTHORITIES

ANTHROPIC, *Introducing the Model Context Protocol* (Nov. 25,
2024), https://modelcontextprotocol.io/docs/getting-started/intro ....... 7

OPENAI DEVELOPERS, *Agentic Commerce Protocol*,
https://developers.openai.com/commerce ............................................ 7

SIIA, *About Us*, https://www.siia.net/about-us/member-companies/ ....... 6

Dan Tinkoff, Lieven Van der Veken, Michael Chui & Tara
Balakrishnan, *The State of AI in 2026: On the Road to ROI*,
McKinsey & Co. (Aug. 25, 2026),
https://www.mckinsey.com/capabilities/quantumblack/our-
insights/the-state-of-ai ......................................................................... 14

## RULES

Fed. R. App. P. 40(b)(2)(A) ........................................................ 9, 14, 17

Fed. R. App. P. 40(b)(2)(D) ........................................................ 9, 14, 22

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae*, the Software & Information Industry Association (SIIA), is a global trade association representing nearly 400 firms involved in the business of information.[2] SIIA's membership includes software companies, search engine providers, data and analytics firms, and digital publishers that serve nearly every segment of society—including business, education, government, health care, and consumers. Through its divisions, events, and advocacy, SIIA engages industry leaders and policymakers to ensure a vibrant information ecosystem: one that fosters creation, dissemination, and productive use.

SIIA strongly supports the responsible development and use of AI and the significant benefits for consumers, governments, and businesses. SIIA's members include platform operators, licensed database providers, scientific and technical publishers, market data services, educational technology firms, and financial information providers—as well as artificial intelligence ("AI") developers actively

[1] Counsel for both appellants and appellee consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no person, including any party or party's counsel, contributed money that was intended to fund preparing or submitting this brief.

[2] *See* SIIA, *About Us*, https://www.siia.net/about-us/member-companies/.

building and deploying agentic AI products in compliance with existing access standards. SIIA members have a direct stake in the outcome.

SIIA advocates for the legal clarity and certainty that enables a sustainable and competitive agentic AI ecosystem. Many of SIIA's AI developer members already build to the agent identification and permissioning standards emerging across the industry—including the Agentic Commerce Protocol ("ACP") and the Model Context Protocol ("MCP").[3] Those members are disadvantaged by Perplexity's evasive conduct. Excusing that conduct would not expand access or innovation. Platforms would impose broader limits on AI use, including against compliant agents, and would chill responsible use across the digital ecosystem.

SIIA submits this brief to promote clear, enforceable rules. Such rules protect platform control, reward responsible AI development, and

[3] Those standards include the ACP developed by OpenAI and Stripe, which specifies how an agent identifies itself to a merchant and how a merchant signals whether it accepts agent-initiated transactions, and the MCP developed by Anthropic, which establishes permissioned, authenticated agent-to-tool connections as a baseline. *See* OPENAI DEVELOPERS, *Agentic Commerce Protocol*, https://developers.openai.com/commerce; ANTHROPIC, *Introducing the Model Context Protocol* (Nov. 25, 2024), https://modelcontextprotocol.io/docs/getting-started/intro.

let both platform operators and compliant agent developers invest with confidence.

## SUMMARY OF THE ARGUMENT

The panel candidly acknowledged that there "is little to no existing caselaw directly dealing with how to ascribe responsibility for AI agents like the Assistant, let alone caselaw specifically dealing with agentic AI in the CFAA context." *Amazon.com Servs., LLC v. Perplexity AI, Inc.,* No. 26-1444, slip op. at 12 (9th Cir. Aug. 4, 2026) ("Panel Op."). That novelty, and the panel's departure from this Court's precedent, are why the full Court should decide these questions.

The panel did not hold that Perplexity is beyond the reach of the CFAA. Its error lies elsewhere. The district court found facts establishing that Perplexity exercised sufficient control over the Comet browser and its Assistant to be responsible for the Assistant's conduct, yet the panel did not credit those findings and did not hold them clearly erroneous. It set that standard aside without applying the rule this Court had already supplied in *Power Ventures*. This creates profound uncertainty about when the operator of an agentic AI tool answers for what its agent does, arriving precisely as agentic AI deployment is



405127050.1

accelerating and the industry is most dependent on clear rules.

The panel further narrowed this Court's holding in *Power Ventures*, which had already resolved the intermediary-access question. The resulting uncertainty could be read to shield AI tools from liability, regardless of their conduct, including tools deployed by malicious actors. That is contrary to the legislative intent behind the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502. The decision conflicts with decisions of this Court, so consideration by the full Court is necessary to secure and maintain uniformity of its decisions. Fed. R. App. P. 40(b)(2)(A). It also involves questions of exceptional importance. *Id*. 40(b)(2)(D).

The panel compounded that problem in its treatment of the CDAFA. It disposed of a claim governed by the broader state statute in a single paragraph of analysis built on the narrower federal statute, leaving an independent ground for relief undecided.

The Court should grant the petition for rehearing en banc.

## ARGUMENT

### I. The Panel's Failure to Credit the Record Facts Establishing Perplexity's Control over the Assistant Creates Profound Uncertainty for the Agentic AI Industry

In its discussion of the CFAA and the CDAFA, the panel left open that a corporate deployer of agentic AI can be liable but declined to find liability on the facts before it. The district court found facts establishing that Perplexity exercised sufficient control over the Comet browser and its Assistant (the "Assistant"). The panel neither credited those findings nor held them clearly erroneous. Rather than apply the standard this Court supplied in *Power Ventures*, the panel set it aside and put nothing in its place. Together those omissions create profound uncertainty about when the operator of an agentic AI tool answers for what its agent does, and blur the line between the operator and the user. That line should be clear for developers, for platforms, and for the people who use these products.

#### a. The Panel Did Not Credit the District Court's Findings That Perplexity Controlled and Directed the Assistant

The district court made findings that bear directly on control. It found "strong evidence" that "Perplexity, through its Comet browser, accesses with the Amazon user's permission but without authorization

by Amazon, the user's password-protected account," and that the information obtained "is transmitted to Perplexity's servers." Panel Op. at 10 (quoting the district court's order). The panel's own recitation points the same way: the Assistant "cannot operate wholly independently; it relies on direction from the user and instructions from Perplexity's servers." Panel Op. at 7. The navigational decisions executed on Amazon's servers are generated by Perplexity, not by the user's keystrokes. Amazon's petition sets out the remaining findings and the standard of review in detail. Pet. 5-11.

The panel did not hold any of those findings clearly erroneous. It did not address them. A court of appeals may not set aside findings that are plausible on the record as a whole, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). This Court's own formulation comes from *Anderson*: findings stand unless "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). The panel recited that standard, Panel Op. at 9, and then did not apply

it. A corporation acts only through instrumentalities, and the law has attributed an instrumentality's conduct to the corporation that directs it for more than a century. *See New York Cent. & Hudson River R.R. v. United States*, 212 U.S. 481, 494-95 (1909); *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004-05 (9th Cir. 1972). On this record, attributing the Assistant's access to Perplexity was at a minimum a permissible inference.

**b. The Panel Created Uncertainty by Departing from an Existing Standard**

The panel did not need to announce a new standard. This Court supplied one in *Power Ventures*: a company that directs automated conduct into the password-protected areas of a platform, after the platform has revoked its authorization, has accessed that platform's computers. 844 F.3d at 1067-69. The uncertainty here comes from the panel's departure from that standard, not from any failure to devise a replacement. The panel set *Power Ventures* aside as not "devoted" to the access question, Panel Op. at 12-13, then reserved whether "on a different record or new facts, Perplexity may exercise control over the Assistant in such a way as to gain entry to Amazon's servers," *id*. at 15-16, leaving the existing rule unapplied and the question open. The

panel acknowledged that there "is little to no existing caselaw directly dealing with how to ascribe responsibility for AI agents like the Assistant." *Id*. at 12. That is precisely why displacing the case law that does exist leaves deployers, platforms, and users with no way to conform their conduct to the law.

#### c. The Resulting Uncertainty Threatens the Entire Agentic AI Industry

That silence will have consequences well beyond this case, at a moment when agentic AI use is accelerating and the industry most needs a clear rule. SIIA's members build, deploy, and rely on AI across nearly every segment of society. They must decide now what to build, what to disclose to the platforms their agents visit, what to place in their terms of service, and what to tell customers about who bears the risk. None of those decisions can be made against a rule that has been set aside without being applied.

The uncertainty also blurs the line between the operator and the user, and if the operator is not the accessor, the user is the one left exposed. Perplexity controls the operation of its agent, as the record findings establish, and on those facts it should answer for the agent's

conduct.[4] Because the panel neither credited those findings nor applied the standard this Court has already supplied, the operators, platforms, and users who make up the agentic AI ecosystem cannot order their conduct with any confidence. That is a question of exceptional importance. Fed. R. App. P. 40(b)(2)(D); *see Hart v. Massanari*, 266 F.3d 1155, 1172 n.29 (9th Cir. 2001) ("We take cases en banc to answer questions of . . . transcendent public significance"). And because the panel displaced the district court's findings without applying this Court's standard of review, consideration by the full Court is necessary to secure and maintain uniformity of the Court's decisions. Fed. R. App. P. 40(b)(2)(A); *Hinkson*, 585 F.3d at 1261-62.

## II. The Opinion Narrows Power Ventures Without Saying So

This Court has already decided the intermediary-access question that the panel's decision contemplates. In *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), the corporate defendant

[4] Dan Tinkoff, Lieven Van der Veken, Michael Chui & Tara Balakrishnan, *The State of AI in 2026: On the Road to ROI*, McKinsey & Co. (Aug. 25, 2026), https://www.mckinsey.com/capabilities/quantumblack/our-insights/the-state-of-ai. ("Use of agentic AI is increasing, mostly accounted for by large enterprises. Forty percent of respondents from large organizations (those with annual revenues of more than $1 billion) report scaling AI agents, up from 27 percent last year.")

accomplished its access through user-initiated action when Power's platform required Facebook users to supply their credentials, and Power's system then "caused a message to be transmitted to the user's friends within the Facebook system." *Power Ventures*, 844 F.3d at 1063. This Court explained that when a user consented, Power "had at least arguable permission to access Facebook's computers." *Id.* at 1067. This Court then analyzed authorization under the CFAA as to Power, not as to Power's user.

The panel narrows this Court's decision in *Power Ventures* without adequate reasoning. The panel states that this "case differs from *Power Ventures* in several respects" and that the analysis in *Power Ventures* was not devoted to access. Panel Op. at 12-13. Whether or not the Court's analysis was "devoted" to the intermediary-access question, this Court determined the question. The Court's published reasoning binds the panel. *United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011) (courts must "focus on the reasoning and analysis in support of a holding, rather than the holding alone"); *United States v. Jingles*, 702 F.3d 494, 502-03 (9th Cir. 2012).

The only difference the panel identified is the use of AI. A user

authorizes Perplexity to access their Amazon account, exactly as a user authorized Power to access their Facebook account. In *Power Ventures*, the authorization occurred through clicking a "Yes, I do!" button, which this Court described as "akin to allowing a friend to use a computer or to log on to an e-mail account." *Power Ventures*, 844 F.3d at 1067. For Perplexity, the authorization occurred through a user downloading the Assistant onto their browser. In each case the user took an affirmative act that let the company into the account. In *Power Ventures* that permission was not enough. This Court held Power liable because Facebook, not the user, had withdrawn authorization. *Id.* at 1067-69. The opinion does not explain why the use of AI should change that analysis, beyond its caution that "agentic AI is an emerging technology." Panel Op. at 12. If the user's permission is dispositive and the platform's revocation beside the point, the opinion has reversed *Power Ventures* without saying so.

A panel may not narrow a published decision of this Court by recharacterizing what it decided. *See Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003) (en banc)*; Spinelli v. Gaughan*, 12 F.3d 853, 855 n.1 (9th Cir. 1993) ("[A] panel of this court cannot overrule Ninth Circuit

precedent”). Further, a panel’s decision conflicting with “a decision of the court” where a “full court’s consideration is … necessary to secure or maintain uniformity of the court’s decisions” is a ground for rehearing en banc. Fed. R. App. P. 40(b)(2)(A). Only the full Court can settle which reading of *Power Ventures* governs.

## III. The Panel’s Rule Creates Uncertainty Around Liability That Hinges on a Software’s Architecture, Rather Than the Party’s Actions

Because the panel neither credited the findings before it nor applied the standard this Court had already supplied, the opinion can be read to make liability under both statutes turn on where the code runs rather than on what the operator did. Read that way, an operator whose software executes on the user’s machine would sit outside both statutes regardless of notice, revocation, or deliberate evasion. SIIA does not contend that the panel intended that result. However, what that reading would permit is the measure of what is at stake.

### a. The Panel’s Reading Excuses Deliberate Evasion of a Platform’s Revocation

On that reading, a user’s authorization would excuse deliberate evasion by the operator. The conduct here shows what that means. The panel’s own recitation supplies the chronology. Before Comet’s release,

Amazon told Perplexity's CEO that Perplexity's AI products could not access the Amazon Store. Perplexity launched anyway, without a user-agent string that would have let Amazon identify and block the Assistant. Amazon then told Perplexity a second time that it had no authorization. Panel Op. at 7-8.

The panel opens its decision by explaining the purpose of the CFAA and the CDAFA as "prevent[ing] intentional intrusion" and "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any … computer network." Panel Op. at 5-6 (emphasis added). Both formulations look to what a party did. Neither looks to where its code ran.

So read, the opinion would permit AI deployers to engage in conduct that otherwise violates the CFAA and the CDAFA, based solely on their choice of AI over other software. *See Power Ventures*, 844 F.3d at 1069 (holding Power liable where Power intentionally accessed Facebook's server through automated tools and a user's consent, "knowing that it was not authorized to do so" by Facebook); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194-1203 (9th Cir. 2022) (analyzing company's liability under CFAA's "authorization" standard

where company deployed automated bots onto LinkedIn's servers based on public accessibility of information on LinkedIn, not based on the architecture of software used).

The panel's reading of *BrandTotal* shows how that reading takes hold. *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022). The panel distinguished that case on the ground that *BrandTotal's* browser extension was "not proactively 'accessing' or 'communicating with' Meta's servers," while the Assistant "appears to do more than passive data collection." Panel Op. at 13-14. The quoted language describes only BrandTotal's collection of information Meta had already sent to users, which was not on Meta's servers. *BrandTotal,* 605 F. Supp. 3d at 1260. It does not describe what BrandTotal did inside password-protected pages.

For automated activity on Meta's servers, the district court asked whether access to password-protected pages was "without authorization" after Meta revoked it. *Id.* at 1262. The district court explained that "[i]t is not entirely clear from Regev's testimony whether any of that debugging software or leftover code actually connects to password-protected pages on Facebook. Such a connection, even if not

used to collect data, could violate the CFAA." *Id.* at 1263. The same opinion found a violation where the activity moved inside an authenticated session after revocation: "Once Meta revoked BrandTotal's continued use of its various programs to actively collect data while panelists were logged into Facebook . . . it violated the CFAA." *Id.* at 1267. BrandTotal, like Perplexity, ran a browser extension on the user's machine and made no direct server-to-server connection to the platform. That decision drew the line at the authenticated perimeter, not at the network boundary. Under the reading the panel's opinion leaves open, the same circumvention would be unlawful when carried out by ordinary software and lawful when carried out by an agentic AI tool.

That distinction cannot be reconciled with the purpose of either statute. The panel disclaimed any intent to "establish a new legal regime governing agentic AI." Panel Op. at 17. SIIA takes the disclaimer at face value. It does not solve the problem, because a published opinion that leaves the governing standard unstated will still be applied.

**b. The Panel Creates Uncertainty in Liability that Could Be Extended to Malicious Browser Extensions**

The uncertainty in liability created by the panel's decision could lead to surprising results and could be read as a safe harbor for malicious uses. The panel does not supply a principle separating a user who genuinely consents to the use of an AI tool from one who is deceived or whose machine is compromised. The Assistant collects data from the user's computer and sends it to Perplexity's servers. Those servers instruct the Assistant what to do. This same architecture could describe a malicious browser extension. The panel addressed the consenting user, applying the rule of lenity so that such a user faces no criminal liability. Panel Op. at 16. It did not address the user who never consented at all. One reading would leave an extension that deceives the user, or that runs on a compromised computer, outside these statutes entirely, because the user could lawfully access the site.

Take, for example, a situation where an AI tool purports to be a browser designed to help make purchases off Amazon, but in the process also uses the user's computer to access another platform's servers without authorization. Under the panel's logic, the deployer has not "accessed" those servers, because the deployer's own servers did not, and the fact that the user was deceived changes nothing. Without a

principle bounding consent, an innocent third party's lawful access would shield the wrongdoer. SIIA does not suggest the panel intended that outcome. It is a result the opinion leaves available.

The panel's reasoning creates such uncertainty that it could be interpreted as leaving AI developers free to engage in conduct these statutes have prohibited for decades, without consequence. Given how quickly agent software is being deployed, this uncertainty is of broad public significance, meeting the "exceptional importance" requirement under Fed. R. App. P. 40(b)(2)(D), and thus the petition for rehearing en banc should be granted. *See Hart, 266 F.3d at 1172 n.29.*

## IV. The Panel's Treatment of the CDAFA Warrants the Full Court's Attention

### a. The CDAFA Independently Reaches Perplexity, and the Panel Folded the Claim into Its CFAA Analysis

The panel's CDAFA analysis carries forward the same omission, passing over the facts that establish Perplexity's control of the Assistant. Panel Op. at 18. California law reaches corporate conduct: "'Person' includes a corporation as well as a natural person." Cal. Penal Code § 7(a)(1). Courts in this Circuit have applied the CDAFA accordingly where a corporation controls the instrumentality. *See Smith v. Rack Room Shoes, Inc.,* No. 24-cv-06709-RFL, 2025 WL 2210002, at

*1 (N.D. Cal. Aug. 4, 2025) (allowing a CDAFA claim to proceed against a corporation which embedded code into its website that directs the browser of a person visiting the website to send a message to the relevant third party's server); *In re Apple Inc. Device Performance Litigation*, 347 F. Supp. 3d 434, 454 (N.D. Cal. 2018) (allowing a CDAFA claim against Apple for a knowing access to users' iPhones).

The panel acknowledges that "Amazon might be correct that 'access' under the CDAFA is broader than the CFAA's definition," but disposes of the claim on the same view of the facts. Panel Op. at 18. The CDAFA defines "access" broadly to mean "to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1). The panel recited only "caus[ing] input to [or] data processing with," and omitted "instruct" and "communicate with." Panel Op. at 18. "Instruct" and "cause input" describe exactly what the panel says Perplexity's servers do to the Assistant. A corporation that instructs software to navigate a computer system "cause[s] [it] to be accessed," even on the assumption that the corporation itself never

"gain[ed] entry." Cal. Penal Code § 502(b)(1) & (c)(7). Section 502(j), though addressed to cross-jurisdictional reach rather than to who may be liable, confirms the point. It deems one who "causes, by any means, the access of a computer" to have "personally accessed" it.

### b. The Panel Read the CDAFA as Coextensive with the CFAA, Which This Court Has Declined to Do

The panel disposes of the CDAFA claim in a single paragraph of analysis, and reverses course within it by conceding that the CDAFA's "access" definition may be broader than the CFAA's and then folding it into a holding built on the narrower statute. That is what this Court declined to do in *United States v. Christensen,* 828 F.3d 763, 789 (9th Cir. 2016), which refused to read § 502 as coextensive with § 1030 of the CFAA. The consequence is that an independent ground for relief went undecided.

The CDAFA is broader than the CFAA, and on the findings the district court made, it reaches Perplexity's conduct. The panel did not apply that broader scope. Resolving the claim required no novel

question of state law, only the ordinary meaning of the statute's terms.[5]

## CONCLUSION

The panel's decision leaves unresolved when the operator of an agentic AI product answers for what its agent does on a user's machine. It set aside findings that spoke directly to that question without holding them erroneous, and it displaced the standard this Court had already supplied. Rehearing by the full Court would settle how the CFAA and the CDAFA apply to these operators, and would supply the certainty that developers, platforms, and users all need. SIIA respectfully urges the Court to grant Amazon's petition for rehearing en banc.

Dated: August 28, 2026

Respectfully submitted,

**MANATT, PHELPS & PHILLIPS, LLP**

By: s/ Tod Cohen
Tod Cohen
Alysha Agarwal

*Counsel for Amicus Curiae*
Software & Information
Industry Association

[5] SIIA believes the law is clear that the CDAFA is broader than the CFAA and that, applying related precedent, the CDAFA reaches Perplexity's conduct in this case.



405127050.1

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limits of Ninth Circuit Rule 29-2(c)(2) because it contains 4,094 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses 14-point Century Schoolbook font.

By: s/ Tod Cohen
Tod Cohen

August 28, 2026