# No. 26-1444

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

AMAZON.COM SERVICES LLC,

*Plaintiff-Appellee,*

v.

PERPLEXITY AI, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California,
No. 3:25-cv-09514
Hon. Maxine M. Chesney

**BRIEF OF AMICUS CURIAE DIGITAL CONTENT NEXT
IN SUPPORT OF PLAINTIFF-APPELLEE'S PETITION FOR
REHEARING EN BANC**

Karl Huth
Matthew Reynolds
J. Lee Hill
Jack Mitchell
HUTH REYNOLDS LLP
41 Cannon Court
Huntington, NY 11743
(631) 263-3648
*Counsel for Amicus Curiae
Digital Content Next*

# CORPORATE DISCLOSURE STATEMENT

No. 26-1444

AMAZON.COM SERVICES LLC,
*Plaintiff-Appellee,*

v.

PERPLEXITY AI, INC.,
*Defendant-Appellant.*

Under Federal Rule of Appellate Procedure 26.1, Digital Content Next certifies that it has no parent corporation, and that no publicly held company owns 10% or more of its stock.

Date: August 28, 2026

HUTH REYNOLDS LLP

*/s/ Karl Huth*
Karl Huth
*Counsel for Amicus Curiae*
*Digital Content Next*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF AMICUS CURIAE ....................................................................1

INTRODUCTION ..........................................................................................2

ARGUMENT ..................................................................................................4

I. The Panel's Flawed Reading of the CFAA Harms Publishers' Rights...........4

II. Etymology of "Agentic AI" ........................................................................5

III. Users of AI "Agents", Such As Perplexity's Assistant, Act As Vectors for Perplexity-Directed Tasks, Like Passengers in Autonomous Vehicles. .................8

IV. The Panel's Departure from Circuit Precedent Was Erroneous. .....................9

V. The Stakes for Journalism Are High Because AI "Agent" Access to Protected Systems Undermines Investments in Journalism................................14

A. Intrusion by AI "Agents" Threatens Publisher Ad Revenue. ....................14

B. Intrusion by AI "Agents" Threatens Digital Subscription Revenue..........18

CONCLUSION ............................................................................................19

## TABLE OF AUTHORITIES

### Cases

*Abu v. Dickson*, 107 F.4th 508 (6th Cir. 2024) ........................................13

*Amazon.com Services, LLC v. Perplexity AI, Inc.*, No. 26-1444, 2026 WL 2237587 (9th Cir. Aug. 4, 2026) ........................................passim

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016).............9, 10

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022)............................13

*Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F.Supp.3d 1218 (N.D. Cal. 2022)....19

### Statutes

18 U.S.C. § 1030 ........................................passim

Cal. Penal Code § 502 ........................................19

### Other Authorities

*Agentic*, Merriam-Webster Dictionary, https://www.merriam-webster.com/slang/agentic (last accessed Aug. 28, 2026) ....................................7

S. Alexander Haslam & Stephen D. Reicher, 50 Years of "Obedience to Authority": From Blind Conformity to Engaged Followership, 31 Ann. Rev. L. & Soc. Sci. 59........................................6

## INTEREST OF AMICUS CURIAE[1]

Founded in 2001, Digital Content Next ("DCN") is the leading trade organization representing digital content companies. DCN members, the corporate logos of which are displayed below, include many of the most trusted publishing brands in the United States. Together, DCN members have an unduplicated audience of 259 million unique visitors per month and reach 95 percent of the U.S. online population. Consumers seek out DCN member brands because they value trustworthy information that has gone through a rigorous editorial process, and publishers are held to account for the quality and integrity of their news and entertainment by audiences with high expectations.

News reporting by DCN members has profoundly impacted public policy and the nation's history. Millions of Americans rely on news and entertainment published by DCN members to stay informed and engage in public debate. DCN has an interest in ensuring its members can continue to invest in high-quality journalism and engage in First Amendment activities without having their work unfairly misappropriated or exploited by others. DCN submits this brief to offer the perspective of the nation's premier news and content organizations on the far-reaching stakes of this case.

---

[1] No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than DCN or its counsel contributed money that was intended to fund preparing or submitting the brief.

## DCN Member Organizations

AARP
AccuWeather
Advance Local
ACBJ American City Business Journals
America's Test Kitchen
AP
BBC Studios
BET Digital
Bloomberg
Condé Nast
CR Consumer Reports
Dow Jones
FT Financial Times
FP
FOX
FOX Local
FOX News Digital
The Guardian
Harvard Business Review
Hearst magazines
Hearst newspapers
Hearst television
Inc. + Fast Company
Independent
NBCUniversal
NBCUniversal Local
NBCUniversal News Group
News Corp
The New York Times
Paramount
PBS
recurrent
Slate
TelevisaUnivision
npr
Vox Media
Warner Bros. Discovery
The Washington Post
The Weather Company
WebMD

## INTRODUCTION

DCN, by and through the undersigned, hereby submits this Brief of Amicus Curiae in support of Plaintiff-Appellee Amazon.com Services, LLC's ("Amazon") Petition for Rehearing En Banc, Dkt. No. 66.1 (the "Petition") as to this Court's opinion in *Amazon.com Services, LLC v. Perplexity AI, Inc.*, No. 26-1444, 2026 WL 2237587 (9th Cir. Aug. 4, 2026) (the "Opinion").[2]

In addition to the reasons discussed in Amazon's Petition, the Petition should be granted both because of the significant stakes of this appeal and the Opinion's mistaken reliance on a false distinction. The panel erred by adopting Perplexity's characterization of its Assistant as a web browser ***user's*** AI "agent" or "agentic web

[2] Unless stated otherwise, terms have the same definitions as in Amazon's Petition.

browser AI tool"—*i.e.*, a tool being used by a human user to serve that user's purposes.[3] Doing so led the panel to mistakenly analyze AI "agents" as simple tools divorced from Perplexity's commercial interests that truly direct the "agent's" activities.[4] That erroneous premise led the panel to conclude that "Amazon is unlikely to succeed in showing that Perplexity 'accessed' Amazon computers for CFAA purposes".[5]

But as discussed below, the "agentic" label that Perplexity affixes to the Assistant masks the fact that the underlying technology departs radically from traditional notions of "agent" and "agency", as well as more benign online tools like password managers or spell-checkers. Perplexity's camouflage is not incidental. Indeed, it mirrors the Assistant's surreptitious dual role as both a tool (or, euphemistically, "agent") for its users and an infiltration vector for Perplexity's own broader commercial purposes, which treat the user as a carrier to gain access to a reservoir of data for self-interested collection and repurposing, regardless of that data's protected status.

The implications of the business model Perplexity pursues through its "agentic" Comet web browser and Comet Assistant are far-reaching and potentially catastrophic to a wide range of actors, institutions, and interests on which our society

[3] Opinion, at *1.
[4] *Id.*
[5] *Id.*

depends. DCN represents just one set of such stakeholders: publishers, journalists, and, more broadly, the free press.

Failing to correct the errors in the panel's Opinion will undermine this critical institution that is enshrined within, and protected by, the United States Constitution. DCN appreciates the Court's instinct to move cautiously in this matter, and acknowledges the strictures it must adhere to in evenhandedly applying laws (such as evidentiary requirements at the preliminary injunction stage and the rule of lenity) without fear or favor.[6] Notwithstanding that principle, however, DCN submits that the greater caution, and attendant valor, calls for rejecting Perplexity's misleading paradigm, recognizing it for what it truly is, and halting Perplexity's relentless and irresponsible march towards a future that spells potential consequences that no one—respectfully, not even tech-savvy Ninth Circuit judges—can easily predict.

## ARGUMENT

### I. The Panel's Flawed Reading of the CFAA Harms Publishers' Rights.

The panel erred and misapplied the CFAA by adopting Perplexity's misleading characterization of Comet browser users as the principals who, using Perplexity's Assistant as their "agent", "accessed" Amazon, rather than Perplexity.[7]

---

[6] As Sir Thomas More famously declared in Robert Bolt's play *A Man for All Seasons*, "I'd give the Devil benefit of law, for my own safety's sake!" Robert Bolt, A Man for All Seasons 66 (1962).

[7] Opinion, at *5-6.

Perplexity mischaracterizes how the Assistant operates in practice. The Assistant does not function solely as a faithful user "agent" but instead ***also*** follows secret instructions from Perplexity that go far beyond the limited directions given to the Assistant by everyday users. By design, the instructions from Perplexity include directives that serve Perplexity's own interests in data-gathering and commercial activities without users' knowledge. By adopting Perplexity's characterization of the Assistant as a ***user's*** agent, the panel fundamentally mistook the Assistant's nature—*i.e.*, ***Perplexity's*** deliberately engineered agent to penetrate systems and gather information for Perplexity's own benefit.

## II. Etymology of "Agentic AI"

Because "[a]gentic AI is an emerging technology", as the panel noted,[8] that accurate assessment is worth contrasting with the much more longstanding concepts into which this Court is being asked to fit Perplexity's conduct and products, such as the Assistant. The etymology of the term "agentic" is therefore instructive.

The term "agentic" gained its first sustained usage in the field of psychology, starting with David Bakan, who contrasted two concepts of human society that lie in tension with one another: first, humanity's "agentic" orientation, which emphasizes individual agency, self-assertion, and isolation; and second, humanity's communal

[8] Opinion, at *4.

orientation, which emphasizes communion and the desire for union with others.[9] The term then figured prominently in the social psychologist Stanley Milgram's classic research into obedience: Milgram's famous obedience experiment asked participants to administer electric shocks to a "learner" whenever the learner made errors on a task.[10] While the shocks were not real and the learners were only actors, the study participants believed they were delivering actual shocks. Milgram wanted to know "how far participants would be willing to follow their instructions".[11] Milgram theorized many participants were willing to harm an innocent person because they entered into an "agentic state" in which they defined themselves as instruments for carrying out the wishes of others.[12] The etymology of "agentic" reveals its dualistic nature: "agentic" can simultaneously describe an individual asserting themself as an individual (Bakan's original sense) and, in almost total opposition to this meaning, ***also*** describe an individual outsourcing their decision-making autonomy to another entity to advance that external entity's goals (in Milgram's usage).

---

[9] *See generally* David Bakan, The Duality of Human Existence: Isolation and Communion in Western Man (1966). Indeed, this dichotomy has roots going to the very foundations of modern society, such as Aristotle's dictum that "Man is by nature a political animal." Aristotle, *Politics*, in The Basic Works of Aristotle 1113, 1129 (Richard McKeon ed., Benjamin Jowett trans., Random House 1941).

[10] S. Alexander Haslam & Stephen D. Reicher, 50 Years of "Obedience to Authority": From Blind Conformity to Engaged Followership, 31 Ann. Rev. L. & Soc. Sci. 59, 60.

[11] *Id.* at 60.

[12] *Id.*

Merriam-Webster currently defines "agentic" as "able to accomplish results with autonomy, used especially in reference to artificial intelligence" and provides the following discussion:

> *Agentic* describes someone or something that is capable of achieving outcomes independently ("functioning like an agent") or possessing such ability, means, or power ("having agency"). It is especially used with ***a type of artificial intelligence (AI)***, ***often referred to as an AI agent***, ***designed to execute complex tasks autonomously or with little human involvement***. ***In social sciences***, agentic is ***more specifically used to describe people's self-assertive behaviors or actions directed towards individual accomplishment, status, and independence***.[13]

Thus, the term "agentic" itself functionally acts as its own antonym: it can, depending on the subject/actor, describe (1) AI "agents" (like Perplexity's Assistant) that are "designed to execute complex tasks autonomously or with little human involvement", or (2) describe human individuals engaging in "self-assertive behaviors or actions directed towards individual accomplishment, status, and independence." Thus, the autonomous view of AI "agents" contrasts with the panel's treatment of the Assistant as a "tool" or instrument for carrying out the user's wishes, and conflates the two distinct, even contradictory, senses to which the term "agentic" evolved to denote.

This conflation is crucial because it led the panel to overlook the role AI companies like Perplexity play as the creators, chief beneficiaries, and, indeed,

---

[13] *Agentic*, Merriam-Webster Dictionary, https://www.merriam-webster.com/slang/agentic (last accessed Aug. 28, 2026) (emphasis added).

primary directors of AI agentic technologies' multifarious activities. The panel acknowledged that Perplexity's Assistant "receives instructions from Perplexity's servers" and "cannot operate wholly independently"; it "relies on direction" from ***both*** the user and instructions from Perplexity's servers.[14] But despite this acknowledgment, the panel erroneously held that Perplexity did not "exercise control over the Assistant in such a way as to" constitute access to Amazon's servers.[15] By focusing so heavily on the "help" that Perplexity's Assistant provides a user, the panel failed to fully appreciate that ***Perplexity***, not the user, controls the Assistant's actions.

## III. Users of AI "Agents", Such As Perplexity's Assistant, Act As Vectors for Perplexity-Directed Tasks, Like Passengers in Autonomous Vehicles.

Given the transformative nature of Perplexity's Assistant, and "agentic AI" more broadly, it is perhaps appropriate to compare those technologies with another new technology that raises concerns about legal responsibility: Waymo's autonomous vehicles. Waymo is a ride-hailing service that owns and operates a fleet of self-driving cars. A passenger hails a Waymo car from a mobile app, selects a destination, and then chooses to ride in the Waymo car to the destination. But Waymo

---

[14] Opinion, at *2.
[15] *Id.* at *6.

picks the route, owns the vehicle, and programs the vehicle's self-driving technology.

Imagine that Waymo deliberately programmed its cars to run red lights, speed, and make illegal turns. If a Waymo car made one of these violations with a passenger inside, there would be no question that Waymo, not the passenger, was responsible for the car's actions. Here, Perplexity users are fundamentally in the same position as a Waymo passenger. Both the Perplexity user and the Waymo passenger input general objectives (get me to the airport; order paper towels; *etc.*) but the AI assistant (or vehicle) then takes over the active execution of the task as directed by its maker. In further parallel, even though both Waymo and Perplexity offer consumer tech products/services (ride-hailing; Perplexity's Assistant), making money directly from those products/services is secondary to the greater monetization potential lying in the troves of data the product collects. Here too, the Assistant has only one master and principal: Perplexity—the company that created it; developed and updates its programming; instills in the Assistant a mission hidden from the everyday user; and profits from it.

## IV. The Panel's Departure from Circuit Precedent Was Erroneous.

The district court below correctly based its finding that Amazon was likely to succeed on this Court's precedent in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016). But the panel, in vacating the district court's order, did not

actually distinguish *Power Ventures*. This was error. Though the *Power Ventures* case did not deal with an AI "agent", it also involved a consumer-facing technology that took some direction from the end user but was developed, programmed, and operated to benefit a for-profit parent company.

In the same sense that the tech company in *Power Ventures* "caused a message to be transmitted to the user's friends within the Facebook system", Perplexity "caused" Amazon customers' shopping carts to be filled by the Assistant.[16] Yet, erroneously, the panel reached a different result here than in *Power Ventures* and found no "access" by Perplexity. Moreover, the panel's other rationale—the rule of lenity—does not provide a basis to depart from existing precedent interpreting the CFAA where the same lenity concerns were present.

The right of website operators, such as DCN's members, to control access to protected systems is fundamental—both from a security standpoint and because it is a necessary precondition for preventing bad actors from usurping proprietary content while developing successful AI "agent" policies. The panel's erroneous application of the CFAA unfairly diminishes that right.

*First*, AI "agents" that are disguised as human users compromise system security and the safety of sensitive consumer data. Publishers dedicate significant resources toward cybersecurity measures, which are important to maintaining

[16] Opinion, at *4 (citing *Power Ventures*, 844 F.3d at 1063).

customer trust.[17] Many publishers are entrusted with keeping customers' personally identifiable information and payment data safe. Like Amazon, publishers are concerned that AI "agents" that evade detection and refuse to identify themselves as AI "agents" create a security risk to this data.[18]

*Second*, unscrupulous actors could deploy AI "agents" to misappropriate content and datasets for use in developing a range of AI technologies, including model training, retrieval-augmented generation ("RAG"), and "grounding", and to deliver AI-generated responses to users—with stolen publisher content.[19] The panel's decision makes it harder to stop AI "agents" cloaked as individual human subscribers from systematically extracting, repackaging, and distributing paywalled content to any number of non-subscribers. The Opinion comes at a time when the market for AI content licensing deals for model training, RAG, or other AI

---

[17] *See, e.g.*, New York Times Company 2025 Annual Report at 25-26, https://nytco-assets.nytimes.com/2026/03/The-New-York-Times-Company-2025-Annual-Report.pdf (noting cybersecurity investments); *see also* Isabella Jenkins, *User privacy and revenue are directly links for publishers*, Digital Content Next Blog (Oct. 14, 2022), https://digitalcontentnext.org/blog/2022/10/14/user-privacy-and-revenue-are-directly-linked-for-publishers/.

[18] Amazon Br. at 10; Pl. Mot. at 2, 21-22.

[19] *See* Kim Martineau, *What is retrieval-augmented generation?*, IBM Research (Aug. 22, 2023), https://research.ibm.com/blog/retrieval-augmented-generation-RAG ("Retrieval-augmented generation (RAG) is an AI framework for improving the quality of LLM-generated responses by grounding the model on external sources of knowledge to supplement the LLM's internal representation of information").

development purposes is starting to gain momentum.[20] Some deals provide annual payments over multiple years.[21] An AI "agent" that commercializes publisher content for AI products without authorization effectively commandeers a perpetual license without paying a cent to the content's owner, and thereby deprives the publisher of an important, regular source of revenue. The harm is compounded by the facts that publishers have no way of knowing if an AI company has already appropriated a (bogus) license, AI developers have often sought to conceal their infringements, and litigation is costly and slow. This is simply not sustainable.

*Third*, publishers' legal right to exclude AI "agents" that break the rules is critical to building productive working relationships with AI companies. Just as shopkeepers' rights to eject a trespasser enable them to develop rules for customer behavior (say, an art gallery's "no photography" policy), publishers' control over unauthorized access to sites, including content protected by a paywall or otherwise "demarcated . . . as private", such as through registration requirements, allows them

[20] *See, e.g.,* Alexandra Bruell, *News Corp, Meta in AI Content Licensing Deal Worth Up to $50 Million a Year*, Wall St. J. (March 3, 2026), https://www.wsj.com/business/media/news-corp-meta-in-ai-content-licensing-deal-worth-up-to-50-million-a-year-d4fbf244; *see also generally* AI Deals and Disputes Tracker, Tow Center for Digital Journalism, Columbia Journalism School, https://tow.cjr.org/ai-deals-lawsuits/ (last accessed Aug. 28, 2026).

[21] *Id.*; *see also* Alexandra Bruell, *Marketplaces Are the Next Frontier in Publisher Deals With AI Companies*, Wall St. J. (Feb. 16, 2026), https://www.wsj.com/business/media/marketplaces-are-the-next-frontier-in-publisher-deals-with-ai-companies-11515b00.

to put mutually beneficial policies in place that foster transparency and minimize risks like data breaches.[22] Similarly, these rights entitle publishers to charge different rates for different levels of use and access, whether that be personal use, business use, or AI model training.

The CFAA is a critical legal safeguard that enables publishers, like other website owners, to revoke an AI "agent's" "right to be in the [protected areas of the website]" in the first place.[23] If an AI "agent" continues to access private areas of web systems after its access "has been revoked", its continued presence there will be "without authorization" under the CFAA.[24]

For all these reasons, publishers' ability to manage access to their protected content is a fundamental safeguard to protect publishers' rights. Given the stakes involved, this Circuit should carefully consider the CFAA's text and resolve the intra-circuit conflict that now exists. As publishers know firsthand, vindicating the CFAA will support, not stifle, digital innovation and AI partnerships.

---

[22] *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022).

[23] *See Abu v. Dickson*, 107 F.4th 508, 514 (6th Cir. 2024).

[24] *See HiQ*, 31 F.4th at 1199 (contrasting cases where information is "presumptively open to all comers" to cases where authorization "has been revoked").

## V. The Stakes for Journalism Are High Because AI "Agent" Access to Protected Systems Undermines Investments in Journalism.

DCN members invest immense resources to create high-quality journalism and take steps to protect that content. But if publishers cannot effectively prevent access by AI "agents", publishers will be unable to protect journalism's main income sources: advertisement revenue and digital subscriptions.[25]

### A. Intrusion by AI "Agents" Threatens Publisher Ad Revenue.

On the advertising side, unauthorized "agentic AI" access to user account information and other protected content threatens revenue in several major ways. To state the obvious, advertisers pay for their ads to be seen by ***humans***, not AI "agents". If publishers cannot distinguish between AI "agents" and humans to accurately measure their audience, selling ad space will be harder—a problem publishers face today. In one publicly reported case, digital publisher Salon lost the ad business of a mid-size buyer that was concerned with the alarming rise of general invalid traffic ("GIVT")—non-human visits from bots, scrapers, and crawlers.[26] As

---

[25] Nonprofit journalism is susceptible to these same pressures. Nonprofit news organizations often rely on subscription and advertising revenue in addition to donations, and donations themselves are often prompted by direct engagement between the news publisher and its readers. *See, e.g.*, Sara Fischer, *NPR doubling down on podcast subscriptions*, Axios (Jan. 4, 2022), https://www.axios.com/2022/01/04/npr-podcast-subscriptions-memberships.

[26] Jessica Davies, *When bots look like buyers: agentic traffic causing new publisher headaches*, Digiday (Nov. 12, 2025), https://digiday.com/media/when-bots-look-like-buyers-agentic-traffic-causing-new-publisher-headaches.

this example illustrates, unrestricted AI "agent" access forces publishers into difficult choices: either sink valuable time, money, and focus into technical countermeasures to detect and filter out non-human ad impressions, or allow undisclosed AI "agents" to access (and appropriate for their own commercial use) publisher content without viewing or engaging with the advertisements that fund the creation of such content.[27] Either way, publishers are forced to pay for AI "agents'" attempts at free access.

Publishers are already grappling with the rise of "agentic" visitors to their sites and the ever-rising "invalid traffic" (or "IVT") rate. According to a study commissioned by the Association of National Advertisers ("ANA"), across all media channels that rate today already stands at 8.5 percent, translating to $63 billion lost to invalid traffic—a figure "expected to grow significantly this year amid the ongoing rise of AI "agents" and bot traffic."[28] This reflects an ongoing explosive

---

[27] When bot traffic causes publishers' websites to go offline, that service disruption also costs money. *See* Bron Maher, *AI Bot Traffic's Effect on Publishers: The Indirect Costs Adding Up*, A Media Operator (Apr. 23, 2026), https://www.amediaoperator.com/analysis/ai-bots-crawlers-web-hosting-costs-indirect/; Charlotte Tobitt, *AI bots bombard publisher websites with 'no meaningful value exchange'*, Press Gazette (Sept. 5, 2025), https://pressgazette.co.uk/publishers/digital-journalism/ai-bots-bombard-publisher-websites-with-no-meaningful-value-exchange/

[28] Matthew Schwartz, *Report: Ad Spending Wasted on Invalid Traffic Reaches $63 Billion, ANA* (Jan. 21, 2026), https://www.ana.net/magazines/show/id/news-2026-01-21-global-invalid-traffic-report-2026.

growth rate in GIVT. According to data from DoubleVerify, a media analytics firm, GIVT increased by eighty-six percent year-over-year in the second half of 2024, and for the first time ever, monthly volumes attributable to GIVT surpassed two billion requests.[29] Sixteen percent of GIVT from known-bot impressions in 2024 was associated with AI scrapers.[30] Relatedly, operators of click farms and similar schemes are suspected of using AI to further such "ad fraud", an immense global problem that is projected to grow.[31]

If other AI firms' "agents" are permitted to interface with publishers' protected web assets the same way as Perplexity's Assistant interfaces with Amazon's password-protected web systems, it will be even harder for publishers to measure actual human audience size, and thus their entitlement to ad revenue, accurately—at least not without being drawn into an "arms race" to stay ahead of new technologies that make AI "agents" evermore difficult to detect. This development would draw resources away from publishers' core missions.

---

[29] *AI Crawlers and Scrapers Are Contributing to an 86% Increase in General Invalid Traffic*, DoubleVerify Blog (Jan. 9, 2025), https://doubleverify.com/blog/web/verify/ai-crawlers-and-scrapers-are-contributing-to-an-increase-in-general-invalid-traffic#xd_co_f=Y2U1NTEzMTctYWYzOC00ZWQ2LThmZjctZDJmM2E2M2RhMjQz~.

[30] *Id.*

[31] *See* Juniper Research, Quantifying the Cost of Ad Fraud: 2023-2028 (2023) at 4, 6, 11, https://fraudblocker.com/wp-content/uploads/2023/09/Ad-Fraud-Whitepaper_Juniper-Research.pdf.

Allowing the panel's Opinion to stand without being corrected by the full Court could enable Perplexity and similar companies to commercialize publishers' content and then use that same content to compete directly with those publishers for advertisements.[32] For instance, Perplexity could sell ad space alongside content that its Assistant improperly obtained from the protected publisher website—essentially pirating the publisher's content to generate ad revenue for Perplexity. Or Perplexity could create its own affiliate links program using this expropriated content, depriving publishers of another important source of revenue.[33]

Similarly, by misappropriating publisher content without attribution, AI "agents" may tarnish publishers' brands and indirectly harm publishers' ad revenue. Because many advertisers intentionally place advertisements with high-quality media brands, weakened media brand reputation and awareness may reduce the incentives for sophisticated brand-conscious advertising. If left unchecked, this

---

[32] Perplexity is not a neutral party in this space. Perplexity previously announced plans to use scraped and captured data to sell "hyper personalized" ads published on its own AI-powered browser. *See* Julie Bort, *Perplexity CEO says its browser will track everything users do online to sell 'hyper personalized' ads*, TechCrunch (Apr. 24, 2025), https://techcrunch.com/2025/04/24/perplexity-ceo-says-its-browser-will-track-everything-users-do-online-to-sell-hyper-personalized-ads/.

[33] *See, e.g.*, Charlotte Tobitt, *Guardian moves into e-commerce amid revenue shortfall for 2023/2024*, Press Gazette (Sept. 5, 2024), https://pressgazette.co.uk/media_business/guardian-moves-into-e-commerce-amid-revenue-shortfall-for-2023-2024/ ("The Guardian will begin making product recommendations . . . with the aim of making revenue through affiliate links").

unauthorized access may reduce incentives to invest in resource-intensive investigative or foreign reporting, or other high-quality journalistic activities.

**B. Intrusion by AI "Agents" Threatens Digital Subscription Revenue.**

AI "agents" undermine the second pillar of news publishers' revenue: subscriptions. The panel's decision makes it easier for AI "agents" to access protected publisher content—against the content owners' wishes—using only a single subscriber's login. Once "in the door", the AI "agent" and its parent firm could extract all content to which that subscriber has access, and then summarize, repackage, strip of attribution, and distribute that content for their own profit. This scenario creates a substantial risk of incentivizing subscribers to cancel their paid subscriptions (or never subscribe in the first place) in order to access publisher content for free. The misappropriation of protected content by Perplexity's Assistant or other AI "agents" that refuse to follow reasonable policies governing their access thus threatens digital subscriptions, the "stabilizing core" of many news publishers' businesses.[34]

Publishers also rely on data from user activity to develop marketing strategies to attract new subscribers. The intrusion of AI "agents" into protected publisher web

[34] Sara Guaglione, *In Graphic Detail: Subscriptions are rising at big news publishers – even as traffic shrinks*, Digiday (Feb. 17, 2026), https://digiday.com/media/in-graphic-detail-subscriptions-are-rising-at-big-news-publishers-even-as-traffic-shrinks/.

assets may render this user data unreliable or unusable. To determine whether to grant access in light of this risk, website owners need transparency—including requiring AI "agents" to clearly identify themselves as AI "agents". Amazon's policies for AI "agents" included a rule against impersonating a human user.[35] An impersonation tactic to gain access to protected website spaces is not "far afield" from the anti-computer hacking purposes of the CFAA or CDAFA, as the panel somewhat inaccurately stated.[36] Courts have already found such tactics fall within the CFAA's and CDAFA's ambit.[37] By contrast, an AI "agent" that operates with transparency—clearly identifying itself as an AI "agent", not using user login credentials, not circumventing authentication requirements, and honoring websites' crawling instructions—would pose few concerns for publishers.

## CONCLUSION

For these reasons, the Court should grant en banc review and reverse the panel's decision.

---

[35] *See* Pl. Mot. Preliminary Injunctive Relief at 2-3, 6, *Amazon.com Services LLC v. Perplexity AI, Inc.*, No. 3:25-cv-09513 (N.D. Cal. Nov. 4, 2025), ECF No. 4 ("Plaintiff's Motion").

[36] Opinion, at *8.

[37] *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F.Supp.3d 1218, 1266-68 (N.D. Cal. 2022) (finding party's use of "Muppet" accounts set up with fake user credentials to directly access password-protected areas of Meta's platforms violated the CFAA and the CDAFA).

Dated: August 28, 2026

Respectfully submitted,

*/s/ Karl Huth*

Karl Huth
Matthew Reynolds
J. Lee Hill
Jack Mitchell
HUTH REYNOLDS LLP
41 Cannon Court
Huntington, NY 11743
(631) 263-3648

*Counsel for Amicus Curiae*
*Digital Content Next*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system on August 28, 2026. All participants in the case are registered ACMS users, and service will be accomplished using the ACMS system.

*/s/ Karl Huth*
Karl Huth

*Counsel for Amicus Curiae*
*Digital Content Next*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number 26-1444**

I am the attorney or self-represented party.

**This brief contains 4,192 words,** including 88 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Karl C. Huth* **Date** August 28, 2026